**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) WYNN WESTMINSTER LLC, | ) | |
| (2) WYNN WOOD CREEK LLC, and | ) | |
| (3) GOLD WYNN PARKWOOOD INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| (1) TIMBERCREEK ACQUISITIONS | ) | |
| INC., and | ) | |
| (2) FIRST AMERICAN TITLE | ) | |
| INSURANCE COMPANY, | | |
| | | |
| Defendants. | | |

## NOTICE OF REMOVAL

1.      Timbercreek Acquisitions LLC ("Timbercreek") and First American Title Insurance Company ("First American") are defendants in a civil action brought against them in the District Court of Tulsa County, State of Oklahoma, styled *Wynn Westminister LLC, Wynn Wood Creek LLC, and Gold Wynn Parkwood Inc., v. Timbercreek Acquisitions Inc., and First American Title Insurance Company*, Case No. CJ-2019-00125.

2.      On information and belief, Plaintiff Wynn Westminster LLC is a limited liability company, organized under Delaware law, whose members are all citizens of Oklahoma.

3.      On information and belief, Plaintiff Wynn Wood Creek LLC is a limited liability company, organized under Delaware law, whose members are all citizens of Oklahoma.

4.      Plaintiff Gold Wynn Parkwood Inc. is a Delaware corporation with its principal place of business in Tulsa, Oklahoma.

5.      Defendant Timbercreek is a Canadian corporation with its principal place of business in Toronto, Canada.

6.    Defendant First American is a Nebraska corporation with is principal place of business in California.[1] *See* First American Certificate of Good Standing and First American Financial Corporation 2018 Form 10-K at 9, attached hereto as Exhibit 1 and Exhibit 2, respectively.

7.    The citizenship of the parties is the same at the time of the filing of this action and at the present time.

8.    Plaintiffs claim to be entitled to recover $3,284,750.00, plus interest, costs, and fees.  Therefore, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs under 28 U.S.C. § 1332.

9.    This is the kind of action of which the United States District Courts have original jurisdiction because of diversity of citizenship.  *See* 28 U.S.C. § 1332.

10.    The aforementioned action was commenced by service of summons on January 23, 2019, and this Notice of Removal is, therefore, timely filed under the provisions of 28 U.S.C. § 1446.

11.    First American consents to the removal of this action, as required by 28 U.S.C. § 1446(b)(2)(A). Its consent is attached hereto as Exhibit 3.[2]

---

[1] In its Complaint, Plaintiffs alleged that First American was a Delaware corporation with its principal place of business in New York. *See* Ex. 1, ¶ 5. However, it appears that Plaintiffs mistook First American Title Insurance *Company* (the defendant here), with First American Title Insurance *Corporation*, which is a separate corporation and indeed is a Delaware corporation with its principal place of business in New York.

[2] The attached Exhibit is a copy of an email from First American stating that it consents to removal. This court has previously found "no meaningful difference between a statement of "no objection" and consent to removal. *Moses v. Forkeotes*, Case No. 16-CV-0303-CVE, 2016 WL 4449654 (N.D. Okla. Aug. 24, 2016) (citing with approval *Griffioen v. Ceder Rapids and Iowa City Ry. Co.*, 785 F.3d 1182, 1187 (8th Cir. 2015) (declining to remand based on defendant's statement of no objection to removal); *Mayo v. Bd. of Educ. of Prince George's Cty.*, 713 F.3d 735, 742 (4th Cir. 2013) (holding that a notice of removal stating that all other defendants

12.     Pursuant to 28 U.S.C. § 1446(a) and N.D. LCvR 81.2, copies of the docket sheet and all process, pleadings, and orders filed or served upon Defendants in the aforementioned state action are attached hereto, marked Exhibits 4 through 9, and made a part hereof.

DATED February 22, 2019.             Respectfully submitted,


/s/ Deric McClellan_____
Victor E. Morgan, OBA #12419
Deric McClellan, OBA # 32827
CROWE & DUNLEVY
A Professional Corporation
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313
(918) 592-9800
(918) 592-9801 (Facsimile)
victor.morgan@crowedunlevy.com
deric.mcclellan@crowedunlevy.com
*Attorney for Defendant Timbercreek Acquisitions Inc.*

---

properly served consent to removal is sufficient); *Bruning v. City of Guthrie*, 101 F. Supp. 3d 1142, 1144 (W.D. Okla. 2015) (same)).

<u>CERTIFICATE OF SERVICE</u>

☐      I hereby certify that on this _____ day of February, 2019, I electronically transmitted the attached document to the Court Clerk using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

*n/a*


☒      I hereby certify that on this 22nd day of February, 2019, I served the same document by:

| ☒ U.S. Postal Service | ☐ Courier Service | ☐ In Person Delivery | ☒ Email |
|---|---|---|---|

on the following, who are not registered participants of the ECF system:

John F. Heil III, OBA # 15904
Johnathon L. Rogers, OBA #21341
**Hall, Estill, Hardwick, Gable, Golden, &**
**Nelson, P.C.**
320 South Boston Ave., Suite 200
Tulsa, OK 74103-3706
Telephone (918) 594-0400
Facsimile (918) 594-0505
*Attorneys for Plaintiffs, Wynn Westminster*
*LLC, Wynn Wood Creek LLC, and Gold*
*Wynn Parkwood Inc.*

and delivered a copy of said Notice of Removal with the Court Clerk of Tulsa County, Oklahoma, for filing on the same date.


/s/ Deric McClellan_____
Deric McClellan

# STATE OF NEBRASKA

United States of America,  } ss.
State of Nebraska           }

Secretary of State
State Capitol
Lincoln, Nebraska

I, Robert B. Evnen, Secretary of State of the
State of Nebraska, do hereby certify that

### FIRST AMERICAN TITLE INSURANCE COMPANY

incorporated on June 30, 2014 and is duly incorporated under the law of
Nebraska;

that no occupation taxes due from and assessable against the Corporation are
unpaid and have become delinquent;

that no annual or biennial report required to be forwarded by the
Corporation to the Secretary of State has become delinquent;

that Articles of Dissolution have not been filed.

*This certificate is not to be construed as an endorsement,
recommendation, or notice of approval of the entity's financial
condition or business activities and practices.*

In Testimony Whereof,

I have hereunto set my hand and
affixed the Great Seal of the
State of Nebraska on this date of

**February 22, 2019**



Secretary of State

Exhibit 1

Verification ID 8d1d9b5 has been assigned to this document.  Go to ne.gov/go/validate to validate authenticity for up to 12 months.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 001-34580**

*First American Financial Corporation*

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **26-1911571** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**1 First American Way, Santa Ana, California 92707-5913**
**(Address of principal executive offices) (Zip Code)**

**(714) 250-3000**
**Registrant's telephone number, including area code**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2018 was $5,602,927,038.

On February 15, 2019, there were 111,476,203 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement with respect to the 2019 annual meeting of the stockholders are incorporated by reference in Part III of this report. The definitive proxy statement or an amendment to this Form 10-K will be filed no later than 120 days after the close of registrant's fiscal year.

**Exhibit 2**

FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES

INFORMATION INCLUDED IN REPORT

**PART I**

Item 1.       Business                                                                                                 5

Item 1A.      Risk Factors                                                                                            11

Item 1B.      Unresolved Staff Comments                                                                              17

Item 2.       Properties                                                                                             17

Item 3.       Legal Proceedings                                                                                      18

Item 4.       Mine Safety Disclosures                                                                                19

**PART II**

Item 5.       Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities    20

Item 6.       Selected Financial Data                                                                                22

Item 7.       Management's Discussion and Analysis of Financial Condition and Results of Operations                 23

Item 7A.      Quantitative and Qualitative Disclosures About Market Risk                                            46

Item 8.       Financial Statements and Supplementary Data                                                           48

Item 9.       Changes in and Disagreements with Accountants on Accounting and Financial Disclosure                 115

Item 9A.      Controls and Procedures                                                                               115

Item 9B.      Other Information                                                                                      115

**PART III**

Item 10.      Directors, Executive Officers and Corporate Governance                                                116

Item 11.      Executive Compensation                                                                                116

Item 12.      Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters        116

Item 13.      Certain Relationships and Related Transactions, and Director Independence                             116

Item 14.      Principal Accountant Fees and Services                                                                116

**PART IV**

Item 15.      Exhibits and Financial Statement Schedules                                                            117

Item 16.      Form 10-K Summary                                                                                     120

*THIS ANNUAL REPORT ON FORM 10-K CONTAINS FORWARD LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE SEC URITIES EXCHANGE ACT OF 1934, AS AMENDED. THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE FACT THAT THEY DO NOT RELATE STRICTLY TO HISTORICAL OR CURRENT FACTS AND MAY CONTAIN THE WORDS "BELIEVE," "ANTICIPATE," "EXPECT," "INTEND," "PLAN," "PREDICT ," "ESTIMATE," "PROJECT," "WILL BE," "WILL CONTINUE," "WILL LIKELY RESULT," OR OTHER SIMILAR WORDS AND PHRASES OR FUTURE OR CONDITIONAL VERBS SUCH AS "WILL," "MAY," "MIGHT," "SHOULD," "WOULD," OR "COULD." THESE FORWARD-LOOKING STATEMENTS INCLUDE, WITHOUT L IMITATION, STATEMENTS REGARDING FUTURE OPERATIONS, PERFORMANCE, FINANCIAL CONDITION, PROSPECTS, PLANS AND STRATEGIES. THESE FORWARD-LOOKING STATEMENTS ARE BASED ON CURRENT EXPECTATIONS AND ASSUMPTIONS THAT MAY PROVE TO BE INCORRECT.*

*RISKS AND UNCERTAINTIES EXIST THAT MAY CAUSE RESULTS TO DIFFER MATERIALLY FROM THOSE SET FORTH IN THESE FORWARD-LOOKING STATEMENTS. FACTORS THAT COULD CAUSE THE ANTICIPATED RESULTS TO DIFFER FROM THOSE DESCRIBED IN THE FORWARD-LOOKING STATEMENTS INCLUDE, WITHOUT LIMITATION:*

- *INTEREST RATE FLUCTUATIONS;*

- *CHANGES IN THE PERFORMANCE OF THE REAL ESTATE MARKETS;*

- *VOLATILITY IN THE CAPITAL MARKETS;*

- *UNFAVORABLE ECONOMIC CONDITIONS;*

- *FAILURES AT FINANCIAL INSTITUTIONS WHERE THE COMPANY DEPOSITS FUNDS;*

- *CHANGES IN APPLICABLE LAWS AND GOVERNMENT REGULATIONS, INCLUDING DATA PRIVACY LAWS;*

- *HEIGHTENED SCRUTINY BY LEGISLATORS AND REGULATORS OF THE COMPANY'S TITLE INSURANCE AND SERVICES SEGMENT AND CERTAIN OTHER OF THE COMPANY'S BUSINESSES;*

- *USE OF SOCIAL MEDIA BY THE COMPANY AND OTHER PARTIES;*

- *REGULATION OF TITLE INSURANCE RATES;*

- *LIMITATIONS ON ACCESS TO PUBLIC RECORDS AND OTHER DATA;*

- *CHANGES IN RELATIONSHIPS WITH LARGE MORTGAGE LENDERS AND GOVERNMENT-SPONSORED ENTERPRISES;*

- *CHANGES IN MEASURES OF THE STRENGTH OF THE COMPANY'S TITLE INSURANCE UNDERWRITERS, INCLUDING RATINGS AND STATUTORY CAPITAL AND SURPLUS;*

- *LOSSES IN THE COMPANY'S INVESTMENT PORTFOLIO;*

- *MATERIAL VARIANCE BETWEEN ACTUAL AND EXPECTED CLAIMS EXPERIENCE;*

- *DEFALCATIONS, INCREASED CLAIMS OR OTHER COSTS AND EXPENSES ATTRIBUTABLE TO THE COMPANY'S USE OF TITLE AGENTS;*

- *ANY INADEQUACY IN THE COMPANY'S RISK MANAGEMENT FRAMEWORK;*

- *SYSTEMS DAMAGE, FAILURES, INTERRUPTIONS AND INTRUSIONS, OR UNAUTHORIZED DATA DISCLOSURES;*

- *INNOVATION EFFORTS OF THE COMPANY AND OTHER INDUSTRY PARTICIPANTS AND ANY RELATED MARKET DISRUPTION;*

- *ERRORS AND FRAUD INVOLVING THE TRANSFER OF FUNDS;*

- *THE COMPANY'S USE OF A GLOBAL WORKFORCE;*

- *INABILITY OF THE COMPANY'S SUBSIDIARIES TO PAY DIVIDENDS OR REPAY FUNDS; AND*

3

- *OTHER FACTORS DESCRIBED IN THIS ANNUAL REPORT ON FORM 10-K, INCLUDING UNDER THE CAPTION "RISK FACTORS" IN ITEM 1A OF PART I.*

*THE FORWARD-LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE THEY ARE MADE. THE COMPANY DOES NOT UNDERTAKE TO UPDATE FORWARD-LOOKING STATEMENTS TO REFLECT CIRCUMSTANCES OR EVENTS THAT OCCUR AFTER THE DATE THE FORWARD-LOOKING STATEMENTS ARE MADE.*

4

PART I

**Item 1.**          **Business**

**The Company**

First American Financial Corporation (the "Company") was incorporated in the state of Delaware in January 2008 to hold the financial services businesses of the Company's prior parent. On June 1, 2010, the Company's common stock was listed on the New York Stock Exchange under the ticker symbol "FAF." The businesses operated by the Company's subsidiaries have, in some instances, been in existence since the late 1800s.

The Company has its executive offices at 1 First American Way, Santa Ana, California 92707-5913. The Company's telephone number is (714) 250-3000.

**General**

The Company, through its subsidiaries, is engaged in the business of providing financial services through its title insurance and services segment and its specialty insurance segment. The title insurance and services segment provides title insurance, closing and/or escrow services and similar or related services domestically and internationally in connection with residential and commercial real estate transactions. It also provides products, services and solutions that are designed to mitigate risk in, or otherwise facilitate real estate transactions.  Many of these products, services and solutions involve the use of real property-related data, including data derived from its proprietary databases. It maintains, manages and provides access to title plant records and images, and, in addition, provides banking, trust, document custodial and wealth management services. The specialty insurance segment issues property and casualty insurance policies and sells home warranty products. In addition, our corporate function consists of certain financing facilities as well as the corporate services that support our business operations.

The substantial majority of our business is dependent upon activity in the real estate and mortgage markets, which are cyclical and seasonal. In the current market environment, we are focused on growing our core title insurance and settlement services business, strengthening our enterprise through data and process advantages and managing and actively investing in complementary businesses that support and/or leverage our core title and settlement services business. We are also focused on continued improvement of our customers' experiences with our products, services and solutions, and on enhancing our services offered to title agents. We remain committed to efficiently managing our business to market conditions throughout business cycles.

**Title Insurance and Services Segment**

Our title insurance and services segment issues title insurance policies on residential and commercial property in the United States and offers similar or related products and services internationally. This segment also provides closing and/or escrow services; accommodates tax-deferred exchanges of real estate; provides products, services and solutions designed to mitigate risk or otherwise facilitate real estate transactions, many of which products, services and solutions involve the use of real property-related data; maintains, manages and provides access to title plant records and images; and provides appraisals and other valuation-related products and services, lien release and document custodial services, warehouse lending services, default-related products and services, evidence of title, and banking, trust and wealth management services. In 2018, 2017 and 2016 the Company derived 91.9%, 91.7% and 92.1% of its consolidated revenues, respectively, from this segment.

*Overview of Title Insurance Industry*

In most instances mortgage lenders and purchasers of real estate desire to be protected from loss or damage in the event of defects in the title of the subject property. Title insurance is a means of providing such protection.

*Title Policies.*          Title insurance policies insure the interests of owners or lenders against defects in the title to real property. These defects include adverse ownership claims, liens, encumbrances or other matters affecting title. Title insurance policies generally are issued on the basis of a title report, which is typically prepared after a search of one or more of public records, maps, documents and prior title policies to ascertain the existence of easements, restrictions, rights of way, conditions, encumbrances or other matters affecting the title to, or use of, real property. In certain limited instances, a visual inspection of the property is also made. To facilitate the preparation of title reports, copies and/or abstracts of public records, maps, documents and prior title policies may be compiled and indexed to specific properties in an area. This compilation is known as a "title plant."

5

The beneficiaries of title insurance policies usually are real estate buyers and mortgage lenders. A title insurance policy indemnifies t he named insured and certain successors in interest against title defects, liens and encumbrances existing as of the date of the policy and not specifically excepted from its provisions. The policy typically provides coverage for the real property mortgage lender in the amount of its outstanding mortgage loan balance and for the buyer in the amount of the purchase price of the property. In some cases the policy might provide insurance in a greater amount, or for automatic increases in coverage over time. Th e potential for claims under a title insurance policy issued to a mortgage lender generally ceases upon repayment of the mortgage loan. The potential for claims under a title insurance policy issued to a buyer generally ceases upon the sale or transfer of the insured property.

Before issuing title policies, title insurers typically seek to limit their risk of loss by accurately performing title searches and examinations and, in many instances, curing title defects identified therein.  These searches, examinations and curative efforts distinguish title insurers from other insurers, such as property and casualty insurers.  Whereas title insurers generally insure against losses arising out of circumstances existing as of the date of the policy, property and casualty insurers generally insure against losses arising out of events that occur subsequent to policy issuance.  As a result of these differences, title insurers typically experience relatively low claims, as a percentage of premiums, when compared to property and casualty insurers, but have relatively high expenses.  The primary costs of a title insurer issuing a policy directly pertain to personnel and other costs associated with the search and examination process, the curative process, the preparation of preliminary reports or commitments, title plant maintenance, and sales, as well as technology and other administrative expenses.  Where the policy is issued by an agent, the premium retained by the agent is also a primary expense.

*The Closing Process.*     In the United States, title insurance is essential to the real estate closing process in most transactions involving real property mortgage lenders. In a typical residential real estate sale transaction where title insurance is issued, a real estate broker, lawyer, developer, lender, closer or other participant involved in the transaction orders the title insurance on behalf of an insured. Once the order has been placed, a title insurance company or an agent typically conducts a title search to determine the current status of the title to the property. When the search is complete, the title insurer or agent prepares, issues and circulates a commitment or preliminary report. The commitment or preliminary report identifies the conditions, exceptions and/or limitations that the title insurer intends to attach to the policy and identifies items appearing on the title that must be eliminated prior to closing.

In the United States, the closing or settlement function, sometimes called an escrow in the western states, is, depending on the local custom in the region, performed by a lawyer, an escrow company or a title insurance company or agent, generally referred to as a "closer." Once documentation has been prepared and signed, and any required mortgage lender payoff demands are obtained, the transaction closes. The closer typically records the appropriate title documents and arranges the transfer of funds to pay off prior loans and extinguish the liens securing such loans. Title policies are then issued, typically insuring the priority of the mortgage of the real property mortgage lender in the amount of its mortgage loan and the buyer in the amount of the purchase price. The time between the opening of the title order and the issuance of the title policy is usually between 30 and 90 days. Before a closing takes place, however, the closer typically requests that the title insurer or agent provide an update to the commitment to discover any adverse matters affecting title and, if any are found, works with the seller to eliminate them so that the title insurer or agent issues the title policy subject only to those exceptions to coverage which are acceptable to the title insurer, the buyer and the buyer's lender.

*Issuing the Policy: Direct vs. Agency.*   A title insurance policy can be issued directly by a title insurer or indirectly on behalf of a title insurer through agents, which usually operate independently of the title insurer and typically issue policies for more than one insurer. Where the policy is issued by a title insurer, the search is performed by or on behalf of the title insurer, and the premium is collected and retained by the title insurer. Where the policy is issued by an agent, the search is typically performed by or on behalf of the agent, and the agent collects, and retains a portion of, the premium. The agent remits the remainder of the premium to the title insurer as compensation for the insurer bearing the risk of loss in the event a claim is made under the policy and for other services the insurer may provide. The percentage of the premium retained by an agent varies by geography and from agent to agent. A title insurer is obligated to pay title claims in accordance with the terms of its policies, regardless of whether it issues its policy directly or indirectly through an agent. In addition, when a title insurer has issued a commitment to insure a particular transaction, it may be requested to issue a closing protection letter that protects a lender or borrower, or in some states also a seller, from a loss of funds, under certain conditions, caused by the actions of the title insurer or its agent. When a loss to the title insurer occurs under a policy issued through an agent or a closing protection letter, under certain circumstances the title insurer may seek recovery of all or a portion of the loss from the agent or the agent's errors and omissions insurance carrier.

*Premiums.*     The premium for title insurance is typically due and earned in full when the real estate transaction is closed. Premiums generally are calculated with reference to the policy amount. The premium charged by a title insurer or an agent is subject to regulation in most areas. Such regulations vary from state to state.

6

*Our Title Insurance Operations*

*Overview.*   We conduct our title insurance and closing business through a network of direct operations and agents. Through this network, we issue policies in the 49 states that permit the issuance of title insurance policies, the District of Columbia and certain United States territories.  We also offer title insurance, closing services and similar or related products and services, either directly or through third parties in other countries, including Canada, the United Kingdom, Australia, South Korea and various other established and emerging markets as described in the "International Operations" section below.

*Customers, Sales and Marketing.*   The mortgage market in the United States is concentrated. We believe that the top five mortgage lenders by volume collectively originate or are involved in approximately 28% of the mortgage origination volume in the United States. These institutions purchase title insurance policies and other products and services from us. These institutions also benefit from our products and services which are purchased for their benefit by others, such as title insurance policies purchased by borrowers as a condition to the making of a loan. The refusal of one or more of these or other significant lending institutions to purchase products and services from us or to accept our products and services that are to be purchased for their benefit could have a material adverse effect on the title insurance and services segment.

We distribute our title insurance policies and related products and services through our direct and agent channels. In our direct channel, the distribution of our policies and related products and services occurs through sales representatives located at numerous offices throughout the United States where real estate transactions are handled. Title insurance policies issued and other products and services delivered through this channel are primarily delivered in connection with sales and refinances of residential and commercial real property.

Within the direct channel, our sales and marketing efforts are focused on the primary sources of business referrals. For residential business referred by local or decentralized customers, we market to real estate agents and brokers, mortgage brokers, real estate attorneys, mortgage originators, homebuilders and escrow service providers. We also market directly to firms that purchase and sell residential real estate on a large-scale basis. For refinance and default-related business referred by customers with centrally managed platforms, we market to mortgage originators, servicers and government-sponsored enterprises. For the commercial business we market primarily to commercial real estate investors, including real estate investment trusts, insurance brokers, insurance companies and asset managers, as well as to law firms, commercial banks, investment banks, mortgage brokers and the owners of commercial real estate. In some instances we may supplement the efforts of our sales force with general marketing. Our marketing efforts emphasize our product offerings, the quality and timeliness of our services, our financial strength, process innovation and our national presence. We also provide educational information on our website and through other means to help consumers better understand our services and the homebuying/settlement process in general.

*Underwriting.*   Before a title insurance policy is issued, a number of underwriting decisions are made. For example, matters of record revealed during the title search may require a determination as to whether an exception should be taken in the policy. We believe that it is important for the underwriting function to operate efficiently and effectively at all decision-making levels so that transactions may proceed in a timely manner. To perform this function, we have underwriters at the regional, divisional and corporate levels with varying levels of underwriting authority. In an attempt to enhance efficiency and reduce risk, certain underwriting functions are increasingly being automated.

*Agency Operations.*   As described above, we also issue title insurance policies through a network of agents. Our agreements with our issuing agents typically state the conditions under which the agent is authorized to issue our title insurance policies. The agency agreement also typically prescribes the circumstances under which the agent may be liable to us if a policy loss occurs, as well as the services we provide to the agent and the price for those services.  Those services vary by geography and from agent to agent. We are continuing to seek to provide additional services to our agents, including banking services and closing-related services, in an effort to reduce risk and enhance relationships with our agents. Agency agreements typically are terminable without cause after a specified notice period has been met and are terminable immediately for cause. As is standard in our industry, our agents typically operate with a substantial degree of independence from us and typically act as agents for other title insurers. We evaluate the profitability of our agency relationships on an ongoing basis, including a review of premium splits, deductibles and claims. As a result, from time to time we may terminate or renegotiate the terms of some of our agency relationships.

In determining whether to engage an independent agent, we often obtain information about the agent, including the agent's experience and background. We maintain loss experience records for each agent and also maintain agent representatives and agent auditors. Our agents typically are subject to audit or examination. In addition to routine examinations, other examinations may be triggered if certain "warning signs" are evident. Adverse findings in an agency audit may result in various actions, including, if warranted, termination of the agency relationship.

7

*International Operations.*   We provide products and services in a number of countries outside of the United States, and our international operations accounted for approximately 5.6% of our title insurance and services segment revenues in 2018. Today we have direct operations and a physical presence in several countries , including Canada, the United Kingdom, South Korea and Australia, as well as in Hong Kong. While re liable data are not available, we believ e that we have the largest market share for title insurance outside of the United States.

Our range of international products and services is designed to lower our clients' risk profiles and reduce their operating costs through enhanced operational efficiencies. In established markets, primarily British Commonwealth countries, we have combined title insurance with customized processing offerings to enhance the speed and efficiency of the mortgage and conveyancing processes. In these markets we also offer products designed to mitigate risk and otherwise facilitate real estate transactions.

Our international operations present risks that may not exist to the same extent in our domestic operations, including those associated with differences in the nature of the products provided, the scope of coverage provided by those products and the manner in which risk is underwritten. In instances where we have limited claims experience in a foreign jurisdiction it makes it more difficult to set prices and reserve rates. There may also be risks associated with differences in legal systems and/or unforeseen regulatory changes.

*Title Plants.*   Our title plants constitute one of our principal assets.  A title plant is a collection of data and records on, or which impact, title to real property. A title search is typically conducted by searching the abstracted information from public records or utilizing a title plant holding information abstracted from public records. While public title records generally are indexed by reference to the names of the parties to a given recorded document, our title plants primarily arrange their records on a geographic basis. Because of this difference, title plant records generally may be searched more effectively, which we believe reduces the risk of errors associated with the search. Many of our title plants also index prior policies, adding to searching efficiency. Certain locations utilize jointly owned plants or utilize a plant under a joint user agreement with other title companies. In addition to these ownership interests, we are in the business of maintaining, managing and providing access to title plant records and images that may be owned by us or other parties. We believe that our title plants, whether wholly or partially owned or utilized under a joint user agreement, are among the most comprehensive in the industry.

*Reserves for Claims and Losses .*   We provide for losses associated with title insurance policies, closing protection letters and other risk-based products based upon our historical experience and other factors by a charge to expense when the related premium revenue is recognized. The resulting reserve for incurred but not reported claims, together with the reserve for known claims, reflects management's best estimate of the total costs required to settle all claims reported to us and claims incurred but not reported, and are considered to be adequate for such purpose. Each period the reasonableness of the estimated reserves is assessed; if the estimate requires adjustment, such an adjustment is recorded.

*Reinsurance and Coinsurance.*   We plan to continue our practice of assuming and ceding large title insurance risks through reinsurance. In reinsurance arrangements, the primary insurer retains a certain amount of risk under a policy and cedes the remainder of the risk under the policy to the reinsurer. The primary insurer pays the reinsurer a premium in exchange for accepting this risk of loss. The primary insurer generally remains liable to its insured for the total risk, but is reinsured under the terms of the reinsurance agreement. In addition to reinsurance arrangements involving other industry participants, we maintain a global reinsurance program involving treaty reinsurance provided by a global syndicate of highly rated non-industry reinsurers. Subject to the treaty limits and certain other limitations, the program generally covers claims made while the program is in effect.

We also serve as a coinsurer in connection with certain commercial transactions. In a coinsurance scenario, two or more insurers are selected by the insured and each coinsurer is liable for its specified percentage share of the total liability.

*Competition.*   The business of providing title insurance and related products and services is highly competitive. The number of competing companies and the size of such companies vary in the different areas in which we conduct business. Generally, in areas of major real estate activity, such as metropolitan and suburban localities, we compete with many other title insurers and agents. Our major nationwide competitors in our principal markets include Fidelity National Financial, Inc., Stewart Title Guaranty Company, Old Republic International Corporation and their affiliates. In addition to these national competitors, small nationwide, regional and local competitors, as well as numerous agency operations throughout the country, provide aggressive competition on the local level. We are currently the second largest provider of title insurance in the United States, based on the most recent American Land Title Association market share data.

8

We believe that competition for title insurance, closing services and related products and services is based primarily on servic e, quality, price, customer relationships and the timeliness of the delivery of our products. Customer service is an important competitive factor because parties to real estate transactions are usually concerned with time schedules and costs associated wit h delays in closing transactions. In certain transactions, such as those involving commercial properties, financial strength and scope of coverage are also important . In addition, we regularly evaluate our pricing and agent splits, and based on competitive , market and regulatory conditions and claims history, among other factors, adjust our prices and agent splits as and where appropriate .

*Trust, Wealth Management and Banking Services* .   Our federal savings bank subsidiary offers trust, wealth management and deposit products and related services, including fund transfer services. The bank does not originate loans. As of December 31, 2018, the bank administered fiduciary and custody assets having a market value of $3.6 billion, which includes managed assets of $1.5 billion. The bank's balance sheet had assets of $4.1 billion, with deposits of $3.8 billion and stockholder's equity of $286.9 million. The bank's deposits have traditionally consisted almost entirely of funds deposited by its affiliates, but increasingly the bank is seeking deposits from title agents that are not affiliates. While the majority of the bank's deposited funds are associated with commercial and residential real estate transactions being serviced by its customers that are in the title and/or settlement service business, the bank also maintains other deposits, including operating funds deposited by its affiliates.

## Specialty Insurance Segment

*Property and Casualty Insurance.*   Our property and casualty insurance business provides insurance coverage to residential homeowners and renters for liability losses and typical hazards such as fire, theft, vandalism and other types of property damage. We are licensed to issue policies in all 50 states and the District of Columbia and actively issue policies in 47 states. The majority of policy liability is in the western United States, including approximately 62% in California. In certain markets we also offer preferred risk auto insurance to better compete with other carriers offering bundled home and auto insurance. We market our property and casualty insurance business using both direct distribution channels, including marketing through our existing real estate closing-service activities, and through a network of independent brokers. We purchase reinsurance to limit risk associated with large losses from single events.

*Home Warranties.*   Our home warranty business provides residential service contracts that cover residential systems, such as heating and air conditioning systems, and certain appliances against failures that occur as the result of normal usage during the coverage period. Coverage is typically for one year and is renewable annually at the option of the contract holder and upon our approval. Coverage and pricing typically vary by geographic region. Fees for the warranties generally are paid at the closing of the home purchase or directly by the consumer. Renewal premiums may be paid by a number of different options. In addition, under the contract, the holder is responsible for a service fee for each trade call. First year warranties primarily are marketed through real estate brokers and agents, and we also market directly to consumers. We generally sell renewals directly to consumers. Our home warranty business currently operates in 36 states and the District of Columbia.

## Corporate

The Company's corporate function consists primarily of certain financing facilities as well as the corporate services that support our business operations.

## Regulation

Many of our subsidiaries are subject to extensive regulation by applicable domestic or foreign regulatory agencies. The extent of such regulation varies based on the industry involved, the nature of the business conducted by the subsidiary (for example, licensed title insurers are subject to a heightened level of regulation compared to underwritten title companies or agencies), the subsidiary's jurisdiction of organization and the jurisdictions in which it operates. In addition, the Company is subject to regulation as both an insurance holding company and a savings and loan holding company.

Our domestic subsidiaries that operate in the title insurance industry or the property and casualty insurance industry are subject to regulation by state insurance regulators. Each of our underwriters, or insurers, is regulated primarily by the insurance department or equivalent governmental body within the jurisdiction of its organization, which oversees compliance with the laws and regulations pertaining to such insurer. For example, our primary title insurance underwriter, First American Title Insurance Company, is a Nebraska corporation and, accordingly, is primarily regulated by the Nebraska Department of Insurance. Insurance regulations typically place limits on, among other matters, the ability of the insurer to pay dividends to its parent company or to enter into transactions with affiliates. They also may require approval of the insurance commissioner prior to a third party directly or indirectly acquiring "control" of the insurer.

In addition, our insurers are subject to the laws of other jurisdictions in which they transact business, which laws typically establish supervisory agencies with broad administrative powers relating to issuing and revoking licenses to transact business; regulating trade practices; licensing agents; approving policy forms, accounting practices and financial practices; establishing requirements pertaining to reserves and capital and surplus as regards policyholders; requiring the deferral of a portion of all premiums in a reserve for the protection of policyholders and the segregation of investments in a corresponding amount; establishing parameters regarding suitable investments for reserves, capital and surplus; and approving rate schedules. The manner in which rates are established or changed ranges from states which promulgate rates, to states where individual companies or associations of companies prepare rate filings which are submitted for approval, to a few states in which rate changes do not need to be filed for approval. In addition, each of our insurers is subject to periodic examination by regulatory authorities both within its jurisdiction of organization as well as the other jurisdictions where it is licensed to conduct business.

Our foreign insurance subsidiaries are regulated primarily by regulatory authorities in the regions, provinces and/or countries in which they operate and may secondarily be regulated by the domestic regulator of First American Title Insurance Company as a part of the First American insurance holding company system. Each of these regions, provinces and countries has established a regulatory framework with respect to the oversight of compliance with its laws and regulations. Therefore, our foreign insurance subsidiaries generally are subject to regulatory review, examination, investigation and enforcement in a similar manner as our domestic insurance subsidiaries, subject to local variations.

Our underwritten title companies, agencies and property and casualty insurance agencies are also subject to certain regulation by insurance regulatory or banking authorities, including, but not limited to, minimum net worth requirements, licensing requirements, statistical reporting requirements, rate filing requirements and marketing restrictions.

In addition to state-level regulation, our domestic subsidiaries that operate in the insurance business, as well as our home warranty, banking and certain other subsidiaries, are subject to regulation by federal agencies, including the Consumer Financial Protection Bureau ("CFPB"). The CFPB has broad authority to regulate, among other areas, the mortgage and real estate markets, including our domestic subsidiaries, in matters which impact consumers. This authority includes the enforcement of federal consumer financial laws, including the Real Estate Settlement Procedures Act. Regulations issued by the CFPB, or the manner in which it interprets and enforces existing consumer protection laws, have impacted and could continue to impact the way in which we conduct our businesses and the profitability of those businesses.

In addition, our home warranty and settlement services businesses are subject to regulation in some states by insurance authorities or other applicable regulatory entities. Our federal savings bank is regulated by the Office of the Comptroller of the Currency, with the Federal Reserve Board supervising its parent holding company, and is subject to regulation by the Federal Deposit Insurance Corporation.

**Investment Policies**

The Company's investment portfolio activities, such as policy setting, compliance reporting, portfolio reviews, and strategy, are overseen by an investment committee made up of certain senior executives. Additionally, certain of the Company's regulated subsidiaries have established and maintain investment committees to oversee their own investment portfolios. The Company's investment policies are designed to comply with regulatory requirements and to align the investment portfolio asset allocation with strategic objectives. For example, our federal savings bank is required to maintain at least 65% of its asset portfolio in loans or securities that are secured by real estate. Our federal savings bank currently does not make real estate loans, and therefore fulfills this regulatory requirement through investments in mortgage-backed securities. In addition, applicable law imposes certain restrictions upon the types and amounts of investments that may be made by our regulated insurance subsidiaries.

The Company's investment policies further provide that investments are to be managed to maximize long-term returns consistent with liquidity, regulatory and risk objectives, and that investments should not expose the Company to excessive levels of credit, liquidity, and interest rate risks.

As of December 31, 2018, 94% of our investment portfolio consisted of debt securities. As of that date, 69% of our debt securities portfolio was either United States government-backed or rated AAA, and 97% was either rated or classified as investment grade. Percentages are based on the estimated fair values of the securities. Credit ratings reflect published ratings obtained from globally recognized securities rating agencies. If a security was rated differently among the rating agencies, the lowest rating was selected.

10

In addition to our debt and equity securities portfolio, we maintain certain money-market and other short-term investments. We also hold strategic equity investments in companies engaged in our businesses or similar or related businesses.

## Employees

As of December 31, 2018, the Company employed 18,251 people on either a part-time or full-time basis.

## Available Information

The Company maintains a website, www.firstam.com, which includes financial information and other information for investors, including open and closed title insurance orders (which typically are posted approximately 10 to 12 days after the end of each calendar month). The Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge through the "Investors" page of the website as soon as reasonably practicable after the Company electronically files such material with, or furnishes it to, the Securities and Exchange Commission. The Company's website and the information contained therein or connected thereto are not intended to be incorporated into this Annual Report on Form 10-K, or any other filing with the Securities and Exchange Commission unless the Company expressly incorporates such materials.

## Item 1A.        Risk Factors

You should carefully consider each of the following risk factors and the other information contained in this Annual Report on Form 10-K. The Company faces risks other than those listed here, including those that are unknown to the Company and others of which the Company may be aware but, at present, considers immaterial. Because of the following factors, as well as other variables affecting the Company's operating results, past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results or trends in future periods.

### 1. Conditions in the real estate market generally impact the demand for a substantial portion of the Company's products and services and the Company's claims experience

Demand for a substantial portion of the Company's products and services generally decreases as the number of real estate transactions in which its products and services are purchased decreases.  The number of real estate transactions in which the Company's products and services are purchased decreases in the following situations, among others:

- when mortgage interest rates are high or rising;

- when the availability of credit, including commercial and residential mortgage funding, is limited; and

- when real estate values are declining.

These circumstances, particularly declining real estate values and the increase in foreclosures that often results therefrom, also tend to adversely impact the Company's title claims experience.

### 2. Unfavorable economic conditions could adversely affect the Company

Historically, uncertainty and negative trends in general economic conditions in the United States and abroad, including significant tightening of credit markets and a general decline in the value of real property, have created a difficult operating environment for the Company's businesses and other companies in its industries.  In addition, the Company holds investments in entities, such as title agencies and settlement service providers, as well as securities in its investment portfolio, which may be negatively impacted by these conditions.  The Company also owns a federal savings bank into which it deposits some of its own funds and some funds held in trust for third parties.  This bank invests those funds and any realized losses incurred will be reflected in the Company's consolidated results.  The likelihood of such losses, which generally would not occur if the Company were to deposit these funds in an unaffiliated entity, increases when economic conditions are unfavorable.  Depending upon the ultimate severity and duration of any economic downturn, the resulting effects on the Company could be materially adverse, including a significant reduction in revenues, earnings and cash flows, challenges to the Company's ability to satisfy covenants or otherwise meet its obligations under debt facilities, difficulties in obtaining access to capital, challenges to the Company's ability to pay dividends at currently anticipated levels, deterioration in the value of its investments and increased credit risk from customers and others with obligations to the Company.

11

### 3. Failures at financial institutions at which the Company deposits funds could adversely affect the Company

The Company deposits substantial funds in financial institutions. These funds include amounts owned by third parties, such as escrow deposits. Should one or more of the financial institutions at which deposits are maintained fail, there is no guarantee that the Company would recover the funds deposited, whether through Federal Deposit Insurance Corporation coverage or otherwise. In the event of any such failure, the Company also could be held liable for the funds owned by third parties.

### 4. Changes in government regulation could prohibit or limit the Company's operations, make it more burdensome to conduct such operations or result in decreased demand for the Company's products and services

Many of the Company's businesses, including its title insurance, property and casualty insurance, home warranty, banking, trust and wealth management businesses, are regulated by various federal, state, local and foreign governmental agencies. These and other of the Company's businesses also operate within statutory guidelines. The industry in which the Company operates and the markets into which it sells its products are also regulated and subject to statutory guidelines. Changes in the applicable regulatory environment, statutory guidelines or interpretations of existing regulations or statutes, enhanced governmental oversight or efforts by governmental agencies to cause customers to refrain from using the Company's products or services could prohibit or limit its future operations or make it more burdensome to conduct such operations or result in decreased demand for the Company's products and services or a change in our competitive position. The impact of these changes would be more significant if they involve jurisdictions in which the Company generates a greater portion of its title premiums, such as the states of Arizona, California, Florida, Michigan, New York, Ohio, Pennsylvania and Texas. These changes may compel the Company to reduce its prices, may restrict its ability to implement price increases or acquire assets or businesses, may limit the manner in which the Company conducts its business or otherwise may have a negative impact on its ability to generate revenues, earnings and cash flows.

### 5. Scrutiny of the Company's businesses and the industries in which it operates by governmental entities and others could adversely affect the Company

The real estate settlement services industry, an industry in which the Company generates a substantial portion of its revenue and earnings, is subject to continuous scrutiny by regulators, legislators, the media and plaintiffs' attorneys. Though often directed at the industry generally, these groups may also focus their attention directly on the Company's businesses. In either case, this scrutiny may result in changes which could adversely affect the Company's operations and, therefore, its financial condition and liquidity.

Governmental entities have routinely inquired into certain practices in the real estate settlement services industry to determine whether certain of the Company's businesses or its competitors have violated applicable laws, which include, among others, the insurance codes of the various jurisdictions and the Real Estate Settlement Procedures Act and similar state, federal and foreign laws. The Consumer Financial Protection Bureau ("CFPB"), for example, has actively utilized its regulatory authority over the mortgage and real estate markets by bringing enforcement actions against various participants in the mortgage and settlement industries. Departments of insurance in the various states, the CFPB and other federal regulators and applicable regulators in international jurisdictions, either separately or together, also periodically conduct targeted inquiries into the practices of title insurance companies and other settlement services providers in their respective jurisdictions.

Further, from time to time plaintiffs' lawyers may target the Company and other members of the Company's industry with lawsuits claiming legal violations or other wrongful conduct. These lawsuits may involve large groups of plaintiffs and claims for substantial damages. Any of these types of inquiries or proceedings may result in a finding of a violation of the law or other wrongful conduct and may result in the payment of fines or damages or the imposition of restrictions on the Company's conduct which could impact its operations and financial condition. Moreover, these laws and standards of conduct often are ambiguous and, thus, it may be difficult to ensure compliance. This ambiguity may force the Company to mitigate its risk by settling claims or by ending practices that generate revenues, earnings and cash flows.

### 6. The use of social media by the Company and other parties could result in damage to the Company's reputation or otherwise adversely affect the Company

The Company increasingly utilizes social media to communicate with current and potential customers and employees, as well as other individuals interested in the Company. Information delivered by the Company, or by third parties about the Company, via social media can be easily accessed and rapidly disseminated, and could result in reputational harm, decreased customer loyalty or other issues that may diminish the value of the Company's brand or result in significant liability.

12

*7. Regulation of title insurance rates could adversely affect the Company*

Title insurance rates are subject to extensive regulation, which varies from state to state.  In many states the approval of the applicable state insurance regulator is required prior to implementing a rate change.  This regulation could hinder the Company's ability to promptly adapt to changing market dynamics through price adjustments, which could adversely affect its results of operations, particularly in a rapidly declining market.

*8. Changes in certain laws and regulations, and in the regulatory environment in which the Company operates, could adversely affect the Company*

Federal and state officials are currently discussing various potential changes to laws and regulations that could impact the Company's businesses, including the reform of government-sponsored enterprises such as the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) and data privacy regulations, among others.  Changes in these areas, and more generally in the regulatory environment in which the Company and its customers operate, could adversely impact the volume of mortgage originations in the United States and the Company's competitive position and results of operations.

*9. Recent and pending data privacy laws and regulations could adversely affect the Company*

An increasing number of federal, state, and international laws and regulations apply to the collection, use, retention, protection, disclosure, transfer, and other processing of personal data, including the California Consumer Privacy Act and the European Union General Data Protection Regulation.  We believe that other jurisdictions are considering similar laws.  The effects of these privacy laws, including the cost of compliance, are not fully known and are potentially significant, and the failure to comply could adversely affect the Company.

*10. The Company may find it difficult to acquire necessary data*

Certain data used and supplied by the Company are subject to regulation by various federal, state and local regulatory authorities.  Compliance with existing federal, state and local laws and regulations with respect to such data has not had a material adverse effect on the Company's results of operations to date.  Nonetheless, federal, state and local laws and regulations in the United States designed to protect the public from the misuse of personal information in the marketplace and adverse publicity or potential litigation concerning the commercial use of such information may affect the Company's operations and could result in substantial regulatory compliance expense, litigation expense and a loss of revenue.  The suppliers of data to the Company face similar burdens.  As a result of these and other factors, the Company may find it financially burdensome to acquire necessary data.

*11. Changes in the Company's relationships with large mortgage lenders or government–sponsored enterprises could adversely affect the Company*

The mortgage market in the United States is concentrated.  Due to the consolidated nature of the industry, the Company derives a significant percentage of its revenues from a relatively small base of lenders, and their borrowers, which enhances the negotiating power of these lenders with respect to the pricing and the terms on which they purchase the Company's products and other matters.  Similarly, government-sponsored enterprises, because of their significant role in the mortgage process, have significant influence over the Company and other service providers.  These circumstances could adversely affect the Company's revenues and profitability.  Changes in the Company's relationship with any of these lenders or government-sponsored enterprises, the loss of all or a portion of the business the Company derives from these parties, any refusal of these parties to accept the Company's products and services, the modification of the government-sponsored enterprises' requirement for title insurance in connection with mortgages they purchase or the use of alternatives to the Company's products and services, could have a material adverse effect on the Company.

*1 2 .  A downgrade by ratings agencies, reductions in statutory capital and surplus maintained by the Company's title insurance underwriters or a deterioration in other measures of financial strength could adversely affect the Company*

Certain of the Company's customers use measurements of the financial strength of the Company's title insurance underwriters, including, among others, ratings provided by ratings agencies and levels of statutory capital and surplus maintained by those underwriters, in determining the amount of a policy they will accept and the amount of reinsurance required.  Each of the major ratings agencies currently rates the Company's title insurance operations.  The Company's principal title insurance underwriter's financial strength ratings are "A2" by Moody's Investor Services, Inc., "A" by Fitch Ratings, Inc., "A-" by Standard & Poor's Ratings Services and "A" by A.M. Best Company, Inc. These ratings provide the agencies' perspectives on the financial strength, operating performance and cash generating ability of those operations.  These agencies continually review these ratings and the ratings are subject to change.  Statutory capital and surplus, or the amount by which statutory assets exceed statutory liabilities, is also a measure of financial strength.  The Company's principal title insurance underwriter maintained $1.2 billion of total statutory capital and surplus as of December 31, 2018.  Accordingly, if the ratings or statutory capital and surplus of these title insurance underwriters are reduced from their current levels, or if there is a deterioration in other measures of financial strength, the Company's results of operations, competitive position and liquidity could be adversely affected.

*13. The Company's investment portfolio is subject to certain risks and could experience losses*

The Company maintains a substantial investment portfolio, primarily consisting of fixed income debt securities.  The investment portfolio also includes adjustable-rate debt securities, common and preferred stock, as well as money-market and other short-term investments.  Securities in the Company's investment portfolio are subject to certain economic and financial market risks, such as credit risk, interest rate (including call, prepayment and extension) risk and/or liquidity risk.  The risk of loss associated with the portfolio is increased during periods of instability in credit markets and economic conditions.  Debt and equity securities are carried at fair value on the Company's balance sheet.  Changes in the fair value of debt securities is recorded as a component of accumulated other comprehensive loss on the balance sheet.  For debt securities in an unrealized loss position, where the loss is deemed to be other-than-temporary, the Company records the loss in earnings.  Starting in 2018, changes in the fair value of equity securities are recognized in earnings.  Changes in the fair value of securities in the Company's investment portfolio could have a material adverse effect on the Company's results of operations, statutory surplus, financial condition and cash flow.

*14. Actual claims experience could materially vary from the expected claims experience reflected in the Company's reserve for incurred but not reported claims*

The Company maintains a reserve for incurred but not reported ("IBNR") claims pertaining to its title, escrow and other insurance and guarantee products.  The majority of this reserve pertains to title insurance policies, which are long-duration contracts with the majority of the claims reported within the first few years following the issuance of the policy.  Generally, 70% to 80% of claim amounts become known in the first six years of the policy life, and the majority of IBNR reserves relate to the six most recent policy years.  Changes in expected ultimate losses and corresponding loss rates for recent policy years are considered likely and could result in a material adjustment to the IBNR reserves.  Based on historical experience, management believes a 50 basis point change to the loss rates for recent policy years, positive or negative, is reasonably likely given the long-duration nature of a title insurance policy.  For example, if the expected ultimate losses for each of the last six policy years increased or decreased by 50 basis points, the resulting impact on the Company's IBNR reserve would be an increase or decrease, as the case may be, of $122.4 million.  A material change in expected ultimate losses and corresponding loss rates for older policy years is also possible, particularly for policy years with loss ratios exceeding historical norms.  The estimates made by management in determining the appropriate level of IBNR reserves could ultimately prove to be materially different from actual claims experience.

*15. The issuance of the Company's title insurance policies and related activities by title agents, which operate with substantial independence from the Company, could adversely affect the Company*

The Company's title insurance subsidiaries issue a significant portion of their policies through title agents that operate with a substantial degree of independence from the Company.  While these title agents are subject to certain contractual limitations that are designed to limit the Company's risk with respect to their activities, there is no guarantee that the agents will fulfill their contractual obligations to the Company.  In addition, regulators are increasingly seeking to hold the Company responsible for the actions of these title agents and, under certain circumstances, the Company may be held liable directly to third parties for actions (including defalcations) or omissions of these agents.  Case law in certain states also suggests that the Company is liable for the actions or omissions of its agents in those states, regardless of contractual limitations.  As a result, the Company's use of title agents could result in increased claims on the Company's policies issued through agents and an increase in other costs and expenses.

14

*16 . The Company's risk management framework could prove inadequate, which could adversely affect the Company*

The Company's risk management framework is designed to identify, monitor and mitigate risks that could have a negative impact on the Company's financial condition or reputation.  This framework includes departments or groups dedicated to enterprise risk management, information security, disaster recovery and other information technology-related risks, business continuity, legal and compliance, compensation structures and other human resources matters, vendor management and internal audit, among others.  While many of the processes overseen by these departments function at the enterprise level, many also function through, or rely to a certain degree upon, risk mitigation efforts in local operating groups.  Similarly, with respect to the risks the Company assumes in the ordinary course of its business through the issuance of title insurance policies and the provision of related products and services, the Company employs localized as well as centralized risk mitigation efforts.  These efforts include the implementation of underwriting policies and procedures and other mechanisms for assessing risk.  Underwriting title insurance policies and making other risk-assumption decisions frequently involves a substantial degree of individual judgment and, accordingly, underwriters are maintained at the regional, divisional and corporate levels with varying degrees of underwriting authority.  These individuals may be encouraged by customers or others to assume risks or to expeditiously make risk determinations.  If the Company's risk mitigation efforts prove inadequate, the Company could be adversely affected.

*17. Systems damage, failures, interruptions and intrusions, and unauthorized data disclosures may disrupt the Company's business, harm the Company's reputation, result in material claims for damages or otherwise adversely affect the Company*

The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud."  The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies.  The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities.  Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically.  Accordingly, for a variety of reasons, the integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation.

These systems have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity.  These attacks have increased in frequency and sophistication in recent years.  Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures.  These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, in the event of certain actual or potential data breaches or systems failures.  These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales.  Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences.

Accordingly, any inability to prevent or adequately respond to the issues described above could disrupt the Company's business, inhibit its ability to retain existing customers or attract new customers and/or result in financial losses, litigation, increased costs or other adverse consequences that could be material to the Company.

*18. The Company is pursuing various innovative initiatives, which could result in increased title claims or otherwise adversely affect the Company*

In an effort to speed the delivery of its products, increase efficiency, improve quality, improve the customer experience and decrease risk, the Company is increasingly utilizing decision science, artificial intelligence and other innovative technologies, processes and techniques. These efforts include streamlining the closing process by converting certain manual processes into digital ones, in an endeavor to improve the customer experience by simplifying and reducing the time it takes to close a transaction, reducing the risk of fraud and improving communication. The Company increasingly is employing advanced technologies to automate various processes, including various processes related to the building, maintaining and updating of title plants and other data assets, as well as the search and examination of information in connection with the issuance of title insurance policies. Risks from these and other innovative initiatives include those associated with potential defects in the design and development of the technologies used to automate processes, misapplication of technologies, the reliance on data that may prove inadequate, and failure to meet customer expectations, among others. As a result of these risks the Company could experience increased claims, reputational damage or other adverse effects, which could be material to the Company.

*19. Potentially disruptive innovation in the real estate industry could adversely affect the Company*

In addition to the Company's innovative activities, other participants in the real estate industry are seeking to innovate in ways that could adversely impact the Company's businesses. These participants include certain of the Company's sources of business, competitors and ultimate customers. Innovations of these participants may change the demand for the Company's products and services, the manner in which the Company's products and services are ordered or fulfilled and the revenue or profitability derived from the products and services. The Company's efforts to anticipate and participate in these transformations could require significant additional investment and may not succeed, resulting in a reduction in market share or profitability. Accordingly, these efforts, and the manner in which the Company, its agents and other industry participants respond to them, could have an adverse effect on the Company.

*20. Errors and fraud involving the transfer of funds may adversely affect the Company*

The Company relies on its systems, employees and domestic and international banks to transfer its own funds and the funds of third parties. In addition to relying on third-party banks to transfer these funds, the Company's federal savings bank subsidiary transfers funds on behalf of the Company as well as title agents that are not affiliates of the Company. These transfers are susceptible to user input error, fraud, system interruptions, incorrect processing and similar errors that could result in lost funds or delayed transactions. The Company's email and computer systems and systems used by its agents, customers and other parties involved in a transaction have been subject to, and are likely to continue to be the target of, fraudulent attacks, including attempts to cause the Company or its agents to improperly transfer funds. These attacks have increased in frequency and sophistication in recent years. Funds transferred to a fraudulent recipient are often not recoverable. In certain instances the Company may be liable for those unrecovered funds. The controls and procedures used by the Company to prevent transfer errors and fraud may prove inadequate, resulting in financial losses, reputational harm, loss of customers or other adverse consequences which could be material to the Company.

*21. The Company's use of a global workforce involves risks that could adversely affect the Company*

The Company utilizes lower cost labor in countries such as India and the Philippines, among others. These countries are subject to relatively high degrees of political and social instability and may lack the infrastructure to withstand natural disasters. Such disruptions could decrease efficiency and increase the Company's costs. Weakness of the United States dollar in relation to the currencies used in these countries may also reduce the savings achievable through this strategy. Furthermore, the practice of utilizing labor based in other countries is subject to heightened scrutiny in the United States and, as a result, the Company could face pressure to decrease its use of labor based outside the United States. Laws or regulations that require the Company to use labor based in the United States or effectively increase the cost of the Company's labor costs abroad also could be enacted. The Company may not be able to pass on these increased costs to its customers.

*22. As a holding company, the Company depends on distributions from its subsidiaries, and if distributions from its subsidiaries are materially impaired, the Company's ability to declare and pay dividends may be adversely affected; in addition, insurance and other regulations limit the amount of dividends, loans and advances available from the Company's insurance subsidiaries*

The Company is a holding company whose primary assets are investments in its operating subsidiaries.  The Company's ability to pay dividends is dependent on the ability of its subsidiaries to pay dividends or repay funds.  If the Company's operating subsidiaries are not able to pay dividends or repay funds, the Company may not be able to fulfill parent company obligations and/or declare and pay dividends to its stockholders.  Moreover, pursuant to insurance and other regulations under which the Company's insurance subsidiaries operate, the amount of dividends, loans and advances available is limited.  As of December 31, 2018, under such regulations, the maximum amount available in 2019 from these insurance subsidiaries, without prior approval from applicable regulators, was dividends of $291.2 million and loans and advances of $98.6 million.

*23. Certain provisions of the Company's bylaws and certificate of incorporation may reduce the likelihood of any unsolicited acquisition proposal or potential change of control that the Company's stockholders might consider favorable*

The Company's bylaws and certificate of incorporation contain provisions that could be considered "anti-takeover" provisions because they make it harder for a third-party to acquire the Company without the consent of the Company's incumbent board of directors.  Under these provisions:

- election of the Company's board of directors is staggered such that only one-third of the directors are elected by the stockholders each year and the directors serve three year terms prior to reelection;

- stockholders may not remove directors without cause, change the size of the board of directors or, except as may be provided for in the terms of preferred stock the Company issues in the future, fill vacancies on the board of directors;

- stockholders may act only at stockholder meetings and not by written consent;

- stockholders must comply with advance notice provisions for nominating directors or presenting other proposals at stockholder meetings; and

- the Company's board of directors may without stockholder approval issue preferred shares and determine their rights and terms, including voting rights, or adopt a stockholder rights plan.

While the Company believes that they are appropriate, these provisions, which may only be amended by the affirmative vote of the holders of approximately 67% of the Company's issued voting shares, could have the effect of discouraging an unsolicited acquisition proposal or delaying, deferring or preventing a change of control transaction that might involve a premium price or otherwise be considered favorably by the Company's stockholders.

## Item 1B.          Unresolved Staff Comments

Not applicable.

## Item 2.          Properties

Each of our business segments uses our executive offices in Santa Ana, California. This office campus consists of five office buildings, a technology center and a two-story parking structure, totaling approximately 490,000 square feet. Three office buildings, totaling approximately 210,000 square feet, and the fixtures thereto and underlying land, are subject to a deed of trust and security agreement securing payment of a promissory note evidencing a loan made in October 2003, to our principal title insurance subsidiary in the original sum of $55.0 million. This loan is payable in monthly installments of principal and interest, is fully amortizing and matures November 1, 2023. The outstanding principal balance of this loan was $19.2 million as of December 31, 2018.

The office facilities we occupy are, in all material respects, in good condition and adequate for their intended use.

**Item 3.**       **Legal Proceedings**

The Company and its subsidiaries are parties to a number of non-ordinary course lawsuits. These lawsuits frequently are similar in nature to other lawsuits pending against the Company's competitors.

For those non-ordinary course lawsuits where the Company has determined that a loss is both probable and reasonably estimable, a liability representing the best estimate of the Company's financial exposure based on known facts has been recorded. Actual losses may materially differ from the amounts recorded.

For a substantial majority of these lawsuits, however, it is not possible to assess the probability of loss. Most of these lawsuits are putative class actions which require a plaintiff to satisfy a number of procedural requirements before proceeding to trial. These requirements include, among others, demonstration to a court that the law proscribes in some manner the Company's activities, the making of factual allegations sufficient to suggest that the Company's activities exceeded the limits of the law and a determination by the court—known as class certification—that the law permits a group of individuals to pursue the case together as a class. In certain instances the Company may also be able to compel the plaintiff to arbitrate its claim on an individual basis. If these procedural requirements are not met, either the lawsuit cannot proceed or, as is the case with class certification or compelled arbitration, the plaintiffs lose the financial incentive to proceed with the case (or the amount at issue effectively becomes de minimis). Frequently, a court's determination as to these procedural requirements is subject to appeal to a higher court. As a result of, among other factors, ambiguities and inconsistencies in the myriad laws applicable to the Company's business and the uniqueness of the factual issues presented in any given lawsuit, the Company often cannot determine the probability of loss until a court has finally determined that a plaintiff has satisfied applicable procedural requirements.

Furthermore, because most of these lawsuits are putative class actions, it is often impossible to estimate the possible loss or a range of loss amounts, even where the Company has determined that a loss is reasonably possible. Generally class actions involve a large number of people and the effort to determine which people satisfy the requirements to become plaintiffs—or class members—is often time consuming and burdensome. Moreover, these lawsuits raise complex factual issues which result in uncertainty as to their outcome and, ultimately, make it difficult for the Company to estimate the amount of damages which a plaintiff might successfully prove. In addition, many of the Company's businesses are regulated by various federal, state, local and foreign governmental agencies and are subject to numerous statutory guidelines. These regulations and statutory guidelines often are complex, inconsistent or ambiguous, which results in additional uncertainty as to the outcome of a given lawsuit—including the amount of damages a plaintiff might be afforded—or makes it difficult to analogize experience in one case or jurisdiction to another case or jurisdiction.

Most of the non-ordinary course lawsuits to which the Company and its subsidiaries are parties challenge practices in the Company's title insurance business, though a limited number of cases also pertain to the Company's other businesses. These lawsuits include, among others, cases alleging, among other assertions, that the Company or one of its subsidiaries engaged in improper debt collection practices, improperly charged fees for products and services, participated in the conveyance of illusory property interests, failed to pay overtime and provide break periods, improperly handled property and casualty claims and gave items of value to builders as inducements to refer business in violation of certain laws, such as consumer protection laws and laws generally prohibiting unfair business practices, and certain obligations, including:

- Bartine v. First American Title Insurance Company, et al., filed on August 17, 2018 and pending in the United States District Court for the Middle District of Florida,

- Brackens v. First American Home Warranty Corporation, filed on November 28, 2018 and pending in the United States District Court for the District of Arizona,

- Lennen v. First American Financial Corporation, et al., filed on May 19, 2016 and pending in the United States District Court for the Middle District of Florida,

- Leramo v. First American Title Insurance Company, et al., filed on December 19, 2018 and pending in the United States District Court for the Eastern District of California,

- Simons v. First American Title Insurance Company, filed on December 14, 2018 and pending in the United States District Court for the Middle District of Florida,

- Tenefufu vs. First American Specialty Insurance Company, filed on June 1, 2017 and pending in the Superior Court of the State of California, County of Sacramento, and

- Wilmot v. First American Financial Corporation, et al., filed on April 20, 2007 and pending in the Superior Court of the State of California, County of Los Angeles.

18

All of these lawsuits are putative class or collective actions for which a class or collective has not been certified.  For the reasons described above, the Company has not yet been able to assess the probability of loss or estimate the possible loss or the range of loss or, where the Company has been able to make an estimate, the Company believes the amou nt is not material to the consolidated financial statements as a whole.

While some of the lawsuits described above may be material to the Company's operating results in any particular period if an unfavorable outcome results, the Company does not believe that any of these lawsuits will have a material adverse effect on the Company's overall financial condition or liquidity.

The Company also is a party to non-ordinary course lawsuits other than those described above.  With respect to these lawsuits, the Company has determined either that a loss is not reasonably possible or that the estimated loss or range of loss, if any, is not material to the consolidated financial statements as a whole.

The Company's title insurance, property and casualty insurance, home warranty, banking, thrift, trust and wealth management businesses are regulated by various federal, state and local governmental agencies.  Many of the Company's other businesses operate within statutory guidelines.  Consequently, the Company may from time to time be subject to examination or investigation by such governmental agencies.  Currently, governmental agencies are examining or investigating certain of the Company's operations.  These exams or investigations include inquiries into, among other matters, pricing and rate setting practices in the title insurance industry, competition in the title insurance industry, real estate settlement service, customer acquisition and retention practices and agency relationships.  With respect to matters where the Company has determined that a loss is both probable and reasonably estimable, the Company has recorded a liability representing its best estimate of the financial exposure based on known facts.  While the ultimate disposition of each such exam or investigation is not yet determinable, the Company does not believe that individually or in the aggregate they will have a material adverse effect on the Company's financial condition, results of operations or cash flows.  These exams or investigations could, however, result in changes to the Company's business practices which could ultimately have a material adverse impact on the Company's financial condition, results of operations or cash flows .

The Company's Canadian operations provide certain services to lenders which it believes to be exempt from excise tax under applicable Canadian tax laws.  However, in October 2014, the Canadian taxing authority provided internal guidance that the services in question should be subject to the excise tax.  The Company believes it will receive an assessment related to this matter in the first half of 2019.  While the amount of such assessment is not currently known, based on preliminary discussions with the taxing authority, the Company expects the assessment to be in the range of $12.0 million to $12.8 million, plus interest charges.  As the Company does not believe that the services in question are subject to excise tax, it intends to avail itself of avenues of appeal after the assessment is received, and it believes it is reasonably likely that the Company will prevail on the merits.  Based on the current facts and circumstances, the Company does not believe a loss is probable, therefore no liability has been recorded.

The Company and its subsidiaries also are involved in numerous ongoing routine legal and regulatory proceedings related to their operations.  With respect to each of these proceedings, the Company has determined either that a loss is not reasonably possible or that the estimated loss or range of loss, if any, is not material to the consolidated financial statements as a whole.

**Item 4.**          **Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5.**          **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Common Stock Market Prices and Dividends**

The Company's common stock trades on the New York Stock Exchange (ticker symbol FAF). The approximate number of record holders of common stock on February 15, 2019, was 2,358.

In January 2019, the Company's board of directors declared a cash dividend of $0.42 per share. We expect that the Company will continue to pay quarterly cash dividends at or above the current level. The timing, declaration and payment of future dividends, however, falls within the discretion of the Company's board of directors and will depend upon many factors, including the Company's financial condition and earnings, the capital requirements of our businesses, restrictions imposed by applicable law and any other factors the board of directors deems relevant from time to time. In addition, the ability to pay dividends also is potentially affected by the restrictions described in Note 2 Statutory Restrictions on Investments and Stockholders' Equity to the consolidated financial statements included in "Item 8. Financial Statements and Supplementary Data" of Part II of this report.

**Unregistered Sales of Equity Securities**

During the year ended December 31, 2018, the Company did not issue any unregistered common stock.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

Pursuant to the share repurchase program initially announced by the Company on March 16, 2011 and expanded on March 11, 2014, which program has no expiration date, the Company may repurchase up to $250.0 million of the Company's issued and outstanding common stock.  The following table describes purchases by the Company under the share repurchase program that settled during each period set forth in the table.  Prices in column (b) include commissions.  Cumulatively, as of December 31, 2018, the Company had repurchased $86.4 million (including commissions) of its shares and had the authority to repurchase an additional $163.6 million (including commissions) under the program.

| Period | (a) Total Number of Shares Purchased | (b) Average Price Paid per Share | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1, 2018 to October 31, 2018 | 70,000 | $ 44.16 | 70,000 | $ 179,346,548 |
| November 1, 2018 to November 30, 2018 | 153,739 | 44.94 | 153,739 | 172,437,668 |
| December 1, 2018 to December 31, 2018 | 201,394 | 43.70 | 201,394 | 163,637,006 |
| Total | 425,133 | $ 44.22 | 425,133 | $ 163,637,006 |

20

**Stock Performance Graph**

*The following performance graph and related information shall not be deemed "soliciting material" or "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or the Securities Exchange Act of 1934, each as amended, except to the extent that it is specifically incorporated by reference into such filing.*

The following graph compares the cumulative total stockholder return on the Company's common stock with the corresponding cumulative total returns of the Russell 1000 Index and two industry peer groups for the period from December 31, 2013 through December 31, 2018. The comparison assumes an investment of $100 on December 31, 2013 and reinvestment of dividends. This historical performance is not indicative of future performance.



**Comparison of Cumulative Total Return**

| | First American Financial Corporation (FAF) (1) | | Custom Peer Group (new) (1)(2) | | Custom Peer Group (prior) (1)(2) | | Russell 1000 Index (1) | |
|---|---|---|---|---|---|---|---|---|
| December 31, 2013 | $ | 100 | $ | 100 | $ | 100 | $ | 100 |
| December 31, 2014 | $ | 124 | $ | 104 | $ | 111 | $ | 113 |
| December 31, 2015 | $ | 135 | $ | 113 | $ | 125 | $ | 114 |
| December 31, 2016 | $ | 142 | $ | 134 | $ | 148 | $ | 128 |
| December 31, 2017 | $ | 224 | $ | 154 | $ | 179 | $ | 156 |
| December 31, 2018 | $ | 184 | $ | 153 | $ | 175 | $ | 148 |

(1)   As calculated by Bloomberg Financial Services, where available, to include reinvestment of dividends.

(2)   The new custom peer group consists of the following companies: American Financial Group, Inc.; Assurant, Inc.; Axis Capital Holdings Limited; Cincinnati Financial Corporation; Everest Re Group, Ltd.; Fidelity National Financial, Inc.; Genworth Financial, Inc.; The Hanover Insurance Group, Inc.; Kemper Corporation; Mercury General Corporation; Old Republic International Corp.; and W.R. Berkley Corporation each of which operates in a business similar to a business operated by the Company. The compensation committee of the Company utilizes the compensation practices of these companies as benchmarks in setting the compensation of its executive officers.  The prior custom peer group also included White Mountains Insurance Group Ltd., which was dropped after it divested a large business unit, but did not include Axis Capital Holdings Limited, Everest Re Group, Ltd. and Genworth Financial, Inc., each of which was added by the compensation committee at the time White Mountains Insurance Group was dropped.

**Item 6. Selected Financial Data**

The selected historical consolidated financial data for First American Financial Corporation (the "Company") as of and for each of the five years in the period ended December 31, 2018, have been derived from the Company's consolidated financial statements. The selected historical consolidated financial data should be read in conjunction with "Item 8. Financial Statements and Supplementary Data," "Item 1—Business," and "Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations."

**First American Financial Corporation and Subsidiary Companies**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| | (in thousands, except percentages, per share amounts and employee data) | | | | |
| Revenues | $ 5,747,844 | $ 5,772,363 | $ 5,575,846 | $ 5,175,456 | $ 4,677,949 |
| Net income | $ 475,898 | $ 421,863 | $ 343,476 | $ 288,870 | $ 234,215 |
| Net income (loss) attributable to noncontrolling interests | $ 1,402 | $ (1,186) | $ 483 | $ 784 | $ 681 |
| Net income attributable to the Company | $ 474,496 | $ 423,049 | $ 342,993 | $ 288,086 | $ 233,534 |
| Total assets | $ 10,630,635 | $ 9,573,222 | $ 8,831,777 | $ 8,236,715 | $ 7,647,889 |
| Notes and contracts payable | $ 732,019 | $ 732,810 | $ 736,693 | $ 581,052 | $ 582,712 |
| Stockholders' equity | $ 3,741,881 | $ 3,479,955 | $ 3,008,179 | $ 2,749,960 | $ 2,564,375 |
| Return on average stockholders' equity | 13.1% | 13.0% | 11.9% | 10.8% | 9.3% |
| Dividends on common shares | $ 178,487 | $ 159,284 | $ 131,541 | $ 108,524 | $ 89,939 |
| Per share of common stock *(Note A)*— | | | | | |
| Net income attributable to the Company: | | | | | |
| Basic | $ 4.21 | $ 3.79 | $ 3.10 | $ 2.65 | $ 2.18 |
| Diluted | $ 4.19 | $ 3.76 | $ 3.09 | $ 2.62 | $ 2.15 |
| Stockholders' equity | $ 33.56 | $ 31.37 | $ 27.36 | $ 25.21 | $ 23.85 |
| Cash dividends declared | $ 1.60 | $ 1.44 | $ 1.20 | $ 1.00 | $ 0.84 |
| Number of common shares outstanding | | | | | |
| Weighted-average during the year: | | | | | |
| Basic | 112,613 | 111,668 | 110,548 | 108,427 | 106,884 |
| Diluted | 113,279 | 112,435 | 111,156 | 109,826 | 108,688 |
| End of year | 111,496 | 110,925 | 109,944 | 109,098 | 107,541 |
| Other Operating Data (unaudited): | | | | | |
| Title orders opened *(Note B)* | 982 | 1,069 | 1,281 | 1,262 | 1,156 |
| Title orders closed *(Note B)* | 731 | 824 | 958 | 882 | 816 |
| Number of employees *(Note C)* | 18,251 | 18,705 | 19,531 | 17,955 | 17,103 |

Note A—Per share information relating to net income is based on weighted-average number of shares outstanding for the years presented. Per share information relating to stockholders' equity is based on shares outstanding at the end of each year.

Note B—Title order volumes are those processed by the direct domestic title operations of the Company and do not include orders processed by agents.

Note C—Number of employees is based on actual employee headcount.

**Item 7.**        **Management's Di scussion and Analysis of Financial Condition and Results of Operations**

*CERTAIN STATEMENTS IN THIS ANNUAL REPORT ON FORM 10-K ARE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. THESE FORWARD-LOOKING STATEMENTS MAY CONTAIN THE WORDS "BELIEVE," "ANTICIPATE," "EXPECT," "PLAN," "PREDICT," "ESTIMATE," "PROJECT," "WILL BE," "WILL CONTINUE," "WILL LIKELY RESULT," OR OTHER SIMILAR WORDS AND PHRASES.*

*RISKS AND UNCERTAINTIES EXIST THAT MAY CAUSE RESULTS TO DIFFER MATERIALLY FROM THOSE SET FORTH IN THESE FORWARD-LOOKING STATEMENTS. FACTORS THAT COULD CAUSE THE ANTICIPATED RESULTS TO DIFFER FROM THOSE DESCRIBED IN THE FORWARD-LOOKING STATEMENTS INCLUDE THE FACTORS SET FORTH ON PAGES 3-4 OF THIS ANNUAL REPORT. THE FORWARD-LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE THEY ARE MADE. THE COMPANY DOES NOT UNDERTAKE TO UPDATE FORWARD-LOOKING STATEMENTS TO REFLECT CIRCUMSTANCES OR EVENTS THAT OCCUR AFTER THE DATE THE FORWARD-LOOKING STATEMENTS ARE MADE.*

*This Management's Discussion and Analysis contains certain financial measures that are not presented in accordance with generally accepted accounting principles ("GAAP"), including adjusted information and other revenues, adjusted personnel costs, and adjusted other operating expenses, in each case excluding the effects of recent acquisitions. The Company is presenting these non-GAAP financial measures because they provide the Company's management and readers of this Annual Report on Form 10-K with additional insight into the operational performance of the Company relative to earlier periods. The Company does not intend for these non-GAAP financial measures to be a substitute for any GAAP financial information. In this Annual Report on Form 10-K, these non-GAAP financial measures have been presented with, and reconciled to, the most directly comparable GAAP financial measures. Readers of this Annual Report on Form 10-K should use these non-GAAP financial measures only in conjunction with the comparable GAAP financial measures.*

**Principles of Consolidation**

The consolidated financial statements have been prepared in accordance with GAAP and reflect the consolidated operations of the Company. The consolidated financial statements include the accounts of First American Financial Corporation and all controlled subsidiaries. All significant intercompany transactions and balances have been eliminated. Investments in affiliates in which the Company exercises significant influence, but does not control and is not the primary beneficiary, are accounted for using the equity method. Investments in affiliates in which the Company does not exercise significant influence over the investee are accounted for under the cost method.

**Reportable Segments**

The Company consists of the following reportable segments and a corporate function:

•    The Company's title insurance and services segment issues title insurance policies on residential and commercial property in the United States and offers similar or related products and services internationally. This segment also provides closing and/or escrow services; accommodates tax-deferred exchanges of real estate; provides products, services and solutions designed to mitigate risk or otherwise facilitate real estate transactions, many of which products, services and solutions involve the use of real property-related data; maintains, manages and provides access to title plant records and images; and provides appraisals and other valuation-related products and services, lien release and document custodial services, warehouse lending services, default-related products and services, evidence of title, and banking, trust and wealth management services. The Company, through its principal title insurance subsidiary and such subsidiary's affiliates, transacts its title insurance business through a network of direct operations and agents. Through this network, the Company issues policies in the 49 states that permit the issuance of title insurance policies, the District of Columbia and certain United States territories. The Company also offers title insurance, closing services and similar or related products and services, either directly or through third parties in other countries, including Canada, the United Kingdom, Australia, South Korea and various other established and emerging markets.

- The Company's specialty insurance segment issues property and casualty insurance policies and sells home warranty products. The property and casualty insurance business provides insurance coverage to residential homeowners and renters for liability losses and typical hazards such as fire, theft, vandalism and other types of property damage. This business is licensed to issue policies in all 50 states and the District of Columbia and actively issues policies in 47 states. The majority of policy liability is in the western United States, including approximately 62% in California. In certain markets it also offers preferred risk auto insurance to better compete with other carriers offering bundled home and auto insurance. The home warranty business provides residential service contracts that cover residential systems, such as heating and air conditioning systems, and certain appliances against failures that occur as the result of normal usage during the coverage period. This business currently operates in 36 states and the District of Columbia.

The corporate function consists primarily of certain financing facilities as well as the corporate services that support the Company's business operations.

## Critical Accounting Estimates

The preparation of financial statements in accordance with GAAP requires the application of accounting policies that often involve a significant degree of judgment. The Company's management considers the accounting policies described below to be the most dependent on the application of estimates and assumptions in preparing the Company's consolidated financial statements. See Note 1 Basis of Presentation and Significant Accounting Policies to the consolidated financial statements for a more detailed description of the Company's significant accounting policies.

*Provision for policy losses.* The Company provides for title insurance losses through a charge to expense when the related premium revenue is recognized. The amount charged to expense is generally determined by applying a rate (the loss provision rate) to total title insurance premiums and escrow fees. The Company's management estimates the loss provision rate at the beginning of each year and reassesses the rate quarterly to ensure that the resulting incurred but not reported ("IBNR") loss reserve and known claims reserve included in the Company's consolidated balance sheets together reflect management's best estimate of the total costs required to settle all IBNR and known claims. If the ending IBNR reserve is not considered adequate, an adjustment is recorded.

The process of assessing the loss provision rate and the resulting IBNR reserve involves an evaluation of the results of an in-house actuarial review. The Company's in-house actuary performs a reserve analysis utilizing generally accepted actuarial methods that incorporate cumulative historical claims experience and information provided by in-house claims and operations personnel. Current economic and business trends are also reviewed and used in the reserve analysis. These include conditions in the real estate and mortgage markets, changes in residential and commercial real estate values, and changes in the levels of defaults and foreclosures that may affect claims levels and patterns of emergence, as well as any company-specific factors that may be relevant to past and future claims experience. Results from the analysis include, but are not limited to, a range of IBNR reserve estimates and a single point estimate for IBNR as of the balance sheet date.

For recent policy years at early stages of development (generally the last three years), IBNR is generally estimated using a combination of expected loss rate and multiplicative loss development factor calculations. For more mature policy years, IBNR generally is estimated using multiplicative loss development factor calculations. The expected loss rate method estimates IBNR by applying an expected loss rate to total title insurance premiums and escrow fees, and adjusting for policy year maturity using estimated loss development patterns. Multiplicative loss development factor calculations estimate IBNR by applying factors derived from loss development patterns to losses realized to date. The expected loss rate and loss development patterns are based on historical experience and the relationship of the history to the applicable policy years.

The Company's management uses the IBNR point estimate from the in-house actuary's analysis and other relevant information concerning claims to determine what it considers to be the best estimate of the total amount required for the IBNR reserve.

The volume and timing of title insurance claims are subject to cyclical influences from both the real estate and mortgage markets. Title policies issued to lenders constitute a large portion of the Company's title insurance volume. These policies insure lenders against losses on mortgage loans due to title defects in the collateral property. Even if an underlying title defect exists that could result in a claim, often, the lender must realize an actual loss, or at least be likely to realize an actual loss, for a title insurance liability to exist. As a result, title insurance claims exposure is sensitive to lenders' losses on mortgage loans and is affected in turn by external factors that affect mortgage loan losses, particularly macroeconomic factors.

24

A general decline in real estate prices can expose lenders to greater risk of losses on mortgage loans, as loan-to-valu e ratios increase and defaults and foreclosures increase. Title insurance claims exposure for a given policy year is also affected by the quality of mortgage loan underwriting during the corresponding origination year. The Company believes that the sensi tivity of claims to external conditions in the real estate and mortgage markets is an inherent feature of title insurance's business economics that applies broadly to the title insurance industry.

Title insurance policies are long-duration contracts with the majority of the claims reported to the Company within the first few years following the issuance of the policy. Generally, 70% to 80% of claim amounts become known in the first six years of the policy life, and the majority of IBNR reserves relate to the six most recent policy years. Changes in expected ultimate losses and corresponding loss rates for recent policy years are considered likely and could result in a material adjustment to the IBNR reserves. Based on historical experience, management believes a 50 basis point change to the loss rates for recent policy years, positive or negative, is reasonably likely given the long duration nature of a title insurance policy. For example, if the expected ultimate losses for each of the last six policy years increased or decreased by 50 basis points, the resulting impact on the Company's IBNR reserve would be a corresponding increase or decrease of $122.4 million. A material change in expected ultimate losses and corresponding loss rates for older policy years is also possible, particularly for policy years with loss rates exceeding historical norms. The estimates made by management in determining the appropriate level of IBNR reserves could ultimately prove to be materially different than actual claims experience.

The reserve for property and casualty insurance losses reflects management's best estimate of the amount necessary to settle all reported and unreported claims for the ultimate cost of insured losses, based upon the facts of each case and the Company's experience with similar cases. The Company also utilizes the services of an independent actuary as part of its reserve analysis. Because the establishment of appropriate reserves, including reserves for catastrophes, is an inherently uncertain and complex process, the ultimate cost of insured losses may be more or less than the reserve amount. Reserve estimates are regularly analyzed and updated to reflect the most current information available.

The Company provides for claims losses relating to its home warranty business based on the average cost per claim and historical loss experience as applied to the total of new claims incurred. The average cost per home warranty claim is calculated using the average of the most recent 12 months of claims experience adjusted for estimated future increases in costs.

A summary of the Company's loss reserves is as follows:

| (in thousands, except percentages) | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Known title claims | $  80,306 | 7.7% | $  83,094 | 8.1% |
| IBNR title claims | 877,134 | 84.1% | 875,724 | 85.1% |
| Total title claims | 957,440 | 91.8% | 958,818 | 93.2% |
| Non-title claims | 85,239 | 8.2% | 70,115 | 6.8% |
| Total loss reserves | $  1,042,679 | 100.0% | $  1,028,933 | 100.0% |

Activity in the reserve for known title claims is summarized as follows:

| | December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Balance at beginning of year | $  83,094 | $  83,805 | $  87,543 |
| Provision transferred from IBNR title claims related to: | | | |
| Current year | 17,770 | 17,471 | 15,098 |
| Prior years | 147,271 | 180,602 | 188,066 |
| | 165,041 | 198,073 | 203,164 |
| Payments, net of recoveries, related to: | | | |
| Current year | 14,338 | 14,835 | 12,420 |
| Prior years | 151,433 | 185,515 | 197,821 |
| | 165,771 | 200,350 | 210,241 |
| Other | (2,058) | 1,566 | 3,339 |
| Balance at end of year | $  80,306 | $  83,094 | $  83,805 |

The provision transferred from IBNR title claims related to current year increased by $ 0 .3 million in 201 8 from 201 7 and increased by $2.4 million in 2017 from 2016 and payments, net of recoveries, related to current year de creased by $ 0. 5 million in 201 8 from 201 7 and increased by $2.4 million in 2017 from 2016 , reflecting variability in claims volumes characteristic of a policy year during its first year of development.

The provision transferred from IBNR title claims related to prior years decreased by $33.3 million, or 18.5%, in 2018 from 2017 and decreased by $7.5 million, or 4.0%, in 2017 from 2016. Payments, net of recoveries, related to prior years decreased by $34.1 million, or 18.4%, in 2018 from 2017 and decreased by $12.3 million, or 6.2%, in 2017 from 2016. Generally, the provision transferred from IBNR title claims and payments are expected to decline with the runoff of older policy years that have higher expected ultimate losses, particularly policy years 2005 through 2008.

Activity in the reserve for IBNR title claims is summarized as follows:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Balance at beginning of year | $ 875,724 | $ 888,126 | $ 844,364 |
| Provision related to: | | | |
| Current year | 173,520 | 175,322 | 193,109 |
| Prior years | — | — | 42,552 |
| | 173,520 | 175,322 | 235,661 |
| Provision transferred to known title claims related to: | | | |
| Current year | 17,770 | 17,471 | 15,098 |
| Prior years | 147,271 | 180,602 | 188,066 |
| | 165,041 | 198,073 | 203,164 |
| Other | (7,069) | 10,349 | 11,265 |
| Balance at end of year | $ 877,134 | $ 875,724 | $ 888,126 |

"Other" primarily includes foreign currency translation gains and losses and ceded reinsurance claims.

The provision related to current year decreased by $1.8 million, or 1.0%, in 2018 from 2017. This decrease was attributable to a decrease in title premiums and escrow fees in 2018 from 2017.

The provision related to current year decreased by $17.8 million, or 9.2%, in 2017 from 2016. This decrease was attributable to a lower current year loss rate of 4.0% in 2017 when compared to 4.5% in 2016, partly offset by a 2.1% increase in title premiums and escrow fees in 2017 from 2016.

For further discussion of title provision recorded in 2018, 2017 and 2016, see Results of Operations, pages 37 and 38.

*Fair value of investment portfolio.* The Company categorizes the fair values of its debt and equity securities using a three-level hierarchy for fair value measurements that distinguishes between market participant assumptions developed based on market data obtained from sources independent of the Company (observable inputs) and the Company's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs). The hierarchy for inputs used in determining fair value maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that observable inputs be used when available. The hierarchy level assigned to each security in the Company's investment portfolio was based on management's assessment of the transparency and reliability of the inputs used to estimate the fair values at the measurement date. See Note 14 Fair Value Measurements to the consolidated financial statements for a more detailed description of the three-level hierarchy and a description for each level.

The valuation techniques and inputs used to estimate the fair values of the Company's debt and equity securities are summarized as follows:

*Fair value of debt securities*

The fair values of debt securities were based on the market values obtained from independent pricing services that were evaluated using pricing models that vary by asset class and incorporate available trade, bid and other market information and price quotes from well-established independent broker-dealers. The independent pricing services monitor market indicators, industry and economic events, and for broker-quoted only securities, obtain quotes from market makers or broker-dealers that they recognize to be market participants. The pricing services utilize the market approach in determining the fair values of the debt securities held by the Company. The Company obtains an understanding of the valuation models and assumptions utilized by the services and has controls in place to determine that the values provided represent fair values. The Company's validation procedures include comparing prices received from the pricing services to quotes received from other third party sources for certain securities with market prices that are readily verifiable. If the price comparison results in differences over a predefined threshold, the Company will assess the reasonableness of the changes relative to prior periods given the prevailing market conditions and assess changes in the issuers' credit worthiness, performance of any underlying collateral and prices of the instrument relative to similar issuances. To date, the Company has not made any material adjustments to the fair value measurements provided by the pricing services.

Typical inputs and assumptions to pricing models used to value the Company's debt securities include, but are not limited to, benchmark yields, reported trades, broker-dealer quotes, credit spreads, credit ratings, bond insurance (if applicable), benchmark securities, bids, offers, reference data and industry and economic events. For mortgage-backed securities, inputs and assumptions may also include the structure of issuance, characteristics of the issuer, collateral attributes and prepayment speeds.

*Other-than-temporary impairment–debt securities*

If the Company intends to sell a debt security in an unrealized loss position or determines that it is more likely than not that the Company will be required to sell a debt security before it recovers its amortized cost basis, the debt security is other-than-temporarily impaired and it is written down to fair value with all losses recognized in earnings. As of December 31, 2018, the Company did not intend to sell any debt securities in an unrealized loss position and it is not more likely than not that the Company will be required to sell any debt securities before recovery of their amortized cost basis.

If the Company does not expect to recover the amortized cost basis of a debt security with declines in fair value (even if the Company does not intend to sell the debt security and it is not more likely than not that the Company will be required to sell the debt security), the loss is considered an other-than-temporary impairment loss and the credit portion of the loss ("credit loss") is recognized in earnings and the non-credit portion is recognized in other comprehensive income. The credit loss is the difference between the present value of the cash flows expected to be collected and the amortized cost basis of the debt security. The cash flows expected to be collected are discounted at the rate implicit in the security immediately prior to the recognition of the other-than-temporary impairment.

Expected future cash flows for debt securities are based on qualitative and quantitative factors specific to each security, including the probability of default and the estimated timing and amount of recovery. The detailed inputs used to project expected future cash flows may be different depending on the nature of the individual debt security.

The Company did not recognize any other-than-temporary impairment losses related to its debt securities for 2018 and 2017 and recognized $0.5 million of other-than-temporary impairment losses considered to be credit related for 2016.

*Fair value of equity securities*

The fair values of equity securities, including preferred and common stocks, were based on quoted market prices for identical assets that are readily and regularly available in an active market.

27

*Litigation and regulatory contingencies.*        The Company and its subsidiaries are parties to a number of ongoing routine and non-ordinary course legal proceedings. For those lawsuits where the Company has determined that a loss is both probable and reasonably estimable, a liability representing the best estimate of the Company's financial exposure based on known facts has been recorded. Actual losses may materially differ from the amounts recorded. Fo r a substantial majority of these lawsuits it is not possible to assess the probability of loss. Most of these lawsuits are putative class actions which require a plaintiff to satisfy a number of procedural requirements before proceeding to trial. As a r esult of, among other factors, ambiguities and inconsistencies in the myriad laws applicable to the Company's business and the uniqueness of the factual issues presented in any given lawsuit, the Company often cannot determine the probability of loss until a court has finally determined that a plaintiff has satisfied applicable procedural requirements. Furthermore, because most of these lawsuits are putative class actions, it is often impossible to estimate the possible loss or a range of loss, even where the Company has determined that a loss is reasonably possible.  In addition, many of the Company's businesses are regulated by various federal, state, local and foreign governmental agencies and are subject to numerous statutory guidelines. These regulati ons and statutory guidelines often are complex, inconsistent or ambiguous, which results in additional uncertainty as to the outcome of a given lawsuit—including the amount of damages a plaintiff might be afforded—or makes it difficult to analogize experie nce in one case or jurisdiction to another case or jurisdiction.

*Business Combinations.*        The Company allocates the fair value of purchase consideration to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. When determining the fair values of assets acquired and liabilities assumed, management makes significant estimates and assumptions, especially with respect to intangible assets.

Critical estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows, useful lives and discount rates. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, may differ from actual results. Other estimates associated with the accounting for acquisitions may change as additional information becomes available regarding the assets acquired and liabilities assumed.

*Impairment assessment for goodwill.*        The Company is required to perform an annual goodwill impairment assessment for each reporting unit for which goodwill has been allocated. Those reporting units include title insurance, home warranty and property and casualty insurance.  The Company's trust and other services reporting unit has no allocated goodwill and is, therefore, not assessed for impairment. The Company has elected to perform this annual assessment in the fourth quarter of each fiscal year or sooner if circumstances indicate possible impairment. Based on accounting guidance, the Company has the option to perform a qualitative assessment to determine if the fair value is more likely than not (i.e., a likelihood of greater than 50%) less than the carrying amount as a basis for determining whether it is necessary to perform a quantitative impairment test, or may choose to forego a qualitative assessment and perform a quantitative impairment test. The qualitative factors considered in this assessment may include macroeconomic conditions, industry and market considerations, overall financial performance as well as other relevant events and circumstances as determined by the Company. The Company evaluates the weight of each factor to determine whether it is more likely than not that impairment may exist. If the results of a qualitative assessment indicate the more likely than not threshold was not met, the Company may choose not to perform a quantitative impairment test. If, however, the more likely than not threshold is met, the Company will perform a quantitative test as required and discussed below.

Management's quantitative impairment testing process includes two steps. The first step ("Step 1") compares the fair value of each reporting unit to its carrying amount. The fair value of each reporting unit is determined by using discounted cash flow analysis and market approach valuations. If the fair value of the reporting unit exceeds its carrying amount, the goodwill is not considered impaired and no additional analysis is required. However, if the carrying amount is greater than the fair value, a second step ("Step 2") must be completed to determine if the fair value of the goodwill exceeds the carrying amount of goodwill.

Step 2 involves calculating an implied fair value of goodwill for each reporting unit for which Step 1 indicated impairment. The implied fair value of goodwill is determined in a manner similar to the amount of goodwill calculated in a business com bination, by measuring the excess of the estimated fair value of the reporting unit, as determined in Step 1, over the aggregate estimated fair values of the individual assets, liabilities and identifiable intangibles as if the reporting unit was being acq uired in a business combination. If the implied fair value of goodwill exceeds the carrying value of goodwill assigned to the reporting unit, there is no impairment. If the carrying value of goodwill assigned to a reporting unit exceeds the implied fair value of the goodwill, an impairment loss is recorded for the excess. An impairment loss cannot exceed the carrying value of goodwill assigned to a reporting unit, and the loss establishes a new basis in the goodwill. Subsequent reversal of goodwill impa irment losses is not permitted.

The quantitative impairment test for goodwill utilizes a variety of valuation techniques, all of which require the Company to make estimates and judgments. Fair value is determined by employing an expected present value technique, which utilizes expected cash flows and an appropriate discount rate. The use of comparative market multiples (the "market approach") compares the reporting unit to other comparable companies (if such comparables are present in the marketplace) based on valuation multiples to arrive at a fair value. In assessing the fair value, the Company utilizes the results of the valuations (including the market approach to the extent comparables are available) and considers the range of fair values determined under all methods and the extent to which the fair value exceeds the carrying amount of the reporting unit.

The valuation of each reporting unit includes the use of assumptions and estimates of many critical factors, including revenue growth rates and operating margins, discount rates and future market conditions, determination of market multiples and the establishment of a control premium, among others. Forecasts of future operations are based, in part, on operating results and the Company's expectations as to future market conditions. These types of analyses contain uncertainties because they require the Company to make assumptions and to apply judgments to estimate industry economic factors and the profitability of future business strategies. However, if actual results are not consistent with the Company's estimates and assumptions, the Company may be exposed to future impairment losses that could be material.

For 2018 and 2017, the Company chose to perform qualitative assessments for its title insurance and home warranty reporting units and performed a quantitative impairment test for its property and casualty insurance reporting unit.  Based on the results of its quantitative impairment tests for 2018 and 2017, the Company determined that the fair value of its property and casualty insurance reporting unit exceeded the carrying amount and, therefore, no additional analysis was required.  The results of the Company's qualitative assessments for its title insurance and home warranty reporting units for 2018 and 2017 supported the conclusion that their fair values were not more likely than not less than their carrying amounts and, therefore, a quantitative impairment test was not considered necessary.  For 2016, the Company chose to perform a quantitative impairment test for all three reporting units and, based on the results, determined that the fair values of its reporting units exceeded their carrying amounts and, therefore, no additional analysis was required.  As a result of the Company's annual goodwill impairment assessments, the Company did not record any goodwill impairment losses for 2018, 2017 or 2016.

*Impairment assessment for other intangible assets.*     Management uses estimated future cash flows (undiscounted and excluding interest) to measure the recoverability of intangible assets with finite lives, whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. If the undiscounted cash flow analysis indicates that the carrying amount is not recoverable, an impairment loss is recorded for the excess of the carrying amount over its fair value.

Management's impairment assessment for indefinite-lived other intangible assets may involve calculating the fair value by using a discounted cash flow analysis or through a market approach valuation. If the fair value exceeds its carrying amount, the asset is not considered impaired and no additional analysis is required. However, if the carrying amount is greater than the fair value, an impairment loss is recorded equal to the excess.

*Impairment of equity method investments.*     The carrying value of investments accounted for under the equity method of accounting is written down, or impaired, to fair value when a decline in value is considered to be other-than-temporary. In making the determination as to whether an individual investment is impaired, the Company assesses the current and expected financial condition of each relevant entity, including, but not limited to, the anticipated ability of the entity to make its contractually required payments to the Company (with respect to debt obligations to the Company), the results of valuation work performed with respect to the entity, the entity's anticipated ability to generate sufficient cash flows and the market conditions in the industry in which the entity is operating.

*Impairment of property and equipment .*      Management uses estimated future cash flows (undiscounted and excluding interest) to measure the recoverability of property and equipment whenever event s or changes in circumstances indicate that the carrying value may not be fully recoverable. If the undiscounted cash flow analysis indicates that the carrying amount is not recoverable, an impairment loss is recorded for the excess of the carrying amount over its fair value. Impairment losses on property and equipment, which primarily related to impairments of internally developed software, were $ 41  thousand , $ 0.5  million and $ 5.2  million for 201 8 , 201 7 and 201 6 , respectively.

*Income taxes.*      The Company accounts for income taxes under the asset and liability method, whereby deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. The Company evaluates the need to establish a valuation allowance for deferred tax assets based upon the amount of existing temporary differences, the period in which they are expected to be recovered and expected levels of taxable income. A valuation allowance to reduce deferred tax assets is established when it is considered more likely than not that some or all of the deferred tax assets will not be realized.

The Company recognizes the effect of income tax positions only if sustaining those positions is considered more likely than not.  Changes in recognition or measurement of uncertain tax positions are reflected in the period in which a change in judgment occurs.  The Company recognizes interest and penalties, if any, related to uncertain tax positions in income tax expense.

*Employee benefit plans.*      The Company recognizes the underfunded status of its unfunded supplemental benefit plans as a liability on its consolidated balance sheets. Actuarial gains and losses and prior service costs and credits that have not been recognized as a component of net periodic benefit cost previously are recorded as a component of accumulated other comprehensive loss. Plan obligations are measured annually as of December 31.

The assumption that has had the most significant impact to net periodic costs for the unfunded supplemental benefit plans is the discount rate.  The discount rate assumption reflects the yield available on high-quality, fixed-income debt securities that match the expected timing of the benefit obligation payments.

The weighted-average discount rate assumptions used to determine net periodic benefit costs for the Company's unfunded supplemental benefits plans for 2018, 2017 and 2016, were as follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Discount rate for projected benefit obligation | 3.61% | 4.03% | 4.33% |
| Discount rate for service cost | 3.78% | 4.32% | 4.69% |
| Discount rate for interest cost | 3.23% | 3.43% | 3.56% |

The weighted-average discount rate assumption used to determine the projected benefit obligation for the Company's unfunded supplemental benefits plans at December 31, 2018 and 2017, was as follows:

|  | December 31, | |
|---|---|---|
|  | **2018** | **2017** |
| Discount rate | 4.32% | 3.61% |

During 2016, the Company terminated its funded defined benefit pension plans and, in 2017, transferred all remaining benefit obligations relating to the pension plans to a highly rated insurance company.  See Note 13 Employee Benefit Plans to the consolidated financial statements for further discussion of the termination of the Company's funded defined benefit pension plans.

**Recently Adopted Accounting Pronouncements**

In May 2017, the Financial Accounting Standards Board ("FASB") issued updated guidance intended to reduce diversity in practice by clarifying which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The adoption of this guidance had no impact on the Company's consolidated financial statements.

In March 2017, the FASB issued updated guidance intended to improve the presentation of net periodic pension cost and net periodic postretirement benefit cost through the disaggregation of the service cost component from the other components of net benefit cost.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The Company adopted this change in accounting principle at the beginning of 2018 and applied the change retrospectively.  As a result, other components of net benefit cost totaling $175.0 million and $101.5 million were reclassified from personnel costs to other operating expenses on the consolidated statements of income for the years ended December 31, 2017 and 2016, respectively.  See Note 13 Employee Benefit Plans to the consolidated financial statements for further information on the Company's net periodic pension costs.

In January 2017, the FASB issued updated guidance to clarify the definition of a business with the objective of providing guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The adoption of this guidance had no impact on the Company's consolidated financial statements.

In November 2016, the FASB issued updated guidance intended to reduce the diversity in practice on presenting restricted cash and restricted cash equivalents in the statement of cash flows.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The adoption of this guidance had no impact on the Company's consolidated financial statements.

In October 2016, the FASB issued updated guidance intended to simplify and improve the accounting for the income tax consequences of intra-entity transfers of assets, other than inventory.  The updated guidance, which eliminates the intra-entity transfers exception, requires entities to recognize the income tax consequences of intra-entity transfers of assets, other than inventory, when the transfers occur.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The adoption of this guidance had no impact on the Company's consolidated financial statements.

In August 2016, the FASB issued updated guidance intended to eliminate the diversity in practice regarding the presentation and classification of certain cash receipts and cash payments in the statement of cash flows.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The adoption of this guidance had no impact on the Company's consolidated financial statements.

In January 2016, the FASB issued updated guidance intended to enhance the reporting model for financial instruments to provide users of financial statements with more decision-useful information.  In addition to making other targeted improvements to current guidance, the updated guidance also requires all equity investments, except those accounted for under the equity method of accounting or those that result in consolidation of the investee, to be measured at fair value with changes in the fair value recognized through net income.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The Company adopted this guidance at the beginning of 2018 and recognized cumulative net unrealized gains, net of taxes, of $40.6 million related to its investments in equity securities, previously classified as available-for-sale, through a cumulative-effect adjustment to retained earnings.  Changes in the fair values of these investments are reflected in net realized investment gains/losses on the Company's consolidated statements of income. See Note 3 Debt and Equity Securities to the consolidated financial statements for further discussion of the Company's investments in equity securities.

31

In May 2014, the FASB issued updated guidance for recognizing revenue from contracts with customers to provide a single, comprehensive revenue recognition model for all contracts with customers to improve comparability within and across i ndustries, and across capital markets.  The new revenue standard contains principles that an entity will apply to determine the measurement of revenue and the timing of recognition.  The underlying principle is that an entity will recognize revenue to depi ct the transfer of goods or services to customers at an amount that the entity expects to be entitled to in exchange for those goods or services.  Revenue from insurance contracts is not within the scope of this guidance.  In 2016, the FASB issued addition al updates to the new guidance primarily to clarify, among other things, the implementation guidance related to principal versus agent considerations, identifying performance obligations, accounting for licenses of intellectual property, and to provide nar row-scope improvements and additional practical expedients.  In February 2017, the FASB issued an additional update to the new guidance to clarify the scope of derecognition guidance for nonfinancial assets and to provide guidance for partial sales of nonf inancial assets.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The Company elected to adopt the new guidance under the modified retrospective approach , which did not have a material impact o n its consolidated financial statements .  See Note 1 Basis of Presentation and Significant Accounting Policies to the consolidated financial statements for further information about the Company's revenues within the scope of the new guidance.

**Pending Accounting Pronouncements**

In August 2018, the FASB issued updated guidance that is intended to reduce potential diversity in practice in accounting for the costs of implementing cloud computing arrangements (i.e., hosting arrangements) that are service contracts.  The updated guidance aligns the requirements for capitalizing implementation costs for these arrangements with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software and hosting arrangements that include an internal-use software license.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  The Company is currently assessing the impact of this guidance on its consolidated financial statements.

In August 2018, the FASB issued updated guidance as part of its disclosure framework project intended to improve the effectiveness of disclosures in the notes to the financial statements.  The updated guidance eliminates, adds and modifies certain disclosure requirements related to fair value measurements.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  Except for the disclosure requirements, the Company does not expect the adoption of this guidance to have a material impact on its consolidated financial statements.

In January 2017, the FASB issued updated guidance intended to simplify how an entity tests goodwill for impairment by eliminating Step 2 from the goodwill impairment test.  Under the updated guidance, an entity will perform its goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount and will recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value, with the loss recognized limited to the total amount of goodwill allocated to that reporting unit.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  The Company does not expect the adoption of this guidance to have a material impact on its consolidated financial statements.

In June 2016, the FASB issued updated guidance intended to provide financial statement users with more decision-useful information about the expected credit losses on financial instruments and other commitments to extend credit held by a reporting entity at each reporting date.  The updated guidance replaces the current incurred loss impairment methodology with a methodology that reflects expected credit losses and requires the consideration of a broader range of reasonable and supportable information to inform credit loss estimates.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  The Company is currently assessing the impact of this guidance on its consolidated financial statements.

In February 2016, the FASB issued updated guidance that requires the rights and obligations associated with leasing arrangements be reflected on the balance sheet in order to increase transparency and comparability among organizations.  Under the updated guidance, lessees will be required to recog nize a right-of-use asset and a liability to make lease payments and disclose key information about leasing arrangements.  The updated guidance is effective for interim and annual reporting periods beginning after December  15,  2018.  The updated guidance m ay either be adopted using a modified retrospective transition approach or may be initially applied on the adoption date with the recognition of a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption.  The Comp any has elected to initially apply the guidance as of the adoption date, January  1,  2019, and expects to record on its balance sheet right-of-use assets and lease liabilities of approximately $3 5 0  million and an immaterial cumulative-effect adjustment to retained earnings.  T he Company expects the new guidance to have an insignificant impact on its consolidated statements of income and statements of cash flows.

## Results of Operations

### Overview

A  substantial  portion  of  the  revenues  for  the  Company's  title  insurance  and  services  segment  results  from  the  sale  and  refinancing  of  residential  and commercial real estate.  In the Company's specialty insurance segment, revenues associated with the initial year of coverage in both the home warranty and property and casualty operations are impacted by volatility in residential purchase transactions.  Traditionally, the greatest volume of real estate activity, particularly residential purchase activity, has occurred in the spring and summer months.  However, changes in interest rates, as well as other changes in general economic conditions in the United States and abroad, can cause fluctuations in the traditional pattern of real estate activity.

The  Company's  total  revenues  for  2018  were  $5.7  billion,  which  reflected  a  decrease  of  $24.5  million,  or  0.4%,  when  compared  with  $5.8  billion  for 2017.  This decrease was attributable to lower agent premiums in the title insurance and services segment and a higher level of net realized investment losses, partially offset by higher net investment income and direct premiums and escrow fees.  The increase in direct premiums and escrow fees attributable to the title insurance and services  segment  was  $30.6  million,  or  1.5%.  Direct  premiums  and  escrow  fees  from  domestic  commercial  and  residential  purchase  transactions  increased $57.5 million and $22.6 million, or 8.3% and 2.5%, respectively, while direct premiums and escrow fees from domestic residential refinance transactions decreased $49.3 million, or 21.4%, in 2018 when compared to 2017.

According to the Mortgage Bankers Association's February 11, 2019 Mortgage Finance Forecast (the "MBA Forecast"), residential mortgage originations in the United States (based on the total dollar value of the transactions) decreased 6.6% in 2018 when open purchase orders declined 4.0% when compared to January 2018.  According to the MBA Forecast, the dollar amount of purchase originations increased 3.7% and refinance originations decreased 25.6%.  This volume of domestic residential mortgage origination activity contributed to an increase in direct premiums and escrow fees for the Company's direct title operations of 2.5% from domestic residential purchase transactions and a 21.4% decrease in direct premiums and escrow fees from domestic refinance transactions in 2018 when compared to 2017.

During 2018, the level of domestic title orders opened per day by the Company's direct title operations decreased 8.5% when compared to 2017.  Residential refinance and purchase opened orders per day decreased 25.2% and 1.5%, respectively, while commercial opened orders per day increased 2.8% in 2018 when compared to 2017.

During the fourth quarter of 2018, the level of domestic residential purchase title orders opened per day by the Company's direct title operations decreased 4.5% when compared to the same quarter in 2017.  This trend continued in January 2019 as open purchase orders declined 4.0% when compared to January 2018.  The Company expects the ongoing decline in the residential purchase market to continue in 2019 but also anticipates rising investment income.  Based on current orders and market conditions, the Company also expects its commercial business to continue to perform well.  During the fourth quarter of 2018, the Company adjusted its cost structure to position itself for 2019.

The Company adopted new accounting guidance on January 1, 2018, which requires investments in equity securities with readily determinable fair values to be measured at fair value with changes in the fair value recognized through net income.  Previously, changes in the fair value where recognized through accumulated other comprehensive loss on the consolidated balance sheets.  Beginning in the first quarter of 2018, the Company records changes in the fair values of its equity securities as a component of net realized investment gains (losses) on the consolidated statements of income.  See Note 1 Basis of Presentation and Significant Accounting Policies to the consolidated financial statements for further discussion of the new guidance.

During 2018, the Company completed acquisitions for an aggregate purchase price of $82.9 million, which are included in the Company's title insurance and services segment.  These acquisitions enable the Company to offer its custo mers new ways to reduce risk and increase efficiency.

The Company is increasingly utilizing decision science, artificial intelligence and other innovative technologies, processes and techniques to speed the delivery of its products, increase efficiency and otherwise improve the customer experience.  These efforts include streamlining the closing process by converting certain manual processes into digital ones, which improves the customer experience by simplifying and reducing the time it takes to close a transaction, reducing the risk of fraud and improving communication.  These efforts also include the automation of many of the tasks required to build and update title plants and to search and examine title records, among others.  While many of these initiatives are also designed to decrease risk, they present risks of their own.  The degree to which these innovative efforts will be successful, and their ultimate impact on the Company's results of operations, is not currently known.

In addition to the Company's innovative activities, other participants in the real estate and mortgage industries are seeking to innovate in ways that could impact the Company's businesses.  These participants include certain of the Company's sources of business, competitors and ultimate customers.  Innovations of these participants may change the demand for the Company's products and services, the manner in which the Company's products and services are ordered or fulfilled and the revenue or profitability derived from the products and services.  The Company's efforts to anticipate and participate in these transformations could require significant additional investment and may not succeed, resulting in a reduction in market share or profitability.  The ultimate degree to which these and other innovations in the real estate industry will impact the Company's business and results of operations is not currently known.

On December 22, 2017, comprehensive tax reform legislation known as the Tax Cuts and Jobs Act (the "Tax Reform Act") was signed into law.  The Tax Reform Act amended the Internal Revenue Code to reduce U.S. tax rates and modify policies, credits and deductions for individuals and businesses.  The changes resulting from the Tax Reform Act had an overall favorable impact on the Company's effective tax rate, and the Company expects the Tax Reform Act will continue to have an overall favorable impact on its effective tax rate in the future.

Additionally, the Company continues to monitor developments in its regulatory environment.  Currently, federal officials are discussing various potential changes to laws and regulations that could impact the Company's businesses, including the reform of government-sponsored enterprises such as the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) and data privacy regulations, among others.  In addition, the Tax Reform Act included changes that could affect the real estate and mortgage markets, including changes to the mortgage interest deduction, the increase in the standard deduction (which limits the benefit of itemizing and deducting mortgage interest separately) and the limitation of state and local tax deductions, among others.  The full extent of the impact of the Tax Reform Act on volumes of real estate transactions and mortgage originations is not currently known.  Other changes in these areas, and more generally in the regulatory environment in which the Company and its customers operate, could similarly impact the volume of mortgage originations in the United States and the Company's competitive position and results of operations.

34

**Title Insurance and Services**

| | 2018 | 2017 | 2016 | 2018 vs. 2017 | | 2017 vs. 2016 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | $ Change | % Change | $ Change | % Change |
| | | | | (in thousands, except percentages) | | | |
| **Revenues** | | | | | | | |
| Direct premiums and escrow fees | $ 2,052,951 | $ 2,022,384 | $ 2,004,686 | $ 30,567 | 1.5 | $ 17,698 | 0.9 |
| Agent premiums | 2,284,906 | 2,360,659 | 2,286,630 | (75,753) | (3.2) | 74,029 | 3.2 |
| Information and other | 770,725 | 766,018 | 713,137 | 4,707 | 0.6 | 52,881 | 7.4 |
| Net investment income | 223,318 | 137,439 | 110,757 | 85,879 | 62.5 | 26,682 | 24.1 |
| Net realized investment (losses) gains | (49,119) | 6,656 | 18,915 | (55,775) | NM1 | (12,259) | (64.8) |
| | 5,282,781 | 5,293,156 | 5,134,125 | (10,375) | (0.2) | 159,031 | 3.1 |
| **Expenses** | | | | | | | |
| Personnel costs | 1,671,846 | 1,636,429 | 1,578,130 | 35,417 | 2.2 | 58,299 | 3.7 |
| Premiums retained by agents | 1,799,836 | 1,863,356 | 1,801,571 | (63,520) | (3.4) | 61,785 | 3.4 |
| Other operating expenses | 793,364 | 788,074 | 764,502 | 5,290 | 0.7 | 23,572 | 3.1 |
| Provision for policy losses and other claims | 173,520 | 175,322 | 235,661 | (1,802) | (1.0) | (60,339) | (25.6) |
| Depreciation and amortization | 119,053 | 121,540 | 93,069 | (2,487) | (2.0) | 28,471 | 30.6 |
| Premium taxes | 62,646 | 62,545 | 59,464 | 101 | 0.2 | 3,081 | 5.2 |
| Interest | 7,513 | 3,526 | 2,856 | 3,987 | 113.1 | 670 | 23.5 |
| | 4,627,778 | 4,650,792 | 4,535,253 | (23,014) | (0.5) | 115,539 | 2.5 |
| Income before income taxes | $ 655,003 | $ 642,364 | $ 598,872 | $ 12,639 | 2.0 | $ 43,492 | 7.3 |
| Margins | 12.4% | 12.1% | 11.7% | 0.3% | 2.5 | 0.4% | 3.4 |

(1)   Not meaningful

Direct premiums and escrow fees increased $30.6 million, or 1.5%, in 2018 from 2017 and $17.7 million, or 0.9%, in 2017 from 2016.  The increases in direct premiums and escrow fees in 2018 from 2017 and in 2017 from 2016 were primarily due to an increase in domestic average revenues per order closed, partially offset by a decrease in the domestic title orders closed by the Company's direct title operations.  The domestic average revenues per order closed were $2,600, $2,264 and $1,931 for 2018, 2017 and 2016, respectively.  The 14.8% increase in average revenues per order closed in 2018 from 2017 and the 17.2% increase in average revenues per order closed in 2017 from 2016 were primarily due to a shift in the mix of direct revenues generated from lower premium residential refinance products to higher premium commercial products, higher average revenues per order from commercial transactions, higher residential real estate values, and premium and fee increases related to residential purchase transactions.  The Company's direct title operations closed 730,800, 823,700 and 958,400 domestic title orders during 2018, 2017 and 2016, respectively.  The 11.3% decrease in orders closed in 2018 from 2017 and the 14.1% decrease in orders closed in 2017 from 2016 were generally consistent with the changes in residential mortgage origination activity in the United States as reported in the MBA Forecast.

Agent premiums decreased $75.8 million, or 3.2%, in 2018 from 2017 and increased $74.0 million, or 3.2%, in 2017 from 2016. Agent premiums are recorded when notice of issuance is received from the agent, which is generally when cash payment is received by the Company. As a result, there is generally a delay between the agent's issuance of a title policy and the Company's recognition of agent premiums. Therefore, full year agent premiums typically reflect mortgage origination activity from the fourth quarter of the prior year through the third quarter of the current year. The decrease in agent premiums in 2018 from 2017 was generally consistent with the 1.0% increase in the Company's direct premiums and escrow fees in the twelve months ended September 30, 2018 as compared with the twelve months ended September 30, 2017. The increase in agent premiums in 2017 from 2016 was generally consistent with the 3.0% increase in the Company's direct premiums and escrow fees in the twelve months ended September 30, 2017 as compared with the twelve months ended September 30, 2016.

Information and other revenues primarily consist of revenues generated from fees associated with title search and related reports, title and other real property records and images, other non-insured settlement services, and risk mitigation products and services.  These revenues generally trend with direct premiums and escrow fees but are typically less volatile since a portion of the revenues are subscription based and do not fluctuate with transaction volumes.

Information and other revenues increased $4.7 million, or 0.6%, in 2018 from 2017 and $52.9 million, or 7.4%, in 2017 from 2016. The increases were driven by recent acquisitions.   Excluding the $42.2 million impact of new acquisitions for the year ended De cember 31, 2018, information and other revenues decreased $37.5 million, or 4.9%, in 2018 compared to 2017.   The decrease in 2018 from 2017, adjusted for the impact of new acquisitions, was primarily due to lower demand for the Company's valuation services , fulfillment services, and automated products driven by a decrease in mortgage origination volumes and, to a lesser extent, lower demand for the Company's default information products driven by a decrease in loss mitigation activities.   Excluding the $77. 4 million impact of new acquisitions for the year ended December  31,  2017, information and other revenues decreased $24.5 million, or 3.4%, in 2017 compared to 2016.  The decrease in 2017 from 2016, adjusted for the impact of new acquisitions, was due to l ower demand for the Company's default information products driven by a decrease in loss mitigation activities and lower demand for the Company's valuation services, fulfillment services, and automated products driven by a decrease in mortgage origination v olumes, partially offset by higher fees earned on non-insured products related to commercial transactions .

Net investment income increased $85.9 million, or 62.5%, in 2018 from 2017 and $26.7 million, or 24.1%, in 2017 from 2016.  The increase in 2018 from 2017 was mainly attributable to higher average balances due primarily to strength in our commercial business and rising short-term interest rates, which drove higher income from the Company's cash and investment portfolio, tax-deferred property exchange business and escrow balances.  The increase in 2017 from 2016 was primarily attributable to the increase in short-term interest rates which drove higher income from the Company's cash and investment portfolio, tax-deferred property exchange business and escrow balances.

Net realized investment losses were $49.1 million for 2018 and were primarily from a decrease in the fair values of equity securities of $32.6 million and losses from the sales of debt securities.  Net realized investment gains totaled $6.7 million for 2017 and were primarily from the sales of debt and equity securities, partially offset by a $6.6 million loss recognized when the Company purchased the remaining equity ownership in an investment in an affiliate during the third quarter of 2017.  Net realized investment gains were $18.9 million for 2016 and were primarily from the sales of debt and equity securities.  Net realized investment gains for 2018, 2017 and 2016 included $1.1 million, $0.8 million and $3.3 million, respectively, of gains from the sale of real estate.  In addition, net realized investment gains for 2018, 2017 and 2016 included impairment losses of $1.1 million, $3.0 million and $5.2 million, respectively.  The impairment losses in 2018, 2017 and 2016 were primarily related to the retirement of a trade name, title plants and internally developed software, respectively.

The title insurance and services segment (primarily direct operations) is labor intensive; accordingly, a major expense component is personnel costs.  This expense component is affected by two primary factors: the need to monitor personnel changes to match the level of corresponding or anticipated new orders and the need to provide quality service.

Personnel costs increased $35.4 million, or 2.2%, in 2018 from 2017 and $58.3 million, or 3.7%, in 2017 from 2016.  The increases were largely driven by recent acquisitions.  Excluding the $28.3 million impact of new acquisitions for the year ended December 31, 2018, personnel costs increased $7.1 million, or 0.4%, in 2018 compared to 2017. The slight increase in 2018 from 2017, adjusted for the impact of new acquisitions, was primarily attributable to higher employee benefit, salary, severance and stock-based compensation expenses, partially offset by lower incentive compensation, overtime and temporary labor expenses.  The increase in employee benefit costs was due to a higher 401(k) savings plan match.  The higher salary expense was due to one additional payroll day and higher average headcount in our international operations.  Excluding the $57.5 million impact of new acquisitions for the year ended December 31, 2017, personnel costs increased $0.8 million, or were essentially flat, in 2017 compared to 2016.  The minor increase in 2017 from 2016, adjusted for the impact of new acquisitions, was primarily attributable to higher salary, incentive compensation and employee retention costs, mostly offset by lower temporary labor costs and overtime expense.  The higher salary cost was due to an increase in average salaries, partially offset by lower average headcount.   The increase in incentive compensation expense was due to higher profitability.  Personnel costs included severance expense of $15.2 million, $10.1 million and $8.3 million for 2018, 2017 and 2016, respectively.

The Company continues to closely monitor order volumes and related staffing levels and intends to adjust staffing levels as considered necessary. The Company's direct title operations opened 981,800, 1,069,000 and 1,281,400 domestic title orders in 2018, 2017 and 2016, respectively, representing decreases of 8.2% in 2018 from 2017 and 16.6% in 2017 from 2016.

36

A summary of premiums retained by agents and agent premiums is as follows:

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| | (in thousands, except percentages) | | |
| Premiums retained by agents | $ 1,799,836 | $ 1,863,356 | $ 1,801,571 |
| Agent premiums | $ 2,284,906 | $ 2,360,659 | $ 2,286,630 |
| % retained by agents | 78.8% | 78.9% | 78.8% |

The premium split between underwriter and agents is in accordance with the respective agency contracts and can vary from region to region due to divergences in real estate closing practices and state regulations. As a result, the percentage of title premiums retained by agents can vary due to the geographic mix of revenues from agency operations. The changes in the percentage of title premiums retained by agents in 2018 from 2017 and in 2017 from 2016 were primarily due to changes in the geographic mix of agency revenues.

Other operating expenses (principally related to direct operations) increased $5.3 million, or 0.7%, in 2018 from 2017 and $23.6 million, or 3.1%, in 2017 from 2016. The increases were driven by recent acquisitions. Excluding the $19.6 million impact of new acquisitions for the year ended December 31, 2018, other operating expenses decreased $14.3 million, or 1.8%, in 2018 compared to 2017. The decrease in 2018 from 2017, adjusted for the impact of new acquisitions, was primarily attributable to a reduction in discretionary spending, an increase in earnings credits and small decreases across several expense categories, partially offset by higher software expense and foreign currency exchange losses. The decrease was also related to the $8.5 million out-of-period adjustment recorded in 2017, which is further discussed below. Excluding the $32.4 million impact of new acquisitions for the year ended December 31, 2017, other operating expenses decreased $8.8 million, or 1.2%, in 2017 compared to 2016. The decrease in 2017 from 2016, adjusted for the impact of new acquisitions, was primarily attributable to lower production related costs driven by lower order volumes, higher foreign currency exchange gains, and declines in furniture and equipment costs, software related costs and litigation related costs. The decreases were partially offset by increased occupancy expense and the first quarter of 2016 benefitting from the recovery of an insurance claim. In addition, other operating expenses increased by $8.5 million due to an out-of-period adjustment recorded to write-off certain uncollectible balances related to fees that should have been previously written off. To correct for this error, the Company recorded the $8.5 million adjustment in the fourth quarter of 2017. For further discussion of the out-of-period adjustments see Note 1 Basis of Presentation and Significant Accounting Policies to the consolidated financial statements.

The provision for policy losses and other claims, expressed as a percentage of title insurance premiums and escrow fees, was 4.0% for the years ended December 31, 2018 and 2017 and 5.5% for the year ended December 31, 2016.

The current year rate of 4.0% reflects the ultimate loss rate for the current policy year and no change in the loss reserve estimates for prior policy years.

As of December 31, 2018, the IBNR claims reserve for the title insurance and services segment was $877.1 million, which reflected management's best estimate. The Company's internal actuary determined a range of reasonable estimates of $737.7 million to $925.8 million. The range limits are $139.4 million below and $48.7 million above management's best estimate, respectively, and represent an estimate of the range of variation among reasonable estimates of the IBNR reserve. Actuarial estimates are sensitive to assumptions used in models, as well as the structures of the models themselves, and to changes in claims payment and incurral patterns, which can vary materially due to economic conditions, among other factors.

The 2017 rate of 4.0% reflected the ultimate loss rate for policy year 2017 and no change in the loss reserve estimates for prior policy years.

The 2016 rate of 5.5% reflected an ultimate loss rate of 4.5% for policy year 2016 a nd a $42.6  million net increase in loss reserve estimates for prior policy years.  The increase in loss reserve estimates for prior policy years was primarily attributable to potential uncertainty with respect to the Company's exposure to large title claim s.  A large title claim is defined as a title claim with a total ultimate loss in excess of $2.5  million.  This uncertainty was due to the following factors, among others: (i) the volatility associated with the timing and severity of large title claims, (i i) the potential of incurring one or more large title claims that significantly exceed estimated ultimate losses indicated by current historical trends, and (iii) the complexity associated with handling large title claims which makes it difficult to estima te the ultimate outcome.  While the Company believed its claims reserve attributable to large title claims was reasonable, this uncertainty increased the potential for adverse loss development.

As of December 31, 2018, the projected ultimate loss rates for policy years 2018, 2017 and 2016 were 4.0%, 3.9% and 3.8%, respectively.

Depreciation and amortization expense decreased $2.5 million, or 2.0%, in 2018 from 2017 and increased $28.5 million, or 30.6%, in 2017 from 2016.  The decrease in 2018 from 2017 was primarily attributable to 2017 being impacted by $5.3 million of accelerated amortization charges and $4.7 million in out-of-period adjustments, both of which are further discussed below.  The decrease in 2018 was partially offset by $7.7 million of amortization expense related to recent acquisitions.  The increase in 2017 from 2016 was primarily attributable to higher amortization expense associated with internally developed technology and purchased software licenses, $6.5 million related to recent acquisitions, and $4.7 million in out-of-period adjustments to fully amortize certain title plant imaging assets that were misclassified as title plants assets.  The higher amortization expense related to internally developed technology included $5.3 million of accelerated amortization for 2017, resulting from a shortened useful life for a software interface.  For further discussion of the out-of-period adjustments see Note 1 Basis of Presentation and Significant Accounting Policies to the consolidated financial statements.

Insurers generally are not subject to state income or franchise taxes.  However, in lieu thereof, a premium tax is imposed on certain operating revenues, as defined by statute.  Tax rates and bases vary from state to state; accordingly, the total premium tax burden is dependent upon the geographical mix of operating revenues.  The Company's noninsurance subsidiaries are subject to state income tax and do not pay premium tax.  Accordingly, the Company's total tax burden at the state level for the title insurance and services segment is composed of a combination of premium taxes and state income taxes.  Premium taxes as a percentage of title insurance premiums and escrow fees were 1.4% for the years ended December 31, 2018, 2017 and 2016.

Interest expense increased $4.0 million, or 113.1%, in 2018 from 2017 and $670 thousand, or 23.5%, in 2017 from 2016.  The increase in 2018 from 2017 was primarily attributable to higher interest paid related to customer deposits at the Company's banking subsidiary, First American Trust, FSB, and secured financings payable.  The increase in interest paid on customer deposits is due to an increase in average balances and higher interest rates paid.  The secured financings payable relate to a specialized warehouse lender that the Company acquired in 2018.

The profit margins for the title insurance business reflect the high cost of performing the essential services required before insuring title, whereas the corresponding revenues are subject to regulatory and competitive pricing restraints.  Due to the relatively high proportion of fixed costs, title insurance profit margins generally improve as closed order volumes increase.  Title insurance profit margins are also impacted by the segment's net investment income and net realized investment gains or losses, which may not move in the same direction as closed order volumes.  Title insurance profit margins are affected by the composition (residential or commercial) and type (resale, refinancing or new construction) of real estate activity.  Title insurance profit margins are also affected by the percentage of title insurance premiums generated by agency operations. Profit margins from direct operations are generally higher than from agency operations due primarily to the large portion of the premium that is retained by the agent.  The pre-tax margins were 12.4%, 12.1% and 11.7% for the years ended December 31, 2018, 2017 and 2016, respectively.

38

**Specialty Insurance**

| | 2018 | 2017 | 2016 | 2018 vs. 2017 | | 2017 vs. 2016 | |
|---|---|---|---|---|---|---|---|
| | | | | $ Change | % Change | $ Change | % Change |
| | | | | (in thousands, except percentages) | | | |
| **Revenues** | | | | | | | |
| Direct premiums | $ 454,718 | $ 439,470 | $ 411,353 | $ 15,248 | 3.5 | $ 28,117 | 6.8 |
| Information and other | 11,802 | 11,259 | 10,877 | 543 | 4.8 | 382 | 3.5 |
| Net investment income | 10,190 | 9,713 | 9,476 | 477 | 4.9 | 237 | 2.5 |
| Net realized investment (losses) gains | (7,368) | 4,578 | 4,138 | (11,946) | (260.9) | 440 | 10.6 |
| | 469,342 | 465,020 | 435,844 | 4,322 | 0.9 | 29,176 | 6.7 |
| **Expenses** | | | | | | | |
| Personnel costs | 75,355 | 71,604 | 67,733 | 3,751 | 5.2 | 3,871 | 5.7 |
| Other operating expenses | 74,025 | 67,813 | 62,610 | 6,212 | 9.2 | 5,203 | 8.3 |
| Provision for policy losses and other claims | 279,113 | 275,088 | 252,940 | 4,025 | 1.5 | 22,148 | 8.8 |
| Depreciation and amortization | 6,721 | 6,351 | 5,593 | 370 | 5.8 | 758 | 13.6 |
| Premium taxes | 7,129 | 7,256 | 6,894 | (127) | (1.8) | 362 | 5.3 |
| | 442,343 | 428,112 | 395,770 | 14,231 | 3.3 | 32,342 | 8.2 |
| Income before income taxes | $ 26,999 | $ 36,908 | $ 40,074 | $ (9,909) | (26.8) | $ (3,166) | (7.9) |
| Margins | 5.8% | 7.9% | 9.2% | (2.1)% | (26.6) | (1.3)% | (14.1) |

Direct premiums increased $15.2 million, or 3.5%, in 2018 from 2017 and $28.1 million, or 6.8%, in 2017 from 2016.  The increases were due to higher premiums earned in the home warranty business driven by an increase in the number of home warranty residential service contracts issued and an increase in the average price charged per contract.

Net realized investment losses for the specialty insurance segment were $7.4 million for 2018 and were primarily from a decrease in the fair values of equity securities of $6.1 million and losses from the sales of debt securities.  Net realized investment gains totaled $4.6 million and $4.1 million for 2017 and 2016, respectively, and were primarily from the sales of debt and equity securities, and for 2016, included $2.3 million of gains from the sale of real estate.

Personnel costs and other operating expenses increased $10.0 million, or 7.1%, in 2018 from 2017 and $9.1 million, or 7.0%, in 2017 from 2016.  The increase in 2018 from 2017 was primarily attributable to higher salary expense due to higher average salaries, higher allocations related to corporate shared services, and higher advertising, sales tax, and employee benefit expenses.  The increase in 2017 from 2016 was primarily attributable to higher salary expense due to higher average headcount, higher incentive compensation in the home warranty business on higher revenue and profitability, and higher offshore labor expense related to increased customer support activities associated with increased volume in the home warranty business.  The increase was also related to a $3.5 million benefit recorded in 2016 from higher deferred acquisition costs associated with the change in how the Company reports installment fees related to home warranty residential service contracts.

The provision for home warranty claims, expressed as a percentage of home warranty premiums, was 53.8% in 2018, 53.5% in 2017 and 60.7% in 2016.  The slight increase in rate in 2018 from 2017 was primarily attributable to an increase in claims severity, mostly offset by a decrease in claims frequency.  The increase in claims severity was primarily due to higher claims management costs driven in part by the mix of claims.  The decrease in rate in 2017 from 2016 was primarily attributable to a decrease in the frequency and severity of claims and, to a lesser extent, an increase in average revenue per contract.  The decrease in the severity of claims was primarily due to more efficient claims management, which was mainly driven by improved rates with contractors and more efficient allocation of claims to contractors. The severity and frequency of home warranty claims also benefited from milder weather conditions in 2017 when compared to 2016.

The provision for property and casualty claims, expressed as a percentage of property and casualty insurance premiums, was 82.3% in 2018, 85.0% in 2017 and 63.3% in 2016.  The decrease in rate in 2018 from 2017 was primarily attributable to the occurrence of one event in 2018 compared with two events in 2017 with losses exceeding property and casualty's reinsurance retention limit of $5.0 million for each event.  During the fourth quarter of 2018 there was one wildfire in California that exceeded the reinsurance retention limit compared to two separate wildfires during the fourth quarter of 2017 that exceeded the reinsurance retention limit.  The increase in rate in 2017 from 2016 was primarily attributable to an increase in the severity and, to a lesser extent, frequency of claims.  The increase in claims severity was primarily due to wildfires in California, including the two separate wildfires with losses exceeding the reinsurance retention limit for each event, and rainstorms in the western portion of the United States.

Premium taxes as a percentage of specialty insurance segment premiums were 1.6% in 2018 and were 1.7% in 2017 and 2016.

A large part of the revenues for the specialty insurance businesses are generated by renewals and are not dependent on the level of real estate activity in the year of renewal.  With the exception of loss expense, the majority of the expenses for this segment are variable in nature and therefore generally fluctuate consistent with revenue fluctuations.  Accordingly, profit margins for this segment (before loss expense) are relatively constant, although as a result of some fixed expenses, profit margins (before loss expense) should nominally improve as premium revenues increase.  Specialty insurance profit margins are also impacted by the segment's net investment income and net realized investment gains or losses, which may not move in the same direction as premium revenues.  Pre-tax margins were 5.8%, 7.9% and 9.2% for the years ended December 31, 2018, 2017 and 2016, respectively.

## Corporate

| | 2018 | 2017 | 2016 | 2018 vs. 2017 | | 2017 vs. 2016 | |
|---|---|---|---|---|---|---|---|
| | | | | $ Change | % Change | $ Change | % Change |
| | | | | (in thousands, except percentages) | | | |
| **Revenues** | | | | | | | |
| Net investment (losses) income | $ (3,115) | $ 15,326 | $ 5,946 | $ (18,441) | (120.3) | $ 9,380 | 157.8 |
| | (3,115) | 15,326 | 5,946 | (18,441) | (120.3) | 9,380 | 157.8 |
| **Expenses** | | | | | | | |
| Personnel costs | 1,748 | 15,506 | 9,301 | (13,758) | (88.7) | 6,205 | 66.7 |
| Other operating expenses | 33,879 | 201,062 | 128,222 | (167,183) | (83.1) | 72,840 | 56.8 |
| Depreciation and amortization | 153 | 162 | 385 | (9) | (5.6) | (223) | (57.9) |
| Interest | 33,569 | 32,537 | 29,403 | 1,032 | 3.2 | 3,134 | 10.7 |
| | 69,349 | 249,267 | 167,311 | (179,918) | (72.2) | 81,956 | 49.0 |
| Loss before income taxes | $ (72,464) | $ (233,941) | $ (161,365) | $ 161,477 | 69.0 | $ (72,576) | (45.0) |

Net investment losses totaled $3.1 million in 2018 and net investment income totaled $15.3 million and $5.9 million in 2017 and 2016, respectively.  The change in net investment income for all three years was primarily attributable to fluctuations in earnings on investments associated with the Company's deferred compensation plan.

Corporate personnel costs and other operating expenses were $35.6 million, $216.6 million and $137.5 million in 2018, 2017 and 2016, respectively.  The change in personnel costs and other operating expenses for all three years was primarily attributable to pension settlement costs that the Company recognized related to the termination of its funded defined benefit pension plans of $152.4 million and $66.3 million in 2017 and 2016, respectively.

Interest expense increased $1.0 million, or 3.2%, in 2018 from 2017 and $3.1 million, or 10.7%, in 2017 from 2016.  The increase in 2018 from 2017 was due to an increase in the interest rate on borrowings under the Company's credit facility.  Borrowings under the credit facility bear interest at a variable rate, which increased in 2018 when compared to 2017.  The increase in 2017 from 2016 was due to the Company borrowing $160.0 million under its credit facility during September 2016.

## Eliminations

The Company's inter-segment eliminations were not material for the years ended December 31, 2018, 2017 and 2016.

**Income Taxes**

Income taxes differ from the amounts computed by applying the federal income tax rates of 21% for 2018 and 35.0% for 2017 and 2016. A reconciliation of these differences is as follows:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | (in thousands, except percentages) | | | | | |
| Taxes calculated at federal rate | $ 128,003 | 21.0% | $ 155,866 | 35.0% | $ 167,153 | 35.0% |
| State taxes, net of federal benefit | 9,941 | 1.6 | (872) | (0.2) | 3,703 | 0.8 |
| Change in liability for tax positions | 875 | 0.1 | (3,482) | (0.8) | (10,512) | (2.2) |
| Foreign income taxed at different rates | 7,287 | 1.2 | (6,163) | (1.3) | (7,983) | (1.7) |
| Federal tax credits | — | — | — | — | (12,265) | (2.6) |
| Tax reform impact | (6,804) | (1.1) | (129,139) | (29.0) | — | — |
| Unremitted foreign earnings | (146) | — | 14,997 | 3.3 | — | — |
| Other items, net | (5,516) | (0.9) | (7,739) | (1.7) | (5,991) | (1.2) |
| | $ 133,640 | 21.9% | $ 23,468 | 5.3% | $ 134,105 | 28.1% |

The Company's effective income tax rates (income tax expense as a percentage of income before income taxes) were 21.9% for 2018, 5.3% for 2017 and 28.1% for 2016. The differences in the effective tax rates year over year are typically due to changes in state and foreign income taxes resulting from fluctuations in the Company's noninsurance and foreign subsidiaries' contributions to pretax income and changes in the ratio of permanent differences to income before income taxes. The Company's effective tax rate for 2018 also includes a reduction in the federal tax rate from 35% to 21% as a result of the Tax Reform Act. In addition, the Company's effective tax rate for 2018 reflects the adjustment made to its initial 2017 estimates for the Tax Reform Act. The Company's effective tax rate for 2017 reflects the estimated impact of the Tax Reform Act, state tax benefits relating to the termination of the Company's pension plan, and the release of reserves relating to tax positions taken on prior year tax returns. For further discussion of the impact of the Tax Reform Act on the Company's consolidated financial statements, see Note 11 Income Taxes to the consolidated financial statements. In addition, the Company's effective tax rates for 2018 and 2017 reflected the adoption of new accounting guidance related to the accounting for share-based payment transactions, which requires, among other items, that all excess tax benefits and tax deficiencies associated with share-based payment transactions be recorded in income tax expense rather than in additional paid-in capital, as previously required. The Company's effective tax rate for 2016 reflects the resolution of certain tax authority examinations and tax credits claimed in 2016 and in prior years.

**Net Income and Net Income Attributable to the Company**

Net income and per share information are summarized as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | (in thousands, except per share amounts) | | |
| Net income attributable to the Company | $ 474,496 | $ 423,049 | $ 342,993 |
| Net income per share attributable to the Company's stockholders: | | | |
| Basic | $ 4.21 | $ 3.79 | $ 3.10 |
| Diluted | $ 4.19 | $ 3.76 | $ 3.09 |
| Weighted-average common shares outstanding: | | | |
| Basic | 112,613 | 111,668 | 110,548 |
| Diluted | 113,279 | 112,435 | 111,156 |

See Note 12 Earnings Per Share to the consolidated financial statements for further discussion of earnings per share.

**Liquidity and Capital Resources**

*Cash requirements.*   The Company generates cash primarily from the sale of its products and services and investment income.  The Company's current cash requirements include operating expenses, taxes, payments of principal and interest on its debt, capital expenditures, dividends on its common stock, and may include business acquisitions and repurchases of its common stock.  Management forecasts the cash needs of the holding company and its primary subsidiaries and regularly reviews their short-term and long-term projected sources and uses of funds, as well as the asset, liability, investment and cash flow assumptions underlying such forecasts.  Based on the Company's ability to generate cash flows from operations, its liquid-asset position and amounts available on its revolving credit facility, management believes that its resources are sufficient to satisfy its anticipated operational cash requirements and obligations for at least the next twelve months.

The substantial majority of the Company's business is dependent upon activity in the real estate and mortgage markets, which are cyclical and seasonal.  Periods of increasing interest rates and reduced mortgage financing availability generally have an adverse effect on residential real estate activity and therefore typically decrease the Company's revenues.  In contrast, periods of declining interest rates and increased mortgage financing availability generally have a positive effect on residential real estate activity, which typically increases the Company's revenues.  Residential purchase activity is typically slower in the winter months with increased volumes in the spring and summer months.  Residential refinance activity is typically more volatile than purchase activity and is highly impacted by changes in interest rates.  Commercial real estate volumes are less sensitive to changes in interest rates, but fluctuate based on local supply and demand conditions for space and mortgage financing availability.

Cash provided by operating activities totaled $793.2 million, $632.1 million and $489.4 million for the years ended December 31, 2018, 2017 and 2016, respectively, after claim payments, net of recoveries, of $450.8 million, $472.0 million and $463.0 million, respectively.  The principal nonoperating uses of cash and cash equivalents for the years ended December 31, 2018, 2017 and 2016 were purchases of debt and equity securities, dividends to common stockholders, capital expenditures and business acquisitions, and for the year ended December 31, 2018, advances and repayments under secured financing agreements.  The most significant nonoperating sources of cash and cash equivalents for the years ended December 31, 2018, 2017 and 2016 were proceeds from the sales and maturities of debt and equity securities and increases in the deposit balances at the Company's banking operations, and, for the years ended December 31, 2018 and 2016, borrowings and collections under secured financing agreements and net proceeds from the issuance of notes and contracts payable, respectively. The net effect of all activities on total cash and cash equivalents were increases of $79.9 million and $381.1 million for the years ended December 31, 2018 and 2017, respectively, and a decrease of $21.2 million for the year ended December 31, 2016.

The Company continually assesses its capital allocation strategy, including decisions relating to dividends, stock repurchases, capital expenditures, acquisitions and investments. In August 2018, the Company's board of directors approved an increase in the Company's quarterly cash dividend to 42 cents per common share, representing an 11% increase from the prior level of 38 cents per common share.  The dividend increase became effective beginning with the September 2018 dividend.  In January 2019, the Company's board of directors approved a first quarter cash dividend of 42 cents per common share.  Management expects that the Company will continue to pay quarterly cash dividends at or above the current level.  The timing, declaration and payment of future dividends, however, falls within the discretion of the Company's board of directors and will depend upon many factors, including the Company's financial condition and earnings, the capital requirements of the Company's businesses, restrictions imposed by applicable law and any other factors the board of directors deems relevant from time to time.

In March 2014, the Company's board of directors approved an increase in the size of the Company's stock repurchase plan from $150.0 million to $250.0 million, of which $163.6 million remained as of December 31, 2018. Purchases may be made from time to time by the Company in the open market at prevailing market prices or in privately negotiated transactions. During the year ended December 31, 2018, the Company repurchased and retired 425 thousand shares of its common stock for a total purchase price of $18.8 million and, as of December 31, 2018, had repurchased and retired 3.6 million shares of its common stock under the current authorization for a total purchase price of $86.4 million.  In January 2019, the Company repurchased and retired 47 thousand shares of its common stock for a total purchase price of $2.1 million.

42

*Holding company.*     First American Financial Corporation is a holding company that conducts all of its operations through its subsidiaries. The holding company's current cash requirements include payments of principal and interest on its debt, taxes, payments in connection with employee benefit plans, dividends on its common stock and other expenses. The holding company is dependent upon dividends and other payments from its operating subsidiaries to meet its cash requirements. The Company's target is to maintain a cash balance at the holding company equal to at least twelve months of estimated cash requirements. At certain points in time, the actual cash balance at the holding company may vary from this target due to, among other factors, the timing and amount of cash payments made and dividend payments received. Pursuant to insurance and other reg ulations under which the Company's insurance subsidiaries operate, the amount of dividends, loans and advances available to the holding company is limited, principally for the protection of policyholders. As of December 31, 2018, under such regulations, t he maximum amount available to the holding company from its insurance subsidiaries in 2019, without prior approval from applicable regulators, was dividends of $ 2 91.2 million and loans and advances of $ 98.6  million . However, the timing and amount of divid ends paid by the Company's insurance subsidiaries to the holding company falls within the discretion of each insurance subsidiary's board of directors and will depend upon many factors, including the level of total statutory capital and surplus required to support minimum financial strength ratings by certain rating agencies .  Such restrictions have not had, nor are they expected to have, an impact on the holding company's ability to meet its cash obligations.

The Tax Reform Act amended the Internal Revenue Code to reduce U.S. tax rates and modify policies, credits and deductions for individuals and businesses. The changes resulting from the Tax Reform Act had an overall favorable impact on the Company's effective tax rate, resulting in less cash required for tax payments, and the Company expects the Tax Reform Act will continue to have an overall favorable impact on its effective tax rate and tax payments in future periods. In addition, the Tax Reform Act moves the U.S. to a partial territorial tax system, which as a result, will reduce the tax costs associated with future distributions of earnings from foreign subsidiaries.

As of December 31, 2018, the holding company's sources of liquidity included $327.3 million of cash and cash equivalents and $540.0 million available on the Company's revolving credit facility. Management believes that liquidity at the holding company is sufficient to satisfy anticipated cash requirements and obligations for at least the next twelve months.

*Financing.*     The Company maintains a credit agreement with JPMorgan Chase Bank, N.A. in its capacity as administrative agent and the lenders party thereto. The credit agreement is comprised of a $700.0 million revolving credit facility. Unless terminated earlier, the revolving loan commitments under the credit agreement will terminate and outstanding borrowings will become due and payable on May 14, 2019. The obligations of the Company under the credit agreement are neither secured nor guaranteed. Proceeds under the credit agreement may be used for general corporate purposes. At December 31, 2018, outstanding borrowings under the facility totaled $160.0 million at an interest rate of 4.15%.

The credit agreement includes an expansion option that permits the Company, subject to satisfaction of certain conditions, to increase the revolving commitments and/or add term loan tranches ("Incremental Term Loans") in an aggregate amount not to exceed $150.0 million. Incremental Term Loans, if made, may not mature prior to the revolving commitment termination date, provided that amortization may occur prior to such date.

At the Company's election, borrowings under the credit agreement bear interest at (a) the Alternate Base Rate plus the applicable spread or (b) the Adjusted LIBOR rate plus the applicable spread (in each case as defined in the agreement). The Company may select interest periods of one, two, three or six months or (if agreed to by all lenders) such other number of months for Eurodollar borrowings of loans. The applicable spread varies depending upon the debt rating assigned by Moody's Investor Service, Inc. and/or Standard & Poor's Rating Services. The minimum applicable spread for Alternate Base Rate borrowings is 0.625% and the maximum is 1.00%. The minimum applicable spread for Adjusted LIBOR rate borrowings is 1.625% and the maximum is 2.00%. The rate of interest on Incremental Term Loans will be established at or about the time such loans are made and may differ from the rate of interest on revolving loans.

The credit agreement includes representations and warranties, reporting covenants, affirmative covenants, negative covenants, financial covenants and events of default customary for financings of this type. Upon the occurrence of an event of default the lenders may accelerate the loans. Upon the occurrence of certain insolvency and bankruptcy events of default the loans will automatically accelerate. As of December 31, 201 8 , th e Company was in compliance with the financial covenants under the credit agreement.

The Company anticipates that it will enter into a successor credit agreement prior to the current agreement's termination on May 14, 2019.  If necessary, the Company has sufficient liquidity available at its holding company to repay the outstanding balance of $160.0 million without causing significant liquidity issues.

In addition to amounts available under its credit facility, certain subsidiaries of the Company are parties to master repurchase agreements which are used as part of the Company's liquidity management activities and to support its risk management activities.  In particular, securities loaned or sold under repurchase agreements may be used as short-term funding sources. During 2018, the Company financed securities for funds received totaling $10.0 million under these agreements. As of December 31, 2018, no amounts remained outstanding under these agreements.

In addition to being a party to master repur chase agreements, the Company's federal savings bank subsidiary, First American Trust, FSB, maintains a secured line of credit with the Federal Home Loan Bank and federal funds lines of credit with certain correspondent institutions.  As of December 31, 2018, no amounts remained outstanding under any of these facilities.

The Company's debt to capitalization ratio was 17.8% and 17.4% at December 31, 2018 and 2017, respectively.  The increase in 2018 reflects the debt assumed in connection with the Company's 2018 acquisition of a specialized warehouse lender.

*Investment portfolio.*     The Company maintains a high quality, liquid investment portfolio that is primarily held at its insurance and banking subsidiaries. As of December 31, 2018, 94% of the Company's investment portfolio consisted of debt securities, of which 69% were either United States government-backed or rated AAA and 97% were either rated or classified as investment grade. Percentages are based on the estimated fair values of the securities. Credit ratings reflect published ratings obtained from globally recognized securities rating agencies.  If a security was rated differently among the rating agencies, the lowest rating was selected. For further information on the credit quality of the Company's investment portfolio at December 31, 2018, see Note 3 Debt and Equity Securities to the consolidated financial statements.

In addition to its debt and equity securities portfolio, the Company maintains certain money-market and other short-term investments.

*Capital expenditures.*     Capital expenditures are primarily related to software development costs and purchases of property and equipment and software licenses.  Capital expenditures totaled $125.5 million, $136.7 million and $132.3 million for 2018, 2017 and 2016, respectively.

44

*Contractual obligations.*   A summary of the Company's contractual obligations at December 31, 201 8 , by due date, is as follows:

| | Total | | Less than 1 year | | 1-3 years | | 3-5 years | | More than 5 years |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | | |
| Notes and contracts payable | $ | 735,038 | $ | 165,384 | $ | 10,031 | $ | 259,507 | $ | 300,116 |
| Interest on notes and contracts payable | | 129,761 | | 27,888 | | 50,604 | | 39,734 | | 11,535 |
| Secured financings payable | | 76,313 | | 76,313 | | — | | — | | — |
| Operating leases | | 334,793 | | 76,375 | | 122,879 | | 70,807 | | 64,732 |
| Deposits | | 3,786,183 | | 3,786,183 | | — | | — | | — |
| Claims losses | | 1,042,679 | | 273,255 | | 222,635 | | 151,442 | | 395,347 |
| Employee benefit plans | | 399,886 | | 14,588 | | 31,620 | | 32,741 | | 320,937 |
| | $ | 6,504,653 | $ | 4,419,986 | $ | 437,769 | $ | 554,231 | $ | 1,092,667 |

The timing of payments related to claims losses is estimated and is not set contractually. Nonetheless, based on historical claims experience, the Company anticipates the above payment patterns. Changes in future claims settlement patterns, judicial decisions, legislation, economic conditions and other factors could affect the timing and amount of actual claims payments. The timing and amount of payments in connection with employee benefit plans are based on the Company's current estimates and require the use of significant assumptions. Changes in significant assumptions could affect the amount and timing of employee benefit plan payments. The Company is not able to reasonably estimate the timing of payments, or the amount by which the liability for the Company's uncertain tax positions will increase or decrease over time; therefore the liability of $13.3 million has not been included in the contractual obligations table.

*Off-balance sheet arrangements.*   The Company administers escrow deposits and trust assets as a service to its customers. Escrow deposits totaled $7.6 billion and $7.5 billion at December 31, 2018 and 2017, respectively, of which $3.6 billion and $2.9 billion, respectively, were held at First American Trust, FSB. The escrow deposits held at First American Trust, FSB are temporarily invested in cash and cash equivalents and debt securities, with offsetting liabilities included in deposits in the accompanying consolidated balance sheets. The remaining escrow deposits were held at third-party financial institutions.

Trust assets held or managed by First American Trust, FSB totaled $3.6 billion and $3.7 billion at December 31, 2018 and 2017, respectively. Escrow deposits held at third-party financial institutions and trust assets are not considered assets of the Company and, therefore, are not included in the accompanying consolidated balance sheets. However, the Company could be held contingently liable for the disposition of these assets.

In conducting its operations, the Company often holds customers' assets in escrow, pending completion of real estate transactions and, as a result, the Company has ongoing programs for realizing economic benefits with various financial institutions. The results from these programs are included as income or a reduction in expense, as appropriate, in the consolidated statements of income based on the nature of the arrangement and benefit received.

The Company facilitates tax-deferred property exchanges for customers pursuant to Section 1031 of the Internal Revenue Code and tax-deferred reverse exchanges pursuant to Revenue Procedure 2000-37. As a facilitator and intermediary, the Company holds the proceeds from sales transactions and takes temporary title to property identified by the customer to be acquired with such proceeds. Upon the completion of each such exchange, the identified property is transferred to the customer or, if the exchange does not take place, an amount equal to the sales proceeds or, in the case of a reverse exchange, title to the property held by the Company is transferred to the customer. Like-kind exchange funds held by the Company totaled $2.7 billion and $2.6 billion at December 31, 2018 and 2017, respectively. The like-kind exchange deposits are held at third-party financial institutions and, due to the structure utilized to facilitate these transactions, the proceeds and property are not considered assets of the Company and, therefore, are not included in the accompanying consolidated balance sheets. All such amounts are placed in deposit accounts insured, up to applicable limits, by the Federal Deposit Insurance Corporation. The Company could be held contingently liable to the customer for the transfers of property, disbursements of proceeds and the returns on such proceeds.

**Item 7A.**          **Quantitative and Qualitative Disclosures About Market Risk**

The Company's assets and liabilities include financial instruments subject to the risk of loss from adverse changes in market rates and prices.  The Company's primary market risk exposures relate to interest rate risk, equity price risk, foreign currency risk and credit risk.

The Company manages its primary market risk exposures through an investment committee made up of certain senior executives which is advised by an experienced investment management staff.

While the hypothetical scenarios below are considered to be near-term reasonably possible changes demonstrating potential risk, they are for illustrative purposes only and do not reflect the Company's expectations about future market changes.

**Interest Rate Risk**

The Company monitors its risk associated with fluctuations in interest rates and makes investment decisions to manage accordingly. The Company does not currently use derivative financial instruments in any material amount to hedge these risks.

The Company's exposure to interest rate changes primarily results from the Company's significant portfolio of debt securities, which includes a high proportion of fixed income securities, and from its financing activities. In general, the fair value of fixed income securities increases or decreases inversely with changes in market interest rates.  The Company also considers its investments in preferred stock to be exposed to interest rate risk.  The fair values of the Company's debt securities portfolio at December 31, 2018 and 2017 were $5.7 billion and $4.8 billion, respectively.  One means of assessing the exposure of the Company's debt securities portfolio to interest rate changes is a duration-based analysis that measures the potential changes in fair value resulting from a hypothetical parallel and instantaneous shift in interest rates across all maturities.  Under this model, with all other factors held constant, the Company estimates that increases in interest rates of 100 and 200 basis points could cause the fair value of its debt securities portfolio (including investments in preferred stock) at December 31, 2018 to decrease by approximately $198 million, or 3.5%, and $408 million, or 7.1%, respectively, and at December 31, 2017 to decrease by approximately $172 million, or 3.6%, and $344 million, or 7.2%, respectively.

With respect to adjustable-rate debt, the Company is primarily exposed to the effects of changes in prevailing interest rates through its variable rate credit facility and its interest bearing escrow deposit liabilities.  As of December 31, 2018 and 2017, the Company had $160.0 million outstanding under its credit facility.  Assuming the full utilization of available funds under the facility of $700.0 million at December 31, 2018 and 2017, and assuming that the borrowings were outstanding for the entire year, increases of 50 and 100 basis points in the prevailing interest rate on the Company's credit facility would result in increases in interest expense of $3.5 million and $7.0 million for 2018 and 2017.

The Company's interest bearing escrow deposit liabilities totaled $2.5 billion and $2.1 billion at December 31, 2018 and 2017, respectively.  These variable rate customer savings accounts are subject to market rate fluctuations.  The weighted-average interest rate was 0.12% and 0.10% for 2018 and 2017, respectively.  Assuming increases in interest rates of 25 and 50 basis points and that the deposit amounts at December 31, 2018 and 2017 are held constant for the entire year, interest expense for 2018 would be higher by $6.2 million and $12.5 million, respectively, and 2017 would be higher by $5.1 million and $10.3 million, respectively.

**Equity Price Risk**

The Company is also subject to equity price risk related to its equity securities portfolio. The fair value of the Company's equity securities portfolio (excluding preferred stock of $14.2 million and $19.0 million) was $339.4 million and $447.5 million as of December 31, 2018 and 2017, respectively.  Assuming broad-based declines in equity market prices of 10% and 20%, with all other factors held constant, the fair value of the Company's equity securities at December 31, 2018 could decrease by $33.9 million and $67.9 million, respectively, and at December 31, 2017 could decrease by $44.8 million and $89.5 million, respectively.

**Foreign Currency Risk**

Although the Company has exchange rate risk for its operations in certain foreign countries, this risk is not material to the Company's financial condition or results of operations. The Company does not currently use derivative financial instruments in any material amount to hedge its foreign exchange risk.

**Credit Risk**

The Company's debt securities portfolio is subject to credit risk. The Company manages its credit risk through actively monitoring issuer financial reports, credit spreads, security pricing and credit rating migration. Further, diversification and concentration limits by asset type and credit rating are established and monitored by the Company's investment committee.

The Company holds a large concentration in U.S. government agency securities, including agency mortgage-backed securities. In the event of discontinued U.S. government support of its federal agencies, material credit risk could be observed in the portfolio. The Company views that scenario as unlikely but possible. The federal government currently is considering various alternatives to reform the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). The nature and timing of the reforms is unknown, however, the federal government reiterated its commitment to ensuring that Fannie Mae and Freddie Mac have sufficient capital to perform under any guarantees issued now, or in the future, and the ability to meet any of their debt obligations.

The Company's overall investment securities portfolio maintains an average credit quality of AA. For further information on the credit quality of the Company's investment portfolio at December 31, 2018, see Note 3 Debt and Equity Securities to the consolidated financial statements.

47

**Item 8.**          **Financial Statements and Supplementary Data**

<div align="center">

**INDEX**

</div>

|  | Page No. |
|---|---|
| Report of Independent Registered Public Accounting Firm | 49 |
| Financial Statements: | |
|     Consolidated Balance Sheets as of December 31, 2018 and 2017 | 51 |
|     Consolidated Statements of Income for the years ended December 31, 2018, 2017 and 2016 | 52 |
|     Consolidated Statements of Comprehensive Income for the years ended December 31, 2018, 2017 and 2016 | 53 |
|     Consolidated Statements of Equity for the years ended December 31, 2018, 2017 and 2016 | 54 |
|     Consolidated Statements of Cash Flows for the years ended December 31, 2018, 2017 and 2016 | 55 |
|     Notes to Consolidated Financial Statements | 56 |
| Unaudited Quarterly Financial Data | 102 |
| Financial Statement Schedules: | |
|     I.    Summary of Investments—Other than Investments in Related Parties as of December 31, 2018 | 103 |
|     II.    Condensed Financial Information of Registrant as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016 | 104 |
|     III.    Supplementary Insurance Information as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016 | 109 |
|     IV.    Reinsurance for the years ended December 31, 2018, 2017 and 2016 | 111 |
|     V.    Valuation and Qualifying Accounts for the years ended December 31, 2018, 2017 and 2016 | 112 |

Financial statement schedules not listed are either omitted because they are not applicable or the required information is shown in the consolidated financial statements or in the notes thereto.

<div align="center">

48

</div>

**Report of Independent Registered Public Acco unting Firm**

To the Board of Directors and Stockholders of
First American Financial Corporation

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of First American Financial Corporation and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of income, comprehensive income, equity and cash flows for each of the three years in the period ended December 31, 2018, including the related notes and financial statement schedules listed in the accompanying index (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018 based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

*Change in Accounting Principle*

As discussed in Note 1 to the consolidated financial statements, the Company changed the manner in which it accounts for unrealized gains and losses associated with equity securities and the manner in which it accounts for other components of net periodic pension and postretirement benefit cost in 2018.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

49

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PRICEWATERHOUSECOOPERS LLP
Los Angeles, California
February 20, 2019

We have served as the Company's auditor since 2009.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except par values)**

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 1,467,129 | $ 1,387,226 |
| Accounts and accrued income receivable, less allowances of $22,841 and $23,066 | 325,686 | 311,084 |
| Income taxes receivable | 11,007 | 38,673 |
| Investments: | | |
| Deposits with banks | 36,209 | 41,335 |
| Debt securities, includes pledged securities of $110,975 and $108,427 | 5,713,811 | 4,752,684 |
| Equity securities | 353,535 | 466,516 |
| Other investments | 121,965 | 117,768 |
| | 6,225,520 | 5,378,303 |
| Secured financings receivable | 76,311 | — |
| Property and equipment, net | 457,840 | 439,569 |
| Title plants and other indexes | 577,467 | 568,452 |
| Deferred income taxes | 16,636 | 22,803 |
| Goodwill | 1,144,166 | 1,113,005 |
| Other intangible assets, net | 109,372 | 99,913 |
| Other assets | 219,501 | 214,194 |
| | $ 10,630,635 | $ 9,573,222 |
| **LIABILITIES AND EQUITY** | | |
| Deposits | $ 3,786,183 | $ 3,070,566 |
| Accounts payable and accrued liabilities: | | |
| Accounts payable | 47,079 | 68,460 |
| Personnel costs | 199,711 | 194,357 |
| Pension costs and other retirement plans | 386,264 | 401,083 |
| Other | 145,634 | 129,257 |
| | 778,688 | 793,157 |
| Deferred revenue | 243,280 | 240,822 |
| Reserve for known and incurred but not reported claims | 1,042,679 | 1,028,933 |
| Income taxes payable | 8,988 | 4,602 |
| Deferred income taxes | 217,097 | 219,307 |
| Secured financings payable | 76,313 | — |
| Notes and contracts payable | 732,019 | 732,810 |
| | 6,885,247 | 6,090,197 |
| Commitments and contingencies (Notes 18 and 19) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.00001 par value; Authorized—500 shares; | | |
| Outstanding—none | — | — |
| Common stock, $0.00001 par value; Authorized—300,000 shares; | | |
| Outstanding—111,496 shares and 110,925 shares | 1 | 1 |
| Additional paid-in capital | 2,258,290 | 2,236,351 |
| Retained earnings | 1,644,165 | 1,311,112 |
| Accumulated other comprehensive loss | (160,575) | (67,509) |
| Total stockholders' equity | 3,741,881 | 3,479,955 |
| Noncontrolling interests | 3,507 | 3,070 |
| Total equity | 3,745,388 | 3,483,025 |
| | $ 10,630,635 | $ 9,573,222 |

See Notes to Consolidated Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**CONSOLIDATED STATEMENTS OF INCOME**
**(in thousands, except per share amounts)**

| | | Year Ended December 31, | |
| --- | ---: | ---: | ---: |
| | 2018 | 2017 | 2016 |
| *Revenues:* | | | |
| Direct premiums and escrow fees | $ 2,507,669 | $ 2,461,854 | $ 2,416,039 |
| Agent premiums | 2,284,906 | 2,360,659 | 2,286,630 |
| Information and other | 781,467 | 776,214 | 723,990 |
| Net investment income | 230,289 | 162,402 | 126,134 |
| Net realized investment (losses) gains | (56,487) | 11,234 | 23,053 |
| | 5,747,844 | 5,772,363 | 5,575,846 |
| *Expenses:* | | | |
| Personnel costs | 1,748,949 | 1,723,539 | 1,655,164 |
| Premiums retained by agents | 1,799,836 | 1,863,356 | 1,801,571 |
| Other operating expenses | 900,208 | 1,055,886 | 955,310 |
| Provision for policy losses and other claims | 452,633 | 450,410 | 488,601 |
| Depreciation and amortization | 125,927 | 128,053 | 99,047 |
| Premium taxes | 69,775 | 69,801 | 66,358 |
| Interest | 40,978 | 35,987 | 32,214 |
| | 5,138,306 | 5,327,032 | 5,098,265 |
| Income before income taxes | 609,538 | 445,331 | 477,581 |
| Income taxes | 133,640 | 23,468 | 134,105 |
| Net income | 475,898 | 421,863 | 343,476 |
| Less: Net income (loss) attributable to noncontrolling interests | 1,402 | (1,186) | 483 |
| Net income attributable to the Company | $ 474,496 | $ 423,049 | $ 342,993 |
| Net income per share attributable to the Company's stockholders: | | | |
| Basic | $ 4.21 | $ 3.79 | $ 3.10 |
| Diluted | $ 4.19 | $ 3.76 | $ 3.09 |
| Cash dividends declared per share | $ 1.60 | $ 1.44 | $ 1.20 |
| Weighted-average common shares outstanding: | | | |
| Basic | 112,613 | 111,668 | 110,548 |
| Diluted | 113,279 | 112,435 | 111,156 |

See Notes to Consolidated Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Net income | $ 475,898 | $ 421,863 | $ 343,476 |
| Other comprehensive income (loss), net of tax: | | | |
|     Unrealized (losses) gains on securities | (38,418) | 63,563 | (10,359) |
|     Foreign currency translation adjustment | (26,796) | 24,744 | (6,334) |
|     Pension benefit adjustment | 12,680 | 74,597 | 25,300 |
| Total other comprehensive (loss) income, net of tax | (52,534) | 162,904 | 8,607 |
| Comprehensive income | 423,364 | 584,767 | 352,083 |
| Less: Comprehensive income (loss) attributable to noncontrolling interests | 1,384 | (1,173) | 487 |
| Comprehensive income attributable to the Company | $ 421,980 | $ 585,940 | $ 351,596 |

See Notes to Consolidated Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**CONSOLIDATED STATEMENTS OF EQUITY**
**(in thousands)**

| | First American Financial Corporation Stockholders | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Common stock | Additional paid-in capital | Retained earnings | Accumulated other comprehensive loss | Total stockholders' equity | Noncontrolling interests | Total |
| Balance at December 31, 2015 | 109,098 | $ 1 | $ 2,150,813 | $ 838,149 | $ (239,003) | $ 2,749,960 | $ 3,163 | $ 2,753,123 |
| Net income for 2016 | — | — | — | 342,993 | — | 342,993 | 483 | 343,476 |
| Dividends on common shares | — | — | — | (131,541) | — | (131,541) | — | (131,541) |
| Purchase of Company shares | (14) | — | (454) | — | — | (454) | — | (454) |
| Shares issued in connection with share-based compensation | 860 | — | 7,298 | (2,779) | — | 4,519 | — | 4,519 |
| Share-based compensation | — | — | 34,125 | — | — | 34,125 | — | 34,125 |
| Net activity related to noncontrolling interests | — | — | (26) | — | — | (26) | 2,520 | 2,494 |
| Other comprehensive income | — | — | — | — | 8,603 | 8,603 | 4 | 8,607 |
| Balance at December 31, 2016 | 109,944 | 1 | 2,191,756 | 1,046,822 | (230,400) | 3,008,179 | 6,170 | 3,014,349 |
| Net income (loss) for 2017 | — | — | — | 423,049 | — | 423,049 | (1,186) | 421,863 |
| Dividends on common shares | — | — | — | (159,284) | — | (159,284) | — | (159,284) |
| Shares issued in connection with share-based compensation | 981 | — | 6,226 | (3,494) | — | 2,732 | — | 2,732 |
| Share-based compensation | — | — | 37,399 | — | — | 37,399 | — | 37,399 |
| Net activity related to noncontrolling interests | — | — | 970 | — | — | 970 | (1,927) | (957) |
| Other | — | — | — | 4,019 | — | 4,019 | — | 4,019 |
| Other comprehensive income | — | — | — | — | 162,891 | 162,891 | 13 | 162,904 |
| Balance at December 31, 2017 | 110,925 | 1 | 2,236,351 | 1,311,112 | (67,509) | 3,479,955 | 3,070 | 3,483,025 |
| Cumulative effect adjustment (Note 1) | — | — | — | 40,550 | (40,550) | — | — | — |
| Net income for 2018 | — | — | — | 474,496 | — | 474,496 | 1,402 | 475,898 |
| Dividends on common shares | — | — | — | (178,487) | — | (178,487) | — | (178,487) |
| Purchase of Company shares | (425) | — | (18,801) | — | — | (18,801) | — | (18,801) |
| Shares issued in connection with share-based compensation | 996 | — | (599) | (3,506) | — | (4,105) | — | (4,105) |
| Share-based compensation | — | — | 41,145 | — | — | 41,145 | — | 41,145 |
| Net activity related to noncontrolling interests | — | — | 194 | — | — | 194 | (947) | (753) |
| Other comprehensive loss | — | — | — | — | (52,516) | (52,516) | (18) | (52,534) |
| Balance at December 31, 2018 | 111,496 | $ 1 | $ 2,258,290 | $ 1,644,165 | $ (160,575) | $ 3,741,881 | $ 3,507 | $ 3,745,388 |

See Notes to Consolidated Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | | Year Ended December 31, | |
| --- | ---: | ---: | ---: |
| | **2018** | **2017** | **2016** |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income | $ 475,898 | $ 421,863 | $ 343,476 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Provision for policy losses and other claims | 452,633 | 450,410 | 488,601 |
| Depreciation and amortization | 125,927 | 128,053 | 99,047 |
| Amortization of premiums and accretion of discounts on debt securities, net | 26,994 | 31,211 | 28,325 |
| Excess tax benefits from share-based compensation | | | (3,415) |
| Net realized investment losses (gains) | 56,487 | (11,234) | (23,053) |
| Share-based compensation | 41,145 | 37,399 | 34,125 |
| Equity in earnings of affiliates, net | (2,717) | (3,785) | (8,173) |
| Dividends from equity method investments | 4,909 | 11,083 | 10,023 |
| Changes in assets and liabilities excluding effects of acquisitions and noncash transactions: | | | |
| Claims paid, including assets acquired, net of recoveries | (450,756) | (472,047) | (462,999) |
| Net change in income tax accounts | 42,079 | (102,819) | 17,601 |
| Decrease (increase) in accounts and accrued income receivable | 5,264 | 12,426 | (10,017) |
| Increase (decrease) in accounts payable and accrued liabilities | 15,303 | 127,683 | (29,339) |
| Increase in deferred revenue | 2,741 | 10,238 | 21,534 |
| Other, net | (2,742) | (8,347) | (16,320) |
| Cash provided by operating activities | 793,165 | 632,134 | 489,416 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Net cash effect of acquisitions/dispositions | (79,171) | (82,993) | (106,719) |
| Net decrease (increase) in deposits with banks | 3,361 | (18,319) | 712 |
| Purchases of debt and equity securities | (3,157,893) | (1,970,597) | (2,062,743) |
| Proceeds from sales of debt and equity securities | 1,501,402 | 1,163,765 | 731,146 |
| Proceeds from maturities of debt securities | 640,558 | 641,442 | 948,257 |
| Net change in other investments | (6,792) | 3,763 | 2,244 |
| Advances under secured financing agreements | (2,380,878) | | |
| Collections of secured financings receivable | 2,374,329 | | |
| Capital expenditures | (118,170) | (134,206) | (132,265) |
| Proceeds from sales of property and equipment | 2,630 | 9,977 | 9,220 |
| Cash used for investing activities | (1,220,624) | (387,168) | (610,148) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Net change in deposits | 715,617 | 291,088 | 80,463 |
| Borrowings under secured financing agreements | 2,380,976 | — | — |
| Repayments of secured financings payable | (2,374,426) | — | — |
| Net proceeds from issuance of notes and contracts payable | | — | 160,000 |
| Repayment of notes and contracts payable | (5,294) | (5,543) | (5,171) |
| Net activity related to noncontrolling interests | (745) | (969) | (1,029) |
| Excess tax benefits from share-based compensation | | — | 3,415 |
| Net (payments) proceeds in connection with share-based compensation | (4,105) | 2,732 | 1,104 |
| Purchase of Company shares | (18,801) | | (454) |
| Payments of cash dividends | (178,487) | (159,284) | (131,541) |
| Cash provided by financing activities | 514,735 | 128,024 | 106,787 |
| Effect of exchange rate changes on cash | (7,373) | 8,098 | (7,238) |
| Net increase (decrease) in cash and cash equivalents | 79,903 | 381,088 | (21,183) |
| Cash and cash equivalents—Beginning of year | 1,387,226 | 1,006,138 | 1,027,321 |
| Cash and cash equivalents—End of year | $ 1,467,129 | $ 1,387,226 | $ 1,006,138 |
| SUPPLEMENTAL INFORMATION: | | | |
| Cash paid during the year for: | | | |
| Interest | $ 39,183 | $ 33,680 | $ 30,125 |
| Premium taxes | $ 68,526 | $ 66,785 | $ 65,506 |
| Income taxes, less refunds of $7,255, $52,153 and $4,055 | $ 91,745 | $ 126,208 | $ 116,309 |

See Notes to Consolidated Financial Statements

FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1.**        **Basis of Presentation and Significant Accounting Policies:**

First American Financial Corporation (the "Company"), through its subsidiaries, is engaged in the business of providing financial services. The Company consists of the following reportable segments and a corporate function:

- The Company's title insurance and services segment issues title insurance policies on residential and commercial property in the United States and offers similar or related products and services internationally.   This segment also provides closing and/or escrow services; accommodates tax-deferred exchanges of real estate; provides products, services and solutions designed to mitigate risk or otherwise facilitate real estate transactions, many of which products, services and solutions involve the use of real property-related data; maintains, manages and provides access to title plant records and images; and provides appraisals and other valuation-related products and services, lien release and document custodial services, warehouse lending services, default-related products and services, evidence of title, and banking, trust and wealth management services.  The Company, through its principal title insurance subsidiary and such subsidiary's affiliates, transacts its title insurance business through a network of direct operations and agents.  Through this network, the Company issues policies in the 49 states that permit the issuance of title insurance policies, the District of Columbia and certain United States territories.  The Company also offers title insurance, closing services and similar or related products and services, either directly or through third parties in other countries, including Canada, the United Kingdom, Australia, South Korea and various other established and emerging markets.

- The Company's specialty insurance segment issues property and casualty insurance policies and sells home warranty products.  The property and casualty insurance business provides insurance coverage to residential homeowners and renters for liability losses and typical hazards such as fire, theft, vandalism and other types of property damage.  This business is licensed to issue policies in all 50 states and the District of Columbia and actively issues policies in 47 states.  The majority of policy liability is in the western United States, including approximately 62% in California.  In certain markets it also offers preferred risk auto insurance to better compete with other carriers offering bundled home and auto insurance.  The home warranty business provides residential service contracts that cover residential systems, such as heating and air conditioning systems, and certain appliances against failures that occur as the result of normal usage during the coverage period.  This business currently operates in 36 states and the District of Columbia.

The corporate function consists primarily of certain financing facilities as well as the corporate services that support the Company's business operations.

*Principles of Consolidation*

The consolidated financial statements have been prepared in accordance with generally accepted accounting principles ("GAAP") and reflect the consolidated operations of the Company. The consolidated financial statements include the accounts of First American Financial Corporation and all controlled subsidiaries. All significant intercompany transactions and balances have been eliminated. Equity investments in which the Company exercises significant influence, but does not control and is not the primary beneficiary, are accounted for using the equity method. Equity investments in which the Company does not exercise significant influence over the investee and without readily determinable fair values, are accounted for at cost, less impairment and are adjusted for any observable price changes.

O *ut-of-period adjustments*

During 2017, the Company identified certain uncollectible balances related to fees within its title insurance and services segment, which primarily related to reporting periods prior to 2016, that should have been previously written off.  To correct for this error, the Company recorded an adjustment in 2017, which increased other operating expenses and increased accounts payable and accrued liabilities by $8.5 million.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Also, during 2017, t he Company identified certain title plant assets within its title insurance and services segment that should have been previously written off, and certain title plant imaging assets that were misclassified as title plant assets.  To correct for these error s, the Company recorded adjustments in 2017 to net realized investment gains, depreciation and amortization and title plants and other indexes.  The impact of these adjustments included an increase to depreciation and amortization of $4.7 million, a decrease to net realized investment gains of $1.8 million and a decrease to title plant and other indexes of $6.5 million.

The Company does not consider these adjustments to be material, individually or in the aggregate, to any previously issued consolidated financial statements.

*Use of estimates*

The preparation of financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the statements. Actual results could differ from the estimates and assumptions used.

*Cash equivalents*

The Company considers cash equivalents to be all short-term investments that have an initial maturity of 90 days or less and are not restricted for statutory deposit or premium reserve requirements.

*Accounts and accrued income receivable*

Accounts and accrued income receivable are generally due within thirty days and are recorded net of an allowance for doubtful accounts. The Company considers accounts outstanding longer than the contractual payment terms as past due. The Company determines the allowance by considering a number of factors, including the length of time trade accounts receivable are past due, previous loss history, a specific customer's ability to pay its obligations to the Company and the condition of the general economy and industry as a whole. Amounts are charged off in the period in which they are deemed to be uncollectible.

*Investments*

*Deposits with banks*

Deposits with banks are short-term investments with initial maturities of generally more than 90 days.

*Debt securities*

Debt securities are carried at fair value and consist primarily of investments in obligations of the United States Treasury, foreign governments, various U.S. and foreign corporations, certain state and political subdivisions and mortgage-backed securities. The Company classifies its publicly traded debt securities as available-for-sale with unrealized gains or losses recorded as a component of accumulated other comprehensive loss.

The Company maintains investments in debt securities in accordance with certain statutory requirements for the funding of statutory premium reserves and state deposits. At December 31, 2018 and 2017, the fair values of such investments totaled $111.0 million and $108.4 million, respectively. See Note 2 Statutory Restrictions on Investments and Stockholders' Equity for additional discussion of the Company's statutory restrictions.

Interest income, as well as the related amortization of premium and accretion of discount, on debt securities are recognized under the effective yield method and are included in the accompanying consolidated statements of income in net investment income. Realized gains and losses on sales of debt securities are determined on a first-in, first-out basis.

The Company evaluates its debt securities with unrealized losses on a quarterly basis for potential other-than-temporary impairments in value.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

If the Company intends to sell a debt security in an unrealized loss position or determines that it is more likely than not that the Company will be required to sell a debt security before it recovers its amortized cost basis, the debt security is other-than-temporarily impaired and it is written down to fair value with all losses recognized in earnings. As of December 31, 201 8 , the Company did not i ntend to sell any debt securities in an unrealized loss position and it is not more likely than not that the Company will be required to sell any debt securities before recovery of their amortized cost basis.

If the Company does not expect to recover the amortized cost basis of a debt security with declines in fair value (even if the Company does not intend to sell the debt security and it is not more likely than not that the Company will be required to sell the debt security), the loss is considered an other-than-temporary impairment loss and the credit portion of the loss ("credit loss") is recognized in earnings and the non-credit portion is recognized in other comprehensive income. The credit loss is the difference between the present value of the cash flows expected to be collected and the amortized cost basis of the debt security. The cash flows expected to be collected are discounted at the rate implicit in the security immediately prior to the recognition of the other-than-temporary impairment.

Expected future cash flows for debt securities are based on qualitative and quantitative factors specific to each security, including the probability of default and the estimated timing and amount of recovery. The detailed inputs used to project expected future cash flows may be different depending on the nature of the individual debt security.

As a result of its security-level review, the Company did not recognize any other-than-temporary impairment losses considered to be credit related for the years ended December 31, 2018 and 2017 and recognized $0.5 million of other-than-temporary impairment losses considered to be credit related for the year ended December 31, 2016. It is possible that the Company could recognize additional other-than-temporary impairment losses on securities it owns at December 31, 2018 if future events or information cause it to determine that a decline in fair value is other-than-temporary.

*Equity securities*

Equity securities are carried at fair value and consist primarily of investments in exchange traded funds, mutual funds and marketable common and preferred stocks of corporate entities.

The Company adopted new accounting guidance on January 1, 2018, which requires investments in equity securities with readily determinable fair values to be measured at fair value with changes in fair value recognized through net income.  See Recently Adopted Accounting Pronouncements within this note for further discussion of the new guidance.

*Other investments*

Other investments consist primarily of equity investments in which the Company exercises significant influence, but does not control and is not the primary beneficiary; equity investments in which the Company does not exercise significant influence over the investee and without readily determinable fair values; investments in real estate; and notes receivable.

Equity investments in which the Company exercises significant influence, but does not control and is not the primary beneficiary, are accounted for under the equity method of accounting.  These investments are initially measured at cost and are generally adjusted by the Company's share of equity in the income or losses of the investee.  The carrying value of these investments is written down, or impaired, to fair value when a decline in value is considered to be other-than-temporary. In making the determination as to whether an individual investment is impaired, the Company assesses the current and expected financial condition of each relevant entity, including, but not limited to, the anticipated ability of the entity to make its contractually required payments to the Company (with respect to debt obligations to the Company), the results of valuation work performed with respect to the entity, the entity's anticipated ability to generate sufficient cash flows and the market conditions in the industry in which the entity is operating.

Equity investments in which the Company does not exercise significant influence over the investee and without readily determinable fair values are measured at cost, less impairment and are adjusted for any observable price changes.

Investments in real estate are classified as held for sale and carried at the lower of cost or fair value, less estimated selling costs.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Notes receivable are carried at cost, le ss reserves for losses. Loss reserves are established for notes receivable based upon an estimate of probable losses for the individual notes. A loss reserve is established on an individual note when it is deemed probable that the Company will be unable to collect all amounts due in accordance with the contractual terms of the note. The loss reserve is based upon the Company's assessment of the borrower's overall financial condition, resources and payment record; and, if appropriate, the realizable value of any collateral. These estimates consider all available evidence including the expected future cash flows, estimated fair value of collateral on secured notes, general economic conditions and trends, and other relevant factors, as appropriate. Notes a re placed on non-accrual status when management determines that the collectibility of contractual amounts is not reasonably assured.

*Secured financings receivable and payable*

Secured financings receivable, which reflect financing transactions with correspondent mortgage lenders involved in residential real estate lending, are collateralized by mortgages on residential real estate. Collections of the receivable balance occur upon sale of the underlying mortgage loan to investors, generally within 30 days and more typically in less than 10 days. Secured financings receivable is stated at the principal balance outstanding and no allowance for doubtful accounts is maintained as the receivable balance is generally considered fully collectible. Interest income is recorded on an accrual basis during the period the principal balance remains outstanding.

Secured financings payable reflect borrowings under secured warehouse lending facilities with several banking institutions. Repayment of the warehouse borrowing occurs upon sale of the mortgage loan to investors as noted above. Interest expense is recorded during the period the borrowing remains outstanding.

See Note 20 Business Combinations for further information about the Company's 2018 acquisition of a specialized warehouse lender.

*Property and equipment*

Buildings and furniture and equipment are initially recorded at cost and are generally depreciated using the straight-line method over estimated useful lives ranging from 5 to 40 years and from 1 to 15 years, respectively. Leasehold improvements are initially recorded at cost and are amortized over the lesser of the remaining term of the respective lease or the estimated useful life, using the straight-line method. Computer software, which is acquired or developed for internal use and for use with the Company's products, is amortized over estimated useful lives ranging from 1 to 15 years using the straight-line method. Software development costs, which include certain payroll-related costs of employees directly associated with developing software in addition to incremental payments to third parties, are capitalized from the time technological feasibility is established until the software is ready for use.

Management uses estimated future cash flows (undiscounted and excluding interest) to measure the recoverability of property and equipment whenever events or changes in circumstances indicate that the carrying value may not be fully recoverable. If the undiscounted cash flow analysis indicates that the carrying amount is not recoverable, an impairment loss is recorded for the excess of the carrying amount over its fair value. Impairment losses on property and equipment, which primarily related to impairments of internally developed software, were $41 thousand, $0.5 million and $5.2 million for the years ended December 31, 2018, 2017 and 2016, respectively.

*Title plants and other indexes*

Title plants and other indexes included title plants of $530.4 million and $526.2 million and capitalized real estate data of $47.1 million and $42.3 million at December 31, 2018 and 2017, respectively. Title plants are carried at cost, with the costs of daily maintenance (updating) charged to expense as incurred. Because properly maintained title plants have indefinite lives and do not diminish in value with the passage of time, no provision has been made for depreciation or amortization. The Company analyzes its title plants at least annually for impairment. This analysis includes, but is not limited to, the effects of obsolescence, duplication, demand and other economic factors. Capitalized real estate data is initially recorded at cost and is amortized using the straight-line method over estimated useful lives ranging from 5 to 15 years.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Business Combinations*

Amounts paid for acquisitions are allocated to the tangible and intangible assets acquired and liabilities assumed, and are based on their estimated fair values at the date of acquisition. The excess of the fair value of purchase consideration over the fair values of the identifiable assets and liabilities is recorded as goodwill . Acquisition-related costs are expensed in the periods in which the costs are incurred. The results of operations of acquired businesses are included in the consolidated financial statements from the date of acquisition.

*Goodwill Impairment*

The Company is required to perform an annual goodwill impairment assessment for each reporting unit for which goodwill has been allocated. Those reporting units include title insurance, home warranty and property and casualty insurance.  The Company's trust and other services reporting unit has no allocated goodwill and is, therefore, not assessed for impairment. The Company has elected to perform this annual assessment in the fourth quarter of each fiscal year or sooner if circumstances indicate possible impairment. Based on accounting guidance, the Company has the option to perform a qualitative assessment to determine if the fair value is more likely than not (i.e., a likelihood of greater than 50%) less than the carrying amount as a basis for determining whether it is necessary to perform a quantitative impairment test, or may choose to forego a qualitative assessment and perform a quantitative impairment test. The qualitative factors considered in this assessment may include macroeconomic conditions, industry and market considerations, overall financial performance as well as other relevant events and circumstances as determined by the Company. The Company evaluates the weight of each factor to determine whether it is more likely than not that impairment may exist. If the results of the qualitative assessment indicate the more likely than not threshold was not met, the Company may choose not to perform the quantitative impairment test. If, however, the more likely than not threshold is met, the Company will perform a quantitative test as required and discussed below.

Management's quantitative impairment testing process includes two steps. The first step ("Step 1") compares the fair value of each reporting unit to its carrying amount. The fair value of each reporting unit is determined by using discounted cash flow analysis and market approach valuations. If the fair value of the reporting unit exceeds its carrying amount, the goodwill is not considered impaired and no additional analysis is required. However, if the carrying amount is greater than the fair value, a second step ("Step 2") must be completed to determine if the fair value of the goodwill exceeds the carrying amount of goodwill.

Step 2 involves calculating an implied fair value of goodwill for each reporting unit for which Step 1 indicated impairment. The implied fair value of goodwill is determined in a manner similar to the amount of goodwill calculated in a business combination, by measuring the excess of the estimated fair value of the reporting unit, as determined in Step 1, over the aggregate estimated fair values of the individual assets, liabilities and identifiable intangibles as if the reporting unit was being acquired in a business combination. If the implied fair value of goodwill exceeds the carrying value of goodwill assigned to the reporting unit, there is no impairment. If the carrying value of goodwill assigned to a reporting unit exceeds the implied fair value of the goodwill, an impairment loss is recorded for the excess. An impairment loss cannot exceed the carrying value of goodwill assigned to a reporting unit, and the loss establishes a new basis in the goodwill. Subsequent reversal of goodwill impairment losses is not permitted.

The quantitative impairment test for goodwill utilizes a variety of valuation techniques, all of which require the Company to make estimates and judgments. Fair value is determined by employing an expected present value technique, which utilizes expected cash flows and an appropriate discount rate. The use of comparative market multiples (the "market approach") compares the reporting unit to other comparable companies (if such comparables are present in the marketplace) based on valuation multiples to arrive at a fair value. In assessing the fair value, the Company utilizes the results of the valuations (including the market approach to the extent comparables are available) and considers the range of fair values determined under all methods and the extent to which the fair value exceeds the carrying amount of the reporting unit.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The valuation of each reporting unit includes the use of assumptions and estimates of many critical factors, including revenue growth rates and operating m argins, discount rates and future market conditions, determination of market multiples and the establishment of a control premium, among others. Forecasts of future operations are based, in part, on operating results and the Company's expectations as to f uture market conditions. These types of analyses contain uncertainties because they require the Company to make assumptions and to apply judgments to estimate industry economic factors and the profitability of future business strategies. However, if actu al results are not consistent with the Company's estimates and assumptions, the Company may be exposed to future impairment losses that could be material.

For 2018 and 2017, the Company chose to perform qualitative assessments for its title insurance and home warranty reporting units and performed a quantitative impairment test for its property and casualty insurance reporting unit.  Based on the results of its quantitative impairment tests for 2018 and 2017, the Company determined that the fair value of its property and casualty insurance reporting unit exceeded the carrying amount and, therefore, no additional analysis was required.  The results of the Company's qualitative assessments for its title insurance and home warranty reporting units for 2018 and 2017 supported the conclusion that their fair values were not more likely than not less than their carrying amounts and, therefore, a quantitative impairment test was not considered necessary.  For 2016, the Company chose to perform a quantitative impairment test for all three reporting units and, based on the results, determined that the fair values of its reporting units exceeded their carrying amounts and, therefore, no additional analysis was required.  As a result of the Company's annual goodwill impairment assessments, the Company did not record any goodwill impairment losses for 2018, 2017 or 2016.

*Other intangible assets*

The Company's finite-lived intangible assets consist of customer relationships, noncompete agreements, trademarks, internal-use software licenses and patents. These assets are amortized on a straight-line basis over their useful lives ranging from 1 to 20 years and are subject to impairment assessments when there is an indication of a triggering event or abandonment. The Company's indefinite-lived other intangible assets consist of licenses which are not amortized but rather assessed for impairment by comparing the fair values to carrying amounts at least annually, and when an indicator of potential impairment has occurred.

Management uses estimated future cash flows (undiscounted and excluding interest) to measure the recoverability of intangible assets with finite lives, whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. If the undiscounted cash flow analysis indicates that the carrying amount is not recoverable, an impairment loss is recorded for the excess of the carrying amount over its fair value. Management's impairment assessment for indefinite-lived other intangible assets may involve calculating the fair value by using a discounted cash flow analysis or through a market approach valuation. If the fair value exceeds its carrying amount, the asset is not considered impaired and no additional analysis is required. However, if the carrying amount is greater than the fair value, an impairment loss is recorded equal to the excess.

61

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Reserve for known and incurred but not reported claims*

The Company provides for title insurance losses through a charge to expense when the related premium revenue is recognized. The amount charged to expense is generally determined by applying a rate (the loss provision rate) to total title insurance premiums and escrow fees. The Company's management estimates the loss provision rate at the beginning of each year and reassesses the rate quarterly to ensure that the resulting incurred but not reported ("IBNR") loss reserve and known claims reserve included in the Company's consolidated balance sheets together reflect management's best estimate of the total costs required to settle all IBNR and known claims. If the ending IBNR reserve is not considered adequate, an adjustment is recorded.

The process of assessing the loss provision rate and the resulting IBNR reserve involves an evaluation of the results of an in-house actuarial review. The Company's in-house actuary performs a reserve analysis utilizing generally accepted actuarial methods that incorporate cumulative historical claims experience and information provided by in-house claims and operations personnel. Current economic and business trends are also reviewed and used in the reserve analysis. These include conditions in the real estate and mortgage markets, changes in residential and commercial real estate values, and changes in the levels of defaults and foreclosures that may affect claims levels and patterns of emergence, as well as any company-specific factors that may be relevant to past and future claims experience. Results from the analysis include, but are not limited to, a range of IBNR reserve estimates and a single point estimate for IBNR as of the balance sheet date.

For recent policy years at early stages of development (generally the last three years), IBNR is generally estimated using a combination of expected loss rate and multiplicative loss development factor calculations. For more mature policy years, IBNR generally is estimated using multiplicative loss development factor calculations. The expected loss rate method estimates IBNR by applying an expected loss rate to total title insurance premiums and escrow fees, and adjusting for policy year maturity using estimated loss development patterns. Multiplicative loss development factor calculations estimate IBNR by applying factors derived from loss development patterns to losses realized to date. The expected loss rate and loss development patterns are based on historical experience and the relationship of the history to the applicable policy years.

The Company's management uses the IBNR point estimate from the in-house actuary's analysis and other relevant information concerning claims to determine what it considers to be the best estimate of the total amount required for the IBNR reserve.

The volume and timing of title insurance claims are subject to cyclical influences from both the real estate and mortgage markets. Title policies issued to lenders constitute a large portion of the Company's title insurance volume. These policies insure lenders against losses on mortgage loans due to title defects in the collateral property. Even if an underlying title defect exists that could result in a claim, often, the lender must realize an actual loss, or at least be likely to realize an actual loss, for a title insurance liability to exist. As a result, title insurance claims exposure is sensitive to lenders' losses on mortgage loans and is affected in turn by external factors that affect mortgage loan losses, particularly macroeconomic factors.

A general decline in real estate prices can expose lenders to greater risk of losses on mortgage loans, as loan-to-value ratios increase and defaults and foreclosures increase. Title insurance claims exposure for a given policy year is also affected by the quality of mortgage loan underwriting during the corresponding origination year. The Company believes that the sensitivity of claims to external conditions in the real estate and mortgage markets is an inherent feature of title insurance's business economics that applies broadly to the title insurance industry.

62

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Title insurance policies are long-duration contracts with the majority of the claims reported to the Company within the first few yea rs following the issuance of the policy. Generally, 70% to 80 % of claim amounts become known in the first six years of the policy life, and the majority of IBNR reserves relate to the six most recent policy years. Changes in expected ultimate losses and corresponding loss rates for recent policy years are considered likely and could result in a material adjustment to the IBNR reserves. A material change in expected ultimate losses and corresponding loss rates for older policy years is also possible, part icularly for policy years with loss rates exceeding historical norms. The estimates made by management in determining the appropriate level of IBNR reserves could ultimately prove to be materially different from actual claims experience.

The reserve for property and casualty insurance losses reflects management's best estimate of the amount necessary to settle all reported and unreported claims for the ultimate cost of insured losses, based upon the facts of each case and the Company's experience with similar cases.  The Company also utilizes the services of an independent actuary as part of its reserve analysis.  Because the establishment of appropriate reserves, including reserves for catastrophes, is an inherently uncertain and complex process, the ultimate cost of insured losses may be more or less than the reserve amount.  Reserve estimates are regularly analyzed and updated to reflect the most current information available.

The Company provides for claims losses relating to its home warranty business based on the average cost per claim and historical loss experience as applied to the total of new claims incurred. The average cost per home warranty claim is calculated using the average of the most recent 12 months of claims experience adjusted for estimated future increases in costs.

*Contingent litigation and regulatory liabilities*

Amounts related to contingent litigation and regulatory liabilities are accrued if it is probable that a liability has been incurred and an amount is reasonably estimable. The Company records legal fees in other operating expenses in the period incurred.

*Revenues*

Premiums on title policies issued directly by the Company are recognized on the effective date of the title policy and escrow fees are recorded upon close of the escrow.

Premiums on property and casualty insurance policies and home warranty contracts are generally recognized ratably over the 12-month duration of the contract or policy.

Revenues from title policies issued by agents are recorded when notice of issuance is received from the agent, which is generally when cash payment is received by the Company.

Information and other revenues and escrow fees are within the scope of new accounting guidance related to the recognition of revenue from contracts with customers, which the Company adopted effective January 1, 2018.  Under the new guidance, revenue is recognized when control of the promised goods or services is transferred to the customer and in an amount that reflects the consideration the Company expects to be entitled to in exchange for these goods or services.  See Recently Adopted Accounting Pronouncements within this note for further discussion of the new guidance.

For those products and services where the Company's performance obligation is satisfied at a point in time and for which there is no ongoing obligation, revenue is recognized upon delivery.  For those products and services where the Company satisfies its performance obligation over time as the product or service is being transferred to the customer, revenue is generally recognized using the output method as the products or services are delivered.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company has elected to apply the optional exemptions allowed under the new guidance whereby the Company is not required to disclose either the transac tion price allocated to performance obligations that are unsatisfied as of the end of the period or an explanation as to when the Company expects to recognize the related revenue.  Such contracts generally include performance obligations that are contingen t upon the closing of a real estate transaction or include variable consideration based on order volumes, and have remaining contract terms of generally less than three years.  The Company is eligible to apply the optional exemptions to its remaining perfo rmance obligations due to 1) the performance obligation is part of a contract that has an original duration of one year or less, 2) the associated revenue being recognized is based on the Company's right to invoice for the value of the product or service d elivered, 3) the associated variable consideration is being allocated entirely to wholly unsatisfied performance obligations or 4) immateriality.

The Company has also elected to apply the practical expedient allowed under the new guidance whereby it can disregard the impact to the transaction price of the effects of a significant financing component for arrangements where the Company expects the period between delivery of the product or service and customer payment to be one year or less.  In addition, the Company has elected to apply the practical expedient whereby it can recognize the incremental costs of obtaining a contract as an expense when incurred if the amortization period for the asset that the Company otherwise would have recognized is one year or less.

The Company records a contract asset, and recognizes revenue, upon delivery of certain products related to the closing of a real property transaction where the Company's right to payment is subject to the closing of the real estate transaction.  The Company records a contract liability for payments received in advance of revenue recognition for certain products or services.  Contract assets and liabilities were not material at December 31, 2018.  Revenues recognized during the year ended December 31, 2018 that were included in contract liabilities at the beginning of the period were not material.

For information about the Company's revenues disaggregated by reportable segment see Note 21 Segment Financial Information.

*Premium taxes*

Title insurance, property and casualty insurance and home warranty companies, like other types of insurers, are generally not subject to state income or franchise taxes. However, in lieu thereof, most states impose a tax based primarily on insurance premiums written. This premium tax is reported as a separate line item in the consolidated statements of income in order to provide a more meaningful disclosure of the taxation of the Company.

*Income taxes*

The Company accounts for income taxes under the asset and liability method, whereby deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. The Company evaluates the need to establish a valuation allowance for deferred tax assets based upon the amount of existing temporary differences, the period in which they are expected to be recovered and expected levels of taxable income. A valuation allowance to reduce deferred tax assets is established when it is considered more likely than not that some or all of the deferred tax assets will not be realized.

The Company recognizes the effect of income tax positions only if sustaining those positions is considered more likely than not.  Changes in recognition or measurement of uncertain tax positions are reflected in the period in which a change in judgment occurs.  The Company recognizes interest and penalties, if any, related to uncertain tax positions in income tax expense.

64

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Share-based compensation*

The Company measures the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award. The cost is recognized in the Company's financial statements over the requisite service period of the award using the straight-line method for awards that contain only a service condition and the graded vesting method for awards that contain a performance or market condition. For awards with retirement eligibility provisions, the cost is recognized through the date the employee becomes eligible to retire and is no longer required to provide service to earn the award. The Company accounts for forfeitures as they occur.

The Company's primary means of providing share-based compensation is through the granting of restricted stock units ("RSUs"). RSUs granted generally have graded vesting features and include a service condition; and for certain key employees and executives, may also include either a performance or market condition. RSUs receive dividend equivalents in the form of RSUs having the same vesting requirements as the RSUs initially granted.

The Company also offers an employee stock purchase plan that allows eligible employees the option to purchase common stock of the Company at 85% of the lower of the closing price on either the first or last day of each offering period. The offering periods are three-month periods beginning on January 1, April 1, July 1 and October 1 of each fiscal year. The Company recognizes an expense in the amount equal to the value of the 15% discount and look-back feature over the three-month offering period.

*Earnings per share*

Basic earnings per share is computed by dividing net income available to the Company's stockholders by the weighted-average number of common shares outstanding. The computation of diluted earnings per share is similar to the computation of basic earnings per share, except that the weighted-average number of common shares outstanding is increased to include the number of additional common shares that would have been outstanding if dilutive stock options had been exercised and RSUs were vested.

*Employee benefit plans*

The Company recognizes the underfunded status of its unfunded supplemental benefit plans as a liability on its consolidated balance sheets. Actuarial gains and losses and prior service costs and credits that have not been recognized as a component of net periodic benefit cost previously are recorded as a component of accumulated other comprehensive loss. Plan obligations are measured annually as of December 31.

During 2016, the Company terminated its funded defined benefit pension plans and, in 2017, transferred all remaining benefit obligations relating to the pension plans to a highly rated insurance company. See Note 13 Employee Benefit Plans for further discussion of the termination of the Company's funded defined benefit pension plans.

The Company informally funds its nonqualified deferred compensation plan through tax-advantaged investments known as variable universal life insurance. The Company's deferred compensation plan assets are included as a component of other assets and the Company's deferred compensation plan liability is included as a component of pension costs and other retirement plans on the consolidated balance sheets. The income earned on the Company's deferred compensation plan assets is included as a component of net investment income and the income earned by the deferred compensation plan participants is included as a component of personnel costs on the consolidated statements of income.

65

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Foreign currency*

The Company operates in other countries, including Canada, the United Kingdom, Australia, South Korea and Hong Kong. The functional currencies of the Company's foreign subsidiaries are generally their respective local currencies. The financial statements of foreign subsidiaries with local currencies that were determined to be the functional currency are translated into U.S. dollars as follows: assets and liabilities at the exchange rate as of the balance sheet date, equity at the historical rates of exchange, and income and expense amounts at average rates prevailing during the period. Translation adjustments resulting from the translation of the subsidiaries' accounts are included in accumulated other comprehensive loss as a separate component of stockholders' equity. For those foreign subsidiaries where the U.S. dollar has been determined to be the functional currency, non-monetary assets and liabilities are translated using historical rates, while monetary assets and liabilities are translated at current rates, with remeasurement gains and losses included in other operating expenses. Gains and losses resulting from foreign currency transactions are included within other operating expenses.

*Reinsurance*

The Company assumes and cedes large title insurance risks through reinsurance. Additionally, the Company's property and casualty insurance business purchases reinsurance to limit risk associated with large losses from single events. In reinsurance arrangements, the primary insurer retains a certain amount of risk under a policy and cedes the remainder of the risk under the policy to the reinsurer. The primary insurer pays the reinsurer a premium in exchange for accepting this risk of loss. The primary insurer generally remains liable to its insured for the total risk, but is reinsured under the terms of the reinsurance agreement. The amount of premiums assumed and ceded is recorded as a component of direct premiums and escrow fees on the Company's consolidated statements of income. The total amount of premiums assumed and ceded in connection with reinsurance was less than 1.0% of consolidated premium and escrow fees for each of the three years in the period ended December 31, 2018. Payments and recoveries on reinsured losses for the Company's title insurance business were immaterial during the years ended December 31, 2018, 2017 and 2016.  For information related to payments on reinsured losses for the Company's property and casualty insurance business see Note 8 Reserve for Known and Incurred But Not Reported Claims.

*Escrow deposits and trust assets*

The Company administers escrow deposits and trust assets as a service to its customers. Escrow deposits totaled $7.6 billion and $7.5 billion at December 31, 2018 and 2017, respectively, of which $3.6 billion and $2.9 billion, respectively, were held at First American Trust, FSB. The escrow deposits held at First American Trust, FSB are temporarily invested in cash and cash equivalents and debt securities, with offsetting liabilities included in deposits in the accompanying consolidated balance sheets. The remaining escrow deposits were held at third-party financial institutions.

Trust assets held or managed by First American Trust, FSB totaled $3.6 billion and $3.7 billion at December 31, 2018 and 2017, respectively. Escrow deposits held at third-party financial institutions and trust assets are not considered assets of the Company and, therefore, are not included in the accompanying consolidated balance sheets. However, the Company could be held contingently liable for the disposition of these assets.

In conducting its operations, the Company often holds customers' assets in escrow, pending completion of real estate transactions and, as a result, the Company has ongoing programs for realizing economic benefits with various financial institutions. The results from these programs are included as income or a reduction in expense, as appropriate, in the consolidated statements of income based on the nature of the arrangement and benefit received.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Like-kind exchanges*

The Company facilitates tax-deferred property exchanges for customers pursuant to Section 1031 of the Internal Revenue Code and tax-deferred reverse exchanges pursuant to Revenue Procedure 2000-37. As a facilitator and intermediary, the Company holds the proceeds from sales transactions and takes temporary title to property identified by the customer to be acquired with such proceeds. Upon the completion of each such exchange, the identified property is transferred to the customer or, if the exchange does not take place, an amount equal to the sales proceeds or, in the case of a reverse exchange, title to the property held by the Company is transferred to the customer. Like-kind exchange funds held by the Company totaled $2.7 billion and $2.6 billion at December 31, 2018 and 2017, respectively. The like-kind exchange deposits are held at third-party financial institutions and, due to the structure utilized to facilitate these transactions, the proceeds and property are not considered assets of the Company and, therefore, are not included in the accompanying consolidated balance sheets. All such amounts are placed in deposit accounts insured, up to applicable limits, by the Federal Deposit Insurance Corporation. The Company could be held contingently liable to the customer for the transfers of property, disbursements of proceeds and the returns on such proceeds.

**Recently Adopted Accounting Pronouncements:**

In May 2017, the Financial Accounting Standards Board ("FASB") issued updated guidance intended to reduce diversity in practice by clarifying which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017. The adoption of this guidance had no impact on the Company's consolidated financial statements.

In March 2017, the FASB issued updated guidance intended to improve the presentation of net periodic pension cost and net periodic postretirement benefit cost through the disaggregation of the service cost component from the other components of net benefit cost. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017. The Company adopted this change in accounting principle at the beginning of 2018 and applied the change retrospectively. As a result, other components of net benefit cost totaling $175.0 million and $101.5 million were reclassified from personnel costs to other operating expenses on the consolidated statements of income for the years ended December 31, 2017 and 2016, respectively. See Note 13 Employee Benefit Plans for further information on the Company's net periodic pension costs.

In January 2017, the FASB issued updated guidance to clarify the definition of a business with the objective of providing guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017. The adoption of this guidance had no impact on the Company's consolidated financial statements.

In November 2016, the FASB issued updated guidance intended to reduce the diversity in practice on presenting restricted cash and restricted cash equivalents in the statement of cash flows. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017. The adoption of this guidance had no impact on the Company's consolidated financial statements.

In October 2016, the FASB issued updated guidance intended to simplify and improve the accounting for the income tax consequences of intra-entity transfers of assets, other than inventory. The updated guidance, which eliminates the intra-entity transfers exception, requires entities to recognize the income tax consequences of intra-entity transfers of assets, other than inventory, when the transfers occur. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017. The adoption of this guidance had no impact on the Company's consolidated financial statements.

In August 2016, the FASB issued updated guidance intended to eliminate the diversity in practice regarding the presentation and classification of certain cash receipts and cash payments in the statement of cash flows. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017. The adoption of this guidance had no impact on the Company's consolidated financial statements.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In January 2016, the FASB issued updated guidance intended to enhance t he reporting model for financial instruments to provide users of financial statements with more decision-useful information.  In addition to making other targeted improvements to current guidance, the updated guidance also requires all equity investments, except those accounted for under the equity method of accounting or those that result in consolidation of the investee, to be measured at fair value with changes in the fair value recognized through net income.  The updated guidance is effective for interi m and annual reporting periods beginning after December 15, 2017.   The Company adopted this guidance at the beginning of 2018 and recognized cumulative net unrealized gains, net of taxes, of $40.6 million related to its investments in equity securities, pr eviously classified as available-for-sale, through a cumulative-effect adjustment to retained earnings.  Changes in the fair values of these investments are reflected in net realized investment gains/losses on the Company's consolidated statements of incom e. See Note 3 Debt and Equity Securities for further discussion of the Company's investments in equity securities.

In May 2014, the FASB issued updated guidance for recognizing revenue from contracts with customers to provide a single, comprehensive revenue recognition model for all contracts with customers to improve comparability within and across industries, and across capital markets.  The new revenue standard contains principles that an entity will apply to determine the measurement of revenue and the timing of recognition.  The underlying principle is that an entity will recognize revenue to depict the transfer of goods or services to customers at an amount that the entity expects to be entitled to in exchange for those goods or services.  Revenue from insurance contracts is not within the scope of this guidance.  In 2016, the FASB issued additional updates to the new guidance primarily to clarify, among other things, the implementation guidance related to principal versus agent considerations, identifying performance obligations, accounting for licenses of intellectual property, and to provide narrow-scope improvements and additional practical expedients.  In February 2017, the FASB issued an additional update to the new guidance to clarify the scope of derecognition guidance for nonfinancial assets and to provide guidance for partial sales of nonfinancial assets.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2017.  The Company elected to adopt the new guidance under the modified retrospective approach, which did not have a material impact on its consolidated financial statements.  See Revenues within this note for further information about the Company's revenues within the scope of the new guidance.

**Pending Accounting Pronouncements:**

In August 2018, the FASB issued updated guidance that is intended to reduce potential diversity in practice in accounting for the costs of implementing cloud computing arrangements (i.e., hosting arrangements) that are service contracts.  The updated guidance aligns the requirements for capitalizing implementation costs for these arrangements with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software and hosting arrangements that include an internal-use software license.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  The Company is currently assessing the impact of this guidance on its consolidated financial statements.

In August 2018, the FASB issued updated guidance as part of its disclosure framework project intended to improve the effectiveness of disclosures in the notes to the financial statements.  The updated guidance eliminates, adds and modifies certain disclosure requirements related to fair value measurements. The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  Except for the disclosure requirements, the Company does not expect the adoption of this guidance to have a material impact on its consolidated financial statements.

In January 2017, the FASB issued updated guidance intended to simplify how an entity tests goodwill for impairment by eliminating Step 2 from the goodwill impairment test.  Under the updated guidance, an entity will perform its goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount and will recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value, with the loss recognized limited to the total amount of goodwill allocated to that reporting unit.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2019, with early adoption permitted.  The Company does not expect the adoption of this guidance to have a material impact on its consolidated financial statements.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In June 2016, the FASB issued updated gu idance intended to provide financial statement users with more decision-useful information about the expected credit losses on financial instruments and other commitments to extend credit held by a reporting entity at each reporting date.  The updated guid ance replaces the current incurred loss impairment methodology with a methodology that reflects expected credit losses and requires the consideration of a broader range of reasonable and supportable information to inform credit loss estimates.  The updated guidance is effective for interim and annual reporting periods beginning after December  15, 2019, with early adoption permitted.  The Company is currently assessing the impact of this guidance on its consolidated financial statements.

In February 2016, the FASB issued updated guidance that requires the rights and obligations associated with leasing arrangements be reflected on the balance sheet in order to increase transparency and comparability among organizations.  Under the updated guidance, lessees will be required to recognize a right-of-use asset and a liability to make lease payments and disclose key information about leasing arrangements.  The updated guidance is effective for interim and annual reporting periods beginning after December 15, 2018.  The updated guidance may either be adopted using a modified retrospective transition approach or may be initially applied on the adoption date with the recognition of a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption.  The Company has elected to initially apply the guidance as of the adoption date, January 1, 2019, and expects to record on its balance sheet right-of-use assets and lease liabilities of approximately $350 million and an immaterial cumulative-effect adjustment to retained earnings. The Company expects the new guidance to have an insignificant impact on its consolidated statements of income and statements of cash flows.

**NOTE 2.   Statutory Restrictions on Investments and Stockholders' Equity:**

Investments totaling $129.2 million and $131.0 million were on deposit with state treasurers in accordance with statutory requirements for the protection of policyholders at December 31, 2018 and 2017, respectively.

Pursuant to insurance and other regulations under which the Company's insurance subsidiaries operate, the amount of dividends, loans and advances available to the Company is limited, principally for the protection of policyholders.  As of December 31, 2018, under such regulations, the maximum amount available to the Company from its insurance subsidiaries in 2019, without prior approval from applicable regulators, was dividends of $291.2 million and loans and advances of $98.6 million.

The Company's principal title insurance subsidiary, First American Title Insurance Company ("FATICO"), maintained total statutory capital and surplus of $1.2 billion as of December 31, 2018 and 2017.  Statutory net income for the years ended December 31, 2018, 2017 and 2016 was $258.4 million, $306.5 million and $150.0 million, respectively.  FATICO was in compliance with the minimum statutory capital and surplus requirements as of December 31, 2018.

FATICO is domiciled in Nebraska and its statutory-based financial statements are prepared in accordance with accounting practices prescribed or permitted by the Nebraska Department of Insurance.  The National Association of Insurance Commissioners' ("NAIC") Accounting Practices and Procedures Manual ("NAIC SAP") has been adopted as a component of prescribed or permitted practices by the state of Nebraska.  The state of Nebraska has adopted certain prescribed accounting practices that differ from those found in the NAIC SAP.  Specifically, the timing of amounts released from the statutory premium reserve under Nebraska's required practice differs from NAIC SAP resulting in total statutory capital and surplus that was lower by $209.0 million and $148.5 million at December 31, 2018 and 2017, respectively, than if reported in accordance with NAIC SAP.

Statutory accounting principles differ in some respects from GAAP, and these differences include, but are not limited to, non-admission of certain assets (principally limitations on deferred tax assets, goodwill, capitalized furniture and other equipment, capitalized software, and premiums and other receivables 90 days past due), reporting of bonds at amortized cost, amortization of goodwill, deferral of premiums received as statutory premium reserve, supplemental reserve (if applicable) and exclusion of the incurred but not reported claims reserve. In addition, beginning in 2018, the changes in the fair values of equity securities are recorded through net income for GAAP, whereas statutory accounting principles continue to require these changes to be recorded on the balance sheet.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 3.   Debt and Equity Securities:**

Investments in debt securities, classified as available-for-sale, are as follows:

| (in thousands) | Amortized cost | Gross unrealized gains | Gross unrealized losses | Estimated fair value |
|---|---|---|---|---|
| **December 31, 2018** | | | | |
| U.S. Treasury bonds | $    162,904 | $    741 | $    (1,139) | $    162,506 |
| Municipal bonds | 1,050,134 | 7,210 | (12,309) | 1,045,035 |
| Foreign government bonds | 158,885 | 571 | (2,159) | 157,297 |
| Governmental agency bonds | 319,115 | 1,145 | (4,093) | 316,167 |
| Governmental agency mortgage-backed securities | 3,219,585 | 12,030 | (29,016) | 3,202,599 |
| U.S. corporate debt securities | 575,646 | 1,113 | (15,499) | 561,260 |
| Foreign corporate debt securities | 274,881 | 551 | (6,485) | 268,947 |
| | $  5,761,150 | $  23,361 | $  (70,700) | $  5,713,811 |
| **December 31, 2017** | | | | |
| U.S. Treasury bonds | $    173,049 | $    2,199 | $    (1,250) | $    173,998 |
| Municipal bonds | 1,031,146 | 12,185 | (7,394) | 1,035,937 |
| Foreign government bonds | 170,220 | 489 | (1,221) | 169,488 |
| Governmental agency bonds | 212,731 | 1,061 | (2,322) | 211,470 |
| Governmental agency mortgage-backed securities | 2,172,377 | 3,168 | (16,588) | 2,158,957 |
| U.S. corporate debt securities | 734,409 | 11,768 | (2,962) | 743,215 |
| Foreign corporate debt securities | 256,430 | 4,145 | (956) | 259,619 |
| | $  4,750,362 | $  35,015 | $  (32,693) | $  4,752,684 |

Sales of debt securities resulted in realized gains of $3.3 million, $5.4 million and $12.6 million, realized losses of $20.3 million, $16.4 million and $2.7 million, and proceeds of $1.3 billion, $821.0 million and $561.0 million for the years ended December 31, 2018, 2017 and 2016, respectively.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Gross unrealized losses on investments in debt securities are as follows:

| (in thousands) | Less than 12 months | | 12 months or longer | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Estimated fair value | Unrealized losses | Estimated fair value | Unrealized losses | Estimated fair value | Unrealized losses |
| **December 31, 2018** | | | | | | |
| U.S. Treasury bonds | $ 19,749 | $ (85) | $ 55,615 | $ (1,054) | $ 75,364 | $ (1,139) |
| Municipal bonds | 172,387 | (1,772) | 369,139 | (10,537) | 541,526 | (12,309) |
| Foreign government bonds | 23,654 | (1,037) | 42,119 | (1,122) | 65,773 | (2,159) |
| Governmental agency bonds | 56,270 | (748) | 90,631 | (3,345) | 146,901 | (4,093) |
| Governmental agency mortgage-backed securities | 850,459 | (6,955) | 982,610 | (22,061) | 1,833,069 | (29,016) |
| U.S. corporate debt securities | 374,473 | (10,537) | 109,844 | (4,962) | 484,317 | (15,499) |
| Foreign corporate debt securities | 175,762 | (4,575) | 50,802 | (1,910) | 226,564 | (6,485) |
| | $ 1,672,754 | $ (25,709) | $ 1,700,760 | $ (44,991) | $ 3,373,514 | $ (70,700) |
| **December 31, 2017** | | | | | | |
| U.S. Treasury bonds | $ 78,605 | $ (511) | $ 37,498 | $ (739) | $ 116,103 | $ (1,250) |
| Municipal bonds | 279,292 | (1,714) | 226,895 | (5,680) | 506,187 | (7,394) |
| Foreign government bonds | 98,942 | (972) | 6,678 | (249) | 105,620 | (1,221) |
| Governmental agency bonds | 55,707 | (409) | 93,737 | (1,913) | 149,444 | (2,322) |
| Governmental agency mortgage-backed securities | 671,871 | (4,868) | 774,959 | (11,720) | 1,446,830 | (16,588) |
| U.S. corporate debt securities | 171,817 | (1,568) | 60,724 | (1,394) | 232,541 | (2,962) |
| Foreign corporate debt securities | 81,525 | (821) | 5,697 | (135) | 87,222 | (956) |
| | $ 1,437,759 | $ (10,863) | $ 1,206,188 | $ (21,830) | $ 2,643,947 | $ (32,693) |

Based on the Company's review of its debt securities in an unrealized loss position at December 31, 2018, it determined that the losses were primarily the result of changes in interest rates, which were considered to be temporary, rather than a deterioration in credit quality. The Company does not intend to sell and it is not more likely than not that the Company will be required to sell these securities prior to recovering their amortized cost. As such, the Company does not consider these securities to be other-than-temporarily impaired at December 31, 2018.

71

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Investments in debt securities at Decemb er 31, 201 8 , by contractual maturities, are as follows:

| (in thousands) | Due in one year or less | | Due after one through five years | | Due after five through ten years | | Due after ten years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Treasury bonds | | | | | | | | | | |
| Amortized cost | $ | 69,650 | $ | 67,223 | $ | 2,744 | $ | 23,287 | $ | 162,904 |
| Estimated fair value | $ | 69,504 | $ | 67,043 | $ | 2,716 | $ | 23,243 | $ | 162,506 |
| Municipal bonds | | | | | | | | | | |
| Amortized cost | $ | 65,779 | $ | 232,548 | $ | 266,936 | $ | 484,871 | $ | 1,050,134 |
| Estimated fair value | $ | 65,708 | $ | 232,572 | $ | 266,724 | $ | 480,031 | $ | 1,045,035 |
| Foreign government bonds | | | | | | | | | | |
| Amortized cost | $ | 20,304 | $ | 112,746 | $ | 14,336 | $ | 11,499 | $ | 158,885 |
| Estimated fair value | $ | 20,290 | $ | 112,629 | $ | 13,933 | $ | 10,445 | $ | 157,297 |
| Governmental agency bonds | | | | | | | | | | |
| Amortized cost | $ | 21,574 | $ | 122,750 | $ | 127,392 | $ | 47,399 | $ | 319,115 |
| Estimated fair value | $ | 21,379 | $ | 121,397 | $ | 128,075 | $ | 45,316 | $ | 316,167 |
| U.S. corporate debt securities | | | | | | | | | | |
| Amortized cost | $ | 29,561 | $ | 266,261 | $ | 250,275 | $ | 29,549 | $ | 575,646 |
| Estimated fair value | $ | 29,418 | $ | 261,369 | $ | 241,937 | $ | 28,536 | $ | 561,260 |
| Foreign corporate debt securities | | | | | | | | | | |
| Amortized cost | $ | 17,889 | $ | 169,153 | $ | 79,443 | $ | 8,396 | $ | 274,881 |
| Estimated fair value | $ | 17,824 | $ | 166,460 | $ | 76,746 | $ | 7,917 | $ | 268,947 |
| Total debt securities, excluding mortgage-backed securities | | | | | | | | | | |
| Amortized cost | $ | 224,757 | $ | 970,681 | $ | 741,126 | $ | 605,001 | $ | 2,541,565 |
| Estimated fair value | $ | 224,123 | $ | 961,470 | $ | 730,131 | $ | 595,488 | $ | 2,511,212 |
| Total mortgage-backed securities | | | | | | | | | | |
| Amortized cost | | | | | | | | | $ | 3,219,585 |
| Estimated fair value | | | | | | | | | $ | 3,202,599 |
| Total debt securities | | | | | | | | | | |
| Amortized cost | | | | | | | | | $ | 5,761,150 |
| Estimated fair value | | | | | | | | | $ | 5,713,811 |

Mortgage-backed securities, which include contractual terms to maturity, are not categorized by contractual maturity as borrowers may have the right to call or prepay obligations with, or without, call or prepayment penalties.

Investments in equity securities are as follows:

| (in thousands) | Cost | | Estimated fair value | |
|---|---|---|---|---|
| **December 31, 2018** | | | | |
| Preferred stocks | $ | 16,892 | $ | 14,162 |
| Common stocks | | 341,460 | | 339,373 |
| | $ | 358,352 | $ | 353,535 |
| **December 31, 2017** | | | | |
| Preferred stocks | $ | 19,233 | $ | 18,990 |
| Common stocks | | 394,439 | | 447,526 |
| | $ | 413,672 | $ | 466,516 |

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company adopted new accounting guidance on January 1, 2018, which requires investments in equity securities with readily determinable fair values to be measured at fair value with changes in fair value recognized through net income .   See Note 1 Basis of Presentation and Significant Accounting Policies for further discussion of the new guidance.

Net losses (realized and unrealized) of $38.6 million were recognized for the year ended December 31, 2018 as a result of changes in the fair values of equity securities.  Included in net losses during the year ended December 31, 2018 were net unrealized losses of $37.6 million related to equity securities still held at December 31, 2018.  For the years ended December 31, 2017 and 2016, sales of equity securities resulted in realized gains of $30.2 million and $18.1 million and realized losses of $2.1 million and $7.0 million, respectively.

The composition of the investment portfolio at December 31, 2018, by credit rating, is as follows:

| (in thousands, except percentages) | A- or higher | | BBB+ to BBB- | | Non-Investment Grade | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Estimated fair value | Percentage | Estimated fair value | Percentage | Estimated fair value | Percentage | Estimated fair value | Percentage |
| Debt securities: | | | | | | | | |
| U.S. Treasury bonds | $ 162,506 | 100.0 | $ — | — | $ — | — | $ 162,506 | 100.0 |
| Municipal bonds | 978,624 | 93.6 | 56,174 | 5.4 | 10,237 | 1.0 | 1,045,035 | 100.0 |
| Foreign government bonds | 128,759 | 81.9 | 24,888 | 15.8 | 3,650 | 2.3 | 157,297 | 100.0 |
| Governmental agency bonds | 316,167 | 100.0 | — | — | — | — | 316,167 | 100.0 |
| Governmental agency mortgage-backed securities | 3,202,599 | 100.0 | — | — | — | — | 3,202,599 | 100.0 |
| U.S. corporate debt securities | 242,100 | 43.1 | 172,633 | 30.8 | 146,527 | 26.1 | 561,260 | 100.0 |
| Foreign corporate debt securities | 119,565 | 44.4 | 118,029 | 43.9 | 31,353 | 11.7 | 268,947 | 100.0 |
| Total debt securities | 5,150,320 | 90.1 | 371,724 | 6.5 | 191,767 | 3.4 | 5,713,811 | 100.0 |
| Preferred stocks | 48 | 0.3 | 12,916 | 91.2 | 1,198 | 8.5 | 14,162 | 100.0 |
| Total | $ 5,150,368 | 89.9 | $ 384,640 | 6.7 | $ 192,965 | 3.4 | $ 5,727,973 | 100.0 |

Included in debt securities at December 31, 2018, were bank loans totaling $144.6 million, of which $133.2 million were non-investment grade; high yield corporate debt securities totaling $38.7 million, all of which were non-investment grade; and emerging market debt securities totaling $72.2 million, of which $9.6 million were non-investment grade.

The composition of the debt securities portfolio in an unrealized loss position at December 31, 2018, by credit rating, is as follows:

| (in thousands, except percentages) | A- or higher | | BBB+ to BBB- | | Non-Investment Grade | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Estimated fair value | Percentage | Estimated fair value | Percentage | Estimated fair value | Percentage | Estimated fair value | Percentage |
| U.S. Treasury bonds | $ 75,364 | 100.0 | $ — | — | $ — | — | $ 75,364 | 100.0 |
| Municipal bonds | 519,316 | 95.9 | 16,195 | 3.0 | 6,015 | 1.1 | 541,526 | 100.0 |
| Foreign government bonds | 38,237 | 58.1 | 23,886 | 36.3 | 3,650 | 5.6 | 65,773 | 100.0 |
| Governmental agency bonds | 146,901 | 100.0 | — | — | — | — | 146,901 | 100.0 |
| Governmental agency mortgage-backed securities | 1,833,069 | 100.0 | — | — | — | — | 1,833,069 | 100.0 |
| U.S. corporate debt securities | 193,758 | 40.0 | 148,054 | 30.6 | 142,505 | 29.4 | 484,317 | 100.0 |
| Foreign corporate debt securities | 88,816 | 39.2 | 107,806 | 47.6 | 29,942 | 13.2 | 226,564 | 100.0 |
| Total | $ 2,895,461 | 85.8 | $ 295,941 | 8.8 | $ 182,112 | 5.4 | $ 3,373,514 | 100.0 |

Debt securities in an unrealized loss position at December 31, 2018, included bank loans totaling $141.2 million, of which $129.8 million were non-investment grade; high yield corporate debt securities totaling $36.7 million, all of which were non-investment grade; and emerging market debt securities totaling $63.4 million, of which $9.6 million were non-investment grade.

73

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The credit ratings in the above tables reflect published ratings obtained from globally recognized securities rating agencies.  If a secur ity was rated differently among the rating agencies, the lowest rating was selected.  Governmental agency mortgage-backed securities are not rated by any of the ratings agencies; however, these securities have been included in the above table in the "A- or higher" rating category because the payments of principal and interest are guaranteed by the governmental agency that issued the security.

**NOTE 4.    Property and Equipment:**

Property and equipment consists of the following:

|  | December 31, | |
|---|---|---|
|  | **2018** | **2017** |
|  | (in thousands) | |
| Land | $ 25,472 | $ 25,983 |
| Buildings | 257,159 | 255,389 |
| Furniture and equipment | 242,415 | 247,022 |
| Capitalized software | 667,667 | 621,203 |
|  | 1,192,713 | 1,149,597 |
| Accumulated depreciation and amortization | (734,873) | (710,028) |
|  | $ 457,840 | $ 439,569 |

**NOTE 5.    Goodwill:**

A summary of the changes in the carrying amount of goodwill, by reportable segment, for the years ended December 31, 2018 and 2017, is as follows:

|  | Title Insurance and Services | Specialty Insurance | Total |
|---|---|---|---|
|  | (in thousands) | | |
| Balance as of December 31, 2016 | $ 970,652 | $ 46,765 | $ 1,017,417 |
| Acquisitions | 91,516 | — | 91,516 |
| Foreign currency translation | 4,370 | — | 4,370 |
| Other adjustments | (298) | — | (298) |
| Balance as of December 31, 2017 | 1,066,240 | 46,765 | 1,113,005 |
| Acquisitions | 36,806 | — | 36,806 |
| Foreign currency translation | (5,017) | — | (5,017) |
| Other adjustments | (628) | — | (628) |
| Balance as of December 31, 2018 | $ 1,097,401 | $ 46,765 | $ 1,144,166 |

For further discussion about the Company's acquisitions in 2018 and 2017, see Note 20 Business Combinations.

74

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 6.   Other Intangible Assets:**

Other intangible assets consist of the following:

|  | December 31, | | |
| --- | --- | --- | --- |
|  | **2018** | | **2017** |
|  | (in thousands) | | |
| Finite-lived intangible assets: | | | |
| Customer relationships | $ | 114,603 | $ | 106,086 |
| Noncompete agreements |  | 14,402 |  | 11,509 |
| Trademarks |  | 10,753 |  | 9,229 |
| Internal-use software licenses |  | 29,394 |  | 28,956 |
| Patents |  | 2,840 |  | 2,840 |
|  |  | 171,992 |  | 158,620 |
| Accumulated amortization |  | (79,535) |  | (75,591) |
|  |  | 92,457 |  | 83,029 |
| Indefinite-lived intangible assets: | | | |
| Licenses |  | 16,915 |  | 16,884 |
|  | $ | 109,372 | $ | 99,913 |

Amortization expense for finite-lived intangible assets was $30.4 million, $28.1 million and $15.4 million for the years ended December 31, 2018, 2017 and 2016, respectively.

Estimated amortization expense for finite-lived intangible assets for the next five years is as follows:

| Year | (in thousands) | |
| --- | --- | --- |
| 2019 | $ | 25,620 |
| 2020 | $ | 14,294 |
| 2021 | $ | 10,967 |
| 2022 | $ | 10,330 |
| 2023 | $ | 9,859 |

**NOTE 7.   Deposits:**

Deposit accounts are summarized as follows:

|  | December 31, | | |
| --- | --- | --- | --- |
|  | **2018** | | **2017** |
|  | (in thousands, except percentages) | | |
| Escrow accounts: | | | |
| Interest bearing | $ | 2,496,805 | $ | 2,058,596 |
| Non-interest bearing |  | 1,133,825 |  | 879,252 |
|  |  | 3,630,630 |  | 2,937,848 |
| Business checking and other deposits (1) |  | 155,553 |  | 132,718 |
|  | $ | 3,786,183 | $ | 3,070,566 |
| Weighted-average interest rate: | | | |
| Interest bearing escrow accounts |  | 0.12% |  | 0.10% |

_____

(1)     Business checking and other deposits primarily reflect non-interest bearing accounts.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 8.   Reserve for Known and Incurred But Not Reported Claims:**

Activity in the reserve for known and incurred but not reported claims is summarized as follows:

| | | December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| | | (in thousands) | | | | |
| Balance at beginning of year | $ | 1,028,933 | $ | 1,025,863 | $ | 983,880 |
| Provision related to: | | | | | | |
| Current year | | 444,969 | | 446,500 | | 441,228 |
| Prior years | | 7,664 | | 3,910 | | 47,373 |
| | | 452,633 | | 450,410 | | 488,601 |
| Payments, net of recoveries, related to: | | | | | | |
| Current year | | 242,617 | | 240,468 | | 223,735 |
| Prior years | | 208,139 | | 231,579 | | 239,264 |
| | | 450,756 | | 472,047 | | 462,999 |
| Other | | 11,869 | | 24,707 | | 16,381 |
| Balance at end of year | $ | 1,042,679 | $ | 1,028,933 | $ | 1,025,863 |

Current year payments, net of recoveries, include $228.3 million, $225.6 million and $211.3 million for the years ended December 31, 2018, 2017 and 2016, respectively, that relate to the Company's specialty insurance segment. Prior year payments, net of recoveries, include $56.7 million, $46.1 million and $41.4 million for the years ended December 31, 2018, 2017 and 2016, respectively, that relate to the Company's specialty insurance segment.

"Other" primarily includes foreign currency translation gains and losses and ceded reinsurance claims. Payments and recoveries on reinsured losses for the Company's title insurance business were immaterial during the years ended December 31, 2018, 2017 and 2016.  Payments on reinsured losses for the Company's property and casualty insurance business totaled $15.3 million, $8.9 million, and $2.1 million, and recoveries totaled $20.3 million, $9.6 million, and $2.0 million for the years ended December 31, 2018, 2017 and 2016, respectively.

The provision for title insurance losses, expressed as a percentage of title insurance premiums and escrow fees, was 4.0% for the years ended December 31, 2018 and 2017 and 5.5% for the year ended December 31, 2016.

The current year rate of 4.0% reflects the ultimate loss rate for the current policy year and no change in the loss reserve estimates for prior policy years.

The 2017 rate of 4.0% reflected the ultimate loss rate for policy year 2017 and no change in the loss reserve estimates for prior policy years.

The 2016 rate of 5.5% reflected an ultimate loss rate of 4.5% for policy year 2016 and a $42.6 million net increase in loss reserve estimates for prior policy years. This uncertainty was due to the following factors, among others: (i) the volatility associated with the timing and severity of large title claims, (ii) the potential of incurring one or more large title claims that significantly exceed estimated ultimate losses indicated by current historical trends, and (iii) the complexity associated with handling large title claims which makes it difficult to estimate the ultimate outcome.  While the Company believed its claims reserve attributable to large title claims was reasonable, this uncertainty increased the potential for adverse loss development.

As of December 31, 2018, the projected ultimate loss rates for policy years 2018, 2017 and 2016 were 4.0%, 3.9% and 3.8%, respectively.

76

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

A summary of the Company's loss reserves is as follows:

| (in thousands, except percentages) | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Known title claims | $ 80,306 | 7.7% | $ 83,094 | 8.1% |
| IBNR title claims | 877,134 | 84.1% | 875,724 | 85.1% |
| Total title claims | 957,440 | 91.8% | 958,818 | 93.2% |
| Non-title claims | 85,239 | 8.2% | 70,115 | 6.8% |
| Total loss reserves | $ 1,042,679 | 100.0% | $ 1,028,933 | 100.0% |

77

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Specialty Insurance Segmen t*

The following reflects information about incurred and paid claims development for the Company's specialty insurance segment as of December 31, 2018, net of reinsurance, as well as cumulative claims frequency, by claims event, and the total of incurred but not reported claims plus expected development on reported claims included with the net incurred claims amounts.

The information below about incurred and paid claims development for the years ended December 31, 2009 to 2015, is presented as supplementary information.

| | Incurred claims and allocated claim adjustment expenses, net of reinsurance | | | | | | | | | | December 31, 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accident Year | Years ended December 31, | | | | | | | | | | Total of IBNR liabilities plus expected development on reported claims | Cumulative number of reported claims |
| | 2009* | 2010* | 2011* | 2012* | 2013* | 2014* | 2015* | 2016 | 2017 | 2018 | | |
| | | | | | | | (in thousands) | | | | | |
| 2009 | $ 141,154 | $ 139,580 | $ 139,663 | $ 139,266 | $ 138,936 | $ 139,090 | $ 139,191 | $ 139,216 | $ 139,186 | $ 139,186 | — | 605 |
| 2010 | | 140,621 | 139,966 | 139,991 | 139,639 | 140,128 | 140,641 | 140,353 | 140,308 | 140,324 | — | 606 |
| 2011 | | | 148,395 | 149,076 | 149,768 | 149,486 | 149,763 | 149,552 | 149,488 | 149,487 | — | 641 |
| 2012 | | | | 157,287 | 158,981 | 159,918 | 160,579 | 160,517 | 160,911 | 161,650 | — | 692 |
| 2013 | | | | | 182,858 | 184,419 | 185,244 | 184,826 | 184,668 | 184,777 | 26 | 762 |
| 2014 | | | | | | 190,985 | 190,738 | 191,120 | 191,025 | 190,944 | 123 | 789 |
| 2015 | | | | | | | 221,617 | 225,754 | 225,977 | 226,555 | 342 | 867 |
| 2016 | | | | | | | | 245,859 | 249,358 | 251,506 | 939 | 972 |
| 2017 | | | | | | | | | 267,392 | 275,480 | 2,940 | 1,014 |
| 2018 | | | | | | | | | | 264,088 | 11,329 | 1,063 |
| | | | | | | | | | Total | $ 1,983,997 | | |

* Amounts unaudited.

| | Cumulative paid claims and allocated claim adjustment expenses, net of reinsurance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Accident Year | Years ended December 31, | | | | | | | | | |
| | 2009* | 2010* | 2011* | 2012* | 2013* | 2014* | 2015* | 2016 | 2017 | 2018 |
| | | | | | (in thousands) | | | | | |
| 2009 | $ 113,550 | $ 134,606 | $ 137,689 | $ 138,293 | $ 138,710 | $ 138,963 | $ 139,181 | $ 139,186 | $ 139,186 | $ 139,186 |
| 2010 | | 113,513 | 136,770 | 138,978 | 139,486 | 140,136 | 140,886 | 140,302 | 140,304 | 140,321 |
| 2011 | | | 123,116 | 144,367 | 146,952 | 148,984 | 149,358 | 149,495 | 149,485 | 149,486 |
| 2012 | | | | 130,623 | 153,753 | 157,364 | 159,181 | 159,740 | 160,268 | 161,304 |
| 2013 | | | | | 151,377 | 180,277 | 182,565 | 183,957 | 184,473 | 184,711 |
| 2014 | | | | | | 156,536 | 185,686 | 188,117 | 189,525 | 190,398 |
| 2015 | | | | | | | 181,445 | 217,618 | 223,045 | 225,041 |
| 2016 | | | | | | | | 205,857 | 243,111 | 248,211 |
| 2017 | | | | | | | | | 220,218 | 266,653 |
| 2018 | | | | | | | | | | 222,966 |
| | | | | | | | | | Total | $ 1,928,277 |
| | | | | | | All outstanding liabilities before 2009, net of reinsurance | | | | 16 |
| | | | | | | Liabilities for claims and claims adjustment expenses, net of reinsurance | | | | $ 55,736 |

* Amounts unaudited.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

A reconciliation of the net incurred and paid claims development tables to the liability for claims and claim adjustment expense at December 31, 2018, is as follows:

|  | December 31, 2018 |
|---|---|
|  | (in thousands) |
| Liability for unpaid claims and claim adjustment expenses, net of reinsurance: |  |
| Specialty insurance | $ 55,736 |
| Reinsurance recoverable on unpaid claims: |  |
| Specialty insurance | 28,290 |
| Unallocated claims adjustment expenses: |  |
| Specialty insurance | 1,213 |
| Insurance lines other than short-duration: |  |
| Title insurance | 957,440 |
| Liability for unpaid claims and claims adjustment expenses | $ 1,042,679 |

The following reflects supplementary information about average historical claims duration for the Company's specialty insurance segment as of December 31, 2018:

| | | | | | Average annual percentage payout of incurred claims by age, net of reinsurance (unaudited) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Years | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Annual payout | 82.6% | 14.7% | 1.5% | 0.8% | 0.3% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |

**NOTE 9.   Notes and Contracts Payable:**

|  | December 31, | |
|---|---|---|
|  | 2018 | 2017 |
|  | (in thousands, except percentages) | |
| 4.60% senior unsecured notes due November 15, 2024, effective interest rate of 4.60% | $ 300,000 | $ 300,000 |
| 4.30% senior unsecured notes due February 1, 2023, effective interest rate of 4.35% | 250,000 | 250,000 |
| Line of credit borrowings due May 14, 2019, weighted-average interest rate of 4.15% and 3.32% at December 31, 2018 and 2017, respectively | 160,000 | 160,000 |
| Trust deed notes with maturities through 2023, collateralized by land and buildings with net book values of $39,283 and $46,478 at December 31, 2018 and 2017, respectively, weighted-average interest rate of 5.26% and 5.27%, at December 31, 2018 and 2017, respectively | 19,247 | 22,725 |
| Other notes and contracts payable with maturities through 2032, weighted-average interest rate of 4.49% and 4.70% at December 31, 2018 and 2017, respectively | 5,791 | 3,707 |
|  | 735,038 | 736,432 |
| Unamortized discount – senior unsecured notes | (462) | (560) |
| Debt issuance costs – senior unsecured notes | (2,557) | (3,062) |
|  | $ 732,019 | $ 732,810 |

The weighted-average interest rate for the Company's notes and contracts payable was 4.42% and 4.24% at December 31, 2018 and 2017, respectively.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company maintains a credit agreement with JPMorgan Chase Bank, N.A. in its capacity as administrative agent and the lenders party thereto. The credit agreement is comprised of a $700.0 million revolving credit facility. Unless terminated earlier, the revolving loan commitments under the credit agreement will terminate and outstanding borrowings will become due and payable on May 14, 2019. The obligations of the Company under the credit agreement are neither secured nor guaranteed. Proceeds under the credit agreement may be used for general corporate purposes. At December 31, 2018, outstanding borrowings under the facility totaled $160.0 million at an interest rate of 4.15%.

The credit agreement includes an expansion option that permits the Company, subject to satisfaction of certain conditions, to increase the revolving commitments and/or add term loan tranches ("Incremental Term Loans") in an aggregate amount not to exceed $150.0 million. Incremental Term Loans, if made, may not mature prior to the revolving commitment termination date, provided that amortization may occur prior to such date.

At the Company's election, borrowings under the credit agreement bear interest at (a) the Alternate Base Rate plus the applicable spread or (b) the Adjusted LIBOR rate plus the applicable spread (in each case as defined in the agreement). The Company may select interest periods of one, two, three or six months or (if agreed to by all lenders) such other number of months for Eurodollar borrowings of loans. The applicable spread varies depending upon the debt rating assigned by Moody's Investor Service, Inc. and/or Standard & Poor's Rating Services. The minimum applicable spread for Alternate Base Rate borrowings is 0.625% and the maximum is 1.00%. The minimum applicable spread for Adjusted LIBOR rate borrowings is 1.625% and the maximum is 2.00%. The rate of interest on Incremental Term Loans will be established at or about the time such loans are made and may differ from the rate of interest on revolving loans.

The credit agreement includes representations and warranties, reporting covenants, affirmative covenants, negative covenants, financial covenants and events of default customary for financings of this type. Upon the occurrence of an event of default the lenders may accelerate the loans. Upon the occurrence of certain insolvency and bankruptcy events of default the loans will automatically accelerate. As of December 31, 2018, the Company was in compliance with the financial covenants under the credit agreement.

The aggregate annual maturities for notes and contracts payable for the next five years and thereafter, are as follows:

| Year | Annual maturities (in thousands) |
|------|---------------------------------:|
| 2019 | $ 165,384 |
| 2020 | 5,066 |
| 2021 | 4,965 |
| 2022 | 5,104 |
| 2023 | 254,403 |
| Thereafter | 300,116 |
| | $ 735,038 |

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 10.   Net Investment Income:**

The components of net investment income are as follows:

|  | Year ended December 31, | | |
|  | 2018 | 2017 | 2016 |
| --- | ---: | ---: | ---: |
|  | (in thousands) | | |
| Interest on: |  |  |  |
| Cash, cash equivalents and deposits with banks | $ 21,910 | $ 7,321 | $ 3,989 |
| Debt securities | 138,409 | 104,458 | 89,920 |
| Other investments | 64,328 | 22,221 | 7,818 |
| Dividends on equity securities | 12,718 | 12,925 | 12,684 |
| Deferred compensation plan assets | (6,399) | 14,211 | 5,861 |
| Equity in earnings of affiliates, net | 2,717 | 3,785 | 8,173 |
| Other | 106 | 607 | 130 |
| Total investment income | 233,789 | 165,528 | 128,575 |
| Investment expenses | (3,500) | (3,126) | (2,441) |
| Net investment income | $ 230,289 | $ 162,402 | $ 126,134 |

**NOTE 11.   Income Taxes:**

On December 22, 2017, comprehensive tax reform legislation known as the Tax Cuts and Jobs Act (the "Tax Reform Act") was signed into law.  The Tax Reform Act amended the Internal Revenue Code to reduce U.S. tax rates and modify policies, credits and deductions for individuals and businesses.

Also, on December 22, 2017, the SEC issued Staff Accounting Bulletin No. 118, which provided for a one-year measurement period that allowed businesses time to evaluate the financial statement implications of the Tax Reform Act and to analyze its impact on financial statements issued during the measurement period.  This was in recognition of the fact that the ultimate impact of the Tax Reform Act on a business' financial statements could differ, perhaps materially, from the amounts originally estimated due to further refinement of tax calculations, changes in interpretations and assumptions related to the Tax Reform Act, guidance issued by taxing authorities and regulatory bodies, and actions businesses could take as a result of the Tax Reform Act.  The Company completed its accounting for the impact of the Tax Reform Act during the measurement period and recorded adjustments of $6.8 million to its initial 2017 estimates during the fourth quarter of 2018.  Specifically, during 2018 the Company relied on regulations issued by the Internal Revenue Service and recorded an additional $3.0 million of foreign tax credits available to offset taxes due on the future repatriation of foreign earnings.  In addition, the Company recorded a tax benefit of $3.8 million as a result of adjustments made to its deferred tax balances as of December 31, 2017, primarily due to a change in its tax accounting method related to statutory premium reserves.  These amounts are reflected in the 2018 summary of income taxes and effective tax rate reconciliation below.

For the years ended December 31, 2018, 2017 and 2016, domestic and foreign pretax income from continuing operations before noncontrolling interests were $571.9 million and $37.6 million, $391.4 million and $53.9 million, and $416.5 million and $61.1 million, respectively.

81

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Income taxes are summarized as follows:

| | | Year ended December 31, | | | |
| | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Current: | | | | | |
| Federal | $ | 101,427 | $ | 116,400 | $ | 24,208 |
| State | | 12,285 | | 9,382 | | 1,943 |
| Foreign | | 8,990 | | 11,533 | | 10,806 |
| | | 122,702 | | 137,315 | | 36,957 |
| Deferred: | | | | | |
| Federal | | 4,381 | | (104,062) | | 91,190 |
| State | | 299 | | (10,724) | | 3,753 |
| Foreign | | 6,258 | | 939 | | 2,205 |
| | | 10,938 | | (113,847) | | 97,148 |
| | $ | 133,640 | $ | 23,468 | $ | 134,105 |

Income taxes differ from the amounts computed by applying the federal income tax rates of 21% for 2018 and 35.0% for 2017 and 2016. A reconciliation of these differences is as follows:

| | | Year ended December 31, | | | | | |
| | 2018 | | 2017 | | 2016 | | |
|---|---|---|---|---|---|---|---|
| | | | (in thousands, except percentages) | | | | |
| Taxes calculated at federal rate | $ | 128,003 | 21.0% | $ | 155,866 | 35.0% | $ | 167,153 | 35.0% |
| State taxes, net of federal benefit | | 9,941 | 1.6 | | (872) | (0.2) | | 3,703 | 0.8 |
| Change in liability for tax positions | | 875 | 0.1 | | (3,482) | (0.8) | | (10,512) | (2.2) |
| Foreign income taxed at different rates | | 7,287 | 1.2 | | (6,163) | (1.3) | | (7,983) | (1.7) |
| Federal tax credits | | — | — | | — | — | | (12,265) | (2.6) |
| Tax reform impact | | (6,804) | (1.1) | | (129,139) | (29.0) | | — | — |
| Unremitted foreign earnings | | (146) | — | | 14,997 | 3.3 | | — | — |
| Other items, net | | (5,516) | (0.9) | | (7,739) | (1.7) | | (5,991) | (1.2) |
| | $ | 133,640 | 21.9% | $ | 23,468 | 5.3% | $ | 134,105 | 28.1% |

The Company's effective income tax rates (income tax expense as a percentage of income before income taxes) were 21.9% for 2018, 5.3% for 2017, and 28.1% for 2016. The effective tax rates differ from the federal statutory rate as a result of state and foreign income taxes for which the Company is liable, as well as permanent differences between amounts reported for financial statement purposes and taxable income. The Company's effective tax rates for 2018 and 2017 also include the impact of the Tax Reform Act as discussed above, as well as the recognition of excess tax benefits associated with share-based payment transactions through income tax expense. The Company's effective tax rate for 2017 also reflects state tax benefits relating to the termination of the Company's defined benefit pension plan and the release of reserves relating to tax positions taken on prior year tax returns. The Company's effective tax rate for 2016 reflects the resolution of certain tax authority examinations and tax credits claimed in 2016 and in prior years.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The primary components of temporary differences that give rise to the Company's net deferred tax liability are as follows:

|  | December 31, | |
|---|---|---|
|  | **2018** | **2017** |
|  | (in thousands) | |
| Deferred tax assets: | | |
| Deferred revenue | $ 7,362 | $ 7,766 |
| Employee benefits | 87,960 | 86,519 |
| Bad debt reserves | 7,421 | 7,191 |
| Loss reserves | 1,793 | 1,372 |
| Pension | 18,817 | 22,600 |
| Net operating loss carryforward | 13,290 | 13,914 |
| Securities | 11,356 | — |
| Foreign tax credit | 8,415 | 7,976 |
| Other | 5,464 | 5,673 |
|  | 161,878 | 153,011 |
| Valuation allowance | (10,621) | (10,333) |
|  | 151,257 | 142,678 |
| Deferred tax liabilities: | | |
| Depreciable and amortizable assets | 230,758 | 204,863 |
| Claims and related salvage | 108,497 | 104,323 |
| Investments in affiliates | 1,957 | 3,343 |
| Securities | — | 11,656 |
| Unremitted foreign earnings | 10,506 | 14,997 |
|  | 351,718 | 339,182 |
| Net deferred tax liability | $ 200,461 | $ 196,504 |

The exercise of stock options and vesting of RSUs represent a tax benefit that has been reflected as a reduction of income taxes payable and a reduction of income tax expense for the years ended December 31, 2018 and 2017. The benefits recorded were $5.2 million and $3.4 million for the years ended December 31, 2018 and 2017, respectively.

In connection with the Company's June 2010 spin-off from its prior parent, the Company entered into a tax sharing agreement which governs the Company's and its prior parent's respective rights, responsibilities and obligations for certain tax-related matters. At December 31, 2018 and 2017, the Company had a net payable to its prior parent of $15.6 million and $15.0 million, respectively, related to tax matters prior to the spin-off. These amounts are included in the Company's consolidated balance sheets in accounts payable and accrued liabilities. The increase during the current year was primarily the result of an additional accrual for tax matters prior to the spin-off.

At December 31, 2018, the Company had available a foreign tax credit carryover net of valuation allowance of $8.3 million. The Company expects to utilize this credit within the carryover period.

At December 31, 2018, the Company had available net operating loss carryforwards for income tax purposes totaling $78.2 million, consisting of federal, state and foreign losses of $0.4 million, $35.9 million and $41.9 million, respectively. Of the aggregate net operating losses, $28.6 million has an indefinite expiration and the remaining $49.6 million expires at various times beginning in 2019.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company evaluates the realizability of its deferred tax assets by assessing the valuation allowance and makes adjustments to the allowance as necessary. The factors used to assess the likelihood of realization include the Company's forecast of future taxable income and available tax planni ng strategies that could be implemented to realize the deferred tax assets. The Company's ability or failure to achieve forecasted taxable income in the applicable taxing jurisdictions could affect the ultimate realization of deferred tax assets. At Dece mber 31, 2018 and 2017 , t he Company carrie d a valuation allowance of $ 10.6  million and $10.3 million, respectively, against its deferred tax assets.  Of this amount, $ 8.9  million and $9.3 million, respectively, relate d to net operating losses ; the remainin g $ 1.7  million and $1.0 million, respectively, relate d to other foreign deferred tax assets.   The year-over-year increase in the overall valuation allowance is primarily due to additional state and foreign net operating losses incurred in 2018 that are not expected to be realized .  Based on actual future operating results in certain jurisdictions, it is possible that the current valuation allowance positions of those jurisdictions could be adjusted in the next 12 months.

As of December 31, 2018, 2017 and 2016, the liability for income taxes associated with uncertain tax positions was $13.3 million, $12.8 million and $18.1 million, respectively. The net increase in the liability during 2018 was attributable to new uncertain tax positions and the net decreases in the liabilities during 2017 and 2016 were primarily attributable to activity related to examinations conducted by various taxing authorities. The liabilities could be reduced by $3.7 million as of December 31, 2018 and 2017, and $5.7 million as of December 31, 2016, due to offsetting tax benefits associated with the correlative effects of potential adjustments, including timing adjustments and state income taxes. The net amounts of $9.6 million, $9.1 million and $12.4 million as of December 31, 2018, 2017 and 2016, respectively, if recognized, would favorably affect the Company's effective tax rate.

A reconciliation of the beginning and ending amounts of unrecognized tax benefits for the years ended December 31, 2018, 2017 and 2016 is as follows:

|  | December 31, | | |
|---|---|---|---|
|  | 2018 | 2017 | 2016 |
|  | (in thousands) | | |
| Unrecognized tax benefits—beginning balance | $ 12,800 | $ 18,100 | $ 23,800 |
| Gross decreases—prior period tax positions | — | (1,000) | (7,100) |
| Gross increases—current period tax positions | 500 | — | 1,400 |
| Settlements with taxing authorities | — | (4,300) | — |
| Unrecognized tax benefits—ending balance | $ 13,300 | $ 12,800 | $ 18,100 |

The Company's continuing practice is to recognize interest and penalties, if any, related to uncertain tax positions in income tax expense. As of December 31, 2018, 2017 and 2016, the Company had accrued $5.8 million, $5.3 million and $4.1 million, respectively, of interest and penalties (net of tax benefits of $1.6 million, $1.4 million and $1.8 million, respectively) related to uncertain tax positions.

84

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company, or one of its subsidiaries, files income tax returns in the U.S. federal jurisdiction, var ious state jurisdictions and various non-U.S. jurisdictions.  The primary non-federal jurisdictions are California, Canada, India and the United Kingdom.  As of December 31, 2018, the Company had concluded U.S. federal income tax examinations through 2015 and is generally no longer subject to state and non-U.S. income tax examinations for years prior to 2005.

It is reasonably possible that the amount of the unrecognized benefit with respect to certain of the Company's unrecognized tax positions may significantly decrease within the next 12 months.  Any such change may be the result of ongoing audits or the expiration of federal and state statutes of limitations for the assessment of taxes.

The Company records a liability for potential tax assessments based on its estimate of the potential exposure. New tax laws and new interpretations of laws and rulings by tax authorities may affect the liability for potential tax assessments. Due to the subjectivity and complex nature of the underlying issues, actual payments or assessments may differ from estimates. To the extent that the Company's estimates differ from actual payments or assessments, income tax expense is adjusted. The Company's income tax returns in several jurisdictions are being examined by various taxing authorities. The Company believes that adequate amounts of tax and related interest, if any, from any adjustments that may result from these examinations have been provided for.

**NOTE 12.   Earnings Per Share:**

The computation of basic and diluted earnings per share is as follows:

|  | Year ended December 31, | | |
| --- | --- | --- | --- |
|  | **2018** | **2017** | **2016** |
|  | **(in thousands, except per share data)** | | |
| Numerator |  |  |  |
| Net income attributable to the Company | $    474,496 | $    423,049 | $    342,993 |
| Denominator |  |  |  |
| Basic weighted-average shares | 112,613 | 111,668 | 110,548 |
| Effect of dilutive employee stock options and RSUs | 666 | 767 | 608 |
| Diluted weighted-average shares | 113,279 | 112,435 | 111,156 |
| Net income per share attributable to the Company's stockholders |  |  |  |
| Basic | $    4.21 | $    3.79 | $    3.10 |
| Diluted | $    4.19 | $    3.76 | $    3.09 |

For the years ended December 31, 2018 and 2017, 11 thousand and 2 thousand RSUs, respectively, were excluded from the weighted-average diluted common shares outstanding due to their antidilutive effect. For the year ended December 31, 2016, no stock options or RSUs had an antidilutive effect on weighted-average diluted common shares outstanding.

85

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 13.   Employee Benefit Plans:**

The First American Financial Corporation 401(k) Savings Plan (the "Savings Plan") allows for employee-elective contributions up to the maximum amount as determined by the Internal Revenue Code. The Company makes discretionary contributions to the Savings Plan based on profitability, as well as the contributions of participants. The Savings Plan held 2,162,000 shares and 2,428,000 shares of the Company's common stock, representing 1.9% and 2.2% of the Company's total common shares outstanding at December 31, 2018 and 2017, respectively. Effective July 1, 2015, participants in the Savings Plan can no longer make additional investments in common stock of the Company.

The Company maintains a deferred compensation plan for certain employees that allows participants to defer up to 100% of their salary, commissions and certain bonuses. Participants can allocate their deferrals among a variety of investment crediting options (known as "deemed investments"). The term deemed investments means that the participant has no ownership interest in the funds they select; the funds are only used to measure the gains or losses that will be attributed to each participant's deferral account over time. Participants can elect to have their deferral balance paid out while they are still employed or after their employment ends. The deferred compensation plan is exempt from most provisions of the Employee Retirement Income Security Act ("ERISA") because it is only available to a select group of management and highly compensated employees and is not a qualified employee benefit plan. To preserve the tax-deferred savings advantages of a nonqualified deferred compensation plan, federal law requires that it be unfunded or informally funded. Participant deferrals, and any earnings on those deferrals, are general unsecured obligations of the Company. The Company informally funds the deferred compensation plan through a tax-advantaged investment known as variable universal life insurance. Deferred compensation plan assets are held as an asset of the Company within a special trust, known as a "Rabbi Trust." At December 31, 2018 and 2017, the value of the assets held in the Rabbi Trust of $86.5 million and $92.7 million, respectively, and the unfunded liabilities of $94.3 million and $97.2 million, respectively, were included in the consolidated balance sheets in other assets and pension costs and other retirement plans, respectively.

The Company also has nonqualified, unfunded supplemental benefit plans covering certain management personnel. The Executive and Management Supplemental Benefit Plans, subject to certain limitations, provide participants with maximum benefits of 30% and 15%, respectively, of average annual compensation over a fixed five year period. Effective January 1, 2011, the plans were closed to new participants.

During 2016, the Company, and a subsidiary of the Company, terminated their funded defined benefit pension plans.  Also, during 2016, the Company made additional cash contributions of $84.8 million above scheduled amounts and provided lump sum distributions to certain participants from pension plan assets totaling $127.2 million, for which the Company recognized $66.3 million in settlement costs.  During 2017, the Company made cash contributions of $34.0 million to fully fund its pension obligation, completed the transfer of all remaining benefit obligations related to the pension plans to a highly rated insurance company, and recognized $152.4 million in settlement costs in the consolidated statements of income.

Certain of the Company's subsidiaries have separate savings and employee benefit plans. Expenses related to these plans and the Company's deferred compensation plan are included in the table below under "other plans, net".

The principal components of employee benefit costs are as follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
|  | (in thousands) | | |
| Expense: | | | |
| Savings plan | $        46,208 | $        34,520 | $        33,109 |
| Funded defined benefit pension plans | — | 162,368 | 88,908 |
| Unfunded supplemental benefit plans | 9,248 | 12,705 | 13,613 |
| Other plans, net | 2,794 | 17,595 | 10,090 |
|  | $        58,250 | $      227,188 | $      145,720 |

86

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes the benefit obligations and funded status associated with the Company's unfunded supplemental benefit and funded defined benefit pension plans :

| | December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | |
| | **Unfunded supplemental benefit plans** | **Unfunded supplemental benefit plans** | **Defined benefit pension plans** |
| | (in thousands) | | |
| Change in projected benefit obligation: | | | |
| Benefit obligation at beginning of year | $ 258,528 | $ 251,204 | $ 315,108 |
| Service costs | 519 | 734 | — |
| Interest costs | 8,079 | 8,350 | 4,911 |
| Actuarial (gains) losses | (16,517) | 11,761 | 8,560 |
| Annuity purchase | — | — | (318,592) |
| Benefits paid | (13,836) | (13,521) | (9,987) |
| Projected benefit obligation at end of year | 236,773 | 258,528 | — |
| Change in plan assets: | | | |
| Fair value of plan assets at beginning of year | — | — | 291,760 |
| Actual returns on plan assets | — | — | 2,859 |
| Contributions | 13,836 | 13,521 | 33,960 |
| Annuity purchase | — | — | (318,592) |
| Benefits paid | (13,836) | (13,521) | (9,987) |
| Fair value of plan assets at end of year | — | — | — |
| Reconciliation of funded status: | | | |
| Unfunded status of the plans | $ 236,773 | $ 258,528 | $ — |
| Amounts recognized in the consolidated balance sheet: | | | |
| Accrued benefit liability | $ 236,773 | $ 258,528 | $ — |
| Amounts recognized in accumulated other comprehensive loss: | | | |
| Unrecognized net actuarial loss | $ 80,251 | $ 101,596 | $ — |
| Unrecognized prior service credit | (8,250) | (12,429) | — |
| | $ 72,001 | $ 89,167 | $ — |
| Accumulated benefit obligation at end of year | $ 236,773 | $ 258,528 | $ — |

Net periodic costs related to the Company's unfunded supplemental benefit and funded defined benefit pension plans included the following components:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | (in thousands) | | |
| Expense: | | | |
| Service costs | $ 519 | $ 734 | $ 1,042 |
| Interest costs | 8,079 | 13,261 | 24,090 |
| Expected return on plan assets | — | (4,740) | (12,386) |
| Amortization of net actuarial loss | 4,828 | 17,742 | 28,282 |
| Amortization of prior service credit | (4,178) | (4,312) | (4,844) |
| Settlement costs | — | 152,388 | 66,337 |
| | $ 9,248 | $ 175,073 | $ 102,521 |

87

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company adopted new accounting guidance which requires the components of net periodic cost, other than the service cost component, to be included in other operating expenses in the Company's consolidated statements of income.  The change was applied retrospectively to the prior year, which resulted in a reclass of $175.0 million and $101.5 million from personnel costs to other operating expenses for the years ended December 31, 2017 and 2016, respectively.  For further informati on about the new guidance see Note 1 Basis of Presentation and Significant Accounting Policies.

For the years ended December 31, 2017 and 2016, net periodic cost includes costs related to the Company's previously terminated defined benefit pension plans, for which the Company has no remaining obligation.

Net actuarial loss and prior service credit for the unfunded supplemental benefit plans expected to be amortized from accumulated other comprehensive loss into net periodic cost over the next fiscal year include an expense of $3.7 million and a credit of $4.1 million, respectively.

The weighted-average discount rate assumptions used to determine net periodic benefit costs for the Company's unfunded supplemental benefits plans for the years ended December 31, 2018, 2017 and 2016, were as follows:

|  | Year ended December 31, | | |
|  | **2018** | **2017** | **2016** |
|---|---|---|---|
| Discount rate for projected benefit obligation | 3.61% | 4.03% | 4.33% |
| Discount rate for service cost | 3.78% | 4.32% | 4.69% |
| Discount rate for interest cost | 3.23% | 3.43% | 3.56% |

The weighted-average discount rate assumption used to determine the projected benefit obligation for the Company's unfunded supplemental benefits plans at December 31, 2018 and 2017, was as follows:

|  | December 31, | |
|  | **2018** | **2017** |
|---|---|---|
| Discount rate | 4.32% | 3.61% |

The discount rate assumptions used for the Company's benefit plans reflect the yield available on high-quality, fixed-income debt securities that match the expected timing of the benefit obligation payments.

The Company expects to make cash contributions of $14.6 million to its unfunded supplemental benefit plans during 2019.

Benefit payments, which reflect expected future service, as appropriate, are expected to be made as follows:

| Year | (in thousands) |
|---|---|
| 2019 | $ 14,588 |
| 2020 | $ 15,626 |
| 2021 | $ 16,000 |
| 2022 | $ 16,259 |
| 2023 | $ 16,492 |
| Five years thereafter | $ 81,032 |

88

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 14.   Fair Value Measurements:**

Certain of the Company's assets are carried at fair value.  Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

The Company categorizes its assets and liabilities carried at fair value using a three-level hierarchy for fair value measurements that distinguishes between market participant assumptions developed based on market data obtained from sources independent of the Company (observable inputs) and the Company's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs).  The hierarchy for inputs used in determining fair value maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that observable inputs be used when available.  The hierarchy level assigned to the assets and liabilities is based on management's assessment of the transparency and reliability of the inputs used to estimate the fair values at the measurement date.  The three hierarchy levels are defined as follows:

Level 1—Valuations based on unadjusted quoted market prices in active markets for identical assets or liabilities.

Level 2—Valuations based on observable inputs (other than Level 1 prices), such as quoted prices for similar assets or liabilities at the measurement date; quoted prices in markets that are not active; or other inputs that are observable, either directly or indirectly.

Level 3—Valuations based on inputs that are unobservable and significant to the overall fair value measurement, and involve management judgment.

If the inputs used to measure fair value fall into different levels of the fair value hierarchy, the hierarchy level assigned is based upon the lowest level of input that is significant to the fair value measurement.

**Assets measured at fair value on a recurring basis**

The valuation techniques and inputs used by the Company to estimate the fair value of assets measured on a recurring basis are summarized as follows:

*Debt securities*

The fair values of debt securities were based on the market values obtained from independent pricing services that were evaluated using pricing models that vary by asset class and incorporate available trade, bid and other market information and price quotes from well-established, independent broker-dealers.  The independent pricing services monitor market indicators, industry and economic events, and for broker-quoted only securities, obtain quotes from market makers or broker-dealers that they recognize to be market participants. The pricing services utilize the market approach in determining the fair values of the debt securities held by the Company.  The Company obtains an understanding of the valuation models and assumptions utilized by the services and has controls in place to determine that the values provided represent fair values.  The Company's validation procedures include comparing prices received from the pricing services to quotes received from other third party sources for certain securities with market prices that are readily verifiable.  If the price comparison results in differences over a predefined threshold, the Company will assess the reasonableness of the changes relative to prior periods given the prevailing market conditions and assess changes in the issuers' credit worthiness, performance of any underlying collateral and prices of the instrument relative to similar issuances.  To date, the Company has not made any material adjustments to the fair value measurements provided by the pricing services.

Typical inputs and assumptions to pricing models used to value the Company's debt securities include, but are not limited to, benchmark yields, reported trades, broker-dealer quotes, credit spreads, credit ratings, bond insurance (if applicable), benchmark securities, bids, offers, reference data and industry and economic events.  For mortgage-backed securities, inputs and assumptions may also include the structure of issuance, characteristics of the issuer, collateral attributes and prepayment speeds.

*Equity securities*

The fair values of equity securities, including preferred and common stocks, were based on quoted market prices for identical assets that are readily and regularly available in an active market.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables present the fair values of the Company's assets, measured on a recurring basis, as of December 31, 201 8 and 201 7 :

| (in thousands) | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **December 31, 2018** | | | | |
| **Assets:** | | | | |
| Debt securities: | | | | |
| U.S. Treasury bonds | $ 162,506 | $ — | $ 162,506 | $ — |
| Municipal bonds | 1,045,035 | — | 1,045,035 | — |
| Foreign government bonds | 157,297 | — | 157,297 | — |
| Governmental agency bonds | 316,167 | — | 316,167 | — |
| Governmental agency mortgage-backed securities | 3,202,599 | — | 3,202,599 | — |
| U.S. corporate debt securities | 561,260 | — | 561,260 | — |
| Foreign corporate debt securities | 268,947 | — | 268,947 | — |
| | 5,713,811 | — | 5,713,811 | — |
| Equity securities: | | | | |
| Preferred stocks | 14,162 | 14,162 | — | — |
| Common stocks | 339,373 | 339,373 | — | — |
| | 353,535 | 353,535 | — | — |
| Total assets | $ 6,067,346 | $ 353,535 | $ 5,713,811 | $ — |

| (in thousands) | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **December 31, 2017** | | | | |
| **Assets:** | | | | |
| Debt securities: | | | | |
| U.S. Treasury bonds | $ 173,998 | $ — | $ 173,998 | $ — |
| Municipal bonds | 1,035,937 | — | 1,035,937 | — |
| Foreign government bonds | 169,488 | — | 169,488 | — |
| Governmental agency bonds | 211,470 | — | 211,470 | — |
| Governmental agency mortgage-backed securities | 2,158,957 | — | 2,158,957 | — |
| U.S. corporate debt securities | 743,215 | — | 700,347 | 42,868 |
| Foreign corporate debt securities | 259,619 | — | 257,953 | 1,666 |
| | 4,752,684 | — | 4,708,150 | 44,534 |
| Equity securities: | | | | |
| Preferred stocks | 18,990 | 18,990 | — | — |
| Common stocks | 447,526 | 447,526 | — | — |
| | 466,516 | 466,516 | — | — |
| Total assets | $ 5,219,200 | $ 466,516 | $ 4,708,150 | $ 44,534 |

There were no transfers between Levels 1 and 2 during the years ended December 31, 2018 and 2017. Transfers into or out of the Level 3 category occur when unobservable inputs become more or less significant to the fair value measurement. The Company's policy is to recognize transfers between levels in the fair value hierarchy at the end of the reporting period.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables present a summary of the changes in the fair values of Level 3 assets for the years ended December 31, 201 8 and 201 7 :

| (in thousands) | December 31, 2018 | | | December 31, 2017 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | U.S. corporate debt securities | Foreign corporate debt securities | Total | U.S. corporate debt securities | Foreign corporate debt securities | Total |
| Fair value at beginning of period | $ 42,868 | $ 1,666 | $ 44,534 | $ 46,665 | $ 6,268 | $ 52,933 |
| Transfers into Level 3 | — | — | — | 7,991 | — | 7,991 |
| Transfers out of Level 3 | (25,089) | (788) | (25,877) | (14,472) | (1,112) | (15,584) |
| Net realized and unrealized gains (losses): | | | | | | |
| Included in earnings | (194) | 3 | (191) | (172) | 18 | (154) |
| Included in other comprehensive income (loss) | (156) | (6) | (162) | (300) | (52) | (352) |
| Purchases | — | — | — | 26,399 | 1,847 | 28,246 |
| Sales | (8,838) | (349) | (9,187) | (7,606) | (1,737) | (9,343) |
| Settlements | (8,591) | (526) | (9,117) | (15,637) | (3,566) | (19,203) |
| Fair value at end of period | $ — | $ — | $ — | $ 42,868 | $ 1,666 | $ 44,534 |

**Financial instruments not measured at fair value**

In estimating the fair values of its financial instruments not measured at fair value, the Company used the following methods and assumptions:

*Cash and cash equivalents*

The carrying amount for cash and cash equivalents approximates fair value due to the short-term maturity of these investments.

*Deposits with banks*

The fair value of deposits with banks is estimated based on rates currently offered for deposits of similar remaining maturities, where applicable.

*Notes receivable, net*

The fair value of notes receivable, net is estimated based on current market rates being offered for notes with similar maturities and credit quality.

*Secured financings receivable*

The carrying amount of secured financings receivable approximates fair value due to the short-term nature of these assets.

*Secured financings payable*

The carrying amount of secured financings payable approximates fair value due to the short-term nature of these liabilities.

*Notes and contracts payable*

The fair value of notes and contracts payable is estimated based on current rates offered to the Company for debt of similar remaining maturities.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table presents the carrying amounts and estimated fair values of the Company's financial instruments not measured at fair value as of December 31, 201 8 and 201 7 :

| (in thousands) | Carrying Amount | Estimated fair value | | | |
| --- | --- | --- | --- | --- | --- |
| | | Total | Level 1 | Level 2 | Level 3 |
| **December 31, 2018** | | | | | |
| **Assets:** | | | | | |
| Cash and cash equivalents | $ 1,467,129 | $ 1,467,129 | $ 1,467,129 | $ — | $ — |
| Deposits with banks | $ 36,209 | $ 35,979 | $ 4,307 | $ 31,672 | $ — |
| Notes receivable, net | $ 13,237 | $ 12,805 | $ — | $ — | $ 12,805 |
| Secured financings receivable | $ 76,311 | $ 76,311 | $ — | $ 76,311 | $ — |
| **Liabilities:** | | | | | |
| Secured financings payable | $ 76,313 | $ 76,313 | $ — | $ 76,313 | $ — |
| Notes and contracts payable | $ 732,019 | $ 741,839 | $ — | $ 736,048 | $ 5,791 |

| (in thousands) | Carrying Amount | Estimated fair value | | | |
| --- | --- | --- | --- | --- | --- |
| | | Total | Level 1 | Level 2 | Level 3 |
| **December 31, 2017** | | | | | |
| **Assets:** | | | | | |
| Cash and cash equivalents | $ 1,387,226 | $ 1,387,226 | $ 1,387,226 | $ — | $ — |
| Deposits with banks | $ 41,335 | $ 41,259 | $ 6,846 | $ 34,413 | $ — |
| Notes receivable, net | $ 7,066 | $ 6,798 | $ — | $ — | $ 6,798 |
| **Liabilities:** | | | | | |
| Notes and contracts payable | $ 732,810 | $ 755,670 | $ — | $ 751,827 | $ 3,843 |

**NOTE 15.   Share-Based Compensation Plans:**

The First American Financial Corporation 2010 Incentive Compensation Plan (the "Incentive Compensation Plan"), effective May 28, 2010, permits the granting of stock options, stock appreciation rights, restricted stock, RSUs, performance units, performance shares and other stock-based awards. Eligible participants, which include the Company's directors and officers, as well as other employees, may elect to defer the distribution of their RSUs to a future date beyond the scheduled vesting date. At December 31, 2018, 2.5 million shares of common stock remain available to be issued from either authorized and unissued shares or previously issued shares acquired by the Company, subject to certain annual limits based on the type of award granted. The Incentive Compensation Plan terminates 10 years from its effective date unless previously canceled by the Company's board of directors.

The First American Financial Corporation 2010 Employee Stock Purchase Plan (the "ESPP") allows eligible employees the option to purchase common stock of the Company at 85% of the lower of the closing price on either the first or last day of each quarterly offering period. There were 363,000 and 390,000 shares issued in connection with this plan for the years ended December 31, 2018 and 2017, respectively. At December 31, 2018, there were 2.0 million shares reserved for future issuances.

The following table summarizes the costs associated with the Company's share-based compensation plans:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | (in thousands) | | |
| Expense: | | | |
| RSUs | $ 37,597 | $ 34,059 | $ 31,120 |
| Stock options | — | 263 | 271 |
| Employee stock purchase plan | 3,548 | 3,077 | 2,734 |
| | $ 41,145 | $ 37,399 | $ 34,125 |

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes RSU activity for the year ended December 31, 2018:

| (in thousands, except weighted-average grant-date fair value) | Shares | | Weighted-average grant-date fair value |
|---|---|---|---|
| Unvested at December 31, 2017 | 1,411 | $ | 36.66 |
| Granted during 2018 | 791 | | 54.80 |
| Vested during 2018 | (919) | | 41.27 |
| Forfeited during 2018 | (35) | | 44.84 |
| Unvested at December 31, 2018 | 1,248 | $ | 44.53 |

As of December 31, 2018, there was $28.1 million of total unrecognized compensation cost related to unvested RSUs that is expected to be recognized over a weighted-average period of 2.2 years. The fair value of RSUs is generally based on the market value of the Company's shares on the date of grant. The weighted average grant-date fair value of RSUs was $54.80, $39.56 and $36.70 for the years ended December 31, 2018, 2017 and 2016, respectively. The total fair value of shares distributed for the years ended December 31, 2018, 2017 and 2016 was $54.5 million, $34.6 million and $29.0 million, respectively. At December 31, 2018, 1.0 million shares were vested but not distributed.

The following table summarizes stock option activity for the year ended December 31, 2018:

| (in thousands, except weighted-average exercise price and contractual term) | Number outstanding | | Weighted-average exercise price | Weighted-average remaining contractual term | Aggregate intrinsic value | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2017 | 66 | $ | 27.66 | | | |
| Exercised during 2018 | (36) | | 27.66 | | | |
| Balance at December 31, 2018 | 30 | $ | 27.66 | 5.0 years | $ | 509 |
| Exercisable at December 31, 2018 | 30 | $ | 27.66 | 5.0 years | $ | 509 |

As of December 31, 2018, there was no unrecognized compensation cost related to unvested stock options.

Cash proceeds from stock options exercised totaled $1.0 million and $1.8 million, and the total intrinsic value of stock options exercised was $1.1 million and $1.0 million for the years ended December 31, 2018 and 2017, respectively. No stock options were exercised during the year ended December 31, 2016. Intrinsic value represents the difference between the fair market value of the Company's common stock on the date of exercise and the exercise price of each option.

**NOTE 16.   Stockholders' Equity:**

In March 2014, the Company's board of directors approved an increase in the size of the Company's stock repurchase plan from $150.0 million to $250.0 million, of which $163.6 million remained as of December 31, 2018. Purchases may be made from time to time by the Company in the open market at prevailing market prices or in privately negotiated transactions. During the year ended December 31, 2018, the Company repurchased and retired 425 thousand shares of its common stock for a total purchase price of $18.8 million and as of December 31, 2018, had repurchased and retired 3.6 million shares of its common stock under the current authorization for a total purchase price of $86.4 million.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 17.   Accumulated Other Comprehensive Income (Loss) ("AOCI"):**

The following table presents a summary of the changes in each component of AOCI for the years ended December 31, 2018, 2017 and 2016:

| | Unrealized gains (losses) on securities | Foreign currency translation adjustment | Pension benefit adjustment | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|
| | | | (in thousands) | |
| Balance at December 31, 2015 | $ (16,401) | $ (57,242) | $ (165,357) | $ (239,000) |
| Change in unrealized gains (losses) on debt and equity securities | (15,702) | — | — | (15,702) |
| Change in foreign currency translation adjustment | — | (6,334) | — | (6,334) |
| Net actuarial loss | — | — | (48,803) | (48,803) |
| Amortization of net actuarial loss | — | — | 28,282 | 28,282 |
| Amortization of prior service credit | — | — | (4,844) | (4,844) |
| Settlement costs | — | — | 66,337 | 66,337 |
| Tax effect | 5,343 | — | (15,672) | (10,329) |
| Balance at December 31, 2016 | (26,760) | (63,576) | (140,057) | (230,393) |
| Change in unrealized gains (losses) on debt and equity securities | 86,834 | — | — | 86,834 |
| Change in foreign currency translation adjustment | — | 24,744 | — | 24,744 |
| Net actuarial loss | — | — | (20,407) | (20,407) |
| Amortization of net actuarial loss | — | — | 17,742 | 17,742 |
| Amortization of prior service credit | — | — | (4,312) | (4,312) |
| Settlement costs | — | — | 152,388 | 152,388 |
| Tax effect | (23,271) | — | (70,814) | (94,085) |
| Balance at December 31, 2017 | 36,803 | (38,832) | (65,460) | (67,489) |
| Cumulative-effect adjustment, net of taxes (1) | (40,550) | — | — | (40,550) |
| Change in unrealized gains (losses) on debt securities | (49,661) | — | — | (49,661) |
| Change in foreign currency translation adjustment | — | (28,145) | — | (28,145) |
| Net actuarial gain | — | — | 16,517 | 16,517 |
| Amortization of net actuarial loss | — | — | 4,828 | 4,828 |
| Amortization of prior service credit | — | — | (4,178) | (4,178) |
| Tax effect | 11,243 | 1,349 | (4,487) | 8,105 |
| Balance at December 31, 2018 | $ (42,165) | $ (65,628) | $ (52,780) | $ (160,573) |

(1)    The Company recognized a cumulative-effect adjustment to retained earnings for cumulative net unrealized gains related to its investments in equity securities upon adoption of new accounting guidance on January 1, 2018.  See Note 1 Basis of Presentation and Significant Accounting Policies for further discussion of the new guidance.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Components of AOCI allocated to the Company and noncontrolling interests at December 31, 201 8 , 201 7 and 201 6 , are as follows:

| | Unrealized gains (losses) on securities | Foreign currency translation adjustment | Pension benefit adjustment | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|
| | (in thousands) | | | |
| **2018** | | | | |
| Allocated to the Company | $ (42,167) | $ (65,628) | $ (52,780) | $ (160,575) |
| Allocated to noncontrolling interests | 2 | — | — | 2 |
| Balance at December 31, 2018 | $ (42,165) | $ (65,628) | $ (52,780) | $ (160,573) |
| **2017** | | | | |
| Allocated to the Company | $ 36,783 | $ (38,832) | $ (65,460) | $ (67,509) |
| Allocated to noncontrolling interests | 20 | — | — | 20 |
| Balance at December 31, 2017 | $ 36,803 | $ (38,832) | $ (65,460) | $ (67,489) |
| **2016** | | | | |
| Allocated to the Company | $ (26,767) | $ (63,576) | $ (140,057) | $ (230,400) |
| Allocated to noncontrolling interests | 7 | — | — | 7 |
| Balance at December 31, 2016 | $ (26,760) | $ (63,576) | $ (140,057) | $ (230,393) |

The following table presents the other comprehensive income (loss) reclassification adjustments for the years ended December 31, 2018, 2017 and 2016:

| | Unrealized gains (losses) on securities | Foreign currency translation adjustment | Pension benefit adjustment | Total other comprehensive income (loss) |
|---|---|---|---|---|
| | (in thousands) | | | |
| Year ended December 31, 2018 | | | | |
| Pretax change before reclassifications | $ (63,910) | $ (28,145) | $ 16,517 | $ (75,538) |
| Reclassifications out of AOCI | 14,249 | — | 650 | 14,899 |
| Tax effect | 11,243 | 1,349 | (4,487) | 8,105 |
| Total other comprehensive income (loss), net of tax | $ (38,418) | $ (26,796) | $ 12,680 | $ (52,534) |
| Year ended December 31, 2017 | | | | |
| Pretax change before reclassifications | $ 101,553 | $ 24,744 | $ (20,407) | $ 105,890 |
| Reclassifications out of AOCI | (14,719) | — | 165,818 | 151,099 |
| Tax effect | (23,271) | — | (70,814) | (94,085) |
| Total other comprehensive income (loss), net of tax | $ 63,563 | $ 24,744 | $ 74,597 | $ 162,904 |
| Year ended December 31, 2016 | | | | |
| Pretax change before reclassifications | $ 2,617 | $ (6,334) | $ (48,803) | $ (52,520) |
| Reclassifications out of AOCI | (18,319) | — | 89,775 | 71,456 |
| Tax effect | 5,343 | — | (15,672) | (10,329) |
| Total other comprehensive income (loss), net of tax | $ (10,359) | $ (6,334) | $ 25,300 | $ 8,607 |

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table presents the effect of the reclassifications out of AOCI on the respective line items in the consolidated statements of income:

| | Amounts reclassified from AOCI | | | | | | |
|---|---|---|---|---|---|---|---|
| | Year ended December 31, | | | | | | |
| (in thousands) | 2018 | | 2017 | | 2016 | | Affected line items |
| Unrealized gains (losses) on securities: | | | | | | | |
| Net realized gains (losses) on sales of securities (1) | $ | (14,249) | $ | 14,719 | $ | 18,804 | Net realized investment (losses) gains |
| Net other-than-temporary impairment losses | | — | | — | | (485) | Net realized investment (losses) gains |
| Pretax total | $ | (14,249) | $ | 14,719 | $ | 18,319 | |
| Tax effect | $ | 3,226 | $ | (5,259) | $ | (7,007) | |
| Pension benefit adjustment (2): | | | | | | | |
| Amortization of net actuarial loss | $ | (4,828) | $ | (17,742) | $ | (28,282) | Other operating expenses |
| Amortization of prior service credit | | 4,178 | | 4,312 | | 4,844 | Other operating expenses |
| Settlement costs | | — | | (152,388) | | (66,337) | Other operating expenses |
| Pretax total | $ | (650) | $ | (165,818) | $ | (89,775) | |
| Tax effect | $ | 170 | $ | 67,322 | $ | 34,339 | |

(1)    Net realized losses for the year ended December 31, 2018 related to sales of debt securities and net realized gains for the years ended December 31, 2017 and 2016 related to sales of debt and equity securities.

(2)    These components of AOCI are components of net periodic cost.  See Note 13 Employee Benefit Plans for additional details.

**NOTE 18.    Commitments and Contingencies:**

*Lease commitments*

The Company leases certain office facilities, automobiles and equipment under operating leases, which, for the most part, are renewable. The majority of these leases also provide that the Company pay insurance and taxes.

Future minimum rental payments under operating leases that have initial noncancelable lease terms in excess of one year, as of December 31, 2018, are as follows:

| Year | (in thousands) | |
|---|---|---|
| 2019 | $ | 76,375 |
| 2020 | | 68,026 |
| 2021 | | 54,853 |
| 2022 | | 41,859 |
| 2023 | | 28,948 |
| Thereafter | | 64,732 |
| | $ | 334,793 |

Total rental expense for all operating leases, including month-to-month rentals, was $89.4 million, $91.0 million and $91.4 million for the years ended December 31, 2018, 2017 and 2016, respectively.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 19.   Litigation and Regulatory Contingencies:**

The Company and its subsidiaries are parties to a number of non-ordinary course lawsuits.  These lawsuits frequently are similar in nature to other lawsuits pending against the Company's competitors.

For those non-ordinary course lawsuits where the Company has determined that a loss is both probable and reasonably estimable, a liability representing the best estimate of the Company's financial exposure based on known facts has been recorded.  Actual losses may materially differ from the amounts recorded.

For a substantial majority of these lawsuits, however, it is not possible to assess the probability of loss.  Most of these lawsuits are putative class actions which require a plaintiff to satisfy a number of procedural requirements before proceeding to trial.  These requirements include, among others, demonstration to a court that the law proscribes in some manner the Company's activities, the making of factual allegations sufficient to suggest that the Company's activities exceeded the limits of the law and a determination by the court—known as class certification—that the law permits a group of individuals to pursue the case together as a class.  In certain instances the Company may also be able to compel the plaintiff to arbitrate its claim on an individual basis.  If these procedural requirements are not met, either the lawsuit cannot proceed or, as is the case with class certification or compelled arbitration, the plaintiffs lose the financial incentive to proceed with the case (or the amount at issue effectively becomes de minimis).  Frequently, a court's determination as to these procedural requirements is subject to appeal to a higher court.  As a result of, among other factors, ambiguities and inconsistencies in the myriad laws applicable to the Company's business and the uniqueness of the factual issues presented in any given lawsuit, the Company often cannot determine the probability of loss until a court has finally determined that a plaintiff has satisfied applicable procedural requirements.

Furthermore, because most of these lawsuits are putative class actions, it is often impossible to estimate the possible loss or a range of loss amounts, even where the Company has determined that a loss is reasonably possible.  Generally class actions involve a large number of people and the effort to determine which people satisfy the requirements to become plaintiffs—or class members—is time consuming and burdensome.  Moreover, these lawsuits raise complex factual issues which result in uncertainty as to their outcome and, ultimately, make it difficult for the Company to estimate the amount of damages which a plaintiff might successfully prove.  In addition, many of the Company's businesses are regulated by various federal, state, local and foreign governmental agencies and are subject to numerous statutory guidelines.  These regulations and statutory guidelines often are complex, inconsistent or ambiguous, which results in additional uncertainty as to the outcome of a given lawsuit—including the amount of damages a plaintiff might be afforded—or makes it difficult to analogize experience in one case or jurisdiction to another case or jurisdiction.

Most of the non-ordinary course lawsuits to which the Company and its subsidiaries are parties challenge practices in the Company's title insurance business, though a limited number of cases also pertain to the Company's other businesses.  These lawsuits include, among others, cases alleging, among other assertions, that the Company or one of its subsidiaries engaged in improper debt collection practices, improperly charged fees for products and services, participated in the conveyance of illusory property interests, failed to pay overtime and provide break periods, improperly handled property and casualty claims and gave items of value to builders as inducements to refer business in violation of certain laws, such as consumer protection laws and laws generally prohibiting unfair business practices, and certain obligations, including:

- Bartine v. First American Title Insurance Company, et al., filed on August 17, 2018 and pending in the United States District Court for the Middle District of Florida,

- Brackens v. First American Home Warranty Corporation, filed on November 28, 2018 and pending in the United States District Court for the District of Arizona,

- Lennen v. First American Financial Corporation, et al., filed on May 19, 2016 and pending in the United States District Court for the Middle District of Florida,

- Leramo v. First American Title Insurance Company, et al., filed on December 19, 2018 and pending in the United States District Court for the Eastern District of California,

- Simons v. First American Title Insurance Company, filed on December 14, 2018 and pending in the United States District Court for the Middle District of Florida,

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

- Tenefufu vs. First American Specialty Insurance Company, filed on June 1, 2017 and pending in the Superior Court of the State of California, County of Sacramento, and

- Wilmot v. First American Financial Corporation, et al., filed on April 20, 2007 and pending in the Superior Court of the State of California, County of Los Angeles.

All of these lawsuits are putative class or collective actions for which a class or collective has not been certified. For the reasons described above, the Company has not yet been able to assess the probability of loss or estimate the possible loss or the range of loss or, where the Company has been able to make an estimate, the Company believes the amount is not material to the consolidated financial statements as a whole.

While some of the lawsuits described above may be material to the Company's operating results in any particular period if an unfavorable outcome results, the Company does not believe that any of these lawsuits will have a material adverse effect on the Company's overall financial condition or liquidity.

The Company also is a party to non-ordinary course lawsuits other than those described above. With respect to these lawsuits, the Company has determined either that a loss is not reasonably possible or that the estimated loss or range of loss, if any, is not material to the consolidated financial statements as a whole.

The Company's title insurance, property and casualty insurance, home warranty, banking, thrift, trust and wealth management businesses are regulated by various federal, state and local governmental agencies. Many of the Company's other businesses operate within statutory guidelines. Consequently, the Company may from time to time be subject to examination or investigation by such governmental agencies. Currently, governmental agencies are examining or investigating certain of the Company's operations. These exams or investigations include inquiries into, among other matters, pricing and rate setting practices in the title insurance industry, competition in the title insurance industry, real estate settlement service, customer acquisition and retention practices and agency relationships. With respect to matters where the Company has determined that a loss is both probable and reasonably estimable, the Company has recorded a liability representing its best estimate of the financial exposure based on known facts. While the ultimate disposition of each such exam or investigation is not yet determinable, the Company does not believe that individually or in the aggregate they will have a material adverse effect on the Company's financial condition, results of operations or cash flows. These exams or investigations could, however, result in changes to the Company's business practices which could ultimately have a material adverse impact on the Company's financial condition, results of operations or cash flows.

The Company's Canadian operations provide certain services to lenders which it believes to be exempt from excise tax under applicable Canadian tax laws. However, in October 2014, the Canadian taxing authority provided internal guidance that the services in question should be subject to the excise tax. The Company believes it will receive an assessment related to this matter in the first half of 2019. While the amount of such assessment is not currently known, based on preliminary discussions with the taxing authority, the Company expects the assessment to be in the range of $12.0 million to $12.8 million, plus interest charges. As the Company does not believe that the services in question are subject to excise tax, it intends to avail itself of avenues of appeal after the assessment is received, and it believes it is reasonably likely that the Company will prevail on the merits. Based on the current facts and circumstances, the Company does not believe a loss is probable, therefore no liability has been recorded.

The Company and its subsidiaries also are involved in numerous ongoing routine legal and regulatory proceedings related to their operations. With respect to each of these proceedings, the Company has determined either that a loss is not reasonably possible or that the estimated loss or range of loss, if any, is not material to the consolidated financial statements as a whole.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**NOTE 20.   Business Combinations:**

During the year ended December 31, 2018, the Company completed acquisitions for an aggregate purchase price of $82.9 million.  For acquisitions in which the Company has not completed its purchase price allocation, preliminary fair value estimates for the assets acquired and liabilities assumed have been recorded.  The Company allocates the purchase price of each acquisition to the assets acquired and liabilities assumed using a variety of valuation techniques, including discounted cash flow analysis.  These acquisitions have been included in the Company's title insurance and services segment.

Current year acquisitions included the purchase of a specialized warehouse lender that provides financing for correspondent mortgage lenders.  The business has itself secured warehouse lending facilities with several banking institutions.  The mortgage loans are generally sold by the correspondent mortgage lenders to investors within 30 days and more typically in less than 10 days.  The assets acquired included secured financings receivable from correspondent mortgage lenders of $69.6 million and liabilities assumed included secured financings payable of $69.8 million.  The combined capacity for the warehouse lending facilities totals $123.0 million with one additional warehouse lending facility having no stated capacity.  Interest rates for the warehouse lending facilities range from 3.50% to the current prime lending rate as published by The Wall Street Journal.  At December 31, 2018, outstanding borrowings under the facilities totaled $76.3 million.

During the year ended December 31, 2017, the Company completed acquisitions for an aggregate purchase price of $91.1 million.  These acquisitions have been included in the Company's title insurance and services segment.

**NOTE 21.   Segment Financial Information:**

The Company consists of the following reportable segments and a corporate function:

- The Company's title insurance and services segment issues title insurance policies on residential and commercial property in the United States and offers similar or related products and services internationally.  This segment also provides closing and/or escrow services; accommodates tax-deferred exchanges of real estate; provides products, services and solutions designed to mitigate risk or otherwise facilitate real estate transactions, many of which products, services and solutions involve the use of real property-related data; maintains, manages and provides access to title plant records and images; and provides appraisals and other valuation-related products and services, lien release and document custodial services, warehouse lending services, default-related products and services, evidence of title, and banking, trust and wealth management services.  The Company, through its principal title insurance subsidiary and such subsidiary's affiliates, transacts its title insurance business through a network of direct operations and agents.  Through this network, the Company issues policies in the 49 states that permit the issuance of title insurance policies, the District of Columbia and certain United States territories.  The Company also offers title insurance, closing services and similar or related products and services, either directly or through third parties in other countries, including Canada, the United Kingdom, Australia, South Korea and various other established and emerging markets.

- The Company's specialty insurance segment issues property and casualty insurance policies and sells home warranty products.  The property and casualty insurance business provides insurance coverage to residential homeowners and renters for liability losses and typical hazards such as fire, theft, vandalism and other types of property damage.  This business is licensed to issue policies in all 50 states and the District of Columbia and actively issues policies in 47 states.  The majority of policy liability is in the western United States, including approximately 62% in California.  In certain markets it also offers preferred risk auto insurance to better compete with other carriers offering bundled home and auto insurance.  The home warranty business provides residential service contracts that cover residential systems, such as heating and air conditioning systems, and certain appliances against failures that occur as the result of normal usage during the coverage period.  This business currently operates in 36 states and the District of Columbia.

The corporate function consists primarily of certain financing facilities as well as the corporate services that support the Company's business operations.  Eliminations consist of inter-segment revenues and related expenses included in the results of the operating segments.

99

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Selected financial information about the Company's operations, by segment, for the years ended December 31, 201 8 , 201 7 and 201 6 , is as follows:

| | Revenues | Depreciation and amortization | Equity in earnings of affiliates, net | Income (loss) before income taxes | Assets | Investments in equity method affiliates | Capital expenditures |
|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | |
| **2018** | | | | | | | |
| Title Insurance and Services | $ 5,282,781 | $ 119,053 | $ 2,717 | $ 655,003 | $ 9,613,658 | $ 54,674 | $ 112,726 |
| Specialty Insurance | 469,342 | 6,721 | — | 26,999 | 600,268 | — | 12,791 |
| Corporate | (3,115) | 153 | — | (72,464) | 431,222 | — | — |
| Eliminations | (1,164) | — | — | — | (14,513) | — | — |
| | $ 5,747,844 | $ 125,927 | $ 2,717 | $ 609,538 | $ 10,630,635 | $ 54,674 | $ 125,517 |
| **2017** | | | | | | | |
| Title Insurance and Services | $ 5,293,156 | $ 121,540 | $ 3,785 | $ 642,364 | $ 8,669,936 | $ 56,583 | $ 128,751 |
| Specialty Insurance | 465,020 | 6,351 | — | 36,908 | 592,405 | — | 7,913 |
| Corporate | 15,326 | 162 | — | (233,941) | 429,128 | — | — |
| Eliminations | (1,139) | — | — | — | (118,247) | — | — |
| | $ 5,772,363 | $ 128,053 | $ 3,785 | $ 445,331 | $ 9,573,222 | $ 56,583 | $ 136,664 |
| **2016** | | | | | | | |
| Title Insurance and Services | $ 5,134,125 | $ 93,069 | $ 8,173 | $ 598,872 | $ 7,905,433 | $ 102,925 | $ 126,715 |
| Specialty Insurance | 435,844 | 5,593 | — | 40,074 | 551,231 | — | 5,631 |
| Corporate | 5,946 | 385 | — | (161,365) | 453,410 | — | — |
| Eliminations | (69) | — | — | — | (78,297) | — | — |
| | $ 5,575,846 | $ 99,047 | $ 8,173 | $ 477,581 | $ 8,831,777 | $ 102,925 | $ 132,346 |

| | Direct premiums and escrow fees | Agent premiums | Information and other | Net investment income | Net realized investment gains (losses) | Total Revenues |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **2018** | | | | | | |
| Title Insurance and Services | $ 2,052,951 | $ 2,284,906 | $ 770,725 | $ 223,318 | $ (49,119) | $ 5,282,781 |
| Specialty Insurance | 454,718 | — | 11,802 | 10,190 | (7,368) | 469,342 |
| | $ 2,507,669 | $ 2,284,906 | $ 782,527 | $ 233,508 | $ (56,487) | $ 5,752,123 |
| **2017** | | | | | | |
| Title Insurance and Services | $ 2,022,384 | $ 2,360,659 | $ 766,018 | $ 137,439 | $ 6,656 | $ 5,293,156 |
| Specialty Insurance | 439,470 | — | 11,259 | 9,713 | 4,578 | 465,020 |
| | $ 2,461,854 | $ 2,360,659 | $ 777,277 | $ 147,152 | $ 11,234 | $ 5,758,176 |
| **2016** | | | | | | |
| Title Insurance and Services | $ 2,004,686 | $ 2,286,630 | $ 713,137 | $ 110,757 | $ 18,915 | $ 5,134,125 |
| Specialty Insurance | 411,353 | — | 10,877 | 9,476 | 4,138 | 435,844 |
| | $ 2,416,039 | $ 2,286,630 | $ 724,014 | $ 120,233 | $ 23,053 | $ 5,569,969 |

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

R evenues from external customers allocated between domestic and foreign operations, by segment, for the years ended December 31, 201 8 , 201 7 and 201 6 , are as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | Domestic | Foreign | Domestic | Foreign | Domestic | Foreign |
| | (in thousands) | | | | | |
| Title Insurance and Services | $ 4,984,617 | $ 298,059 | $ 5,011,990 | $ 281,090 | $ 4,830,727 | $ 303,352 |
| Specialty Insurance | 469,342 | — | 465,020 | — | 435,844 | — |
| | $ 5,453,959 | $ 298,059 | $ 5,477,010 | $ 281,090 | $ 5,266,571 | $ 303,352 |

Long-lived assets allocated between domestic and foreign operations, by segment, as of December 31, 2018, 2017 and 2016, are as follows:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | Domestic | Foreign | Domestic | Foreign | Domestic | Foreign |
| | (in thousands) | | | | | |
| Title Insurance and Services | $ 994,023 | $ 61,615 | $ 975,443 | $ 59,960 | $ 986,718 | $ 40,161 |
| Specialty Insurance | 65,644 | — | 57,762 | — | 55,045 | — |
| | $ 1,059,667 | $ 61,615 | $ 1,033,205 | $ 59,960 | $ 1,041,763 | $ 40,161 |

101

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

|  | Quarter Ended | | | |
|---|---|---|---|---|
|  | March 31 | June 30 | September 30 | December 31 |
|  | (in thousands, except per share amounts) | | | |
| **2018** | | | | |
| Revenues | $ 1,297,388 | $ 1,491,157 | $ 1,542,186 | $ 1,417,113 |
| Income before income taxes | $ 93,065 | $ 201,968 | $ 195,587 | $ 118,918 |
| Net income | $ 76,172 | $ 155,091 | $ 151,461 | $ 93,174 |
| Net (loss) income attributable to noncontrolling interests | $ (55) | $ (49) | $ (19) | $ 1,525 |
| Net income attributable to the Company | $ 76,227 | $ 155,140 | $ 151,480 | $ 91,649 |
| Net income per share attributable to the Company's stockholders (1): | | | | |
| Basic | $ 0.68 | $ 1.38 | $ 1.34 | $ 0.81 |
| Diluted | $ 0.67 | $ 1.37 | $ 1.34 | $ 0.81 |

|  | Quarter Ended | | | |
|---|---|---|---|---|
|  | March 31 | June 30 | September 30 | December 31 |
|  | (in thousands, except per share amounts) | | | |
| **2017** | | | | |
| Revenues | $ 1,317,043 | $ 1,454,429 | $ 1,519,568 | $ 1,481,323 |
| Income before income taxes | $ 83,880 | $ 184,154 | $ 17,962 | $ 159,335 |
| Net income | $ 58,069 | $ 121,895 | $ 21,186 | $ 220,713 |
| Net income (loss) attributable to noncontrolling interests | $ (213) | $ (362) | $ (197) | $ (414) |
| Net income attributable to the Company | $ 58,282 | $ 122,257 | $ 21,383 | $ 221,127 |
| Net income per share attributable to the Company's stockholders (1): | | | | |
| Basic | $ 0.52 | $ 1.10 | $ 0.19 | $ 1.98 |
| Diluted | $ 0.52 | $ 1.09 | $ 0.19 | $ 1.96 |

(1) Net income per share attributable to the Company's stockholders for the four quarters of each fiscal year may not sum to the total for the fiscal year because of the different number of shares outstanding during each period.

102

<div align="right">S CHEDULE I<br>1 OF 1</div>

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**SUMMARY OF INVESTMENTS—OTHER THAN INVESTMENTS IN RELATED PARTIES**
**(in thousands)**

**December 31, 2018**

| Column A | Column B | Column C | Column D |
|---|---|---|---|
| | | | **Amount at which shown in the** |
| **Type of investment** | **Cost** | **Market value** | **balance sheet** |
| Deposits with banks: | | | |
| Consolidated | $ 36,209 | $ 35,979 | $ 36,209 |
| Debt securities: | | | |
| U.S. Treasury bonds | | | |
| Consolidated | $ 162,904 | $ 162,506 | $ 162,506 |
| Municipal bonds | | | |
| Consolidated | $ 1,050,134 | $ 1,045,035 | $ 1,045,035 |
| Foreign government bonds | | | |
| Consolidated | $ 158,885 | $ 157,297 | $ 157,297 |
| Governmental agency bonds | | | |
| Consolidated | $ 319,115 | $ 316,167 | $ 316,167 |
| Governmental agency mortgage-backed securities | | | |
| Consolidated | $ 3,219,585 | $ 3,202,599 | $ 3,202,599 |
| U.S. corporate debt securities | | | |
| Consolidated | $ 575,646 | $ 561,260 | $ 561,260 |
| Foreign corporate debt securities | | | |
| Consolidated | $ 274,881 | $ 268,947 | $ 268,947 |
| Total debt securities: | | | |
| Consolidated | $ 5,761,150 | $ 5,713,811 | $ 5,713,811 |
| Equity securities: | | | |
| Consolidated | $ 358,352 | $ 353,535 | $ 353,535 |
| Notes receivable, net: | | | |
| Consolidated | $ 13,237 | $ 12,805 | $ 13,237 |
| Other investments: | | | |
| Consolidated | $ 108,728 | $ 108,728(1) | $ 108,728 |
| Total investments: | | | |
| Consolidated | $ 6,277,676 | $ 6,224,858 | $ 6,225,520 |

(1)    As other investments are not publicly traded, estimates of fair value could not be made without incurring excessive costs.

**FIRST AMERICAN FINANCIAL CORPORATION**
**(Parent Company)**

**CONDENSED BALANCE SHEETS**
**(in thousands, except par values)**

| | December 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Assets** | | |
| Cash and cash equivalents | $ 327,306 | $ 233,920 |
| Dividends receivable | — | 54,347 |
| Due from subsidiaries, net | 2,529 | 4,098 |
| Income taxes receivable | 11,007 | 38,673 |
| Investment in subsidiaries | 4,592,281 | 4,360,010 |
| Note receivable from subsidiary | 7,500 | — |
| Deferred income taxes | 16,636 | 22,803 |
| Other assets | 90,164 | 97,991 |
| | $ 5,047,423 | $ 4,811,842 |
| **Liabilities and Equity** | | |
| Accounts payable and other accrued liabilities | $ 34,578 | $ 38,724 |
| Pension costs and other retirement plans | 334,390 | 359,806 |
| Income taxes payable | 8,988 | 4,602 |
| Deferred income taxes | 217,097 | 219,307 |
| Notes and contracts payable | 706,982 | 706,378 |
| | 1,302,035 | 1,328,817 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.00001 par value; Authorized—500 shares; | | |
| Outstanding—none | — | — |
| Common stock, $0.00001 par value; Authorized—300,000 shares; | | |
| Outstanding—111,496 shares and 110,925 shares | 1 | 1 |
| Additional paid-in capital | 2,258,290 | 2,236,351 |
| Retained earnings | 1,644,165 | 1,311,112 |
| Accumulated other comprehensive loss | (160,575) | (67,509) |
| Total stockholders' equity | 3,741,881 | 3,479,955 |
| Noncontrolling interests | 3,507 | 3,070 |
| Total equity | 3,745,388 | 3,483,025 |
| | $ 5,047,423 | $ 4,811,842 |

See Notes to Condensed Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**(Parent Company)**

**CONDENSED STATEMENTS OF INCOME**
**(in thousands)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| **Revenues:** | | | |
| Dividends from subsidiaries | $ 394,742 | $ 354,350 | $ 46,422 |
| Other (losses) income | (2,986) | 15,011 | 5,809 |
| | 391,756 | 369,361 | 52,231 |
| **Expenses:** | | | |
| Other expenses | 40,415 | 54,245 | 44,592 |
| Income before income taxes and equity in undistributed earnings of subsidiaries | 351,341 | 315,116 | 7,639 |
| Income taxes | 77,031 | 16,606 | 2,145 |
| Equity in undistributed earnings of subsidiaries | 201,588 | 123,353 | 337,982 |
| Net income | 475,898 | 421,863 | 343,476 |
| Less: Net income (loss) attributable to noncontrolling interests | 1,402 | (1,186) | 483 |
| Net income attributable to the Company | $ 474,496 | $ 423,049 | $ 342,993 |

See Notes to Condensed Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**(Parent Company)**

**CONDENSED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Net income | $ 475,898 | $ 421,863 | $ 343,476 |
| Other comprehensive income (loss), net of tax: | | | |
|     Unrealized (losses) gains on securities | (38,418) | 63,563 | (10,359) |
|     Foreign currency translation adjustment | (26,796) | 24,744 | (6,334) |
|     Pension benefit adjustment | 12,680 | 74,597 | 25,300 |
| Total other comprehensive (loss) income, net of tax | (52,534) | 162,904 | 8,607 |
| Comprehensive income | 423,364 | 584,767 | 352,083 |
| Less: Comprehensive income (loss) attributable to noncontrolling interests | 1,384 | (1,173) | 487 |
| Comprehensive income attributable to the Company | $ 421,980 | $ 585,940 | $ 351,596 |

See Notes to Condensed Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**(Parent Company)**

**CONDENSED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| **Cash flows from operating activities:** | | | |
| Cash provided by (used for) operating activities | $ 381,516 | $ 232,347 | $ (26,682) |
| **Cash flows from investing activities:** | | | |
| Net cash effect of acquisitions | (67,061) | (21,750) | — |
| Net payments to subsidiaries | (19,676) | (41,726) | (74,318) |
| Net change in other investments | — | 82 | 204 |
| Cash used for investing activities | (86,737) | (63,394) | (74,114) |
| **Cash flows from financing activities:** | | | |
| Net proceeds from issuance of debt | — | — | 160,000 |
| Excess tax benefits from share-based compensation | — | — | 3,415 |
| Net (payments) proceeds in connection with share-based compensation plans | (4,105) | 2,732 | 1,104 |
| Purchase of Company shares | (18,801) | — | (454) |
| Payments of cash dividends | (178,487) | (159,284) | (131,541) |
| Cash (used for) provided by financing activities | (201,393) | (156,552) | 32,524 |
| Net increase (decrease) in cash and cash equivalents | 93,386 | 12,401 | (68,272) |
| Cash and cash equivalents—Beginning of period | 233,920 | 221,519 | 289,791 |
| Cash and cash equivalents—End of period | $ 327,306 | $ 233,920 | $ 221,519 |

See Notes to Condensed Financial Statements

**FIRST AMERICAN FINANCIAL CORPORATION**
**(Parent Company)**

**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**NOTE 1.    Description of the Company:**

First American Financial Corporation is a holding company that conducts all of its operations through its subsidiaries. The Parent Company financial statements should be read in connection with the consolidated financial statements and notes thereto included elsewhere in this Form 10-K.

**NOTE 2.    Dividends Received:**

The holding company received cash dividends from subsidiaries of $394.4 million, $87.4 million and $46.4 million for the years ended December 31, 2018, 2017 and 2016, respectively.

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**SUPPLEMENTARY INSURANCE INFORMATION**
**(in thousands)**

**BALANCE SHEET CAPTIONS**

| Column A | Column B | Column C | Column D |
|---|---|---|---|
| | Deferred policy acquisition costs | Claims reserves | Deferred revenues |
| **Segment** | | | |
| **2018** | | | |
| Title Insurance and Services | $ 343 | $ 957,440 | $ 9,339 |
| Specialty Insurance | 32,390 | 85,239 | 233,941 |
| Total | $ 32,733 | $ 1,042,679 | $ 243,280 |
| **2017** | | | |
| Title Insurance and Services | $ 300 | $ 958,818 | $ 11,124 |
| Specialty Insurance | 31,252 | 70,115 | 229,698 |
| Total | $ 31,552 | $ 1,028,933 | $ 240,822 |

109

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**SUPPLEMENTARY INSURANCE INFORMATION**
**(in thousands)**

**INCOME STATEMENT CAPTIONS**

| Column A | Column F | Column G | Column H | Column I | Column J | Column K |
|---|---|---|---|---|---|---|
| | | | | Amortization of deferred policy acquisition costs (credits) | | |
| Segment | Premiums and escrow fees | Net investment income (1) | Loss provision | | Other operating expenses | Premiums written |
| **2018** | | | | | | |
| Title Insurance and Services | $ 4,337,857 | $ 174,199 | $ 173,520 | $ (125) | $ 793,364 | $ — |
| Specialty Insurance | 454,718 | 2,822 | 279,113 | (1,138) | 74,025 | 459,098 |
| Corporate | — | (3,115) | — | — | 33,879 | — |
| Eliminations | — | (104) | — | — | (1,060) | — |
| Total | $ 4,792,575 | $ 173,802 | $ 452,633 | $ (1,263) | $ 900,208 | $ 459,098 |
| **2017** | | | | | | |
| Title Insurance and Services | $ 4,383,043 | $ 144,095 | $ 175,322 | $ 122 | $ 788,074 | $ — |
| Specialty Insurance | 439,470 | 14,291 | 275,088 | (1,030) | 67,813 | 450,098 |
| Corporate | — | 15,326 | — | — | 201,062 | — |
| Eliminations | — | (76) | — | — | (1,063) | — |
| Total | $ 4,822,513 | $ 173,636 | $ 450,410 | $ (908) | $ 1,055,886 | $ 450,098 |
| **2016** | | | | | | |
| Title Insurance and Services | $ 4,291,316 | $ 129,672 | $ 235,661 | $ — | $ 764,502 | $ — |
| Specialty Insurance | 411,353 | 13,614 | 252,940 | (4,179) | 62,610 | 426,815 |
| Corporate | — | 5,946 | — | — | 128,222 | — |
| Eliminations | — | (45) | — | — | (24) | — |
| Total | $ 4,702,669 | $ 149,187 | $ 488,601 | $ (4,179) | $ 955,310 | $ 426,815 |

(1)   Net investment income includes net investment income and net realized investment gains (losses).

110

**FIRST AMERICAN FINANCIAL CORPORATION**
**AND SUBSIDIARY COMPANIES**

**REINSURANCE**
**(in thousands, except percentages)**

| Segment | Premiums and escrow fees before reinsurance | Ceded to other companies | Assumed from other companies | Premiums and escrow fees | Percentage of amount assumed to premiums and escrow fees |
|---|---|---|---|---|---|
| Title Insurance and Services | | | | | |
| 2018 | $ 4,353,130 | $ 16,398 | $ 1,125 | $ 4,337,857 | 0.0% |
| 2017 | $ 4,396,882 | $ 15,014 | $ 1,175 | $ 4,383,043 | 0.0% |
| 2016 | $ 4,304,868 | $ 16,277 | $ 2,725 | $ 4,291,316 | 0.1% |
| Specialty Insurance | | | | | |
| 2018 | $ 466,245 | $ 11,527 | $ — | $ 454,718 | 0.0% |
| 2017 | $ 448,296 | $ 8,826 | $ — | $ 439,470 | 0.0% |
| 2016 | $ 419,629 | $ 8,276 | $ — | $ 411,353 | 0.0% |

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**VALUATION AND QUALIFYING ACCOUNTS**
**(in thousands)**

**Year Ended December 31, 2018**

| Column A | Column B | Column C | | Column D | Column E |
|---|---|---|---|---|---|
| | | **Additions** | | | |
| | **Balance at beginning of period** | **Charged to costs and expenses** | **Charged to other accounts** | **Deductions from reserve** | **Balance at end of period** |
| **Description** | | | | | |
| Reserve deducted from accounts receivable: | | | | | |
| Consolidated | $ 23,066 | $ 5,039 | $ — | $ 5,264(A) | $ 22,841 |
| Reserve for known and incurred but not reported claims: | | | | | |
| Consolidated | $ 1,028,933 | $ 452,633 | $ 11,869 | $ 450,756(B) | $ 1,042,679 |
| Reserve deducted from notes receivable: | | | | | |
| Consolidated | $ 510 | $ 167 | $ — | $ 334 | $ 343 |
| Reserve deducted from deferred income taxes: | | | | | |
| Consolidated | $ 10,333 | $ 288 | $ — | $ — | $ 10,621 |

Note A—Amount represents accounts written off, net of recoveries.

Note B—Amount represents claim payments, net of recoveries.

112

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**VALUATION AND QUALIFYING ACCOUNTS**
**(in thousands)**

**Year Ended December 31, 2017**

| Column A | Column B | Column C | | Column D | Column E |
|---|---|---|---|---|---|
| | | **Additions** | | | |
| | **Balance at beginning of period** | **Charged to costs and expenses** | **Charged to other accounts** | **Deductions from reserve** | **Balance at end of period** |
| **Description** | | | | | |
| Reserve deducted from accounts receivable: | | | | | |
| Consolidated | $ 30,185 | $ 5,975 | $ — | $ 13,094(A) | $ 23,066 |
| Reserve for known and incurred but not reported claims: | | | | | |
| Consolidated | $ 1,025,863 | $ 450,410 | $ 24,707 | $ 472,047(B) | $ 1,028,933 |
| Reserve deducted from notes receivable: | | | | | |
| Consolidated | $ 2,113 | $ 38 | $ — | $ 1,641 | $ 510 |
| Reserve deducted from deferred income taxes: | | | | | |
| Consolidated | $ 8,049 | $ 2,284 | $ — | $ — | $ 10,333 |

Note A—Amount represents accounts written off, net of recoveries.

Note B—Amount represents claim payments, net of recoveries.

**FIRST AMERICAN FINANCIAL CORPORATION
AND SUBSIDIARY COMPANIES**

**VALUATION AND QUALIFYING ACCOUNTS**
**(in thousands)**

**Year Ended December 31, 2016**

| Column A | Column B | Column C | | Column D | Column E |
|---|---|---|---|---|---|
| | | **Additions** | | | |
| **Description** | **Balance at beginning of period** | **Charged to costs and expenses** | **Charged to other accounts** | **Deductions from reserve** | **Balance at end of period** |
| Reserve deducted from accounts receivable: | | | | | |
| Consolidated | $ 31,552 | $ 5,208 | $ — | $ 6,575(A) | $ 30,185 |
| Reserve for known and incurred but not reported claims: | | | | | |
| Consolidated | $ 983,880 | $ 488,601 | $ 16,381 | $ 462,999(B) | $ 1,025,863 |
| Reserve deducted from notes receivable: | | | | | |
| Consolidated | $ 2,275 | $ 162 | $ — | $ 324 | $ 2,113 |
| Reserve deducted from deferred income taxes: | | | | | |
| Consolidated | $ 6,729 | $ 1,516 | $ — | $ 196 | $ 8,049 |

Note A—Amount represents accounts written off, net of recoveries.

Note B—Amount represents claim payments, net of recoveries.

114

**Item 9.**        **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.**        **Controls and Procedures**

**Disclosure Controls and Procedures**

The Company's chief executive officer and chief financial officer have concluded that, as of December 31, 2018, the end of the fiscal year covered by this Annual Report on Form 10-K, the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

**Management's Annual Report on Internal Control Over Financial Reporting**

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting has been designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP").

The Company's internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets of the Company; provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are being made only in accordance with authorization of management and directors of the Company; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the Company's consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework (2013)* . Based on that assessment under the framework in *Internal Control—Integrated Framework (2013),* management determined that, as of December 31, 2018, the Company's internal control over financial reporting was effective.

PricewaterhouseCoopers LLP, the independent registered public accounting firm that audited the Company's consolidated financial statements provided in Item 8, above, has issued a report on the Company's internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting**

There was no change in the Company's internal control over financial reporting during the quarter ended December 31, 2018, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 9B.**        **Other Information**

On February 19, 2019, the Company entered into amended and restated employment agreements with Dennis J. Gilmore, Kenneth D. DeGiorgio, Christopher M. Leavell and Mark E. Seaton.  Pursuant to the amendments, the term of each of the revised agreements was extended by one year and now expires on December 31, 2021; language was added to expressly make each executive's compensation subject to clawback, forfeiture, recoupment or any similar requirement; and the definition of what constitutes a termination of employment for cause was revised.  Each of the revised agreements incorporates the executive's current base salary.

The description of the amended and restated employment agreements provided herein is qualified in its entirety by reference to the employment agreements, which are attached hereto as Exhibits 10.7 to 10.10.

## P ART III

The information required by Items 10 through 14 of this report is expected to be set forth in the definitive proxy statement to be filed with the Securities and Exchange Commission within 120 days after the fiscal year ended December 31, 2018 for the Company's upcoming 2019 meeting of stockholders (the "2019 Proxy Statement"). If the 2019 Proxy Statement is not filed within 120 days after the fiscal year ended December 31, 2018, the Company will file an amendment to this Annual Report on Form 10-K to include the information required by Items 10 through 14.

**Item 10.          Directors, Executive Officers and Corporate Governance**

The information required by this Item will be set forth under the captions "Information Regarding the Nominees for Election," "Information Regarding the Other Incumbent Directors," "Executive Officers," "Section 16(a) Beneficial Ownership Reporting Compliance," "Code of Ethics" and "Board and Committee Meetings" in the 2019 Proxy Statement and is incorporated herein by reference.

**Item 11.          Executive Compensation**

The information required by this Item will be set forth under the captions "Executive Compensation," "Compensation Discussion and Analysis," "Executive Compensation Tables," "Director Compensation," "Compensation Committee Report" and "Compensation Committee Interlocks and Insider Participation" in the 2019 Proxy Statement and is incorporated herein by reference.

**Item  12.          Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this Item will be set forth under the captions "Securities Authorized for Issuance under Equity Compensation Plans," "Who are the largest principal stockholders outside of management?" and "Security Ownership of Management" in the 2019 Proxy Statement and is incorporated herein by reference.

**Item 13.          Certain Relationships and Related Transactions, and Director Independence**

The information required by this Item will be set forth under the captions "Independence of Directors" and "Transactions with Management and Others" in the 2019 Proxy Statement and is incorporated herein by reference.

**Item 14.          Principal Accountant Fees and Services**

The information required by this Item will be set forth under the captions "Principal Accountant Fees and Services" and "Policy on Audit Committee Pre-approval of Audit and Permissible Nonaudit Services of Independent Auditor" in the 2019 Proxy Statement and is incorporated herein by reference.

**PART IV**

**Item 15.**          **Exhibits and Financial Statement Schedules**

(a)  1. & 2.  Financial Statements and Financial Statement Schedules

The Financial Statements and Financial Statement Schedules filed as part of this report are listed in the accompanying index at page 48 in Item 8 of Part II of this report.

(a)  3.  Exhibits. Each management contract or compensatory plan or arrangement in which any director or named executive officer of First American Financial Corporation, as defined by Item 402(a)(3) of Regulation S-K (17 C.F.R. §229.402(a)(3)), participates that is included among the exhibits listed on the Exhibit Index is identified on the Exhibit Index by an asterisk (*).

| Exhibit No. | Description | Location |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of First American Financial Corporation dated May 28, 2010. | Incorporated by reference herein to Exhibit 3.1 to the Current Report on Form 8-K filed June 1, 2010. |
| 3.2 | Bylaws of First American Financial Corporation, amended and restated effective as of August 16, 2017. | Incorporated by reference herein to Exhibit 3.1 to the Current Report on Form 8-K filed August 22, 2017. |
| 4.1 | Indenture, dated as of January 24, 2013, between First American Financial Corporation and U.S. Bank National Association, as Trustee . | Incorporated by reference herein to Exhibit 4.1 to the Form S-3ASR filed January 24, 2013. |
| 4.2 | First Supplemental Indenture, dated as of January 29, 2013, between First American Financial Corporation and U.S. Bank National Association, as Trustee. | Incorporated by reference herein to Exhibit 4.2 to the Current Report on Form 8-K filed January 29, 2013. |
| 4.3 | Second Supplemental Indenture, dated as of November 10, 2014, between First American Financial Corporation and U.S. Bank National Association, as Trustee. | Incorporated by reference herein to Exhibit 4.2 to the Current Report on Form 8-K filed November 10, 2014. |
| 4.4 | Form of 4.30% Senior Notes due 2023. | Incorporated by reference herein to Exhibit A of Exhibit 4.2 to the Current Report on Form 8-K filed January 29, 2013. |
| 4.5 | Form of 4.60% Senior Notes due 2024 . | Incorporated by reference herein to Exhibit A of Exhibit 4.2 to the Current Report on Form 8-K filed November 10, 2014. |
| 10.1 | Separation and Distribution Agreement by and between The First American Corporation (n/k/a CoreLogic, Inc.) and First American Financial Corporation dated as of June 1, 2010. | Incorporated by reference herein to Exhibit 10.1 to the Current Report on Form 8-K filed June 1, 2010. |
| 10.2 | Amended and Restated Credit Agreement dated as of May 14, 2014, among First American Financial Corporation, the Lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent . | Incorporated by reference herein to Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended June 30, 2014. |
| 10.3 | Tax Sharing Agreement by and between The First American Corporation (n/k/a CoreLogic, Inc.) and First American Financial Corporation dated as of June 1, 2010. | Incorporated by reference herein to Exhibit 10.2 to the Current Report on Form 8-K filed June 1, 2010. |
| *10.4 | First American Financial Corporation Executive Supplemental Benefit Plan, amended and restated effective as of January 1, 2011. | Incorporated by reference herein to Exhibit 10.12 to the Annual Report on Form 10-K for the year ended December 31, 2010. |

117

| Exhibit No. | Description | Location |
|---|---|---|
| *10.4.1 | Amendment No. 1, dated January 21, 2015, to First American Financial Corporation Executive Supplemental Benefit Plan. | Incorporated by reference herein to Exhibit 10.5.1 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2014. |
| *10.5 | First American Financial Corporation Deferred Compensation Plan, amended and restated effective as of January 1, 2012 . | Incorporated by reference herein to Exhibit 10.13 to the Annual Report on Form 10-K for the year ended December 31, 2011. |
| *10.5.1 | First Amendment, effective July 1, 2015, to the First American Financial Corporation Deferred Compensation Plan. | Incorporated by reference herein to Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended June 30, 2015. |
| *10.5.2 | Second Amendment, effective July 1, 2017, to the First American Financial Corporation Deferred Compensation Plan . | Incorporated by reference herein to Exhibit 10.2 to the Quarterly Report on Form 10-Q for the quarter ended June 30, 2017. |
| *10.6 | First American Financial Corporation 2010 Incentive Compensation Plan, amended and restated effective as of February 4, 2019. | Attached. |
| *10.6.1 | Form of Notice of Restricted Stock Unit Grant (Non-Employee Director) and Restricted Stock Unit Award Agreement (Non-Employee Director) for Non-Employee Director Restricted Stock Unit Award approved January 19, 2016. | Incorporated by reference herein to Exhibit 10.6.4 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2015. |
| *10.6.2 | Form of Notice of Restricted Stock Unit Grant (Non-Employee Director) and Restricted Stock Unit Award Agreement (Non-Employee Director) for Non-Employee Director Restricted Stock Unit Award approved January 17, 2017. | Incorporated by reference herein to Exhibit 10.6.4 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2016. |
| *10.6.3 | Form of Notice of Restricted Stock Unit Grant (Non-Employee Director) and Restricted Stock Unit Award Agreement (Non-Employee Director) for Non-Employee Director Restricted Stock Unit Award approved January 23, 2018. | Incorporated by reference herein to Exhibit 10.6.4 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2017. |
| *10.6.4 | Form of Notice of Restricted Stock Unit Grant (Non-Employee Director) and Restricted Stock Unit Award Agreement (Non-Employee Director) for Non-Employee Director Restricted Stock Unit Award approved January 22, 2019. | Attached. |
| *10.6.5 | Form of Notice of Restricted Stock Unit Grant (Employee) and Restricted Stock Unit Award Agreement (Employee), approved January 21, 2015 . | Incorporated by reference herein to Exhibit 10.7.11 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2014. |
| *10.6.6 | Form of Notice of Restricted Stock Unit Grant (Employee) and Restricted Stock Unit Award Agreement (Employee), approved January 19, 2016 . | Incorporated by reference herein to Exhibit 10.6.9 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2015. |
| *10.6.7 | Form of Notice of Restricted Stock Unit Grant (Employee) and Restricted Stock Unit Award Agreement (Employee), approved January 17, 2017 . | Incorporated by reference herein to Exhibit 10.6.9 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2016. |
| *10.6.8 | Form of Notice of Restricted Stock Unit Grant (Employee) and Restricted Stock Unit Award Agreement (Employee), approved January 23, 2018. | Incorporated by reference herein to Exhibit 10.6.9 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2017. |
| *10.6.9 | Form of Notice of Restricted Stock Unit Grant (Employee) and Restricted Stock Unit Award Agreement (Employee), approved February 4, 2019. | Attached. |

| Exhibit No. | Description | Location |
|---|---|---|
| *10.6.10 | Form of Notice of Performance Unit Grant and Performance Unit Award Agreement, approved February 2, 2018. | Incorporated by reference herein to Exhibit 10.6.14 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2017. |
| *10.6.11 | Form of Notice of Performance Unit Grant and Performance Unit Award Agreement, approved January 22, 2019. | Attached. |
| *10.7 | Employment Agreement, dated February 19, 2019, between First American Financial Corporation and Dennis J. Gilmore. | Attached. |
| *10.8 | Employment Agreement, dated February 19, 2019, between First American Financial Corporation and Kenneth D. DeGiorgio. | Attached. |
| *10.9 | Employment Agreement, dated February 19, 2019, between First American Financial Corporation and Christopher M. Leavell. | Attached. |
| *10.10 | Employment Agreement, dated February 19, 2019, between First American Financial Corporation and Mark E. Seaton. | Attached. |
| *10.11 | First American Financial Corporation Form of Amended and Restated Change in Control Agreement effective as of December 31, 2010. | Incorporated by reference herein to Exhibit 10(c) to the Quarterly Report on Form 10-Q for the quarter ended September 30, 2010. |
| 21 | Subsidiaries of the registrant. | Attached. |
| 23 | Consent of Independent Registered Public Accounting Firm. | Attached. |
| 31(a) | Certification by Chief Executive Officer Pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. | Attached. |
| 31(b) | Certification by Chief Financial Officer Pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. | Attached. |
| 32(a) | Certification by Chief Executive Officer Pursuant to 18 U.S.C. Section 1350. | Attached. |
| 32(b) | Certification by Chief Financial Officer Pursuant to 18 U.S.C. Section 1350. | Attached. |
| 101.INS | XBRL Instance Document. | Attached. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. | Attached. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. | Attached. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. | Attached. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. | Attached. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. | Attached. |

**Item 16.**   **Form 10-K Summary**

  None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

FIRST AMERICAN FINANCIAL CORPORATION
(Registrant)

By     / S /   D ENNIS J. G ILMORE
                    Dennis J. Gilmore
                    Chief Executive Officer
                 (Principal Executive Officer)

Date: February 20, 2019

By     / S /   M ARK E. S EATON
                    Mark E. Seaton
                    Chief Financial Officer
                 (Principal Financial Officer)

Date: February 20, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| / S /   D ENNIS J. G ILMORE<br>Dennis J. Gilmore | Chief Executive Officer and Director<br>(Principal Executive Officer) | February 20, 2019 |
| / S /   M ARK E. S EATON<br>Mark E. Seaton | Chief Financial Officer<br>(Principal Financial Officer) | February 20, 2019 |
| / S /   M ATTHEW F. W AJNER<br>Matthew F. Wajner | Chief Accounting Officer<br>(Principal Accounting Officer) | February 20, 2019 |
| / S /   P ARKER S. K ENNEDY<br>Parker S. Kennedy | Chairman of the Board of Directors | February 20, 2019 |
| / S /   J AMES L. D OTI<br>James L. Doti | Director | February 20, 2019 |
| / S /   R EGINALD H. G ILYARD<br>Reginald H. Gilyard | Director | February 20, 2019 |
| / S /   M ARGARET M. M C C ARTHY<br>Margaret M. McCarthy | Director | February 20, 2019 |
| / S /   M ICHAEL D. M C K EE<br>Michael D. McKee | Director | February 20, 2019 |
| / S /   T HOMAS V. M C K ERNAN<br>Thomas V. McKernan | Director | February 20, 2019 |
| /S/   M ARK C. O MAN<br>Mark C. Oman | Director | February 20, 2019 |

| Signature | Title | Date |
|---|---|---|
| / S /   M ARTHA   B .   W YRSCH | Director | February 20, 2019 |
| Martha B. Wyrsch | | |

122

# FIRST AMERICAN FINANCIAL CORPORATION

## 2010 Incentive Compensation Plan

**Amended and Restated**

**Effective as of February 4, 2019**

)

TABLE OF CONTENTS

Page

ARTICLE  I. ESTABLISHMENT; PURPOSES; AND DURATION ............................................. 1
1.1.       Establishment of the Plan. ............................................................................. 1
1.2.       Purposes of the Plan. ...................................................................................... 1
1.3.       Duration of the Plan. ...................................................................................... 1

ARTICLE  II. DEFINITIONS ....................................................................................................... 2
2.1.       "Affiliate" ........................................................................................................ 2
2.2.       "Award" ........................................................................................................... 2
2.3.       "Award Agreement" ........................................................................................ 2
2.4.       "Beneficial Ownership" .................................................................................. 2
2.5.       "Board" or "Board of Directors" ................................................................... 3
2.6.       "Cause" ............................................................................................................ 3
2.7.       "Change of Control" ....................................................................................... 3
2.8.       "Code" ............................................................................................................. 5
2.9.       "Committee" .................................................................................................... 5
2.10.      "Company Incumbent Board" ........................................................................ 5
2.11.      "Company Proxy Contest" .............................................................................. 5
2.12.      "Company Surviving Corporation" ................................................................ 5
2.13.      "Covered Award" ............................................................................................ 5
2.14.      "Covered Employee" ...................................................................................... 5
2.15.      "Director" ........................................................................................................ 6
2.16.      "Disability" ..................................................................................................... 6
2.17.      "Dividend Equivalents" .................................................................................. 6
2.18.      "Effective Date" .............................................................................................. 6
2.19.      "Employee" ..................................................................................................... 6
2.20.      "Exchange Act" ............................................................................................... 6
2.21.      "Fair Market Value" ....................................................................................... 6
2.22.      "Fiscal Year" ................................................................................................... 7
2.23.      "Freestanding SAR" ....................................................................................... 7
2.24.      "Grant Price" ................................................................................................... 7
2.25.      "Incentive Stock Option" ............................................................................... 7
2.26.      "Insider" .......................................................................................................... 7
2.27.      "Non-Control Acquisition" ............................................................................. 7
2.28.      "Non-Control Transaction" ............................................................................ 7
2.29.      "Non-Employee Director" ............................................................................... 7
2.30.      "Nonqualified Stock Option" ......................................................................... 7
2.31.      "Notice" ........................................................................................................... 8
2.32.      "Option" .......................................................................................................... 8
2.33.      "Option Price" ................................................................................................. 8
2.34.      "Other Stock-Based Award" ........................................................................... 8
2.35.      "Participant" .................................................................................................... 8
2.36.      "Performance-Based Compensation" .............................................................. 8

(i )

|  |  | Page |
|---|---|---|
| 2.37. | "Performance Measure" | 8 |
| 2.38. | "Performance Period" | 8 |
| 2.39. | "Performance Share" | 8 |
| 2.40. | "Performance Unit" | 8 |
| 2.41. | "Period of Restriction" | 8 |
| 2.42. | "Person" | 8 |
| 2.43. | "Qualified Change of Control" | 9 |
| 2.44. | "Related Entity" | 9 |
| 2.45. | "Restricted Stock" | 9 |
| 2.46. | "Restricted Stock Unit" | 9 |
| 2.47. | "Retirement" | 9 |
| 2.48. | "Rule 16b-3" | 9 |
| 2.49. | "Securities Act" | 9 |
| 2.50. | "Share" | 9 |
| 2.51. | "Stock Appreciation Right" | 9 |
| 2.52. | "Subject Person" | 9 |
| 2.53. | "Subsidiary" | 9 |
| 2.54. | "Substitute Awards" | 9 |
| 2.55. | "Tandem SAR" | 10 |
| 2.56. | "Termination" | 10 |
| 2.57. | "Voting Securities" | 10 |
|  |  |  |
| ARTICLE III. ADMINISTRATION |  | 10 |
| 3.1. | General. | 10 |
| 3.2. | Committee. | 10 |
| 3.3. | Authority of the Committee. | 11 |
| 3.4. | Award Agreements. | 12 |
| 3.5. | Discretionary Authority; Decisions Binding. | 13 |
| 3.6. | Attorneys; Consultants. | 13 |
| 3.7. | Delegation of Administration. | 13 |
|  |  |  |
| ARTICLE IV. SHARES SUBJECT TO THE PLAN AND ANNUAL AWARD LIMITS |  | 14 |
| 4.1. | Number of Shares Available for Grants. | 14 |
| 4.2. | Annual Award Limits. | 14 |
| 4.3. | Adjustments in Authorized Shares. | 15 |
| 4.4. | No Limitation on Corporate Actions. | 16 |
|  |  |  |
| ARTICLE V. ELIGIBILITY AND PARTICIPATION |  | 16 |
| 5.1. | Eligibility. | 16 |
| 5.2. | Actual Participation. | 16 |
|  |  |  |
| ARTICLE VI. STOCK OPTIONS |  | 16 |
| 6.1. | Grant of Options. | 16 |
| 6.2. | Award Agreement. | 17 |
| 6.3. | Option Price. | 17 |

| | | Page |
|---|---|---|
| 6.4. | Duration of Options. | 17 |
| 6.5. | Exercise of Options. | 17 |
| 6.6. | Payment. | 17 |
| 6.7. | Rights as a Shareholder. | 18 |
| 6.8. | Termination of Employment or Service. | 18 |
| 6.9. | Limitations on Incentive Stock Options. | 19 |
| 6.10. | No Repricing. | 20 |
| | | |
| ARTICLE  VII. STOCK APPRECIATION RIGHTS | | 20 |
| 7.1. | Grant of SARs. | 20 |
| 7.2. | Grant Price. | 20 |
| 7.3. | Exercise of Tandem SARs. | 20 |
| 7.4. | Exercise of Freestanding SARs. | 21 |
| 7.5. | Award Agreement. | 21 |
| 7.6. | Term of SARs. | 21 |
| 7.7. | Payment of SAR Amount. | 21 |
| 7.8. | Rights as a Shareholder. | 21 |
| 7.9. | Termination of Employment or Service. | 21 |
| 7.10. | No Repricing. | 22 |
| | | |
| ARTICLE  VIII. RESTRICTED STOCK AND RESTRICTED STOCK UNITS | | 22 |
| 8.1. | Awards of Restricted Stock and Restricted Stock Units. | 22 |
| 8.2. | Award Agreement. | 22 |
| 8.3. | Nontransferability of Restricted Stock. | 22 |
| 8.4. | Period of Restriction and Other Restrictions. | 22 |
| 8.5. | Delivery of Shares, Payment of Restricted Stock Units. | 22 |
| 8.6. | Forms of Restricted Stock Awards. | 23 |
| 8.7. | Voting Rights. | 23 |
| 8.8. | Dividends and Other Distributions. | 23 |
| 8.9. | Termination of Employment or Service. | 24 |
| 8.10. | Compliance With Code Section 409A. | 24 |
| | | |
| ARTICLE  IX. PERFORMANCE UNITS AND PERFORMANCE SHARES | | 24 |
| 9.1. | Grant of Performance Units and Performance Shares. | 24 |
| 9.2. | Value of Performance Units and Performance Shares. | 24 |
| 9.3. | Earning of Performance Units and Performance Shares. | 24 |
| 9.4. | Form and Timing of Payment of Performance Units and Performance Shares. | 25 |
| 9.5. | Rights as a Shareholder. | 25 |
| 9.6. | Termination of Employment or Service. | 25 |
| 9.7. | Compliance With Code Section 409A. | 25 |
| | | |
| ARTICLE  X. OTHER STOCK-BASED AWARDS | | 26 |
| 10.1. | Other Stock-Based Awards. | 26 |
| 10.2. | Value of Other Stock-Based Awards. | 26 |
| 10.3. | Payment of Other Stock-Based Awards. | 26 |

Page

10.4.    Termination of Employment or Service.                                                    26
10.5.    Compliance With Code Section 409A.                                                       26

ARTICLE  XI. PERFORMANCE MEASURES                                                                27
11.1.    Performance Measures.                                                                    27
11.2.    Evaluation of Performance.                                                               28
11.3.    Adjustment of Performance-Based Compensation.                                            28
11.4.    Committee Discretion.                                                                    28

ARTICLE  XII. DIVIDEND EQUIVALENTS                                                               28
12.1.    Dividend Equivalents.                                                                    28

ARTICLE  XIII. TRANSFERABILITY OF AWARDS; BENEFICIARY DESIGNATION                                29
13.1.    Transferability of Incentive Stock Options.                                              29
13.2.    All Other Awards.                                                                        29
13.3.    Beneficiary Designation.                                                                 30

ARTICLE  XIV. RIGHTS OF PARTICIPANTS                                                             30
14.1.    Rights or Claims.                                                                        30
14.2.    Adoption of the Plan.                                                                    31
14.3.    Vesting.                                                                                 31
14.4.    No Effects on Benefits.                                                                  31
14.5.    One or More Types of Awards.                                                             31

ARTICLE  XV. CHANGE OF CONTROL                                                                   31
15.1.    Treatment of Outstanding Awards.                                                         31
15.2.    No Implied Rights; Other Limitations.                                                    33
15.3.    Termination, Amendment, and Modifications of Change of Control Provisions.               33
15.4.    Compliance with Code Section 409A.                                                       33

ARTICLE  XVI. AMENDMENT, MODIFICATION, AND TERMINATION                                           34
16.1.    Amendment, Modification, and Termination.                                               34
16.2.    Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events.      35

ARTICLE  XVII. TAX WITHHOLDING AND OTHER TAX MATTERS                                             35
17.1.    Tax Withholding.                                                                         35
17.2.    Withholding or Tendering Shares.                                                         36
17.3.    Restrictions.                                                                            36
17.4.    Special ISO Obligations.                                                                 36
17.5.    Section 83(b) Election.                                                                  36
17.6.    No Guarantee of Favorable Tax Treatment.                                                 36

ARTICLE  XVIII. LIMITS OF LIABILITY; INDEMNIFICATION                                             37

| | | Page |
|---|---|---|
| 18.1. | Limits of Liability. | 37 |
| 18.2. | Indemnification. | 37 |
| | | |
| ARTICLE XIX. SUCCESSORS | | 38 |
| 19.1. | General. | 38 |
| | | |
| ARTICLE XX. MISCELLANEOUS | | 38 |
| 20.1. | Drafting Context. | 38 |
| 20.2. | Forfeiture Events. | 38 |
| 20.3. | Severability. | 39 |
| 20.4. | Transfer, Leave of Absence. | 39 |
| 20.5. | Exercise and Payment of Awards. | 40 |
| 20.6. | Deferrals. | 40 |
| 20.7. | Loans. | 40 |
| 20.8. | No Effect on Other Plans. | 40 |
| 20.9. | Section 16 of Exchange Act and Code Section 162(m). | 41 |
| 20.10. | Requirements of Law; Limitations on Awards. | 41 |
| 20.11. | Participants Deemed to Accept Plan. | 42 |
| 20.12. | Governing Law. | 42 |
| 20.13. | Plan Unfunded. | 42 |
| 20.14. | Administration Costs. | 42 |
| 20.15. | Uncertificated Shares. | 42 |
| 20.16. | No Fractional Shares. | 43 |
| 20.17. | Deferred Compensation. | 43 |
| 20.18. | Employees Based Outside of the United States. | 43 |

**FIRST AMERICAN FINANCIAL CORPORATION**
**20 10 INCENTIVE COMPENSATION PLAN**
**Amended and Restated**
**Effective as of February 4, 2019**

First American Financial Corporation, a Delaware corporation (the " Company "), has adopted First American Financial Corporation 2010 Incentive Compensation Plan (the " Plan ") for the benefit of non-employee directors of the Company and officers and eligible employees of the Company and any Subsidiaries and Affiliates (as each term defined below), as follows:

ARTICLE I.
ESTABLISHMENT; PURPOSES; AND DURATION

1.1. Establishment of the Plan .

The Company hereby establishes this incentive compensation plan to be known as "First American Financial Corporation 2010 Incentive Compensation Plan", as set forth in this document.  The Plan permits the grant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Units, Performance Shares and Other Stock-Based Awards.  The Plan was adopted by the Board of Directors (as defined below) on May 28, 2010 and approved by The First American Corporation, as the Company's sole shareholder, on May 28, 2010.  For purposes of Section 422 of the Code and otherwise, the Plan became effective on May 28, 2010 (the " Effective Date ").  The Plan shall remain in effect as provided in Section 1.3.

1.2. Purposes of the Plan .

The purposes of the Plan are to provide additional incentives to non-employee directors of the Company and to those officers and employees of the Company, Subsidiaries and Affiliates whose substantial contributions are essential to the continued growth and success of the business of the Company and the Subsidiaries and Affiliates, in order to strengthen their commitment to the Company and the Subsidiaries and Affiliates, and to attract and retain competent and dedicated individuals whose efforts will result in the long-term growth and profitability of the Company and to further align the interests of such non-employee directors, officers and employees with the interests of the shareholders of the Company.  To accomplish such purposes, the Plan provides that the Company may grant Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Units, Performance Shares and Other Stock-Based Awards.

1.3. Duration of the Plan .

The Plan shall commence on the Effective Date, as described in Section 1.1, and shall remain in effect, subject to the right of the Board of Directors to amend or terminate the Plan at any time pursuant to Article XVII, until all Shares subject to it shall have been delivered, and any restrictions on such Shares have lapsed, pursuant to the Plan's provisions.  However, in no event may an Award be granted under the Plan on or after ten years from the Effective Date.

-1-

ARTICLE II.
DEFINITIONS

Whenever used in the Plan, the following terms shall have the meanings set forth below, and when the meaning is intended, the initial letter of the word shall be capitalized:

2.1. " Affiliate "

means any entity other than the Company and any Subsidiary that is affiliated with the Company through stock or equity ownership or otherwise and is designated as an Affiliate for purposes of the Plan by the Committee; provided , however , that, notwithstanding any other provisions of the Plan to the contrary, for purposes of NQSOs and SARs, if an individual who otherwise qualifies as an Employee or Non-Employee Director provides services to such an entity and not to the Company or a Subsidiary, such entity may only be designated an Affiliate if the Company qualifies as a "service recipient," within the meaning of Code Section 409A, with respect to such individual; provided further that such definition of "service recipient" shall be determined by (a) applying Code Section 1563(a)(1), (2) and (3), for purposes of determining a controlled group of corporations under Code Section 414(b), using the language "at least 50 percent" instead of "at least 80 percent" each place it appears in Code Section 1563(a)(1), (2) and (3), and by applying Treasury Regulations Section 1.414(c)-2, for purposes of determining trades or businesses (whether or not incorporated) that are under common control for purposes of Code Section 414(c), using the language "at least 50 percent" instead of "at least 80 percent" each place it appears in Treasury Regulations Section 1.414(c)-2, and (b) where the use of Shares with respect to the grant of an Option or SAR to such an individual is based upon legitimate business criteria, by applying Code Section 1563(a)(1), (2) and (3), for purposes of determining a controlled group of corporations under Code Section 414(b), using the language "at least 20 percent" instead of "at least 80 percent" at each place it appears in Code Section 1563(a)(1), (2) and (3), and by applying Treasury Regulations Section 1.414(c)-2, for purposes of determining trades or businesses (whether or not incorporated) that are under common control for purposes of Code Section 414(c), using the language "at least 20 percent" instead of "at least 80 percent" at each place it appears in Treasury Regulations Section 1.414(c)-2.

2.2. " Award "

means, individually or collectively, a grant under the Plan of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock Awards, Restricted Stock Units, Performance Shares, Performance Units, and Other Stock-Based Awards.

2.3. " Award Agreement "

means either: (a) a written agreement setting forth the terms and provisions applicable to an Award granted under the Plan, or (b) a written or electronic instrument issued by the Company to a Participant describing the terms and provisions of such Award, including any amendment or modification thereof. An Award Agreement may be in the form of an agreement to be executed by both the Participant and the Company (or an authorized representative of the Company) or certificates, notices or similar instruments as approved by the Committee. The Committee may provide for the use of electronic, internet or other non-paper Award Agreements, and the use of electronic, internet or other non-paper means for the acknowledgement thereof, agreement thereto and actions thereunder by a Participant.

2.4. " Beneficial Ownership "

(including correlative terms) shall have the meaning given such term in Rule 13d-3 promulgated under the Exchange Act.

-2 -

2.5. " <u>Board</u> " or " <u>Board of Directors</u> "

means the Board of Directors of the Company.

2.6. " <u>Cause</u> "

shall have the definition given such term in a Participant's Award Agreement, or in the absence of any such definition, as determined in good faith by the Committee.

2.7. " <u>Change of Control</u> "

means the occurrence of any of the following:

(a) an acquisition in one transaction or a series of related transactions (other than directly from the Company or pursuant to Awards granted under the Plan or compensatory options or other similar awards granted by the Company) by any Person of any Voting Securities of the Company, immediately after which such Person has Beneficial Ownership of fifty percent (50%) or more of the combined voting power of the Company's then outstanding Voting Securities; <u>provided</u> , <u>however</u> , that in determining whether a Change of Control has occurred pursuant to this Section 2.7(a), Voting Securities of the Company which are acquired in a Non-Control Acquisition shall not constitute an acquisition that would cause a Change of Control; or

(b) any Person acquires in one transaction or a series of related transactions (or has acquired during the twelve (12)-month period ending on the date of the most recent acquisition by such Person) Beneficial Ownership of Voting Securities of the Company possessing thirty-five percent (35%) or more of the combined voting power of the Company's then outstanding Voting Securities; <u>provided</u> , <u>however</u> , that in determining whether a Change of Control has occurred pursuant to this Section 2.7(b), Voting Securities of the Company which are acquired in a Non-Control Acquisition shall not constitute an acquisition that would cause a Change of Control; or

(c) the individuals who, immediately prior to the Effective Date, are members of the Board (the " <u>Company Incumbent Board</u>" ) cease for any reason to constitute at least a majority of the members of the Board; <u>provided</u> , <u>however</u> , that if the election, or nomination for election of any new director was approved by a vote of at least a majority of the Company Incumbent Board, such new director shall, for purposes of the Plan, be considered as a member of the Company Incumbent Board; <u>provided further</u> , <u>however</u> , that no individual shall be considered a member of the Company Incumbent Board if such individual initially assumed office as a result of either an actual or threatened " <u>Election Contest</u> " (as described in Rule 14a-11 promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a " <u>Company Proxy Contest</u> " ) including by reason of any agreement intended to avoid or settle any Election Contest or Company Proxy Contest; or

(d) the consummation of any merger, consolidation, recapitalization or reorganization involving the Company unless:

(i) the shareholders of the Company, immediately before such merger, consolidation, recapitalization or reorganization, own, directly or indirectly, immediately following such merger, consolidation, recapitalization or reorganization, more than fifty percent (50%) of the combined voting power of

-3-

the outstanding Voting Securities of the corporation resulting from such merger or consolidation or reorganization (the " Company Surviving Corporation " ) in substantially the same proportion as their ownership of the Voting Securities of the Company immediately before such merger, consolidation, recapitalization or reorganization; and

(ii) the individuals who were members of the Company Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation, recapitalization or reorganization constitute at least a majority of the members of the board of directors of the Company Surviving Corporation, or a corporation Beneficially Owning, directly or indirectly, a majority of the voting securities of the Company Surviving Corporation, and

(iii) no Person, other than (A) the Company, (B) any Related Entity, (C) any employee benefit plan (or any trust forming a part thereof) that, immediately prior to such merger, consolidation, recapitalization or reorganization, was maintained by the Company, the Company Surviving Corporation, or any Related Entity or (D) any Person who, together with its Affiliates, immediately prior to such merger, consolidation, recapitalization or reorganization had Beneficial Ownership of fifty percent (50%) or more of the then outstanding Voting Securities of the Company, owns, together with its Affiliates, Beneficial Ownership of fifty percent (50%) or more of the combined voting power of the Company Surviving Corporation's then outstanding Voting Securities

(a transaction described in clauses (d)(i) through (d)(iii) above is referred to herein as a " Non-Control Transaction "); or

(e) any approval of any plan or proposal for the liquidation or dissolution of the Company; or

(f) any sale, lease, exchange, transfer or other disposition (in one transaction or a series of related transactions) of all or substantially all of the assets or business of the Company to any Person (other than (A) a transfer or distribution to a Related Entity, or (B) a transfer or distribution to the Company's shareholders of the stock of a Related Entity or any other assets).

Notwithstanding the foregoing, a Change of Control shall not be deemed to occur solely because any Person (the " Subject Person ") acquired Beneficial Ownership of fifty percent (50%) or more of the combined voting power of the then outstanding Voting Securities of the Company as a result of the acquisition of Voting Securities of the Company by the Company which, by reducing the number of Voting Securities of the Company then outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change of Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company and (1) before such share acquisition by the Company the Subject Person becomes the Beneficial Owner of any new or additional Voting Securities of the Company in a related transaction or (2) after such share acquisition by the

-4-

Company the Subject Person becomes the Beneficial Owner of any new or additional Voting Securities of the Company which in either case increases the percentage of the then outstanding Voting Securities of the Company Beneficially Owned by the Subject Person, then a Change of Control shall be deemed to occur.

Solely for purposes of this Section 2.7, (1) " Affiliate " shall mean, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and (2) " control " (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.  Any Relative (for this purpose, " Relative " means a spouse, child, parent, parent of spouse, sibling or grandchild) of an individual shall be deemed to be an Affiliate of such individual for this purpose.  None of the Company or any Person controlled by the Company shall be deemed to be an Affiliate of any holder of Shares.

For the avoidance of doubt, the formation of the Company as a wholly-owned subsidiary of The First American Corporation, the consummation of any or all of the transactions contemplated by the Separation and Distribution Agreement between the Company and The First American Corporation, dated as of June 1, 2010 (the "Separation Agreement") and any changes to the capital structure of the Company or the ownership of the Voting Securities of the Company made prior to the time of the consummation of the distribution of the Company's securities to the shareholders of The First American Corporation pursuant to the terms of the Separation Agreement, will not be considered a Change of Control for purposes of this Plan.

2.8. " Code "

means the Internal Revenue Code of 1986, as it may be amended from time to time, including rules and regulations promulgated thereunder and successor provisions and rules and regulations thereto.

2.9. " Committee "

means the Compensation Committee of the Board of Directors or a subcommittee thereof, or such other committee designated by the Board to administer the Plan.

2.10. " Company Incumbent Board "

shall have the meaning provided in Section 2.7(c).

2.11. " Company Proxy Contest "

shall have the meaning provided in Section 2.7(c).

2.12. " Company Surviving Corporation "

has the meaning provided in Section 2.7(d)(i).

2.13. " Covered Award "

has the meaning provided in Section 20.2(b).

2.14. " Covered Employee "

means any Employee who is or may become a "covered employee," as defined in Code Section 162(m), and who is designated, either as an individual Employee or a member of a class of Employees, by the Committee within the shorter of (i) ninety (90) days after the beginning of the Performance Period, or (ii) the first twenty-five

percent (25%) of the Performance Period , as a " Covered Employee " under the Plan for such applicable Performance Period.

2.15. " Director "

means any individual who is a member of the Board of Directors of the Company.

2.16. " Disability "

means the inability to engage in any substantial gainful occupation to which the relevant individual is suited by education, training or experience, by reason of any medically determinable physical or mental impairment, which condition can be expected to result in death or continues for a continuous period of not less than twelve (12) months; provided , however , that, for purposes of ISOs, "Disability" shall mean "permanent and total disability" as set forth in Section 22(e)(3) of the Code.

2.17. " Dividend Equivalents "

means the equivalent value (in cash or Shares) of dividends that would otherwise be paid on the Shares subject to an Award but that have not been issued or delivered, as described in Article XII.

2.18. " Effective Date "

shall have the meaning ascribed to such term in Section 1.1.

2.19. " Employee "

means any person designated as an employee of the Company, a Subsidiary and/or an Affiliate on the payroll records thereof.  An Employee shall not include any individual during any period he or she is classified or treated by the Company, a Subsidiary or an Affiliate as an independent contractor, a consultant, or any employee of an employment, consulting, or temporary agency or any other entity other than the Company, a Subsidiary and/or an Affiliate without regard to whether such individual is subsequently determined to have been, or is subsequently retroactively reclassified as a common-law employee of the Company, a Subsidiary and/or an Affiliate during such period.  As further provided in Section 20.4, for purposes of the Plan, upon approval by the Committee, the term Employee may also include Employees whose employment with the Company, a Subsidiary or an Affiliate has been terminated subsequent to being granted an Award under the Plan.  For the avoidance of doubt, a Director who would otherwise be an "Employee" within the meaning of this Section 2.18 shall be considered an Employee for purposes of the Plan.

2.20. " Exchange Act "

means the Securities Exchange Act of 1934, as it may be amended from time to time, including the rules and regulations promulgated thereunder and successor provisions and rules and regulations thereto.

2.21. " Fair Market Value "

means the fair market value of the Shares as determined by the Committee by the reasonable application of such reasonable valuation method, consistently applied, as the Committee deems appropriate; provided , however , that, with respect to ISOs, for purposes of Section 6.3 and 6.9(c), such fair market value shall be determined subject to Section 422(c)(7) of the Code; provided further , however , that (a) if the Shares are readily tradable on an established securities market, Fair Market Value on any date shall be the last sale price reported for the Shares on such market on such date or, if no sale is reported on such date, on the last date preceding such date on which a sale was reported, or (b) if the Shares are admitted for listing on the New York Stock Exchange or other comparable market,

-6-

Fair Market Value on any date shall be the last sale price reported for the Shares on such market on such date or, if no sale is reported on such date, on the last day preceding such date on which a sale was reported.    In each case, the Committee shall determine Fair Market Value in a manner that satisfies the applicable requirements of Code Section 409A.

2.22. " Fiscal Year "

means the calendar year, or such other consecutive twelve-month period as the Committee may select.

2.23. " Freestanding SAR "

means a SAR that is granted independently of any Options, as described in Article VII.

2.24. " Grant Price "

means the price established at the time of grant of a SAR pursuant to Article VII, used to determine whether there is any payment due upon exercise of the SAR.

2.25. " Incentive Stock Option "

or " ISO " means a right to purchase Shares under the Plan in accordance with the terms and conditions set forth in Article VI and which is designated as an Incentive Stock Option and which is intended to meet the requirements of Section 422 of the Code.

2.26. " Insider "

means an individual who is, on the relevant date, an officer, director or ten percent (10%) Beneficial Owner of any class of the Company's equity securities that is registered pursuant to Section 12 of the Exchange Act, as determined by the Committee in accordance with Section 16 of the Exchange Act.

2.27. " Non-Control Acquisition "

means an acquisition (whether by merger, stock purchase, asset purchase or otherwise) by (a) an employee benefit plan (or a trust forming a part thereof) maintained by (i) the Company or (ii) any corporation or other Person of which fifty percent (50%) or more of its total value or total voting power of its Voting Securities or equity interests is owned, directly or indirectly, by the Company (a " Related Entity "); (b) the Company or any Related Entity; (c) any Person in connection with a Non-Control Transaction; or (d) any Person that owns, together with its Affiliates, Beneficial Ownership of fifty percent (50%) or more of the outstanding Voting Securities of the Company on the Effective Date.

2.28. " Non-Control Transaction "

shall have the meaning provided in Section 2.7(d).

2.29. " Non-Employee Director "

means a Director who is not an Employee.

2.30. " Nonqualified Stock Option "

or " NQSO " means a right to purchase Shares under the Plan in accordance with the terms and conditions set forth in Article VI and which is not intended to meet the requirements of Section 422 of the Code or otherwise does not meet such requirements.

2.31. " Notice "

means notice provided by a Participant to the Company in a manner prescribed by the Committee.

2.32. " <u>Option</u> "

or " <u>Stock Option</u> " means an Incentive Stock Option or a Nonqualified Stock Option, as described in Article VI.

2.33. " <u>Option Price</u> "

means the price at which a Share may be purchased by a Participant pursuant to an Option.

2.34. " <u>Other Stock-Based Award</u> "

means an equity-based or equity-related Award described in Section 10.1, granted in accordance with the terms and conditions set forth in Article X.

2.35. " <u>Participant</u> "

means any eligible individual as set forth in Article V who holds one or more outstanding Awards.

2.36. " <u>Performance-Based Compensation</u> "

means compensation under an Award that is intended to satisfy the requirements of Code Section 162(m) for certain performance-based compensation paid to Covered Employees.  Notwithstanding the foregoing, nothing in the Plan shall be construed to mean that an Award which does not satisfy the requirements for performance-based compensation under Code Section 162(m) does not constitute performance-based compensation for other purposes, including Code Section 409A.

2.37. " <u>Performance Measure</u> "

means performance criteria or measures as described in Section 11.1 on which the performance goals described in Article XI are based and which are approved by the Company's shareholders pursuant to the Plan in order to qualify certain Awards as Performance-Based Compensation in accordance with Article XI.

2.38. " <u>Performance Period</u> "

means the period of time during which the performance goals must be met in order to determine the degree of payout and/or vesting with respect to, or the amount or entitlement to, an Award.

2.39. " <u>Performance Share</u> "

means an Award of a performance share granted to a Participant, as described in Article IX.

2.40. " <u>Performance Unit</u> "

means an Award of a performance unit granted to a Participant, as described in Article IX.

2.41. " <u>Period of Restriction</u> "

means the period during which Shares of Restricted Stock or Restricted Stock Units are subject to a substantial risk of forfeiture, and, in the case of Restricted Stock, the transfer of Shares of Restricted Stock is limited in some way, as provided in Article VIII.

2.42. " <u>Person</u> "

means "person" as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act, including any individual, corporation, limited liability company, partnership, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other entity or any group of persons.

2.43. " <u>Qualified Change of Control</u> "

means a Change of Control that qualifies as a change in the ownership or effective control of the Company, or in the ownership of a

substantial portion of the assets of the Company, within the meaning of Section 409A(a)(2)(A)(v) of the Code.

2.44. " <u>Related Entity</u> "

has the meaning provided in Section 2.26.

2.45. " <u>Restricted Stock</u> "

means an Award granted to a Participant pursuant to Article VIII.

2.46. " <u>Restricted Stock Unit</u> "

means an Award, whose value is equal to a Share, granted to a Participant pursuant to Article VIII.

2.47. " <u>Retirement</u> "

means Termination of a Participant due to either (a) retirement in accordance with any employee pension benefit plan maintained by the Company that is intended to satisfy the requirements of Section 401(a) of the Code entitling such Participant to a full pension under such plan or (b) retirement with the consent of the Committee.

2.48. " <u>Rule 16b-3</u> "

means Rule 16b-3 under the Exchange Act, or any successor rule, as the same may be amended from time to time.

2.49. " <u>Securities Act</u> "

means the Securities Act of 1933, as it may be amended from time to time, including the rules and regulations promulgated thereunder and successor provisions and rules and regulations thereto.

2.50. " <u>Share</u> "

means a share of common stock, par value $0.00001 per share, of the Company (including any new, additional or different stock or securities resulting from any change in corporate capitalization as listed in Section 4.3).

2.51. " <u>Stock Appreciation Right</u> "

or " <u>SAR</u> " means an Award, granted alone (a " <u>Freestanding SAR</u> ") or in connection with a related Option (a " <u>Tandem SAR</u> "), designated as a SAR, pursuant to the terms of Article VII.

2.52. " <u>Subject Person</u> "

has the meaning provided in Section 2.7.

2.53. " <u>Subsidiary</u> "

means any present or future corporation which is or would be a "subsidiary corporation" of the Company as the term is defined in Section 424(f) of the Code.

2.54. " <u>Substitute Awards</u> "

means Awards granted or Shares issued by the Company in assumption of, or in substitution or exchange for, options or other awards previously granted, or the right or obligation to grant future options or other awards, by a company acquired by the Company, a Subsidiary and/or an Affiliate or with which the Company, a Subsidiary and/or an Affiliate combines, or otherwise in connection with any merger, consolidation, acquisition of property or stock, or reorganization involving the Company, a Subsidiary or an Affiliate, including a transaction described in Code Section 424(a).

2.55. " <u>Tandem SAR</u> "

means a SAR that is granted in connection with a related Option pursuant to Article VII.

2.56. "Termination"

means the time when a Participant ceases the performance of services for the Company, any Affiliate or Subsidiary, as applicable, for any reason, with or without Cause, including a Termination by resignation, discharge, death, Disability or Retirement, but excluding (a) a Termination where there is a simultaneous reemployment or continuing employment of a Participant by the Company, Affiliate or any Subsidiary, (b) at the discretion of the Committee, a Termination that results in a temporary severance, and (c) at the discretion of the Committee, a Termination of an Employee that is immediately followed by the Participant's service as a Non-Employee Director. Notwithstanding any other provisions of the Plan or any Award Agreement to the contrary, a Termination shall not be deemed to have occurred for purposes of any provision the Plan or any Award Agreement providing for payment or distribution with respect to an Award constituting deferred compensation subject to Code Section 409A upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A.

2.57. "Voting Securities"

shall mean, with respect to any Person that is a corporation, all outstanding voting securities of such Person entitled to vote generally in the election of the board of directors of such Person.

ARTICLE  III.
ADMINISTRATION

3.1. General.

The Committee shall have exclusive authority to operate, manage and administer the Plan in accordance with its terms and conditions. Notwithstanding the foregoing, in its absolute discretion, the Board may at any time and from time to time exercise any and all rights, duties and responsibilities of the Committee under the Plan, including establishing procedures to be followed by the Committee, but excluding matters which under any applicable law, regulation or rule, including any exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3) or Section 162(m) of the Code, are required to be determined in the sole discretion of the Committee. If and to the extent that the Committee does not exist or cannot function, the Board may take any action under the Plan that would otherwise be the responsibility of the Committee, subject to the limitations set forth in the immediately preceding sentence. Notwithstanding any other provision of the Plan to the contrary, any action or determination specifically affecting or relating to an Award granted to a Non-Employee Director shall be taken or approved, by the Board or the Committee.

3.2. Committee.

The members of the Committee shall be appointed from time to time by, and shall serve at the discretion of, the Board of Directors. The Committee shall consist of not less than three (3) non-employee members of the Board, each of whom satisfies such criteria of independence as the Board may establish and such additional regulatory or listing requirements as the Board may determine to be applicable or appropriate. Appointment of Committee members shall be effective upon their acceptance of such appointment. Committee members may be removed by the Board at any time either with or without cause, and such members may resign at any time by delivering notice thereof to the Board. Any vacancy on the Committee, whether due to action of the Board or any other reason, shall be filled by the Board. The Committee shall keep minutes of its meetings. A majority of the Committee shall constitute a quorum and a majority of a quorum may authorize any action.

-10 -

3.3. <u>Authority of the Committee</u> .

The Committee shall have full discretionary authority to grant, pursuant to the terms of the Plan, Awards to those individuals who are eligible to receive Awards under the Plan. Except as limited by law or by the Articles of Incorporation or Bylaws of the Company, and subject to the provisions herein, the Committee shall have full power, in accordance with the other terms and provisions of the Plan, to:

(a) select Employees and Non-Employee Directors who may receive Awards under the Plan and become Participants;

(b) determine eligibility for participation in the Plan and decide all questions concerning eligibility for, and the amount of, Awards under the Plan;

(c) determine the sizes and types of Awards;

(d) determine the terms and conditions of Awards, including the Option Prices of Options and the Grant Prices of SARs;

(e) grant Awards as an alternative to, or as the form of payment for grants or rights earned or payable under, other bonus or compensation plans, arrangements or policies of the Company or a Subsidiary or Affiliate;

(f) grant Substitute Awards on such terms and conditions as the Committee may prescribe, subject to compliance with the ISO rules under Code Section 422 and the nonqualified deferred compensation rules under Code Section 409A, where applicable;

(g) make all determinations under the Plan concerning Termination of any Participant's employment or service with the Company or a Subsidiary or Affiliate, including whether such Termination occurs by reason of Cause, Disability or Retirement or in connection with a Change of Control and whether a leave constitutes a Termination;

(h) construe and interpret the Plan and any agreement or instrument entered into under the Plan, including any Award Agreement;

(i) establish and administer any terms, conditions, restrictions, limitations, forfeiture, vesting or exercise schedule, and other provisions of or relating to any Award;

(j) establish and administer any performance goals in connection with any Awards, including related Performance Measures or performance criteria and applicable Performance Periods, determine the extent to which any performance goals and/or other terms and conditions of an Award are attained or are not attained, and certify whether, and to what extent, any such performance goals and other material terms applicable to Awards intended to qualify as Performance-Based Compensation were in fact satisfied;

(k) construe any ambiguous provisions, correct any defects, supply any omissions and reconcile any inconsistencies in the Plan and/or any Award Agreement or any other instrument relating to any Awards;

-11 -

(l) establish, adopt, amend, waive and/or rescind rules, regulations, procedures, guidelines, forms and/or instruments for the Plan ' s operation or administration;

(m) make all valuation determinations relating to Awards and the payment or settlement thereof;

(n) grant waivers of terms, conditions, restrictions and limitations under the Plan or applicable to any Award, or accelerate the vesting or exercisability of any Award;

(o) subject to the provisions of Article XVI, amend or adjust the terms and conditions of any outstanding Award and/or adjust the number and/or class of shares of stock subject to any outstanding Award;

(p) at any time and from time to time after the granting of an Award, specify such additional terms, conditions and restrictions with respect to such Award as may be deemed necessary or appropriate to ensure compliance with any and all applicable laws or rules, including terms, restrictions and conditions for compliance with applicable securities laws or listing rules, methods of withholding or providing for the payment of required taxes and restrictions regarding a Participant's ability to exercise Options through a cashless (broker-assisted) exercise;

(q) offer to buy out an Award previously granted, based on such terms and conditions as the Committee shall establish with and communicate to the Participant at the time such offer is made;

(r) determine whether, and to what extent and under what circumstances Awards may be settled in cash, Shares or other property or canceled or suspended; and

(s) exercise all such other authorities, take all such other actions and make all such other determinations as it deems necessary or advisable for the proper operation and/or administration of the Plan.

3.4. <u>Award Agreements</u> .

The Committee shall, subject to applicable laws and rules, determine the date an Award is granted.  Each Award shall be evidenced by an Award Agreement; <u>however</u> , two or more Awards granted to a single Participant may be combined in a single Award Agreement.  An Award Agreement shall not be a precondition to the granting of an Award; <u>provided</u> , <u>however</u> , that (a) the Committee may, but need not, require as a condition to any Award Agreement's effectiveness, that such Award Agreement be executed on behalf of the Company and/or by the Participant to whom the Award evidenced thereby shall have been granted (including by electronic signature or other electronic indication of acceptance), and such executed Award Agreement be delivered to the Company, and (b) no person shall have any rights under any Award unless and until the Participant to whom such Award shall have been granted has complied with the applicable terms and conditions of the Award.  The Committee shall prescribe the form of all Award Agreements, and, subject to the terms and conditions of the Plan, shall determine the content of all Award Agreements.  Any Award Agreement may be supplemented or amended in writing from time to time as approved by the Committee; <u>provided</u> that the terms and conditions of any such Award Agreement as supplemented or amended are not

-12-

inconsistent with the provisions of the Plan.    In the event of any dispute or discrepancy concerning the terms of an Award, the records of the Committee or its designee shall be determinative.

3.5.  Discretionary Authority; Decisions Binding .

The Committee shall have full discretionary authority in all matters related to the discharge of its responsibilities and the exercise of its authority under the Plan.  All determinations, decisions, actions and interpretations by the Committee with respect to the Plan and any Award Agreement, and all related orders and resolutions of the Committee shall be final, conclusive and binding on all Participants, the Company and its shareholders, any Subsidiary or Affiliate and all persons having or claiming to have any right or interest in or under the Plan and/or any Award Agreement.  The Committee shall consider such factors as it deems relevant to making or taking such decisions, determinations, actions and interpretations, including the recommendations or advice of any Director or officer or employee of the Company, any director, officer or employee of a Subsidiary or Affiliate and such attorneys, consultants and accountants as the Committee may select.  A Participant or other holder of an Award may contest a decision or action by the Committee with respect to such person or Award only on the grounds that such decision or action was arbitrary or capricious or was unlawful, and any review of such decision or action shall be limited to determining whether the Committee's decision or action was arbitrary or capricious or was unlawful.

3.6.  Attorneys; Consultants .

The Committee may consult with counsel who may be counsel to the Company.  The Committee may, with the approval of the Board, employ such other attorneys and/or consultants, accountants, appraisers, brokers, agents and other persons, any of whom may be an Employee, as the Committee deems necessary or appropriate.  The Committee, the Company and its officers and Directors shall be entitled to rely upon the advice, opinions or valuations of any such persons.  The Committee shall not incur any liability for any action taken in good faith in reliance upon the advice of such counsel or other persons.

3.7.  Delegation of Administration .

Except to the extent prohibited by applicable law, including any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3) or Section 162(m) of the Code, or the applicable rules of a stock exchange, the Committee may, in its discretion, allocate all or any portion of its responsibilities and powers under this Article III to any one or more of its members and/or delegate all or any part of its responsibilities and powers under this Article III to any person or persons selected by it; provided , however , that the Committee may not delegate its authority to correct defects, omissions or inconsistencies in the Plan.  Any such authority delegated or allocated by the Committee under this Section 3.7 shall be exercised in accordance with the terms and conditions of the Plan and any rules, regulations or administrative guidelines that may from time to time be established by the Committee, and any such allocation or delegation may be revoked by the Committee at any time.

ARTICLE IV.
SHARES SUBJECT TO THE PLAN AND ANNUAL AWARD LIMITS

4.1.  Number of Shares Available for Grants .

The shares of stock subject to Awards granted under the Plan shall be Shares.  Such Shares subject to the Plan may be either authorized

-13-

and unissued shares (which will not be subject to preemptive rights) or previously issued shares acquired by the Company or any Subsidiary.    Subject to adjustment as provided in Section 4.3, the total number of Shares that may be delivered pursuant to Awards under the Plan shall be sixteen million ( 16,000,000 ) Shares.    If (a) any Shares are subject to an Option, SAR, or other Award which for any reason expires or is terminated or canceled without having been fully exercised, or are subject to any Restricted Stock Award (including any Shares subject to a Participant ' s Restricted Stock Award that are repurchased by the Company at the Participant ' s cost), Restricted Stock Unit Award or other Award granted under the Plan which are forfeited, or (b)   any Award based on Shares is settled for cash, expires or otherwise terminates without the issuance of such Shares, the Shares subject to any such Award shall, to the extent of any such expiration, termination, cancellation, forfeiture or cash settlement, be available for delivery in connection with future Awards under the Plan; provided , however , that (i)  all Shares covered by a SAR , to the extent that it is exercised, and whether or not Shares are actually issued to the Participant upon exercise of the SAR and (ii) all Shares withheld by the Company to pay the exercise price of an Option and/or the withholding taxes related an Award shall reduce the total number of Shares available for delivery under the Plan. Any Shares delivered under the Plan upon exercise or satisfaction of Substitute Awards shall not reduce the Shares available for delivery under the Plan; provided , however , that the total number of Shares that may be delivered pursuant to Incentive Stock Options granted under the Plan shall be the number of Shares set forth in the first sentence of this Section 4.1, as adjusted pursuant to this Section 4.1, but without application of the foregoing provisions of this sentence.

4.2.  Annual Award Limits .

The following limits shall apply to grants of all Awards under the Plan:

(a)  Options :   The maximum aggregate number of Shares that may be subject to Options granted in any one Fiscal Year to any one Participant shall be five hundred thousand (500,000) Shares.

(b)  SARs :   The maximum aggregate number of Shares that may be subject to Stock Appreciation Rights granted in any one Fiscal Year to any one Participant shall be five hundred thousand (500,000) Shares.  Any Shares covered by Options which include Tandem SARs granted to one Participant in any Fiscal Year shall reduce this limit on the number of Shares subject to SARs that can be granted to such Participant in such Fiscal Year.

(c)  Restricted Stock or Restricted Stock Units :   The maximum aggregate number of Shares that may be subject to Awards of Restricted Stock or Restricted Stock Units granted in any one Fiscal Year to any one Participant shall be two hundred thousand (200,000) Shares.

(d)  Performance Shares or Performance Units :   The maximum aggregate grant with respect to Awards of Performance Shares or Performance Units granted in any one Fiscal Year to any one Participant shall be two hundred thousand (200,000) Shares.

(e)  Other Stock-Based Awards :   The maximum aggregate grant with respect to Other Stock-Based Awards made in any one Fiscal Year to any one Participant shall be

-14-

two hundred thousand ( 200 ,000) Shares (or cash amounts based on the value of such number of Shares).

(f)  <u>Director Awards </u>:  The maximum aggregate dollar value of equity-based (based on the grant date fair value of equity-based) Awards and cash compensation granted under this Plan or otherwise during any one Fiscal Year to any one Participant who is a Non-Employee Director shall not exceed $500,000.

To the extent required by Section 162(m) of the Code, Shares subject to Options or SARs which are canceled shall continue to be counted against the limits set forth in paragraphs (a) and (b) immediately preceding.

4.3.  <u>Adjustments in Authorized Shares </u>.

In the event of any corporate event or transaction (including a change in the Shares or the capitalization of the Company), such as a reclassification, recapitalization, merger, consolidation, reorganization (whether or not such reorganization comes within the definition of such term in Section 368 of the Code), issuance of warrants or rights, dividend or other distribution (whether in the form of cash, stock or other property), stock split or reverse stock split, spin-off, split-up, combination or exchange of shares, repurchase of shares, or other like change in corporate structure, partial or complete liquidation of the Company or distribution (other than ordinary cash dividends) to shareholders of the Company, or any similar corporate event or transaction, the Committee, in order to prevent dilution or enlargement of Participants' rights under the Plan, shall substitute or adjust, as applicable, the number, class and kind of securities which may be delivered under Section 4.1; the number, class and kind, and/or price (such as the Option Price of Options or the Grant Price of SARs) of securities subject to outstanding Awards; the Award limits set forth in Section 4.2; and other value determinations applicable to outstanding Awards; <u>provided </u>, <u>however </u>, that the number of Shares subject to any Award shall always be a whole number.   The Committee shall also make appropriate adjustments and modifications in the terms of any outstanding Awards to reflect or related to any such events, adjustments, substitutions or changes, including modifications of performance goals and changes in the length of Performance Period s , subject to the requirements of Article XI in the case of Awards intended to qualify as Performance-Based Compensation .   Any adjustment, substitution or change pursuant to this Section 4.3 made with respect to an Award intended to be an Incentive Stock Option shall be made only to the extent consistent with such intent, unless the Committee determines otherwise, and any such adjustment that is made with respect to an Award that provides for Performance-Based Compensation shall be made consistent with the intent that such Award qualify for the performance-based compensation exception under Section 162(m) of the Code. The Committee shall not make any adjustment pursuant to this Section 4.3 that would cause an Award that is otherwise exempt from Code Section 409A to become subject to Code Section 409A, or that would cause an Award that is subject to Code Section 409A to fail to satisfy the requirements of Code Section 409A.  All determinations of the Committee as to adjustments or changes, if any, under this Section 4.3 shall be conclusive and binding on the Participants.

4.4.  <u>No Limitation on Corporate Actions </u>.

The existence of the Plan and any Awards granted hereunder shall not affect in any way the right or power of the Company, any Subsidiary or any Affiliate to make or authorize any adjustment, recapitalization, reorganization or other change in its capital structure or business structure, any merger or consolidation, any issuance of

-15-

debt, preferred or prior preference stock ahead of or affecting the Shares, additional shares of capital stock or other securities or subscription rights thereto, any dissolution or liquidation, any sale or transfer of all or part of its assets or business or any other corporate act or proceeding.   Further, except as expressly provided herein or by the Committee, (i) the issuance by the Company of Shares or any class of securities convertible into shares of stock of any class, for cash, property, labor or services, upon direct sale, upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Company convertible into such shares or other securities, (ii) the payment of a n ordinary dividend in cash or property other than Shares, or (i ii)   the occurrence of any similar transaction, and in any case whether or not for fair value, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number of Shares subject to Awards theretofore granted or the Option Price, Grant Price or purchase price per share applicable to any Award, unless the Committee shall determine, in its discretion, that an adjustment is necessary or appropriate.

<div align="center">ARTICLE  V.<br>ELIGIBILITY AND PARTICIPATION</div>

5.1. Eligibility .

Employees and Non-Employee Directors shall be eligible to become Participants and receive Awards in accordance with the terms and conditions of the Plan, subject to the limitations on the granting of ISOs set forth in Section 6.9(a), the granting of SARs set forth in Section 7.1 and the granting of Performance Units and Performance Shares set forth in Section 9.1.

5.2. Actual Participation .

Subject to the provisions of the Plan, the Committee may, from time to time, select Participants from all eligible Employees and Non-Employee Directors and shall determine the nature and amount of each Award.

<div align="center">ARTICLE  VI.<br>STOCK OPTIONS</div>

6.1. Grant of Options .

Subject to the terms and provisions of the Plan, Options may be granted to Participants in such number, and upon such terms, and at any time and from time to time as shall be determined by the Committee.  The Committee may grant an Option or provide for the grant of an Option, either from time to time in the discretion of the Committee or automatically upon the occurrence of specified events, including the achievement of performance goals, the satisfaction of an event or condition within the control of the recipient of the Option or within the control of others.  The granting of an Option shall take place when the Committee by resolution, written consent or other appropriate action determines to grant such Option for a particular number of Shares to a particular Participant at a particular Option Price.

6.2. Award Agreement .

Each Option grant shall be evidenced by an Award Agreement that shall specify the Option Price, the maximum duration of the Option, the number of Shares to which the Option pertains, the conditions upon which the Option shall become exercisable and such other provisions as the Committee shall determine, which are not inconsistent with the terms of the Plan; provided that if an Award Agreement does not contain exercisability criteria, the Option governed by such Award Agreement shall become exercisable in equal parts on each of the first five (5) anniversaries of the date on which the Option was

<div align="center">-16-</div>

granted, subject to the other terms and conditions of the Award Agreement and the Plan .    The Award Agreement also shall specify whether the Option is intended to be an ISO or an NQSO.    To the extent that any Option does not qualify as an ISO (whether because of its provisions or the time or manner of its exercise or otherwise), such Option, or the portion thereof which does not so qualify, shall constitute a separate NQSO.

6.3.  Option Price .

The Option Price for each Option shall be determined by the Committee and set forth in the Award Agreement; provided that, subject to Section 6.9(c), the Option Price of an Option shall be not less than one hundred percent (100%) of the Fair Market Value of a Share on the date the Option is granted; provided further , that Substitute Awards or Awards granted in connection with an adjustment provided for in Section 4.3, in the form of stock options, shall have an Option Price per Share that is intended to maintain the economic value of the Award that was replaced or adjusted, as determined by the Committee.

6.4.  Duration of Options .

Each Option granted to a Participant shall expire at such time as the Committee shall determine at the time of grant and set forth in the Award Agreement; provided , however , that no Option shall be exercisable later than the tenth (10 th ) anniversary of its date of grant, subject to the respective last sentences of Sections 6.5 and 6.9(c).

6.5.  Exercise of Options .

Options shall be exercisable at such times and be subject to such restrictions and conditions as the Committee shall in each instance determine and set forth in the Award Agreement, which need not be the same for each grant or for each Option or Participant.  An Award Agreement may provide that the period of time over which an Option other than an ISO may be exercised shall be automatically extended if on the scheduled expiration date of such Option the Optionee's exercise of such Option would violate applicable securities laws; provided , however , that during such extended exercise period the Option may only be exercised to the extent the Option was exercisable in accordance with its terms immediately prior to such scheduled expiration date; provided further , however , that such extended exercise period shall end not later than thirty (30) days after the exercise of such Option first would no longer violate such laws.

6.6.  Payment .

Options shall be exercised by the delivery of a written notice of exercise to the Company, in a form specified or accepted by the Committee, or by complying with any alternative exercise procedures that may be authorized by the Committee, setting forth the number of Shares with respect to which the Option is to be exercised, accompanied by full payment for such Shares, which shall include applicable taxes, if any, in accordance with Article XVII.  The Option Price upon exercise of any Option shall be payable to the Company in full either:  (a) in cash or its equivalent; (b) subject to such terms, conditions and limitations as the Committee may prescribe, by tendering (either by actual delivery or attestation) unencumbered Shares previously acquired by the Participant exercising such Option having an aggregate Fair Market Value at the time of exercise equal to the total Option Price, (c) by a combination of (a) and (b); or (d) by any other method approved or accepted by the Committee in its sole discretion, including, if the Committee so determines, a cashless (broker-assisted) exercise that complies with all applicable laws and/or by the Company withholding of Shares otherwise deliverable upon exercise of such Option.  Subject to any governing rules or regulations, as soon as practicable after receipt of a written notification of exercise and full payment in accordance with the preceding provisions of this Section 6.6, the Company shall deliver to the Participant

-17-

exercising an Option, in the Participant ' s name, evidence of book entry Shares, or, upon the Participant ' s request, Share certificates, in an appropriate amount based upon the number of Shares purchased under the Option, subject to Section 20.10 .   Unless otherwise determined by the Committee, all payments under all of the methods described above shall be paid in United States dollars.

6.7. <u>Rights as a Shareholder</u> .

No Participant or other person shall become the beneficial owner of any Shares subject to an Option, nor have any rights to dividends or other rights of a shareholder with respect to any such Shares, until the Participant has actually received such Shares following exercise of his or her Option in accordance with the provisions of the Plan and the applicable Award Agreement.

6.8. <u>Termination of Employment or Service</u> .

Except as otherwise provided in the Award Agreement, an Option may be exercised only to the extent that it is then exercisable, and if at all times during the period beginning with the date of granting of such Option and ending on the date of exercise of such Option the Participant is an Employee or Non-Employee Director, and shall terminate immediately upon a Termination of the Participant.

Notwithstanding the immediately foregoing paragraph, an Option may only be exercised following Termination as provided below in this Section 6.8, unless otherwise provided by the Committee or in the Award Agreement:

(a) In the event a Participant ceases to be an Employee because of Retirement or ceases to be a Non-Employee Director because of voluntary resignation, the Participant shall have the right to exercise his or her Option, to the extent exercisable as of the date of such Retirement or voluntary resignation, respectively, at any time within one (1) year after Retirement or voluntary resignation, respectively.

(b) In the event a Participant ceases to be an Employee or Non-Employee Director due to Disability, the Option held by the Participant may be exercised, to the extent exercisable as of the date of such Termination, at any time within one (1) year after such Termination.

(c) In the event a Participant's employment with the Company or any Affiliate or Subsidiary or a Participant's rendering of services as a Non-Employee Director to the Company ceases for reasons other than those described in subsections (a) or (b) immediately above and not due to Termination for Cause, his or her Option, to the extent exercisable as of the date of such Termination, may be exercised at any time prior to the first (1 st ) anniversary of the date of such Termination.

(d) In the event a Participant dies either while an Employee or Non-Employee Director or after Termination under circumstances described in subsections (a), (b) or (c) immediately above within the applicable time period described therein, any Options held by such Participant, to the extent such Options would have been exercisable in accordance with the applicable subsection of this Section 6.8 as of the date of the Participant's death, may be exercised at any time within one (1) year after the Participant's death by the Participant's beneficiary or the executors or administrators of

-18-

the Participant ' s estate or by any person or persons who shall have acquired the Option directly from the Participant by bequest or inheritance, in accordance herewith.

Notwithstanding the foregoing provisions of this Section 6.8 to the contrary, the Committee may determine in its discretion that an Option may be exercised following any such Termination, whether or not exercisable at the time of such Termination.  Subsections (a), (b), (c) and (d) of this Section 6.8, and the immediately preceding sentence, shall be subject to the condition that, except as otherwise provided by the Committee, no Option may be exercised after a Participant's Termination for Cause or after the expiration date of such Option specified in the applicable Award Agreement.

6.9.  Limitations on Incentive Stock Options .

(a)  General .  No ISO shall be granted to any individual otherwise eligible to participate in the Plan who is not an Employee of the Company or a Subsidiary on the date of granting of such Option.  Any ISO granted under the Plan shall contain such terms and conditions, consistent with the Plan, as the Committee may determine to be necessary to qualify such Option as an "incentive stock option" under Section 422 of the Code.  Any ISO granted under the Plan may be modified by the Committee to disqualify such Option from treatment as an "incentive stock option" under Section 422 of the Code.

(b)  $100,000 Per Year Limitation .  Notwithstanding any intent to grant ISOs, an Option granted under the Plan will not be considered an ISO to the extent that it, together with any other "incentive stock options" (within the meaning of Section 422 of the Code, but without regard to subsection (d) of such Section) under the Plan and any other "incentive stock option" plans of the Company, any Subsidiary and any "parent corporation" of the Company within the meaning of Section 424(e) of the Code, are exercisable for the first time by any Participant during any calendar year with respect to Shares having an aggregate Fair Market Value in excess of $100,000 (or such other limit as may be required by the Code) as of the time the Option with respect to such Shares is granted.  The rule set forth in the preceding sentence shall be applied by taking Options into account in the order in which they were granted.

(c)  Options Granted to Certain Shareholders .  No ISO shall be granted to an individual otherwise eligible to participate in the Plan who owns (within the meaning of Section 424(d) of the Code), at the time the Option is granted, more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or a Subsidiary or any "parent corporation" of the Company within the meaning of Section 424(e) of the Code.  This restriction does not apply if at the time such ISO is granted the Option Price of the ISO is at least 110% of the Fair Market Value of a Share on the date such ISO is granted, and the ISO by its terms is not exercisable after the expiration of five years from such date of grant.

6.10.  No Repricing .

Notwithstanding anything in the Plan to the contrary, no Option may be repriced, regranted through cancellation, or otherwise amended to reduce the Option Price applicable thereto (other than with respect to adjustments described in Section 4.3)

-19-

without the approval of the Company's shareholders to the extent required by the listing requirements of any national securities exchange on which the Company's securities are then actively traded .

ARTICLE  VII.
STOCK APPRECIATION RIGHTS

7.1. Grant of SARs .

Subject to the terms and conditions of the Plan, SARs may be granted to Participants other than Non-Employee Directors at any time and from time to time as shall be determined by the Committee.  The Committee may grant a SAR (a) in connection and simultaneously with the grant of an Option (a Tandem SAR) or (b) independent of, and unrelated to, an Option (a Freestanding SAR).  The Committee shall have complete discretion in determining the number of Shares to which a SAR pertains (subject to Article IV) and, consistent with the provisions of the Plan, in determining the terms and conditions pertaining to any SAR.  The terms and conditions of SARs shall be consistent with the Plan and set forth in the Award Agreement and need not be uniform among all SARs or all Participants receiving such SARs.

7.2. Grant Price .

The Grant Price for each SAR shall be determined by the Committee and set forth in the Award Agreement, subject to the limitations of this Section 7.2.  The Grant Price for each Freestanding SAR shall be not less than one hundred percent (100%) of the Fair Market Value of a Share on the date such Freestanding SAR is granted, except in the case of Substitute Awards or Awards granted in connection with an adjustment provided for in Section 4.3.  The Grant Price of a Tandem SAR shall be equal to the Option Price of the related Option.

7.3. Exercise of Tandem SARs .

Tandem SARs may be exercised for all or part of the Shares subject to the related Option upon the surrender of the right to exercise the equivalent portion of the related Option.  A Tandem SAR shall be exercisable only when and to the extent the related Option is exercisable and may be exercised only with respect to the Shares for which the related Option is then exercisable.  A Tandem SAR shall entitle a Participant to elect, in the manner set forth in the Plan and the applicable Award Agreement, in lieu of exercising his or her unexercised related Option for all or a portion of the Shares for which such Option is then exercisable pursuant to its terms, to surrender such Option to the Company with respect to any or all of such Shares and to receive from the Company in exchange therefor a payment described in Section 7.7.  An Option with respect to which a Participant has elected to exercise a Tandem SAR shall, to the extent of the Shares covered by such exercise, be canceled automatically and surrendered to the Company.  Such Option shall thereafter remain exercisable according to its terms only with respect to the number of Shares as to which it would otherwise be exercisable, less the number of Shares with respect to which such Tandem SAR has been so exercised.  Notwithstanding any other provision of the Plan to the contrary, with respect to a Tandem SAR granted in connection with an ISO:  (a) the Tandem SAR will expire no later than the expiration of the related ISO; (b) the value of the payment with respect to the Tandem SAR may not exceed the difference between the Fair Market Value of the Shares subject to the related ISO at the time the Tandem SAR is exercised and the Option Price of the related ISO; and (c) the Tandem SAR may be exercised only when the Fair Market Value of the Shares subject to the ISO exceeds the Option Price of the ISO.

-20 -

7.4. <u>Exercise of Freestanding SARs</u> .

Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its sole discretion, in accordance with the Plan, determines and sets forth in the Award Agreement.

7.5. <u>Award Agreement</u> .

Each SAR grant shall be evidenced by an Award Agreement that shall specify the number of Shares to which the SAR pertains, the Grant Price, the term of the SAR, and such other terms and conditions as the Committee shall determine in accordance with the Plan.

7.6. <u>Term of SARs</u> .

The term of a SAR granted under the Plan shall be determined by the Committee, in its sole discretion; <u>provided</u> , <u>however</u> , that the term of any Tandem SAR shall be the same as the related Option and no SAR shall be exercisable more than ten (10) years after it is granted, subject to the last sentence of Section 6.5 in the case of a Tandem SAR.

7.7. <u>Payment of SAR Amount</u> .

An election to exercise SARs shall be deemed to have been made on the date of Notice of such election to the Company.  Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(a) The excess of the Fair Market Value of a Share on the date of exercise over the Grant Price of the SAR; by

(b) The number of Shares with respect to which the SAR is exercised.

Notwithstanding the foregoing provisions of this Section 7.7 to the contrary, the Committee may establish and set forth in the applicable Award Agreement a maximum amount per Share that will be payable upon the exercise of a SAR.  At the discretion of the Committee, such payment upon exercise of a SAR shall be in cash, in Shares of equivalent Fair Market Value, or in some combination thereof.

7.8. <u>Rights as a Shareholder</u> .

A Participant receiving a SAR shall have the rights of a Shareholder only as to Shares, if any, actually issued to such Participant upon satisfaction or achievement of the terms and conditions of the Award, and in accordance with the provisions of the Plan and the applicable Award Agreement, and not with respect to Shares to which such Award relates but which are not actually issued to such Participant.

7.9. <u>Termination of Employment or Service</u> .

Each SAR Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the SAR following such Participant's Termination, subject to Section 6.8, as applicable to any Tandem SAR.  Such provisions shall be determined in the sole discretion of the Committee, need not be uniform among all SARs issued pursuant to the Plan, and may reflect distinctions based on the reasons for Termination.

7.10. <u>No Repricing</u> .

Notwithstanding anything in the Plan to the contrary, no SAR may be repriced, regranted through cancellation, or otherwise amended to reduce the Grant Price applicable thereto (other than with respect to adjustments described in Section 4.3) without the approval of the Company's shareholders to the extent required by the listing requirements of any national securities exchange on which the Company's securities are then actively traded.

-21 -

ARTICLE VIII.
RESTRICTED STOCK AND RESTRICTED STOCK UNITS

8.1. Awards of Restricted Stock and Restricted Stock Units .

Subject to the terms and provisions of the Plan, the Committee, at any time and from time to time, may grant Shares of Restricted Stock and/or Restricted Stock Units to Participants in such amounts as the Committee shall determine. Subject to the terms and conditions of this Article VIII and the Award Agreement, upon delivery of Shares of Restricted Stock to a Participant, or creation of a book entry evidencing a Participant's ownership of Shares of Restricted Stock, pursuant to Section 8.6, the Participant shall have all of the rights of a shareholder with respect to such Shares, subject to the terms and restrictions set forth in this Article VIII or the applicable Award Agreement or as determined by the Committee. Restricted Stock Units shall be similar to Restricted Stock, except no Shares are actually awarded to a Participant who is granted Restricted Stock Units on the date of grant, and such Participant shall have no rights of a shareholder with respect to such Restricted Stock Units.

8.2. Award Agreement .

Each Restricted Stock and/or Restricted Stock Unit Award shall be evidenced by an Award Agreement that shall specify the Period of Restriction, the number of Shares of Restricted Stock or the number of Restricted Stock Units granted, and such other provisions as the Committee shall determine in accordance with the Plan.

8.3. Nontransferability of Restricted Stock .

Except as provided in this Article VIII, Shares of Restricted Stock may not be sold, transferred, pledged, assigned, encumbered, alienated, hypothecated or otherwise disposed of until the end of the applicable Period of Restriction established by the Committee and specified in the Restricted Stock Award Agreement.

8.4. Period of Restriction and Other Restrictions .

The Period of Restriction shall lapse based on continuing service as a Non-Employee Director or continuing employment with the Company, a Subsidiary or an Affiliate, the achievement of performance goals, the satisfaction of other conditions or restrictions or upon the occurrence of other events, in each case, as determined by the Committee, at its discretion, and stated in the Award Agreement.

8.5. Delivery of Shares, Payment of Restricted Stock Units .

Subject to Section 20.10, after the last day of the Period of Restriction applicable to a Participant's Shares of Restricted Stock, and after all conditions and restrictions applicable to such Shares of Restricted Stock have been satisfied or lapse (including satisfaction of any applicable withholding tax obligations), pursuant to the applicable Award Agreement, such Shares of Restricted Stock shall become freely transferable by such Participant. After the last day of the Period of Restriction applicable to a Participant's Restricted Stock Units, and after all conditions and restrictions applicable to Restricted Stock Units have been satisfied or lapse (including satisfaction of any applicable withholding tax obligations), pursuant to the applicable Award Agreement, such Restricted Stock Units shall be settled by delivery of Shares, a cash payment determined by reference to the then-current Fair Market Value of Shares or a combination of Shares and such cash payment as the Committee, in its sole discretion, shall determine, either by the terms of the Award Agreement or otherwise.

-22-

8.6. <u>Forms of Restricted Stock Awards</u>.

Each Participant who receives an Award of Shares of Restricted Stock shall be issued a stock certificate or certificates evidencing the Shares covered by such Award registered in the name of such Participant, which certificate or certificates may contain an appropriate legend.  The Committee may require a Participant who receives a certificate or certificates evidencing a Restricted Stock Award to immediately deposit such certificate or certificates, together with a stock power or other appropriate instrument of transfer, endorsed in blank by the Participant, with signatures guaranteed in accordance with the Exchange Act if required by the Committee, with the Secretary of the Company or an escrow holder as provided in the immediately following sentence.  The Secretary of the Company or such escrow holder as the Committee may appoint shall retain physical custody of each certificate representing a Restricted Stock Award until the Period of Restriction and any other restrictions imposed by the Committee or under the Award Agreement with respect to the Shares evidenced by such certificate expire or shall have been removed.  The foregoing to the contrary notwithstanding, the Committee may, in its discretion, provide that a Participant's ownership of Shares of Restricted Stock prior to the lapse of the Period of Restriction or any other applicable restrictions shall, in lieu of such certificates, be evidenced by a "book entry" ( <u>i.e.</u>, a computerized or manual entry) in the records of the Company or its designated agent in the name of the Participant who has received such Award.  Such records of the Company or such agent shall, absent manifest error, be binding on all Participants who receive Restricted Stock Awards evidenced in such manner.  The holding of Shares of Restricted Stock by the Company or such an escrow holder, or the use of book entries to evidence the ownership of Shares of Restricted Stock, in accordance with this Section 8.6, shall not affect the rights of Participants as owners of the Shares of Restricted Stock awarded to them, nor affect the restrictions applicable to such shares under the Award Agreement or the Plan, including the Period of Restriction.

8.7. <u>Voting Rights</u>.

Unless otherwise determined by the Committee and set forth in a Participant's Award Agreement, to the extent permitted or required by law, as determined by the Committee, Participants holding Shares of Restricted Stock may be granted the right to exercise full voting rights with respect to those Shares during the Period of Restriction.  A Participant shall have no voting rights with respect to any Restricted Stock Units.

8.8. <u>Dividends and Other Distributions</u>.

During the Period of Restriction, Participants holding Shares of Restricted Stock shall be credited with any cash dividends paid with respect to such Shares while they are so held, unless determined otherwise by the Committee and set forth in the Award Agreement.  The Committee may apply any restrictions to such dividends that the Committee deems appropriate.  Except as set forth in the Award Agreement, in the event of (a) any adjustment as provided in Section 4.3, or (b) any shares or securities are received as a dividend, or an extraordinary dividend is paid in cash, on Shares of Restricted Stock, any new or additional Shares or securities or any extraordinary dividends paid in cash received by a recipient of Restricted Stock shall be subject to the same terms and conditions, including the Period of Restriction, as relate to the original Shares of Restricted Stock.

8.9. <u>Termination of Employment or Service</u>.

Except as otherwise provided in this Section 8.9, during the Period of Restriction, any Restricted Stock Units and/or Shares of Restricted Stock held by a Participant shall be forfeited and revert to the Company (or, if Shares of Restricted Sock were sold to the Participant, the Participant shall be required to resell such Shares to the Company at cost) upon the Participant's Termination or the failure to meet or

-23-

satisfy any applicable performance goals or other terms, conditions and restrictions to the extent set forth in the applicable Award Agreement. Each applicable Award Agreement shall set forth the extent to which, if any, the Participant shall have the right to retain Restricted Stock Units and/or Shares of Restricted Stock following such Participant ' s Termination.    Such provisions shall be determined in the sole discretion of the Committee, shall be included in the applicable Award Agreement, need not be uniform among all such Awards issued pursuant to the Plan, and may reflect distinctions based on the reasons for, or circumstances of, such Termination.

      8.10.  <u>Compliance With Code Section 409A</u> .

        Unless the Committee provides otherwise in an Award Agreement, each Restricted Stock Unit shall be paid in full to the Participant no later than the fifteenth day of the third month after the end of the first calendar year in which the Restricted Stock Unit is no longer subject to a "substantial risk of forfeiture" within the meaning of Code Section 409A.  If the Committee provides in an Award Agreement that a Restricted Stock Unit is intended to be subject to Code Section 409A, the Award Agreement shall include terms that are intended to satisfy the requirements of Code Section 409A.

<div align="center">

ARTICLE  IX.
PERFORMANCE UNITS AND PERFORMANCE SHARES
</div>

      9.1.  <u>Grant of Performance Units and Performance Shares</u> .

        Subject to the terms of the Plan, Performance Units and/or Performance Shares may be granted to Participants other than Non-Employee Directors in such amounts and upon such terms, and at any time and from time to time, as shall be determined by the Committee, in accordance with the Plan.  A Performance Unit or Performance Share entitles the Participant who receives such Award to receive Shares or cash upon the attainment of performance goals and/or satisfaction of other terms and conditions determined by the Committee when the Award is granted and set forth in the Award Agreement.  Such entitlements of a Participant with respect to his or her outstanding Performance Unit or Performance Share shall be reflected by a bookkeeping entry in the records of the Company, unless otherwise provided by the Award Agreement.  The terms and conditions of such Awards shall be consistent with the Plan and set forth in the Award Agreement and need not be uniform among all such Awards or all Participants receiving such Awards.

      9.2.  <u>Value of Performance Units and Performance Shares</u> .

        Each Performance Unit shall have an initial value that is established by the Committee at the time of grant.  Each Performance Share shall have an initial value equal to the Fair Market Value of a Share on the date of grant.  The Committee shall set performance goals in its discretion which, depending on the extent to which they are met, will determine the number and/or value of Performance Units and Performance Shares that will be paid out to the Participant.

      9.3.  <u>Earning of Performance Units and Performance Shares</u> .

        Subject to the terms of the Plan, after the applicable Performance Period has ended, the holder of Performance Units or  Performance Shares shall be entitled to receive payment on the number and value of Performance Units or Performance Shares earned by the Participant over the Performance Period, to be determined as a function of the extent to which the corresponding performance goals and/or other terms and conditions have been achieved or satisfied.  The Committee shall determine the extent to which any such pre-established performance goals and/or other terms and

<div align="center">

-24-
</div>

conditions of a Performance Unit or Performance Share are attained or not attained following conclusion of the applicable Performance Perio d .    The Committee may, in its discretion, waive any such performance goals and/or other terms and conditions relating to any such Award not intended to qualify as Performance-Based Compensation .

    9.4.  <u>Form and Timing of Payment of Performance Units and Performance Shares</u> .

      Payment of earned Performance Units and Performance Shares shall be as determined by the Committee and as set forth in the Award Agreement.  Subject to the terms of the Plan, the Committee, in its sole discretion, may pay earned Performance Units and Performance Shares in the form of cash or in Shares (or in a combination thereof) which have an aggregate Fair Market Value equal to the value of the earned Performance Units or Performance Shares as soon as practicable after the end of the Performance Period and following the Committee's determination of actual performance against the performance goals and/or other terms and conditions established by the Committee.  Such Shares may be granted subject to any restrictions imposed by the Committee, including pursuant to Section 20.10.  The determination of the Committee with respect to the form of payment of such Awards shall be set forth in the Award Agreement pertaining to the grant of the Award.

    9.5.  <u>Rights as a Shareholder</u> .

      A Participant receiving a Performance Unit or Performance Share shall have the rights of a shareholder only as to Shares, if any, actually received by the Participant upon satisfaction or achievement of the terms and conditions of such Award and not with respect to Shares subject to the Award but not actually issued to such Participant.

    9.6.  <u>Termination of Employment or Service</u> .

      Each Award Agreement shall set forth the extent to which the Participant shall have the right to retain Performance Units and/or Performance Shares following such Participant's Termination.  Such provisions shall be determined in the sole discretion of the Committee, shall be included in the applicable Award Agreement, need not be uniform among all such Awards issued pursuant to the Plan, and may reflect distinctions based on the reasons for Termination.

    9.7.  <u>Compliance With Code Section 409A</u> .

      Unless the Committee provides otherwise in an Award Agreement, each Performance Unit and/or Performance Share that is considered deferred compensation subject to the requirements of Code Section 409A shall be paid in full to the Participant no later than the fifteenth day of the third month after the end of the first calendar year in which such Award is no longer subject to a "substantial risk of forfeiture" within the meaning of Code Section 409A.  If the Committee provides in an Award Agreement that a Performance Share or Performance Unit is intended to be subject to Code Section 409A, the Award Agreement shall include terms that are intended to satisfy the requirements of Code Section 409A.

<div align="center">

ARTICLE  X.
OTHER STOCK-BASED AWARDS

</div>

    10.1.  <u>Other Stock-Based Awards</u> .

      The Committee may grant types of equity-based or equity-related Awards not otherwise described by the terms of the Plan (including the grant or offer for sale of unrestricted Shares), in such amounts (subject to Article IV) and subject

<div align="center">

-25-

</div>

to such terms and conditions, as the Committee shall determine. Such Other Stock-Based Awards may involve the transfer of actual Shares to Participants, or payment in cash or otherwise of amounts based on the value of Shares and may include Awards designed to comply with or take advantage of the applicable local laws of jurisdictions other than the United States.   The terms and conditions of such Awards shall be consistent with the Plan and set forth in the Award Agreement and need not be uniform among all such Awards or all Participants receiving such Awards.

10.2.  <u>Value of Other Stock-Based Awards</u> .

Each Other Stock-Based Award shall be expressed in terms of Shares or units based on Shares, as determined by the Committee. The Committee may establish performance goals in its discretion, and any such performance goals shall be set forth in the applicable Award Agreement. If the Committee exercises its discretion to establish performance goals, the number and/or value of Other Stock-Based Awards that will be paid out to the Participant will depend on the extent to which such performance goals are met.

10.3.  <u>Payment of Other Stock-Based Awards</u> .

Payment, if any, with respect to an Other Stock-Based Award shall be made in accordance with the terms of the Award, as set forth in the Award Agreement, in cash or Shares as the Committee determines.

10.4.  <u>Termination of Employment or Service</u> .

The Committee shall determine the extent to which the Participant shall have the right to receive Other Stock-Based Awards following the Participant's Termination. Such provisions shall be determined in the sole discretion of the Committee, such provisions may be included in the applicable Award Agreement, but need not be uniform among all Other Stock-Based Awards issued pursuant to the Plan, and may reflect distinctions based on the reasons for Termination.

10.5.  <u>Compliance With Code Section 409A</u> .

Unless the Committee provides otherwise in an Award Agreement, each Other Stock-Based Award that is considered deferred compensation subject to the requirements of Code Section 409A shall be paid in full to the Participant no later than the fifteenth day of the third month after the end of the first calendar year in which the Other Stock-Based Award is no longer subject to a "substantial risk of forfeiture" within the meaning of Code Section 409A.  If the Committee provides in an Award Agreement that an Other Stock-Based Award is intended to be subject to Code Section 409A, the Award Agreement shall include terms that are intended to satisfy the requirements of Code Section 409A.

<div align="center">

ARTICLE  XI.
PERFORMANCE MEASURES

</div>

11.1.  <u>Performance Measures</u> .

The objective performance goals upon which the granting, payment and/or vesting of Awards to Covered Employees that are intended to qualify as Performance-Based Compensation may occur shall be based on any one or more of the following Performance Measures selected by the Committee:

(a) Earnings per share;

(b) Net earnings or net income (before or after taxes);

<div align="center">-26 -</div>

(c)       Net sales or revenue;

(d)Net operating profit;

(e) Return measures (including return on assets, capital, invested capital, equity, sales or revenue);

(f) Cash flow (including operating cash flow, free cash flow, cash flow return on equity and cash flow return on investment);

( g)       Earnings before or after interest, taxes, depreciation and/or amortization;

( h)       Gross or operating margins;

( i)       Productivity ratios;

(j) Revenue growth;

( k)       Expenses;

( l)       Margins;

( m)       Operating efficiency;

( n)       Customer satisfaction;

( o)       Working capital;

(p) Market share;

(q) Share price (including growth measures, market capitalization, total shareholder return and return relative to market indices); and

( r)       Economic value added or EVA (net operating profit after tax minus capital multiplied by the cost of capital).

Such performance goals shall be established by the Committee within the time period prescribed by, and shall otherwise comply with the requirements of, Code Section 162(m)(4)(C), or any successor provision thereto, and the regulations thereunder, for performance-based compensation, and may be set forth in the applicable Award Agreement.   Any Performance Measures may be used to measure the performance of the Company, its Affiliates, and/or Subsidiaries as a whole or any business unit of the Company, its Affiliates, and/or Subsidiaries or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Measures as compared to the performance of a group of comparator companies, or published or special index that the Committee, in its sole discretion, deems appropriate, or the Company may select Performance Measure (g) above as compared to various stock market indices.

11.2. Evaluation of Performance .

Notwithstanding any other provision of the Plan, payment or vesting of any such Award that is intended to qualify as Performance-Based Compensation shall not be made until the Committee certifies in writing that the applicable performance goals and any other material terms of such Award were in fact satisfied, except as otherwise provided in Section 11.3. The Committee may provide in any such Award that any evaluation of performance may include or exclude any of the following events that occurs during a Performance Period:  (a) asset write-downs, (b) litigation or claim judgments or settlements, (c)

the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results, (d) any reorganization and restructuring programs, (e) extraordinary, unusual and/or nonrecurring items of gain or loss, (f) acquisitions or divestitures, and (g) foreign exchange gains and losses.    To the extent such inclusions or exclusions affect Awards to Covered Employees, they shall be prescribed in a form that meets the requirements of Code Section 162(m) for deductibility.

11.3. Adjustment of Performance-Based Compensation .

Notwithstanding any provision of the Plan to the contrary, with respect to any Award that is intended to qualify as Performance-Based Compensation, (a) the Committee may adjust downwards, but not upwards, any amount payable, or other benefits granted, issued, retained and/or vested pursuant to such an Award on account of satisfaction of the applicable performance goals on the basis of such further considerations as the Committee in its discretion shall determine, and (b) the Committee may not waive the achievement of the applicable performance goals, except in the case of the Participant's death or Disability, or a Change of Control.

11.4. Committee Discretion .

In the event that applicable tax and/or securities laws change to permit Committee discretion to alter the governing Performance Measures without obtaining shareholder approval of such changes, the Committee shall have sole discretion to make such changes without obtaining shareholder approval.  In addition, in the event that the Committee determines that it is advisable to grant Awards that shall not qualify as Performance-Based Compensation, the Committee may make such grants without satisfying the requirements of Code Section 162(m) and base vesting of such Awards on performance measures other than those set forth in Section 11.1 and establish terms and conditions that do not satisfy all of the specific requirements set forth in this Article XI.

ARTICLE  XII.
DIVIDEND EQUIVALENTS

12.1. Dividend Equivalents .

Unless otherwise provided by the Committee, no adjustment shall be made in the Shares issuable or taken into account under Awards on account of cash dividends that may be paid or other rights that may be issued to the holders of Shares prior to issuance of such Shares under such Award.  The Committee may grant Dividend Equivalents based on the dividends declared on Shares that are subject to any Award, including any Award the payment or settlement of which is deferred pursuant to Section 20.6.  Dividend Equivalents may be credited as of the dividend payment dates, during the period between the date the Award is granted and the date the Award becomes payable or terminates or expires.   Dividend Equivalents may be subject to any limitations and/or restrictions determined by the Committee. Dividend Equivalents shall be converted to cash or additional Shares by such formula and at such time , and shall be paid at such times, as may be determined by the Committee.  Unless the Award Agreement provides otherwise, Dividend Equivalents that are considered deferred compensation subject to the requirements of Code Section 409A shall be paid to the Participant at least annually, not later than the fifteenth day of the third month following the end of the calendar year in which the Dividend Equivalents are credited (or, if later, the fifteenth day of the third month following the end of the calendar year in which the Dividend Equivalents are no longer subject to a substantial risk of forfeiture within the meaning of Code Section 409A).  Any Dividend Equivalents that are accumulated and paid after the date

-28-

specified in the preceding sentence shall be explicitly set forth in a separate arrangement that provides for the payment of the dividend equivalents at a time and in a manner that satisfies the requirements of Code Section 409A.   No Dividend Equivalents shall relate to Shares underlying an Option or SAR unless such Dividend Equivalent rights are explicitly set forth as a separate arrangement and do not cause any such Option or SAR to be subject to Code Section 409A.

ARTICLE  XIII.
TRANSFERABILITY OF AWARDS; BENEFICIARY DESIGNATION

13.1. Transferability of Incentive Stock Options .

No ISO or Tandem SAR granted in connection with an ISO may be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution or in accordance with Section 13.3. Further, all ISOs and Tandem SARs granted in connection with ISOs granted to a Participant shall be exercisable during his or her lifetime only by such Participant.

13.2. All Other Awards .

Except as otherwise provided in Section 8.5 or Section 13.3 or a Participant's Award Agreement or otherwise determined at any time by the Committee, no Award granted under the Plan may be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution; provided that the Committee may permit further transferability, on a general or a specific basis, and may impose conditions and limitations on any permitted transferability , subject to Section 13.1 and any applicable Period of Restriction. Further, except as otherwise provided in a Participant's Award Agreement or otherwise determined at any time by the Committee, or unless the Committee decides to permit further transferability, subject to Section 13.1 and any applicable Period of Restriction, all Awards granted to a Participant under the Plan, and all rights with respect to such Awards, shall be exercisable or available during his or her lifetime only by or to such Participant. With respect to those Awards, if any, that are permitted to be transferred to another individual, references in the Plan to exercise or payment related to such Awards by or to the Participant shall be deemed to include, as determined by the Committee, the Participant's permitted transferee.  In the event any Award is exercised by or otherwise paid to the executors, administrators, heirs or distributees of the estate of a deceased Participant, or such a Participant's beneficiary, or the transferee of an Award, in any such case, pursuant to the terms and conditions of the Plan and the applicable Award Agreement and in accordance with such terms and conditions as may be specified from time to time by the Committee, the Company shall be under no obligation to issue Shares thereunder unless and until the Company is satisfied, as determined in the discretion of the Committee, that the person or persons exercising such Award, or to receive such payment, are the duly appointed legal representative of the deceased Participant's estate or the proper legatees or distributees thereof or the named beneficiary of such Participant, or the valid transferee of such Award, as applicable.   Any purported assignment, transfer or encumbrance of an Award that does not comply with this Section 13.2 shall be void and unenforceable against the Company.

13.3. Beneficiary Designation .

Each Participant may, from time to time, name any beneficiary or beneficiaries who shall be permitted to exercise his or her Option or SAR or to whom any benefit under the Plan is to be paid in case of the Participant's death before he or she fully exercises his or her Option or SAR or receives any or all of such benefit.  Each such

-29-

designation shall revoke all prior designations by the same Participant, shall be in a form prescribed by the Company, and will be effective only when filed by the Participant in writing with the Company during the Participant's lifetime.   In the absence of any such beneficiary designation, a Participant's unexercised Option or SAR, or amounts due but remaining unpaid to such Participant, at the Participant's death, shall be exercised or paid as designated by the Participant by will or by the laws of descent and distribution .

ARTICLE  XIV.
RIGHTS OF PARTICIPANTS

14.1. Rights or Claims .

No individual shall have any rights or claims under the Plan except in accordance with the provisions of the Plan and any applicable Award Agreement.  The grant of an Award under the Plan shall not confer any rights upon the Participant holding such Award other than such terms, and subject to such conditions, as are specified in the Plan as being applicable to such type of Award, or to all Awards, or as are expressly set forth in the Award Agreement evidencing such Award.  Without limiting the generality of the foregoing, nothing contained in the Plan or in any Award Agreement shall be deemed to:

(a)   Give any Employee or Non-Employee Director the right to be retained in the service of the Company, an Affiliate and/or a Subsidiary, whether in any particular position, at any particular rate of compensation, for any particular period of time or otherwise;

(b)   Restrict in any way the right of the Company, an Affiliate and/or a Subsidiary to terminate, change or modify any Employee's employment or any Non-Employee Director's service as a Director at any time with or without Cause;

(c)   Give any Employee or Non-Employee Director the right to receive any bonus, whether payable in cash or in Shares, or in any combination thereof, from the Company, an Affiliate and/or a Subsidiary, nor be construed as limiting in any way the right of the Company, an Affiliate and/or a Subsidiary to determine, in its sole discretion, whether or not it shall pay any Employee or Non-Employee Director bonuses, and, if so paid, the amount thereof and the manner of such payment; or

(d)   Give any Participant any rights whatsoever with respect to an Award except as specifically provided in the Plan and the Award Agreement.

14.2. Adoption of the Plan .

The adoption of the Plan shall not be deemed to give any Employee or Non-Employee Director or any other individual any right to be selected as a Participant or to be granted an Award, or, having been so selected, to be selected to receive a future Award.

14.3. Vesting .

Notwithstanding any other provision of the Plan, a Participant's right or entitlement to exercise or otherwise vest in any Award not exercisable or vested at the time of grant shall only result from continued services as a Non-Employee Director or continued employment with the Company or any Subsidiary or Affiliate, or satisfaction of any other performance goals or other conditions or restrictions applicable, by its terms, to such Award

-30 -

14.4. <u>No Effects on Benefits</u> .

Payments and other compensation received by a Participant under an Award are not part of such Participant's normal or expected compensation or salary for any purpose, including calculating termination, indemnity, severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments under any laws, plans, contracts, arrangements or otherwise. No claim or entitlement to compensation or damages arises from the termination of the Plan or diminution in value of any Award or Shares purchased or otherwise received under the Plan.

14.5. <u>One or More Types of Awards</u> .

A particular type of Award may be granted to a Participant either alone or in addition to other Awards under the Plan.

<div align="center">

ARTICLE XV.
<u>CHANGE OF CONTROL</u>

</div>

15.1. <u>Treatment of Outstanding Awards</u> .

In the event of a Change of Control, unless otherwise specifically prohibited by any applicable laws, rules or regulations or otherwise provided in any applicable Award Agreement, as in effect prior to the occurrence of the Change of Control, specifically with respect to a Change of Control:

(a) Immediately prior to the occurrence of such Change of Control, any and all Options, SARs and Other Stock-Based Awards (if applicable) which are outstanding shall immediately become fully exercisable as to all Shares covered thereby, notwithstanding anything to the contrary in the Plan or the Award Agreement, and, in the event of a Participant's Termination (including termination of employment or services with any successor of the Company, a Subsidiary or an Affiliate) under any circumstances during the one year period following the Change of Control, all Options, SARs and Other Stock-Based Awards (if applicable) held by such Participant (or such Participant's beneficiary or transferee) shall remain exercisable at least until the first anniversary of such Termination or the expiration of the term of such Option, SAR or Other Stock-Based Award, if earlier.

(b) Immediately prior to the occurrence of such Change of Control, any restrictions, performance goals or other conditions applicable to Restricted Stock Units, Shares of Restricted Stock and Other Stock-Based Awards previously awarded to Participants shall be immediately canceled or deemed achieved, the Period of Restriction applicable thereto shall immediately terminate, and all restrictions on transfer, sale, assignment, pledge or other disposition applicable to any such Shares of Restricted Stock shall immediately lapse, notwithstanding anything to the contrary in the Plan or the Award Agreement.

(c) Immediately prior to the occurrence of such Change of Control, all Awards which are outstanding shall immediately become fully vested and nonforfeitable.

(d) The target payment opportunities attainable under any outstanding Awards of Performance Units, Performance Shares and other Awards shall be deemed to have been fully earned for the entire Performance Period(s) immediately prior to the effective date of the Change of Control, unless actual performance exceeds the target, in which

<div align="center">

-31-

</div>

case actual performance shall be used .    There shall be paid out to each Participant holding such an Award denominated in Shares, not later than five (5) days prior to the effective date of the Change of Control, a pro rata number of Shares (or the equivalent Fair Market Value thereof, as determined by the Committee, in cash) based upon an assumed achievement of all relevant targeted performance goals , unless actual performance exceeds the target, in which case actual performance shall be used, and upon the length of time within the Performance Period which has elapsed prior to the Change of Control.    Awards denominated in cash shall be paid pro rata to applicable Participants in cash within thirty (30) days following the effective date of the Change of Control, with the pro-ration determined as a function of the length of time within the Performance Period which has elapsed prior to the Change of Control, and based on an assumed achievement of all relevant targeted performance goals , unless actual performance exceeds the target, in which case actual performance shall be used .

(e) Subject to Section 15.4, any Award the payment or settlement of which was deferred under Section 20.6 or otherwise shall be paid or distributed immediately prior to the Change of Control, except as otherwise provided by the Committee in accordance with Section 15.1(f).

(f) In its discretion, and on such terms and conditions as it deems appropriate, the Committee may provide, either by the terms of the Award Agreement applicable to any Award or by resolution adopted prior to the occurrence of the Change of Control, that any outstanding Award shall be adjusted by substituting for each Share subject to such Award immediately prior to the transaction resulting in the Change of Control the consideration (whether stock or other securities of the surviving corporation or any successor corporation to the Company, or a parent or subsidiary thereof, or that may be issuable by another corporation that is a party to the transaction resulting in the Change of Control) received in such transaction by holders of Shares for each Share held on the closing or effective date of such transaction, in which event the aggregate Option Price or Grant Price, as applicable, of the Award shall remain the same; provided , however , that if such consideration received in such transaction is not solely stock of a successor, surviving or other corporation, the Committee may provide for the consideration to be received upon exercise or payment of an Award, for each Share subject to such Award, to be solely stock or other securities of the successor, surviving or other corporation, as applicable, equal in fair market value, as determined by the Committee, to the per-Share consideration received by holders of Shares in such transaction.

(g) In its discretion, and on such terms and conditions as it deems appropriate, the Committee may provide, either by the terms of the Award Agreement applicable to any Award or by resolution adopted prior to the occurrence of the Change of Control, that any outstanding Award (or portion thereof) shall be converted into a right to receive cash,  on or as soon as practicable following the closing date or expiration date of the transaction resulting in the Change of Control in an amount equal to the highest value of the consideration to be received in connection with such transaction for one Share, or, if higher, the highest Fair Market Value of a Share during the thirty (30) consecutive business days immediately prior to the closing date or expiration date of such transaction, less the per-Share Option Price, Grant Price or outstanding unpaid purchase price, as

-32-

applicable to the Award, multiplied by the number of Shares subject to such Award, or the applicable portion thereof.

(h) The Committee may, in its discretion, provide that an Award can or cannot be exercised after, or will otherwise terminate or not terminate as of, a Change of Control.

15.2. <u>No Implied Rights; Other Limitations</u> .

No Participant shall have any right to prevent the consummation of any of the acts described in Section 4.3 or 15.1 affecting the number of Shares available to, or other entitlement of, such Participant under the Plan or such Participant's Award. Any actions or determinations of the Committee under this Article XV need not be uniform as to all outstanding Awards, nor treat all Participants identically. Notwithstanding the adjustments described in Section 15.1, in no event may any Option or SAR be exercised after ten (10) years from the date it was originally granted, and any changes to ISOs pursuant to this Article XV shall, unless the Committee determines otherwise, only be effective to the extent such adjustments or changes do not cause a "modification" (within the meaning of Section 424(h)(3) of the Code) of such ISOs or adversely affect the tax status of such ISOs.

15.3. <u>Termination, Amendment, and Modifications of Change of Control Provisions</u> .

Notwithstanding any other provision of the Plan (but subject to the limitations of Section 15.1(g), the last sentence of Section 16.1 and Section 16.2) or any Award Agreement provision, the provisions of this Article XV may not be terminated, amended, or modified on or after the date of a Change of Control to materially impair any Participant's Award theretofore granted and then outstanding under the Plan without the prior written consent of such Participant.

15.4. <u>Compliance with Code Section 409A</u> .

Notwithstanding any other provisions of the Plan or any Award Agreement to the contrary, if a Change of Control that is not a Qualified Change of Control occurs, and payment or distribution of an Award constituting deferred compensation subject to Code Section 409A would otherwise be made or commence on the date of such Change of Control (pursuant to the Plan, the Award Agreement or otherwise), (a) the vesting of such Award shall accelerate in accordance with the Plan and the Award Agreement, (b) such payment or distribution shall not be made or commence prior to the earliest date on which Code Section 409A permits such payment or distribution to be made or commence without additional taxes or penalties under Code Section 409A, and (c) in the event any such payment or distribution is deferred in accordance with the immediately preceding clause (b), such payment or distribution that would have been made prior to the deferred payment or commencement date, but for Code Section 409A, shall be paid or distributed on such earliest payment or commencement date, together, if determined by the Committee, with interest at the rate established by the Committee. The Committee shall not extend the period to exercise an Option or Stock Appreciation Right to the extent that such extension would cause the Option or Stock Appreciation Right to become subject to Code Section 409A. Additionally, t he Committee shall not take any action pursuant to this Article XV that would cause an Award that is otherwise exempt from Code Section 409A to become subject to Code Section 409A, or that would cause an Award that is subject to Code Section 409A to fail to satisfy the requirements of Code Section 409A.

-33 -

ARTICLE XVI.
AMENDMENT, MODIFICATION, AND TERMINATION

16.1. Amendment, Modification, and Termination .

The Board may, at any time and with or without prior notice, amend, alter, suspend, or terminate the Plan, and the Committee may, to the extent permitted by the Plan, amend the terms of any Award theretofore granted, including any Award Agreement, in each case, retroactively or prospectively; provided , however , that no such amendment, alteration, suspension, or termination of the Plan shall be made which, without first obtaining approval of the shareholders of the Company (where such approval is necessary to satisfy (i) the then-applicable requirements of Rule 16b-3, (ii) any requirements under the Code relating to ISOs or for exemption from Section 162(m) of the Code, or (iii) any applicable law, regulation or rule (including the applicable regulations and rules of the SEC and any national securities exchange)), would:

(a) except as is provided in Section 4.3, increase the maximum number of Shares which may be sold or awarded under the Plan or increase the maximum limitations set forth in Section 4.2;

(b) except as is provided in Section 4.3, decrease the minimum Option Price or Grant Price requirements of Sections 6.3 and 7.2, respectively;

(c) change the class of persons eligible to receive Awards under the Plan;

(d) change the Performance Measures set forth in Section 11.1;

(e) extend the duration of the Plan or the period during which Options or SARs may be exercised under Section 6.4 or 7.6, as applicable; or

(f) otherwise require shareholder approval to comply with any applicable law, regulation or rule (including the applicable regulations and rules of the SEC and any national securities exchange).

In addition, (A) no such amendment, alteration, suspension or termination of the Plan or any Award theretofore granted, including any Award Agreement, shall be made which would materially impair the previously accrued rights of a Participant under any outstanding Award without the written consent of such Participant, provided , however , that the Board may amend or alter the Plan and the Committee may amend or alter any Award, including any Award Agreement, either retroactively or prospectively, without the consent of the applicable Participant, (x) so as to preserve or come within any exemptions from liability under Section 16(b) of the Exchange Act, pursuant to the rules and releases promulgated by the SEC (including Rule 16b-3), and/or so that any Award that is intended to qualify as Performance-Based Compensation shall qualify for the performance-based compensation exception under Code Section 162(m) (or any successor provision) , or (y) if the Board or the Committee determines in its discretion that such amendment or alteration either (I) is required or advisable for the Company, the Plan or the Award to satisfy, comply with or meet the requirements of any law, regulation, rule or accounting standard or (II) is not reasonably likely to significantly diminish the benefits provided under such Award, or that such diminishment has been or will be adequately compensated, and (B) except as is provided in Section 4.3, but notwithstanding any other

-34-

provisions of the Plan, neither the Board nor the Committee may take any action (1) to amend the terms of an outstanding Option or SAR to reduce the Option Price or Grant Price thereof, cancel an Option or SAR and replace it with a new Option or SAR with a lower Option Price or Grant Price, or that has an economic effect that is the same as any such reduction or cancellation; or (2) to cancel an outstanding Option or SAR having an Option Price or Grant Price above the then-current Fair Market Value of the Shares in exchange for the grant of another type of Award, without, in each such case, first obtaining approval of the share holders of the Company of such action.

16.2. Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events .

The Board or the Committee may make adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (including the events described in Section 4.3) affecting the Company or the financial statements of the Company or of changes in applicable laws, regulations, or accounting principles, whenever the Committee determines that such adjustments are appropriate in order to prevent unintended dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan. Any such adjustment with respect to an Award intended to be an ISO shall be made only to the extent consistent with such intent, unless the Board or the Committee determines otherwise, and any such adjustment that is made with respect to an Award that is intended to qualify as Performance-Based Compensation shall be made consistent with the intent that such Award qualify for the performance-based compensation exception under Code Section 162(m) (or any successor provision). Additionally, neither the Board nor t he Committee shall not make any adjustment pursuant to this Article XVI that would cause an Award that is otherwise exempt from Code Section 409A to become subject to Code Section 409A, or that would cause an Award that is subject to Code Section 409A to fail to satisfy the requirements of Code Section 409A. The determination of the Committee as to the foregoing adjustments, if any, shall be conclusive and binding on Participants under the Plan.

ARTICLE  XVII.
TAX WITHHOLDING AND OTHER TAX MATTERS

17.1. Tax Withholding .

The Company and/or any Subsidiary or Affiliate are authorized to withhold from any Award granted or payment due under the Plan the amount of all Federal, state, local and non-United States taxes due in respect of such Award or payment and take any such other action as may be necessary or appropriate, as determined by the Committee, to satisfy all obligations for the payment of such taxes.  The recipient of any payment or distribution under the Plan shall make arrangements satisfactory to the Company, as determined in the Committee's discretion, for the satisfaction of any tax obligations that arise by reason of any such payment or distribution.  The Company shall not be required to make any payment or distribution under or relating to the Plan or any Award until such obligations are satisfied or such arrangements are made, as determined by the Committee in its discretion.

17.2. Withholding or Tendering Shares .

Without limiting the generality of Section 17.1, the Committee may in its discretion permit a Participant to satisfy or arrange to satisfy, in whole or in part, the tax obligations incident to an Award by: (a) electing to have the Company withhold Shares or other property otherwise deliverable to such Participant pursuant to his or her Award and/or (b) tendering to the Company Shares owned by such Participant (or by

-35-

such Participant and his or her spouse jointly) and purchased or held for the requisite period of time as may be required to avoid the Company's or the Affiliates' or Subsidiaries' incurring an adverse accounting charge, based, in each case, on the Fair Market Value of the Shares on the payment date as determined by the Committee. All such elections shall be irrevocable, made in writing, signed by the Participant, and shall be subject to any restrictions or limitations that the Committee, in its sole discretion, deems appropriate.  For avoidance of doubt, the amount of any Shares so withheld under (a) may exceed the amount necessary to satisfy the minimum required Federal, state, local and non-United States withholding obligations.

17.3. <u>Restrictions</u> .

The satisfaction of tax obligations pursuant to this Article XVII shall be subject to such restrictions as the Committee may impose, including any restrictions required by applicable law or the rules and regulations of the SEC, and shall be construed consistent with an intent to comply with any such applicable laws, rule and regulations.

17.4. <u>Special ISO Obligations</u> .

The Committee may require a Participant to give prompt written notice to the Company concerning any disposition of Shares received upon the exercise of an ISO within:  (i) two (2) years from the date of granting such ISO to such Participant or (ii) one (1) year from the transfer of such Shares to such Participant or (iii) such other period as the Committee may from time to time determine.  The Committee may direct that a Participant with respect to an ISO undertake in the applicable Award Agreement to give such written notice described in the preceding sentence, at such time and containing such information as the Committee may prescribe, and/or that the certificates evidencing Shares acquired by exercise of an ISO refer to such requirement to give such notice.

17.5. <u>Section 83(b) Election</u> .

If a Participant makes an election under Section 83(b) of the Code to be taxed with respect to an Award as of the date of transfer of Shares rather than as of the date or dates upon which the Participant would otherwise be taxable under Section 83(a) of the Code, such Participant shall deliver a copy of such election to the Company immediately after filing such election with the Internal Revenue Service.  Neither the Company nor any Subsidiary or Affiliate shall have any liability or responsibility relating to or arising out of the filing or not filing of any such election or any defects in its construction.

17.6. <u>No Guarantee of Favorable Tax Treatment</u> .

Although the Company intends to administer the Plan so that Awards will be exempt from, or will comply with, the requirements of Code Section 409A, the Company does not warrant that any Award under the Plan will qualify for favorable tax treatment under Code Section 409A or any other provision of federal, state, local, or non-United States law.  The Company shall not be liable to any Participant for any tax, interest, or penalties the Participant might owe as a result of the grant, holding, vesting, exercise, or payment of any Award under the Plan.

ARTICLE  XVIII.
LIMITS OF LIABILITY; INDEMNIFICATION

18.1. Limits of Liability .

(a) Any liability of the Company or a Subsidiary or Affiliate to any Participant with respect to any Award shall be based solely upon contractual obligations created by the Plan and the Award Agreement.

(b) None of the Company, any Subsidiary, any Affiliate, any member of the Board or the Committee or any other person participating in any determination of any question under the Plan, or in the interpretation, administration or application of the Plan, shall have any liability, in the absence of bad faith, to any party for any action taken or not taken in connection with the Plan, except as may expressly be provided by statute.

(c) Each member of the Committee, while serving as such, shall be considered to be acting in his or her capacity as a director of the Company.  Members of the Board of Directors and members of the Committee acting under the Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability except for gross negligence or willful misconduct in the performance of their duties.

(d) The Company shall not be liable to a Participant or any other person as to:  (i) the non-issuance of Shares as to which the Company has been unable to obtain from any regulatory body having relevant jurisdiction the authority deemed by the Committee or the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, and (ii) any tax consequence expected, but not realized, by any Participant or other person due to the receipt, exercise or settlement of any Option or other Award.

18.2. Indemnification .

Subject to the requirements of Delaware law, each individual who is or shall have been a member of the Committee or of the Board, or an officer of the Company to whom authority was delegated in accordance with Article III, shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken or failure to act under the Plan and against and from any and all amounts paid by him or her in settlement thereof, with the Company's approval, or paid by him or her in satisfaction of any judgment in any such action, suit, or proceeding against him or her, provided he or she shall give the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf, unless such loss, cost, liability, or expense is a result of the individual's own willful misconduct or except as provided by statute.  The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such individual may be entitled under the Company's Articles of Incorporation or Bylaws, as a matter of law, or otherwise, or any power that the Company may have to indemnify or hold harmless such individual.

-37 -

## ARTICLE XIX.
## SUCCESSORS

19.1. <u>General</u> .

All obligations of the Company under the Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

## ARTICLE XX.
## MISCELLANEOUS

20.1. <u>Drafting Context</u> .

Except where otherwise indicated by the context, any masculine term used herein also shall include the feminine; the plural shall include the singular and the singular shall include the plural.  The words "Article," "Section," and "paragraph" herein shall refer to provisions of the Plan, unless expressly indicated otherwise. The words "include," "includes," and "including" herein shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import, unless the context otherwise requires.

20.2. <u>Forfeiture Events</u> .

(a) Notwithstanding any provision of the Plan to the contrary, the Committee shall have the authority to determine (and may so provide in any Award Agreement) that a Participant's (including his or her estate's, beneficiary's or transferee's) rights (including the right to exercise any Option or SAR), payments and benefits with respect to any Award shall be subject to reduction, cancellation or forfeiture in the event of the Participant's Termination for Cause or due to voluntary resignation; material violation of the Company's or a Subsidiary's or Affiliate's policies; willful breach of fiduciary duty; willful unauthorized disclosure of any trade secret or confidential information of the Company or a Subsidiary or Affiliate; breach of applicable noncompetition, nonsolicitation, confidentiality or other restrictive covenants; or other misconduct or unauthorized activity that is substantially detrimental to the business, reputation or interests of the Company and/or any Subsidiary or Affiliate; or upon the occurrence of certain events specified in the applicable Award Agreement (in any such case, whether or not the Participant is then an Employee or Non-Employee Director).  The determination of whether a Participant's conduct, activities or circumstances are described in the immediately preceding sentence shall be made by the Committee in its good faith discretion, and pending any such determination, the Committee shall have the authority to suspend the exercise, payment, delivery or settlement of all or any portion of such Participant's outstanding Awards pending an investigation of the matter.

(b) Notwithstanding any provision of the Plan to the contrary, the Committee shall have the authority to determine (and may so provide in any Award Agreement) that a Participant's (including his or her estate's, beneficiary's or transferee's) rights, payments and benefits with respect to any Covered Award shall be subject to recoupment in the event of the Participant's Termination for Cause; willful breach of fiduciary duty; willful unauthorized disclosure of any trade secret or confidential information of the

-38-

Company or a Subsidiary or Affiliate; or other misconduct or unauthorized activity that is substantially detrimental to the business, reputation or interests of the Company and/or any Subsidiary or Affiliate; or upon the occurrence of certain events specified in the applicable Award Agreement (in any such case, whether or not the Participant is then an Employee or Non-Employee Director). The determination of whether a Participant's conduct, activities or circumstances are described in the immediately preceding sentence shall be made by the Committee in its good faith discretion. "Covered Award" means an Award granted at any time during the then current fiscal year and the two full fiscal years prior to the date on which the Committee makes a determination in a manner consistent with Section 20.2(b). For the avoidance of doubt, an Award (or any portion thereof) which would have been delivered but for a deferral pursuant to a deferred compensation arrangement made available by the Company shall be subject to the provisions of this Section 20.2(b) ( to the extent it is a "Covered Award" ) but not subject to the provisions of Section 20.2(a).

(c) If the Company is required to prepare an accounting restatement due to the material noncompliance of the Company, as a result of misconduct, with any financial reporting requirement under the securities laws, if the Participant knowingly or grossly negligently engaged in the misconduct, or knowingly or grossly negligently failed to prevent the misconduct, or if the Participant is one of the individuals subject to automatic forfeiture under Section 304 of the Sarbanes-Oxley Act of 2002, the Participant shall reimburse the Company the amount of any payment in settlement of an Award earned or accrued during the twelve- (12-) month period following the first public issuance or filing with the SEC (whichever just occurred) of the financial document embodying such financial reporting requirement.

20.3. <u>Severability</u> .

In the event any provision of the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

20.4. <u>Transfer, Leave of Absence</u> .

For purposes of the Plan, a transfer of an Employee from the Company to an Affiliate or Subsidiary (or, for purposes of any ISO granted under the Plan, only a Subsidiary), or vice versa, or from one Affiliate or Subsidiary to another (or in the case of an ISO, only from one Subsidiary to another), and a leave of absence, duly authorized in writing by the Company or a Subsidiary or Affiliate, shall not be deemed a Termination of the Employee for purposes of the Plan or with respect to any Award (in the case of ISOs, to the extent permitted by the Code). The Committee shall have the discretion to determine the effects upon any Award, upon an individual's status as an Employee or Non-Employee Director for purposes of the Plan (including whether a Participant shall be deemed to have experienced a Termination or other change in status) and upon the exercisability, vesting, termination or expiration of any Award in the case of: (a) any Participant who is employed by an entity that ceases to be an Affiliate or Subsidiary (whether due to a spin-off or otherwise), (b) any transfer of a Participant between locations of employment with the Company, an Affiliate, and/or Subsidiary or between the Company, an Affiliate or Subsidiary or between Affiliates or Subsidiaries, (c) any leave of absence of a Participant, (d) any change in a Participant's status from an Employee to a Non-Employee Director, or vice versa; and (e) upon approval by the

-39-

Committee, any Employee who experiences a Termination but becomes employed by a partnership, joint venture, corporation or other entity not meeting the requirements of an Affiliate or Subsidiary , subject, in each case, to the requirements of Code Section 422 applicable to any ISOs and Code Section 409A applicable to any Options and SARs .

20.5. Exercise and Payment of Awards .

An Award shall be deemed exercised or claimed when the Secretary of the Company or any other Company official or other person designated by the Committee for such purpose receives appropriate written notice from a Participant, in form acceptable to the Committee, together with payment of the applicable Option Price, Grant Price or other purchase price, if any, and compliance with Article XVII, in accordance with the Plan and such Participant's Award Agreement.

20.6. Deferrals .

To the extent provided in the Award Agreement, the Committee may permit or require a Participant to defer such Participant's receipt of the payment of cash or the delivery of Shares that would otherwise be due to such Participant by virtue of the lapse or waiver of the Period of Restriction or other restrictions with respect to Restricted Stock or  the payment or satisfaction of Restricted Stock Units, Performance Units, Performance Shares, or Other Stock-Based Awards.  If any such deferral election is required or permitted, (a) such deferral shall represent an unfunded and unsecured obligation of the Company and shall not confer the rights of a shareholder unless and until Shares are issued thereunder; (b) the number of Shares subject to such deferral shall, until settlement thereof, be subject to adjustment pursuant to Section 4.3; and (c) the Committee shall establish rules and procedures for such deferrals and payment or settlement thereof, which may be in cash, Shares or any combination thereof, and such deferrals may be governed by the terms and conditions of any deferred compensation plan of the Company or Affiliate specified by the Committee for such purpose.  Notwithstanding any provisions of the Plan to the contrary, in no event shall any deferral under this Section 20.6 be permitted if the Committee determines that such deferral would result in the imposition of additional tax under Code Section 409A.

20.7. Loans .

The Company may, in the discretion of the Committee, extend one or more loans to Participants in connection with the exercise or receipt of an Award granted to any such Participant; provided , however , that the Company shall not extend loans to any Participant if prohibited by law or the rules of any stock exchange or quotation system on which the Company's securities are listed.  The terms and conditions of any such loan shall be established by the Committee.

20.8. No Effect on Other Plans .

Neither the adoption of the Plan nor anything contained herein shall affect any other compensation or incentive plans or arrangements of the Company or any Subsidiary or Affiliate, or prevent or limit the right of the Company or any Subsidiary or Affiliate to establish any other forms of incentives or compensation for their directors, officers or eligible employees or grant or assume options or other rights otherwise than under the Plan.

20.9. Section 16 of Exchange Act and Code Section 162(m) .

Unless otherwise stated in the Award Agreement, notwithstanding any other provision of the Plan, any Award granted to an Insider shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3) that are

requirements for the application of such exemptive rule, and the Plan and the Award Agreement shall be deemed amended to the extent necessary to conform to such limitations.   Furthermore, notwithstanding any other provision of the Plan or an Award Agreement , any Award to a Covered Employee that is intended to qualify as Performance-Based Compensation shall be subject to any applicable limitations set for th in Code Section 162(m) or any regulations or rulings issued thereunder (including any amendment to the foregoing) that are requirements for qualification as " other performance-based compensation " as described in Code Section 162(m)(4) (C) , and the Plan and the Award Agreement shall be deemed amended to the extent necessary to conform to such requirements and no action of the Committee that would cause such Award not to so qualify shall be effective.

20.10.  <u>Requirements of Law; Limitations on Awards</u> .

(a) The granting of Awards and the issuance of Shares under the Plan shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

(b) If at any time the Committee shall determine, in its discretion, that the listing, registration and/or qualification of Shares upon any securities exchange or under any state, Federal or non-United States law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of, or in connection with, the sale or purchase of Shares hereunder, the Company shall have no obligation to allow the grant, exercise or payment of any Award, or to issue or deliver evidence of title for Shares issued under the Plan, in whole or in part, unless and until such listing, registration, qualification, consent and/or approval shall have been effected or obtained, or otherwise provided for, free of any conditions not acceptable to the Committee.

(c) If at any time counsel to the Company shall be of the opinion that any sale or delivery of Shares pursuant to an Award is or may be in the circumstances unlawful or result in the imposition of excise taxes on the Company or any Subsidiary or Affiliate under the statutes, rules or regulations of any applicable jurisdiction, the Company shall have no obligation to make such sale or delivery, or to make any application or to effect or to maintain any qualification or registration under the Securities Act, or otherwise with respect to Shares or Awards and the right to exercise or payment of any Option or Award shall be suspended until, in the opinion of such counsel, such sale or delivery shall be lawful or will not result in the imposition of excise taxes on the Company or any Subsidiary or Affiliate.

(d) Upon termination of any period of suspension under this Section 20.10, any Award affected by such suspension which shall not then have expired or terminated shall be reinstated as to all Shares available before such suspension and as to the Shares which would otherwise have become available during the period of such suspension, but no suspension shall extend the term of any Award.

(e) The Committee may require each person receiving Shares in connection with any Award under the Plan to represent and agree with the Company in writing that

such person is acquiring such Shares for investment without a view to the distribution thereof, and/or provide such other representations and agreements as the Committee may prescribe.   The Committee, in its absolute discretion, may impose such restrictions on the ownership and transferability of the Shares purchasable or otherwise receivable by any person under any Award as it deems appropriate.   Any such restrictions shall be set forth in the applicable Award Agreement, and the certificates evidencing such shares may include any legend that the Committee deems appropriate to reflect any such restrictions.

(f) An Award and any Shares received upon the exercise or payment of an Award shall be subject to such other transfer and/or ownership restrictions and/or legending requirements as the Committee may establish in its discretion and may be referred to on the certificates evidencing such Shares, including restrictions under applicable Federal securities laws, under the requirements of any stock exchange or market upon which such Shares are then listed and/or traded, and under any blue sky or state securities laws applicable to such Shares.

20.11. <u>Participants Deemed to Accept Plan</u>.

By accepting any benefit under the Plan, each Participant and each person claiming under or through any such Participant shall be conclusively deemed to have indicated their acceptance and ratification of, and consent to, all of the terms and conditions of the Plan and any action taken under the Plan by the Board, the Committee or the Company, in any case in accordance with the terms and conditions of the Plan.

20.12. <u>Governing Law</u>.

The Plan and all Award Agreements and other agreements hereunder shall be construed in accordance with and governed by the laws of the state of Delaware, without giving effect to the choice of law principles thereof, except to the extent superseded by applicable United States federal law.  Unless otherwise provided in the Award Agreement, Participants are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Delaware, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement.

20.13. <u>Plan Unfunded</u>.

The Plan shall be unfunded.  The Company shall not be required to establish any special or separate fund or to make any other segregation of assets to assure the issuance of Shares or the payment of cash upon exercise or payment of any Award.  Proceeds from the sale of Shares pursuant to Options or other Awards granted under the Plan shall constitute general funds of the Company.

20.14. <u>Administration Costs</u>.

The Company shall bear all costs and expenses incurred in administering the Plan, including expenses of issuing Shares pursuant to any Options or other Awards granted hereunder.

20.15. <u>Uncertificated Shares</u>.

To the extent that the Plan provides for issuance of certificates to reflect the transfer of Shares, the transfer of such Shares may nevertheless be effected on a noncertificated basis, to the extent not prohibited by applicable law or the rules of any stock exchange.

20.16. <u>No Fractional Shares</u>.

An Option or other Award shall not be exercisable with respect to a fractional Share or the lesser of fifty (50) shares or the full number of Shares

-42-

then subject to the Option or other Award.    No fractional Shares shall be issued upon the exercise or payment of an Option or other Award.

20.17. <u>Deferred Compensation</u> .

If any Award would be considered deferred compensation as defined under Code Section 409A and would fail to meet the requirements of Code Section 409A, then such Award shall be null and void; <u>provided</u> , <u>however</u> , that the Committee may permit deferrals of compensation pursuant to the terms of a Participant's Award Agreement, a separate plan, or a subplan which (in each case) meets the requirements of Code Section 409A. Additionally, to the extent any Award is subject to Code Section 409A, notwithstanding any provision herein to the contrary, the Plan does not permit the acceleration of the time or schedule of any distribution related to such Award, except as permitted by Code Section 409A.

20.18. <u>Employees Based Outside of the United States</u> .

Notwithstanding any provision of the Plan to the contrary, in order to comply with the laws or practices of countries other than the United States in which the Company, any Affiliate, and/or any Subsidiary operates or has Employees or Non-Employee Directors, the Committee, in its sole discretion, shall have the power and authority to:

(a)     Determine which Affiliates and Subsidiaries shall be covered by the Plan;

(b)     Determine which Employees and/or Non-Employee Directors outside the United States are eligible to participate in the Plan;

(c)     Grant Awards (including substitutes for Awards), and modify the terms and conditions of any Awards, on such terms and conditions as the Committee determines necessary or appropriate to permit participation in the Plan by individuals otherwise eligible to so participate who are non-United States nationals or employed outside the United States, or otherwise to comply with applicable non-United States laws or conform to applicable requirements or practices of jurisdictions outside the United States;

(d)     Establish subplans and adopt or modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable. Any subplans and modifications to Plan terms and procedures established under this Section 20.18 by the Committee shall be attached to the Plan as appendices; and

(e)     Take any action, before or after an Award is made, that the Committee, in its discretion, deems advisable to obtain approval or comply with any necessary local government regulatory exemptions or approvals.

Notwithstanding the above, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate any applicable law.

*        **

-43 -

-44 -

Exhibit 10.6.4

**[Non-Employee Director]**
**Notice of Restricted Stock Unit Grant**

| | |
|---|---|
| **Participant:** | [Participant Name] |
| **Company:** | First American Financial Corporation |
| **Notice:** | You have been granted the following Restricted Stock Units in accordance with the terms of the Plan and the Restricted Stock Unit Award Agreement attached hereto. |
| **Type of Award:** | Restricted Stock Units |
| **Plan:** | First American Financial Corporation 2010 Incentive Compensation Plan |
| **Grant:** | Date of Grant:  [Grant Date]<br>Number of Shares Underlying Restricted Stock Units:  [Number of Shares Granted] |
| **Period of Restriction:** | Subject to the terms of the Plan and this Agreement, the Period of Restriction applicable to the Restricted Stock Units shall commence on the Date of Grant and shall lapse one year after the Date of Grant. |
| **Rejection:** | If you wish to accept this Restricted Stock Unit Award, please access Fidelity NetBenefits® at www.netbenefits.com/firstamerican and follow the steps outlined under the "Accept Grant" link at any time within forty-five (45) days after the Date of Grant.  If you do not accept your grant via Fidelity NetBenefits® within forty-five (45) days after the Date of Grant, you will have rejected this Restricted Stock Unit Award. |

[ **Non-Employee Director]**
**Restricted Stock Unit Award Agreement**

This Restricted Stock Unit Award Agreement (this "Agreement"), dated as of the Date of Grant set forth in the Notice of Restricted Stock Unit Grant attached hereto (the "Grant Notice"), is made between First American Financial Corporation (the "Company") and the Participant set forth in the Grant Notice.  The Grant Notice is included in and made part of this Agreement.

1.  <u>Definitions</u> .

Capitalized terms used but not defined in this Agreement (including the Grant Notice) have the meaning set forth in the Plan .

2.  <u>Grant of the Restricted Stock Units</u> .

Subject to the provisions of this Agreement and the provisions of the Plan, the Company hereby grants to the Participant, pursuant to the Plan, a right to receive the number of shares of common stock of the Company, par value $.00001 per share ("Shares"), set forth in the Grant Notice (the "Restricted Stock Units").

3.  <u>Dividend Equivalents</u> .

Each Restricted Stock Unit shall accrue Dividend Equivalents with respect to dividends that would otherwise be paid on the Share underlying such Restricted Stock Unit during the period from the Date of Grant to the date such Share is delivered in accordance with Section 6.  Any such Dividend Equivalent shall be deemed reinvested in additional Shares underlying the Restricted Stock Units immediately upon the related dividend's payment date, based on the then-current Fair Market Value (rounded down to the nearest whole number), and shall be subject to the Period of Restriction applicable to the Restricted Stock Unit on which such Dividend Equivalent is paid.  Any such conversion of Dividend Equivalents shall be conclusively determined by the Committee.  The Shares underlying Restricted Stock Units into which Dividend Equivalents are so converted shall be delivered in accordance with Section 6.

4.  <u>Period of Restriction ; Termination</u> .

The Period of Restriction with respect to the Restricted Stock Units shall be as set forth in the Grant Notice.  Subject to the terms of the Plan and the remaining provisions of this Section 4, all Restricted Stock Units for which the Period of Restriction had not lapsed prior to the date of the Participant's Termination shall be immediately forfeited.   Notwithstanding the foregoing to the contrary:

(a)  In the event of the Participant's Termination due to his or her death or Disability, the Period of Restriction as to all Restricted Stock Units shall immediately lapse in its entirety.

(b)  In the event of the Participant's Termination due to his or her retirement from the Board, irrespective of length of service prior to such retirement, the Period of Restriction as to all Restricted Stock Units shall immediately lapse in its entirety.

5.  <u>Change of Control</u> .

Except for a Change of Control that has been approved by the Company's Incumbent Board prior to the occurrence of such Change of Control, the provisions of Section 15.1 of the Plan shall apply to the Restricted Stock Units.

6.  <u>Delivery of Shares</u> .

Unless delivery is deferred for reasons set forth in Section 11, as soon as reasonably

- 2 -

practicable following the lapse of the applicable portion of the Period of Restriction, but in no event later than 90 days following the date of such lapse, the Company shall cause to be delivered to the Participant the full number of Shares underlying the Restricted Stock Units as to which such portion of the Period of Restriction has so lapsed, together with Shares comprising all accrued Dividend Equivalents with respect to such Restricted Stock Units, subject to the satisfaction of applicable Tax-Related Items with respect thereto pursuant to Article XVII of the Plan.    Restricted Stock Units may only be settled by delivery of Shares and not by any cash payment.  No fractional Share will be issued pursuant to an award granted hereunder.  The number of Shares issuable upon the settlement of the Restricted Stock Units will be rounded down to the nearest whole number of Shares.  No payment or other adjustment will be made with respect to the fractional shares so disregarded.

7.      No Ownership Rights Prior to Issuance of Shares .

Restricted Stock Units shall not be considered Shares and neither the Participant nor any other person shall become the beneficial owner of the Shares underlying the Restricted Stock Units, nor have any rights to dividends or other rights as a shareholder with respect to any such Shares, until and after such Shares have been actually issued to the Participant and transferred on the books and records of the Company or its agent in accordance with the terms of the Plan and this Agreement.

8.      Detrimental Activity .

(a)  Notwithstanding any other provisions of this Agreement to the contrary, if at any time prior to the earlier of the delivery of Shares with respect to the Restricted Stock Units or, if applicable, the date on which such Shares would have been delivered but for a deferral pursuant to a deferred compensation arrangement made available by the Company, the Participant engages in Detrimental Activity, such Restricted Stock Units shall be cancelled and rescinded without any payment or consideration therefor.  The determination of whether the Participant has engaged in Detrimental Activity shall be made by the Committee in its good faith discretion, and lapse of the Period of Restriction and delivery of Shares with respect to the Restricted Stock Units shall be suspended pending resolution to the Committee's satisfaction of any investigation of the matter.

(b)  For purposes of this Agreement, "Detrimental Activity" means at any time (i) using information received during the Participant's membership on the Board relating to the business affairs of the Company or any of its Subsidiaries or Affiliates, in breach of the Participant's express or implied undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of the Company or any of its Subsidiaries or Affiliates to breach any of the terms of his or her employment with the Company, its Subsidiaries or its Affiliates; (iii) directly or indirectly making any statement that is, or could be, disparaging of the Company or any of its Subsidiaries or Affiliates, or any of their respective employees (except to the extent necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) directly or indirectly engaging in any illegal, unethical or otherwise wrongful activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of the Company or any of its Subsidiaries or Affiliates, including, but not limited to, fraudulent accounting, embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Company or any of its Subsidiaries or Affiliates, breach of fiduciary duty or disregard or violation of rules, policies or procedures of the Company or any of its Subsidiaries or Affiliates, an unauthorized disclosure of any trade secret or confidential information of the Company or any of its Subsidiaries or Affiliates, any conduct constituting unfair competition, or inducing any customer to breach a contract with the Company or any of its Subsidiaries or Affiliates, in each case as determined by the Committee in its good faith discretion.

9.      Responsibility for Taxes .

The Participant acknowledges that, regardless of any action taken by the Company, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items") is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company. The Participant further acknowledges that the Company (i) makes no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Plan, including, but not

- 3 -

limited to, the grant, vesting or settlement of the Restricted Stock Units, the subsequent sale of Shares acquired pursuant to such settlement and the receipt of any dividends and/or Dividend Equivalents ; and (ii) do es not commit to and is under no obligation to structure the terms of the grant of Restricted Stock Units or any aspect of the Plan to reduce or eliminate the Participant' s liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

10.  <u>The Plan</u> .

In consideration for this grant, the Participant agrees to comply with the terms of the Plan and this Agreement. This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee.  In the event of any conflict between the provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deemed to be modified accordingly.   The Plan and the prospectus describing the Plan can be found on Fidelity NetBenefits ® at www.netbenefits.com/firstamerican under Plan Information and Documents .  A paper copy of the Plan and the prospectus shall be provided to the Participant upon the Participant's written request to the Company at First American Financial Corporation, 1 First American Way, Santa Ana, California 92707, Attention: Incentive Compensation Plan Administrator, or such other address as the Company may from time to time specify.

11.  <u>Compliance with Laws and Regulations</u> .

(a)  Notwithstanding any other provision of the Plan or this Agreement, the Restricted Stock Units and the obligation of the Company to sell and deliver Shares hereunder shall be subject in all respects to (i) all applicable Federal and state laws, rules and regulations and (ii) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Committee shall, in its discretion, determine to be necessary or applicable.  Moreover, the Company shall not deliver any certificates for Shares to the Participant or any other person pursuant to this Agreement if doing so would be contrary to applicable law.  If at any time the Company determines, in its discretion, that the listing, registration or qualification of Shares upon any securities exchange or under any state or Federal law, or the consent or approval of any governmental regulatory body, is necessary or desirable, the Company shall not be required to deliver any certificates for Shares to the Participant or any other person pursuant to this Agreement unless and until such listing, registration, qualification, consent or approval has been effected or obtained, or otherwise provided for, free of any conditions not acceptable to the Company.

(b)  It is intended that t he Shares received in respect of the Restricted Stock Units shall have been registered under the Securities Act .  If the Participant is an "affiliate" of the Company, as that term is defined in Rule 144 under the Securities Act ("Rule 144"), the Participant may not sell the Shares received except in compliance with Rule 144.  Certificates representing Shares issued to an "affiliate" of the Company may bear a legend setting forth such restrictions on the disposition or transfer of the Shares as the Company deems appropriate to comply with Federal and state securities laws.

(c)  If, at any time, the Shares are not registered under the Securities Act, and/or there is no current prospectus in effect under the Securities Act with respect to the Shares, the Participant shall execute, prior to the delivery of any Shares to the Participant by the Company pursuant to this Agreement, an agreement (in such form as the Company may specify) in which the Participant represents and warrants that the Participant is purchasing or acquiring the Shares acquired under this Agreement for the Participant's own account, for investment only and not with a view to the resale or distribution thereof, and represents and agrees that any subsequent offer for sale or distribution of any kind of such Shares shall be made only pursuant to either (i) a registration statement on an appropriate form under the Securities Act, which registration statement has become effective and is current with regard to the Shares being offered or sold, or (ii) a specific exemption from the registration requirements of the Securities Act, but in claiming such exemption the Participant shall, prior to any offer for sale of such Shares, obtain a prior favorable written opinion, in form and substance satisfactory to the Company, from counsel for or approved by the Company, as to the applicability of such exemption thereto.

- 4 -

12.      <u>Notices</u> .

All notices by the Participant or the Participant's assignees shall be addressed to First American Financial Corporation, 1 First American Way, Santa Ana, California 92707, Attention: Incentive Compensation Plan Administrator, or such other address as the Company may from time to time specify.  All notices to the Participant shall be addressed to the Participant at the Participant's address in the Company's records.

13.      <u>Severability</u> .

In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of this Agreement, and this Agreement shall be construed and enforced as if the illegal or invalid provision had not been included.

14.      <u>Waiver</u> .

The Participant acknowledges that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach of this Agreement.

15.      <u>Electronic Delivery</u> .

The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

[SIGNATURES ON NEXT PAGE]


FIRST AMERICAN FINANCIAL CORPORATION


By:_____
　　Name:
　　Title:


Date: [Grant Date]


Acknowledged and agreed as of the Date of Grant:


Printed Name:        [Participant Name]


Date:                [Acceptance Date]

[NOTE:  GRANT WILL BE ACCEPTED ELECTRONICALLY]

- 5 -

Exhibit 10.6.9

**[Employee]**
**Notice of Restricted Stock Unit Grant**

| | |
|---|---|
| **Participant:** | **[Participant Name]** |
| **Company:** | First American Financial Corporation |
| **Notice:** | You have been granted the following Restricted Stock Units in accordance with the terms of the Plan and the Restricted Stock Unit Award Agreement attached hereto. |
| **Type of Award:** | Restricted Stock Units |
| **Plan:** | First American Financial Corporation 2010 Incentive Compensation Plan |
| **Grant:** | Date of Grant:  **[Grant Date]**<br>Number of Shares Underlying Bonus Restricted Stock Units:  **[Number of shares Granted]**<br>Number of Shares Underlying Other Restricted Stock Units:  **[Number of shares Granted]** |
| **Period of Restriction:** | The Restricted Stock Units shall be subject to a Period of Restriction.  Subject to the terms of the Plan and this Agreement, the Period of Restriction shall commence on the Date of Grant and shall lapse on the date listed in the "Lapse Date" column below.  Such a lapse of the Period of Restriction shall apply to that percentage of Shares underlying the Restricted Stock Units set forth below opposite each such Lapse Date. |

| Lapse Date | Percentage of Shares as to Which Period of Restriction Lapses |
|---|---|
| Date of Grant + 1 year | 25% |
| Date of Grant + 2 years | 25% |
| Date of Grant + 3 years | 25% |
| Date of Grant + 4 years | 25% |

[NOTE FOR BONUS RSUS ONLY: FOR NON-EXECUTIVE OFFICERS X6 GRADE AND BELOW THE FOLLOWING 3-YR VESTING SCHEDULE REPLACES THE TABLE ABOVE:]

| Lapse Date | Percentage of Shares as to Which Period of Restriction Lapses |
|---|---|
| Date of Grant + 1 year | 33.333% |
| Date of Grant + 2 years | 33.333% |
| Date of Grant + 3 years | 33.334% |

| | |
|---|---|
| **Rejection:** | If you wish to accept this Restricted Stock Unit Award, please access Fidelity NetBenefits® at www.netbenefits.com/firstamerican and follow the steps outlined under the "Accept Grant" link at any time within forty-five (45) days after the Date of Grant.  If you do not accept your grant via Fidelity NetBenefits® within forty-five (45) days after the Date of Grant, you will have rejected this Restricted Stock Unit Award. |

[ Employee]
## Restricted Stock Unit Award Agreement

This Restricted Stock Unit Award Agreement (this "Agreement"), dated as of the Date of Grant set forth in the Notice of Restricted Stock Unit Grant attached hereto (the "Grant Notice"), is made between First American Financial Corporation (the "Company") and the Participant set forth in the Grant Notice.  The Grant Notice is included in and made part of this Agreement.

1.    Definitions .

Capitalized terms used but not defined in this Agreement (including the Grant Notice) have the meaning set forth in the Plan .

For purposes of this Agreement, "Cause," shall be defined as: (i) embezzlement, theft or misappropriation by the Participant of any property of any of the Company or its Affiliates; (ii) the Participant's willful breach of any fiduciary duty to the Company or its Affiliates; (iii) the Participant's willful failure or refusal to comply with laws or regulations applicable to the Company or its Affiliates and their businesses or the policies of the Company and its Affiliates governing the conduct of its employees or directors; (iv) commission by the Participant of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) the Participant's refusal to perform the Participant's job duties or to perform reasonable specific directives of the Participant's supervisor or designee, or the senior officers or Board of Directors of the Company; or (vi) any gross negligence or willful misconduct of the Participant resulting in loss to the Company or its Affiliates, or damage to the reputation of the Company or its Affiliates.

2.    Grant of the Restricted Stock Units .

Subject to the provisions of this Agreement and the provisions of the Plan, the Company hereby grants to the Participant, pursuant to the Plan, a right to receive the number of shares of common stock of the Company, par value $.00001 per share ("Shares"), set forth in the Grant Notice (the "Restricted Stock Units").

3.    Dividend Equivalents .

Each Restricted Stock Unit shall accrue Dividend Equivalents with respect to dividends that would otherwise be paid on the Share underlying such Restricted Stock Unit during the period from the Date of Grant to the date such Share is delivered in accordance with Section 6.  Any such Dividend Equivalent shall be deemed reinvested in additional Shares underlying the Restricted Stock Units immediately upon the related dividend's payment date, based on the then-current Fair Market Value (rounded down to the nearest whole number), and shall be subject to the Period of Restriction applicable to the Restricted Stock Unit on which such Dividend Equivalent is paid.  Any such conversion of Dividend Equivalents shall be conclusively determined by the Committee.  The Shares underlying Restricted Stock Units into which Dividend Equivalents are so converted shall be delivered in accordance with Section 6.

4.    Period of Restriction; Termination .

The Period of Restriction with respect to the Restricted Stock Units shall be as set forth in the Grant Notice.  Subject to the terms of the Plan and the remaining provisions of this Section 4, all Restricted Stock Units for which the Period of Restriction had not lapsed prior to the date of the Participant's Termination shall be immediately forfeited.   Notwithstanding the foregoing to the contrary, but subject to subsection 4(f):

(a)    In the event of the Participant's Termination due to his or her death, the Period of Restriction as to all Restricted Stock Units shall immediately lapse in its entirety.

(b)    In the event of the Participant's Termination due to his or her Disability, the Period of Restriction as to all Restricted Stock Units shall lapse in its entirety, provided that the Participant shall have signed a separation agreement in the form established by

- 2 -

the Company (within the period specified by the Company and in no event later than the last day of the period within which Shares are required to be delivered pursuant to Section 6) .

(c)  In the event of the Participant's Termination due to his or her Normal Retirement, the Period of Restriction as to all Restricted Stock Units shall continue in effect until, and lapse on, the first anniversary of the date of such Normal Retirement, provided that the Participant shall have signed a separation agreement in the form established by the Company (within the period specified by the Company and in no event later than the last day of the period within which Shares are required to be delivered pursuant to Section 6) .

(d)  In the event of Participant's Termination due to his or her Early Retirement, the outstanding Period of Restriction applicable to all Bonus Restricted Stock Units (but not any Other Restricted Stock Units) shall continue in effect until, and lapse on, the first anniversary of the date of such Early Retirement, provided that the Participant shall have signed a separation agreement in the form established by the Company (within the period specified by the Company and in no event later than the last day of the period within which Shares are required to be delivered pursuant to Section 6).

(e)  In the event of the Participant's involuntary Termination by the Company or an Affiliate without Cause, the outstanding Period of Restriction applicable to all Bonus Restricted Stock Units (but not any Other Restricted Stock Units) shall continue in effect until, and lapse on, the first anniversary of the date of such Termination, provided that the Participant shall have signed a separation agreement in the form established by the Company (within the period specified by the Company and in no event later than the last day of the period within which Shares are required to be delivered pursuant to Section 6).

(f)  Restricted Stock Units may be subject to applicable tax withholding obligations pursuant to Article XVII of the Plan and applicable law (e.g., at Termination or retirement eligibility), regardless of when the Period of Restriction lapses with respect to such Restricted Stock Units.

For purposes of this Agreement, "Normal Retirement" means Termination of the Participant, other than for Cause, after the Participant has reached 62 years of age and "Early Retirement" means Termination of the Participant, other than for Cause, after the Participant has reached 55 years of age (but prior to having reached 62 years of age) and been employed by the Company and/or an Affiliate for more than 10 years.

5.   Change of Control .

Except for a Change of Control that has been approved by the Company's Incumbent Board prior to the occurrence of such Change of Control, the provisions of Section 15.1 of the Plan shall apply to the Restricted Stock Units.

6.   Delivery of Shares .

Unless delivery is deferred pursuant to a deferred compensation arrangement made available by the Company, or for reasons set forth in Section 12, as soon as reasonably practicable following the lapse of the applicable portion of the Period of Restriction, but in no event later than 90 days following the date of such lapse, the Company shall cause to be delivered to the Participant the full number of Shares underlying the Restricted Stock Units as to which such portion of the Period of Restriction has so lapsed, together with Shares comprising all accrued Dividend Equivalents with respect to such Restricted Stock Units, subject to the satisfaction of applicable Tax-Related Items with respect thereto pursuant to Article XVII of the Plan.  In the event that the

- 3 -

obligation to deliver Shares arises under Section s 4(b) , (c), (d) or (e) and the period within which to satisfy the condition to sign a separation agreement commences in one calendar year and ends in the next calendar year, the Shares shall be delivered in the next calendar year. Restricted Stock Units may only be settled by delivery of Shares and not by any cash payment. No fractional Share will be issued pursuant to an award granted hereunder. The number of Shares issuable upon the settlement of the Restricted Stock Units will be rounded down to the nearest whole number of Shares. No payment or other adjustment will be made with respect to the fractional shares so disregarded. Notwithstanding the foregoing, if the Participant is a "specified employee" (as such term is defined in Section 409A(a)(2)(B)(i) of the Code) and if necessary to avoid the imposition of taxes on the Participant pursuant to Section 409A of the Code, such delivery of Shares shall be delayed until the earlier of the date which is six months from the date of such Participant's Termination for any reason other than death, or the date of the Participant's death.

7.     <u>No Ownership Rights Prior to Issuance of Shares</u> .

Restricted Stock Units shall not be considered Shares and neither the Participant nor any other person shall become the beneficial owner of the Shares underlying the Restricted Stock Units, nor have any rights to dividends or other rights as a shareholder with respect to any such Shares, until and after such Shares have been actually issued to the Participant and transferred on the books and records of the Company or its agent in accordance with the terms of the Plan and this Agreement.

8.     <u>Detrimental Activity</u> .

(a)   Notwithstanding any other provisions of this Agreement to the contrary, if at any time prior to the earlier of the delivery of Shares with respect to the Restricted Stock Units or, if applicable, the date on which such Shares would have been delivered but for a deferral pursuant to a deferred compensation arrangement made available by the Company, the Participant engages in Detrimental Activity, such Restricted Stock Units shall be cancelled and rescinded without any payment or consideration therefor. The determination of whether the Participant has engaged in Detrimental Activity shall be made by the Committee in its good faith discretion, and lapse of the Period of Restriction and delivery of Shares with respect to the Restricted Stock Units shall be suspended pending resolution to the Committee's satisfaction of any investigation of the matter.

(b)   For purposes of this Agreement, "Detrimental Activity" means at any time (i) using information received during the Participant's employment with the Company and/or its Subsidiaries and Affiliates relating to the business affairs of the Company or any such Subsidiaries or Affiliates, in breach of the Participant's express or implied undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of the Company or any of its Subsidiaries or Affiliates to breach any of the terms of his or her employment with the Company, its Subsidiaries or its Affiliates; (iii) directly or indirectly making any statement that is, or could be, disparaging of the Company or any of its Subsidiaries or Affiliates, or any of their respective employees (except to the extent necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) directly or indirectly engaging in any illegal, unethical or otherwise wrongful activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of the Company or any of its Subsidiaries or Affiliates; or (v) directly or indirectly engaging in an act of misconduct such as, embezzlement, fraud, dishonesty, nonpayment of any obligation owed to the Company or any of its Subsidiaries or Affiliates, breach of fiduciary duty or disregard or violation of rules, policies or procedures of the Company or any of its Subsidiaries or Affiliates, an unauthorized disclosure of any trade secret or confidential information of the Company or any of its Subsidiaries or Affiliates, any conduct constituting unfair competition, or inducing any customer to breach a contract with the Company or any of its Subsidiaries or Affiliates, in each case as determined by the Committee in its good faith discretion.

9.     <u>Responsibility for Taxes</u> .

The Participant acknowledges that, regardless of any action taken by the Company or, if different, the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items") is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The

- 4 -

Participant further acknowledges that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Plan, including , but not limited to, the grant, vesting or settlement of the Restricted Stock Units, the subsequent sale of Shares acquired pursuant to such settlement and the receipt of any dividends and/or Dividend Equivalents ; and (ii) do not commit to and are under no obligation to structure the terms of the grant of Restricted Stock Units or any aspect of the Plan to reduce or eliminate the Participant' s liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items.  In this regard, the Participant authorizes the Company and/or the Employer or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following: (i) withholding from the Participant's wages or other cash compensation paid to the Participant by the Company and/or the Employer; (ii) withholding from proceeds of the sale of Shares acquired upon settlement of the Restricted Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company on the Participant's behalf pursuant to this authorization without further consent; (iii) withholding in Shares to be issued upon settlement of the Restricted Stock Units; or (iv) any other method permitted by the Company.

Notwithstanding the foregoing, if the Participant is an officer of the Company who is subject to Section 16 of the Exchange Act, then the Company must satisfy any withholding obligations arising upon the occurrence of a taxable or tax withholding event, as applicable, by withholding in Shares to be issued upon settlement of the Restricted Stock Units pursuant to method (iii), unless the Board or the Committee determines in its discretion that the obligation for Tax-Related Items must be satisfied by one or a combination of methods (i), (ii), (iii), and (iv) above.

Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding rates or other applicable withholding rates, including maximum applicable rates, in which case the Participant may receive a refund of any over-withheld amount in cash and will have no entitlement to the Share equivalent. The Participant acknowledges that, if the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant may be deemed to have been issued the full number of Shares subject to the vested Restricted Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items.

The Participant agrees to pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if the Participant fails to comply with his or her obligations in connection with the Tax-Related Items.

Notwithstanding anything in this Section 9 to the contrary, to avoid a prohibited acceleration under U.S. Code Section 409A, if Shares subject to Restricted Stock Units will be withheld (or sold on the Participant's behalf) to satisfy any Tax Related Items arising prior to the date of settlement of the Restricted Stock Units for any portion of the Restricted Stock Units that is considered nonqualified deferred compensation subject to U.S. Code Section 409A, then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for Tax-Related Items.

10.      No Right to Continued Employment .

None of the Restricted Stock Units nor any terms contained in this Agreement shall confer upon the Participant any express or implied right to be retained in the employ of the Company or any Subsidiary or Affiliate for any period, nor restrict in any way the right of the Company or any Subsidiary or any Affiliate, which right is hereby expressly reserved, to terminate the Participant's employment at any time for any reason.  For the avoidance of doubt, this Section 10 is not intended to amend or modify any other agreement,

- 5 -

including any employment agreement, that may be in existence between the Participant and the Company or any Subsidiary or Affiliate.

11.   The Plan .

In consideration for this grant, the Participant agrees to comply with the terms of the Plan and this Agreement. This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee.  In the event of any conflict between the provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deemed to be modified accordingly.   The Plan and the prospectus describing the Plan can be found on Fidelity NetBenefits® at www.netbenefits.com/firstamerican under Plan Information and Documents.  A paper copy of the Plan and the prospectus shall be provided to the Participant upon the Participant's written request to the Company at First American Financial Corporation, 1 First American Way, Santa Ana, California 92707, Attention: Incentive Compensation Plan Administrator, or such other address as the Company may from time to time specify.

12.   Compliance with Laws and Regulations; Recoupment .

(a)   Notwithstanding any other provision of the Plan or this Agreement, the Restricted Stock Units and the obligation of the Company to sell and deliver Shares hereunder shall be subject in all respects to (i) all applicable Federal and state laws, rules and regulations and (ii) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Committee shall, in its discretion, determine to be necessary or applicable.  Moreover, the Company shall not deliver any certificates for Shares to the Participant or any other person pursuant to this Agreement if doing so would be contrary to applicable law.  If at any time the Company determines, in its discretion, that the listing, registration or qualification of Shares upon any securities exchange or under any state or Federal law, or the consent or approval of any governmental regulatory body, is necessary or desirable, the Company shall not be required to deliver any certificates for Shares to the Participant or any other person pursuant to this Agreement unless and until such listing, registration, qualification, consent or approval has been effected or obtained, or otherwise provided for, free of any conditions not acceptable to the Company.

(b)   It is intended that the Shares received in respect of the Restricted Stock Units shall have been registered under the Securities Act.  If the Participant is an "affiliate" of the Company, as that term is defined in Rule 144 under the Securities Act ("Rule 144"), the Participant may not sell the Shares received except in compliance with Rule 144.  Certificates representing Shares issued to an "affiliate" of the Company may bear a legend setting forth such restrictions on the disposition or transfer of the Shares as the Company deems appropriate to comply with Federal and state securities laws.

(c)   If, at any time, the Shares are not registered under the Securities Act, and/or there is no current prospectus in effect under the Securities Act with respect to the Shares, the Participant shall execute, prior to the delivery of any Shares to the Participant by the Company pursuant to this Agreement, an agreement (in such form as the Company may specify) in which the Participant represents and warrants that the Participant is purchasing or acquiring the Shares acquired under this Agreement for the Participant's own account, for investment only and not with a view to the resale or distribution thereof, and represents and agrees that any subsequent offer for sale or distribution of any kind of such Shares shall be made only pursuant to either (i) a registration statement on an appropriate form under the Securities Act, which registration statement has become effective and is current with regard to the Shares being offered or sold, or (ii) a specific exemption from the registration requirements of the Securities Act, but in claiming such exemption the Participant shall, prior to any offer for sale of such Shares, obtain a prior favorable written opinion, in form and substance satisfactory to the Company, from counsel for or approved by the Company, as to the applicability of such exemption thereto.

(d)   To the extent provided by any Company Arrangement or any plan or policy, including any clawback policy, in any case reasonably adopted by the Company from time to time, Shares or Restricted Stock Units awarded under this Agreement shall be subject to clawback, forfeiture, recoupment or similar requirement.  For purposes of this Section, "Company Arrangement" shall mean any employment agreement with

- 6 -

the Company or any of its current or future subsidiaries, affiliates or other related companies (each a "Related Company"); the Company's Executive Supplemental Benefit Plan and Management Supplemental Benefit Plan ; any stock option, restricted stock, stock appreciation right or other equity compensation plan of the Company or any Related Company (including, without limitation, the Plan ); any pension plan and pension restoration plan o f the Company or any Related Company; any deferred compensation plan of the Company or any Related Company; any other employee benefit plan of the Company or any Related Company; any change-of-control or similar agreement to which the Company and/or an y Related Party and the Participant are parties; any Confidential Information and Inventions Agreement between the Company and the Participant ; and any amendment, restatement or successor to any of the foregoing .

13.      Notices .

         All notices by the Participant or the Participant's assignees shall be addressed to First American Financial Corporation, 1 First American Way, Santa Ana, California 92707, Attention: Incentive Compensation Plan Administrator, or such other address as the Company may from time to time specify.  All notices to the Participant shall be addressed to the Participant at the Participant's address in the Company's records.

14.      Severability .

         In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of this Agreement, and this Agreement shall be construed and enforced as if the illegal or invalid provision had not been included.

15.      Waiver .

         The Participant acknowledges that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach of this Agreement.

16.      Other Plans .

         The Participant acknowledges that any income derived from the Restricted Stock Units shall not affect the Participant's participation in, or benefits under, any other benefit plan or other contract or arrangement maintained by the Company or any Subsidiary or Affiliate.  Dividend Equivalents paid on either Bonus Restricted Stock Units or Other Restricted Stock Units shall not be deemed to be "Covered Compensation" under such plans.

17.      Electronic Delivery .

         The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

18.      Imposition of Other Requirements .

         The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the Restricted Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

19 .     Vesting of RSUs Contingent on Company Performance .

         Notwithstanding any other provisions in this Agreement, except in the event of a Change of Control or a Participant's Termination due to his or her death or Disability, the Participant's entitlement to the receipt of any Shares hereunder is contingent upon the Company's achievement of net income (as defined in accordance with generally acceptable accounting principles) for 2019 of $25 million or more.  Net income shall be

- 7 -

determined without regard to (a) asset write-downs, (b) litigation or claim judgments or settlements, (c) the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results, (d) any reorganization and restructuring programs, (e) extraordinary, unusual and/or nonrecurring items of gain or loss, and (f) foreign exchange gains and losses .

FIRST AMERICAN FINANCIAL CORPORATION

By:_____
   Name:
   Title:

Date: **[Grant Date]**

Acknowledged and agreed as of the Date of Grant:

Printed Name: **[Participant Name]**

Date: **[Acceptance Date]**

[NOTE: GRANT WILL BE ACCEPTED ELECTRONICALLY]

- 8 -

Exhibit 10.6.11

## Notice of Performance Unit Grant

| | |
|---|---|
| **Participant:** | [●] |
| **Company:** | First American Financial Corporation (the "Company") |
| **Notice:** | You have been granted a Performance Unit in accordance with the terms of the Plan and the Performance Unit Award Agreement attached hereto. |
| **Type of Award:** | Performance Units |
| **Plan:** | First American Financial Corporation 2010 Incentive Compensation Plan |
| **Grant:** | Date of Grant:  [●], 2019<br>Number of Performance Units:  [●]<br>Each Performance Unit has the value of $1 |
| **Performance Period:** | Subject to the terms of the Plan and this Agreement, the Performance Period applicable to the Performance Units shall be the calendar year 2019. |
| **Performance Condition:** | Your right to the receipt of cash for your Performance Units is conditioned on the Company's achievement of net income (as defined in accordance with generally acceptable accounting principles) for 2019 of $25 million or more, determined without regard to (a) asset write-downs, (b) litigation or claim judgments or settlements, (c) the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results, (d) any reorganization and restructuring programs, (e) extraordinary, unusual and/or nonrecurring items of gain or loss, and (f) foreign exchange gains and losses.  This condition is referred to as the "Performance Target."  Within a reasonable time after the determination of whether the Performance Target has been met, the Committee shall determine the final amount of Performance Units to which you shall be entitled, provided that the total amount thereof shall not exceed the amount set forth above.  The Committee, in its sole and unfettered discretion, may decrease the number of Performance Units awarded to you at any time prior to the payment thereon. |
| **Rejection:** | If you wish to accept this Performance Unit Award, please return this Agreement, executed by you on the last page of this Agreement, at any time within forty-five (45) days after the Date of Grant, to First American Financial Corporation, 1 First American Way, Santa Ana, California 92707, Attn: Incentive Compensation Plan Administrator.   Do not return a signed copy of this Agreement if you wish to reject this Performance Unit Award.  If you do not return a signed copy of this Agreement within forty-five (45) days after the Date of Grant, you will have rejected this Performance Unit Award. |

## Performance Unit Award Agreement

This Performance Unit Award Agreement (this "Agreement"), dated as of the date of the Notice of Performance Unit Grant attached hereto (the "Grant Notice"), is made between First American Financial Corporation (the "Company") and the Participant set forth in the Grant Notice.  The Grant Notice is included and made a part of this Agreement.

1. <u>Definitions</u> .

Capitalized terms used but not defined in this Agreement (including the Grant Notice) have the meaning set forth in the First American Financial Corporation 2010 Incentive Compensation Plan.

2. <u>Grant of the Performance Units</u> .

Subject to the provisions of this Agreement and the provisions of the Plan, the Company hereby grants to the Participant, pursuant to the Plan, the contingent right to receive in cash an amount equal in value to the performance units set forth in the Grant Notice, as such number of performance units may be reduced by the Committee in its sole and unfettered discretion (the "Performance Units").  Each Performance Unit has a value of $1.

3. <u>Vesting and Payment of Performance Units</u> .

After the Performance Period (as specified in the Notice of Grant) has ended and provided that the Committee has determined that the Performance Target (as defined in the Notice of Grant) has been achieved,  the Participant shall be entitled to receive, and the Company shall pay to the Participant, the cash value of the Performance Units; provided, however, that prior to paying to the Participant such cash value, the Committee may, in its sole and unfettered discretion, decrease the amount of Performance Units awarded to the Participant.   If the Performance Target is not met, the Participant shall forfeit the Performance Units and the Participant shall not be entitled to any cash payment in connection therewith.

4. <u>No Right to Continued Employment</u> .

None of the Performance Units nor any terms contained in this Agreement shall confer upon the Participant any express or implied right to be retained in the employ of the Company or any Subsidiary or Affiliate for any period, nor restrict in any way the right of the Company or any Subsidiary or any Affiliate, which right is hereby expressly reserved, to terminate the Participant's employment at any time for any reason.  For the avoidance of doubt, this Section 4 is not intended to amend or modify any other agreement, including any employment agreement, that may be in existence between the Participant and the Company or any Subsidiary or Affiliate.

5. <u>The Plan</u> .

In consideration for this grant, the Participant agrees to comply with the terms of the Plan and this Agreement. This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee.  In the event of any conflict between the

- 2 -

provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deem ed to be modified accordingly.   A paper copy of the Plan and the prospectus shall be provided to the Participant upon the Participant's written request to the Company at First American Financial Corporation, 1 First American Way, Santa Ana, California 92707 , Attention: Incentive Compens ation Plan Administrator, or such other address as the Company may from time to time specify .

6. <u>Notices</u> .

All notices by the Participant or the Participant's assignees shall be addressed to First American Financial Corporation, 1 First American Way, Santa Ana, California 92707, Attention: Incentive Compensation Plan Administrator, or such other address as the Company may from time to time specify.  All notices to the Participant shall be addressed to the Participant at the Participant's address in the Company's records.

7. <u>Severability</u> .

In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of this Agreement, and this Agreement shall be construed and enforced as if the illegal or invalid provision had not been included.

8. <u>Other Plans</u> .

The Participant acknowledges that any income derived from the Performance Units shall not affect the Participant's participation in, or benefits under, any other benefit plan or other contract or arrangement maintained by the Company or any Subsidiary or Affiliate.  For purposes of the Company's Executive Supplemental Benefit Plan and Management Supplemental Benefit Plan, as the same may be amended from time to time, cash ultimately paid for any Performance Units shall be deemed to be "Covered Compensation".

9. <u>Assignment</u> .

Participant may not transfer or assign this Agreement or any part thereof.  The Company reserves the right to transfer or assign this Agreement to any of its Affiliates.

[SIGNATURES FOLLOW]

- 3 -

FIRST AMERICAN FINANCIAL CORPORATION

By:_____
    Name:
    Title:

Date:

Acknowledged and agreed as of the Date of Grant:

Signature:    _____

Printed Name:    _____

Date:    _____

- 4 -

Exhibit 10.7

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") dated as of February 19, 2019 is made and entered into by and between Dennis J. Gilmore ("Executive") and First American Financial Corporation ("Employer").  In consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

1.  Employment of Executive .  Subject to the terms and conditions of this Agreement, Employer hereby employs Executive, and Executive hereby accepts employment, as Chief Executive Officer.  Executive shall devote Executive's entire productive time, effort and attention to the business of Employer during the Term (as defined below).  Executive will use his best efforts at all times to promote and protect the good name of Employer and Employer's current and future subsidiaries, affiliates and other related companies (together with Employer, each a "Related Company" and, collectively the "Related Companies") as well as that of their respective officers, directors, employees, agents, products and services.  Executive shall not directly or indirectly render any service of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of Employer.

2.  Duties To Be Performed .  Executive shall perform the duties and have the responsibilities customarily performed and held by a person in a position similar to that set forth in Section 1.  Executive shall also perform such other duties as directed by Employer's Board of Directors.  Any modification made by Employer's Board of Directors to the duties of Executive shall not constitute a breach of this Agreement.

3.  Term of Agreement .  This Agreement shall become effective on the date of this Agreement and, unless earlier terminated pursuant to the provisions of the Agreement, shall continue through the close of business on December 31, 2021 (the "Term").  Unless continued on an "at-will" basis by Employer or any other Related Company or pursuant to another agreement, Executive's employment shall terminate upon the termination of this Agreement for any reason.

4.  Compensation .  In full payment for Executive's services, Employer shall provide to Executive compensation and benefits determined in accordance with this Section 4.

4.1  Salary.  During the Term, Employer shall pay Executive a base annual salary (the "Base Salary"), before deducting all applicable withholdings, of $1,000,000 per year, payable at the times and in the manner dictated by Employer's standard payroll policies, which Base Salary may be increased in the sole and unfettered discretion of the Compensation Committee of the Board of Directors of Employer (the "Compensation Committee") or the Board of Directors of Employer. The Base Salary shall be prorated for any partial pay period that occurs during the Term.

4.2  Performance Bonus; Long-Term Incentive Equity Awards .  During the Term, in addition to the Base Salary, Employer may, in the sole and unfettered discretion of

the Compensation Committee , pay to Executive an annual bonus and long-term incentive equity award .

4.3 <u>Benefits</u> . Executive shall, subject to the terms and conditions of any applicable benefits plan documents and applicable law, be entitled to receive all benefits of employment generally available to other similarly situated executives of Employer when and as he becomes eligible for them, including medical, dental, life and disability insurance benefits. Employer reserves the right to modify, suspend or discontinue any and all of the above benefit plans, policies, and practices at any time without notice to or recourse by Executive, so long as such action is taken generally with respect to other similarly situated executives of Employer and does not single out Executive.

4.4 <u>Taxes and Withholdings</u> . Employer may deduct from all compensation payable under this Agreement to Executive any taxes or withholdings Employer is required to deduct pursuant to state and federal laws or by mutual agreement between the parties. Executive is solely liable for any and all taxes beyond those specifically withheld by Employer.

4.5 <u>Recoupment</u> . Executive acknowledges and agrees that to the extent provided by any Employment Arrangement (as defined in Section 20(a) below) or any plan or policy, including any clawback policy, in any case reasonably adopted by the Company from time to time, compensation paid to Executive shall be subject to clawback, forfeiture, recoupment or similar requirement.

5. <u>Termination</u> .

5.1 <u>Termination Upon Death</u> . The Term (and Executive's employment) shall automatically terminate with immediate effect upon the death of Executive.

5.2 <u>Termination by Employer</u> . Notwithstanding anything in this Agreement to the contrary, express or implied, the Term (and Executive's employment) may be terminated immediately by Employer (by delivery of written notice specifying that termination is made pursuant to this Section 5.2) as follows:

(a) Whenever Executive is not physically or mentally able (with reasonable accommodation) to perform the essential functions of Executive's job;

(b) For "Cause," which shall be defined as: (i) embezzlement, theft or misappropriation by the Executive of any property of any of the Related Companies; (ii) Executive's willful breach of any fiduciary duty to Employer; (iii) Executive's willful failure or refusal to comply with laws or regulations applicable to Employer and its business or the policies of Employer governing the conduct of its employees; (iv) commission by Executive of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) Executive's refusal to perform Executive's job duties or to perform reasonable specific directives of Executive's supervisor or his successor or designee and the Board of Directors of Employer; or (vi) any gross negligence or willful misconduct of

-2-

Executive resulting in a loss to Employer o r any other Related Company, or damage to the reputation of Employer or any other Related Company ; or

(c) Upon the occurrence of any material breach (not covered by any of clauses (i) through (viii) of Section 5.2(b) above) of any of the provisions of this Agreement, it being agreed that for all purposes under this Agreement any violation of any of the provisions of Sections 6, 7, 8, 10 or 11 shall be deemed to be a material breach of this Agreement.

5.3  <u>Termination by Employer without Cause</u> .  Employer may terminate the Term (and Executive's employment) by giving two weeks written notice to Executive.  A termination made pursuant to this Section 5.3 is a "termination Without Cause."  A termination made pursuant to Section 5.2 (and satisfying the notice requirement set forth therein) shall under no circumstance be considered a termination Without Cause.

5.4  <u>Rights and Obligations Upon Termination</u> .

(a)  In the event of Employer's termination of the Term (and Executive's employment) pursuant to Section 5.3 (which, for the avoidance of doubt, is a termination Without Cause), Employer shall pay Executive:

(i)  his Base Salary through the date of termination, paid within 5 days following the termination date (or earlier if required by law);

(ii)  any annual bonus earned for any fiscal year completed before the date of termination that remains unpaid as of the date of termination, paid within 5 days following the termination date (or earlier if required by law); and

(iii)  an amount (the "Severance Amount") equal to two (2) times the sum of (A) his Base Salary and (B) the median of the last three (3) annual bonuses paid to Executive (whether earned pursuant to this Agreement or otherwise and whether paid in cash, restricted stock units, stock options or otherwise) (the "Median Bonus"), fifty percent (50%) of which will be paid on the first business day following the 12-month anniversary of the date of termination and fifty percent (50%) of which will be paid in twelve installments equal to 1/24 th of the Severance Amount, the first payment of which will be made on the 29 th day following termination and the remaining eleven payments of which will be made on the first business day of each calendar month thereafter.

For the purpose of determining the Median Bonus, the value of (1) the portion of any annual bonus paid in the form of restricted stock or restricted stock units ("RSUs") shall be determined by multiplying the number of restricted shares or RSUs granted by the closing price of the restricted shares or stock underlying the RSUs on the grant date and (2) the portion of any annual bonus paid in the form of stock options or other equity (excluding restricted stock or RSUs) shall be determined using the methodology utilized by Employer for determining the cost of such stock option or other equity for financial reporting purposes, but without giving effect to the amortization of such stock option or other equity.  For the avoidance of doubt, the Median Bonus

-3-

shall not include any long-term incentive equity awards which would not be included in "Covered Compensation" under the Executive Supplemental Benefit Plan ( including any amendment, modification or successor thereto, the "SERP") . For the avoidance of doubt, "median" means, with respect to a set of three amounts, the middle amount and not the highest or the lowest amount, unless two of the amounts in the set are the same amount, in which case "median" means the amount which occurs twice in the set.

In exchange for Employer's agreement to pay the Severance Amount and as a condition thereto, Executive agrees to execute (within 21 days following the date of termination of employment), deliver and not revoke (within the time period permitted by applicable law) a general release of the Related Companies and their respective officers, directors, employees and owners from any and all claims, obligations and liabilities of any kind whatsoever, including all such claims arising from or in connection with Executive's employment or termination of employment with Employer or this Agreement (including, without limitation, civil rights claims), in such form as is reasonably requested by Employer.  Executive's right to receive the Severance Amount is conditioned upon the release described in the preceding sentence becoming irrevocable within the prescribed time period.  In addition, Executive's right to receive the Severance Amount shall immediately cease in the event that Executive violates any of the provisions of Sections 7 or 8.  Apart from the payments set forth in this Section 5.4(a) and the benefits to which Executive may be entitled under the Employment Arrangements (as defined below), upon such termination Employer shall have no further liability whatsoever to Executive.

(b)  In the event of the termination of the Term (and Executive's employment) pursuant to Sections 5.1 or 5.2 or, if Executive's employment does not continue on an at-will basis or pursuant to another agreement, upon the expiration of the Term, Employer shall be obligated to pay Executive (or, in the case of a termination under Section 5.1, Executive's heir or successor) the Base Salary through the date of termination and any annual bonus earned for any fiscal year completed before the date of termination, in each case, that remains unpaid as of the date of termination.  Apart from the payments set forth in this Section 5.4(b) and the benefits to which Executive may be entitled under the Employment Arrangements, upon such termination or expiration, as the case may be, Employer shall have no further liability whatsoever to Executive.

(c)  If (i) Executive's employment is terminated Without Cause by Employer prior to the expiration of the Term, (ii) as of the date of such termination Executive has not yet reached his "Early Retirement Date", as defined in the SERP and (iii) Executive would have reached his "Early Retirement Date" during the Term had his employment not been earlier terminated, Executive will be deemed to be vested in the SERP on the date he would have reached his "Early Retirement Date" and he will begin receiving payments under the SERP on such date as otherwise provided in, and otherwise subject to the provisions of, the SERP; provided , however , that in such circumstance Executive's "Final Average Compensation" (or equivalent) for purposes of the SERP shall be determined as of the date of the termination of his employment.

(d)  If it becomes known that Executive's employment will terminate for any reason, Employer may, in its sole discretion and subject to its other obligations under this

-4-

Agreement, relieve Executive of his duties under this Agreement and assign Executive other reasonable duties and responsibilities to be performed until the termination becomes effective.

(e) In the event that any payment or benefit received or to be received by Executive under this Agreement and all other arrangements or programs, including any acceleration of vesting of stock options, restricted stock, restricted stock units, deferred compensation, or long-term incentive awards (collectively, the "Payments"), would constitute an excess parachute payment within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), as determined in good faith by Employer's independent auditors, then the portion of the Payments that would be treated as parachute payments under Section 280G of the Code shall be reduced so that the Payments, in the aggregate, are reduced to the Safe Harbor Amount (as defined below). For purposes of this Agreement, the term "Safe Harbor Amount" means the largest portion of the Payments that would result in no portion of the Payments being considered parachute payments under Section 280G of the Code. In applying this principle, the reduction shall be made in a manner consistent with the requirements of Section 409A of the Code and where two economically equivalent amounts are subject to reduction but payable at different times, such amounts shall be reduced on a pro rata basis but not below zero. In addition, with regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A of the Code, all such payments shall be made on or before the last day of calendar year following the calendar year in which the expense occurred.

(f) A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment or the provision of any benefit (whether under this Agreement or otherwise) that is considered deferred compensation under Section 409A of the Code payable on account of a "separation from service," and that is not exempt from Section 409A of the Code as involuntary separation pay or a short-term deferral (or otherwise), such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive or (ii) the date of Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 5.4(f) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum without interest, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. For purposes of Section 409A of the Code, each payment amount or benefit due under this Agreement will be considered a separate payment and Executive's entitlement to a series of payments or benefits under this Agreement is to be treated as an entitlement to a series of separate payments.

(g) Upon termination of Executive's employment for any reason, Executive hereby resigns from any and all (i) positions with all Related Companies, whether as a

-5-

director, manager, general partner, officer or otherwise ; (ii) committee memberships, fiduciary capacities or similar positions with respect to employee benefit plans sponsored by any Related Compan y , and (iii) any other positions associated with any Related Company .

      6. <u>Restrictive Covenants</u>

      6.1 <u>Access to Trade Secrets and Confidential Information</u> .   Executive acknowledges and agrees that in the performance of Executive's duties of employment Executive will be brought into frequent contact with existing and potential customers of Employer and the other Related Companies throughout the world.   Executive also agrees that trade secrets and confidential information of Employer and the other Related Companies gained by Executive during Executive's association with Employer and the other Related Companies have been developed by Employer and the other Related Companies through substantial expenditures of time, effort and money and constitute valuable and unique property of Employer and the other Related Companies, and Employer and/or the Related Companies will suffer substantial damage and irreparable harm which will be difficult to compute if, during the Term and thereafter, Executive should disclose or improperly use such confidential information and trade secrets in violation of the provisions of this Section 6.  Executive further understands and agrees that the foregoing makes it necessary for the protection of the businesses of Employer and the other Related Companies that Executive not compete with Employer or any other Related Company during his or her employment, as further provided in this Section 6.

      6.2 <u>Non-Compete and Non-Solicit</u> .   While employed by Employer or any other Related Company, Executive will not, directly or indirectly, engage in or render any service of a business, commercial or professional nature to any other person, entity or organization, whether for compensation or otherwise, that is in competition with Employer or any other Related Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, Executive will not:

      (a) enter into or engage in any business which competes with the business of Employer or any other Related Company;

      (b) solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the business of Employer or any other Related Company;

      (c) divert, entice, or take away any customers, business, patronage or orders of Employer or any other Related Company or attempt to do so; or

      (d) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the business of Employer or any other Related Company.

      6.3 <u>Scope of Restricted Activities</u> .   For the purposes of Section 6.2, but without limitation thereof, Executive will be in violation thereof if Executive engages in any or all of the activities set forth therein directly as an individual on Executive's own account, or indirectly as a stockholder, partner, joint venturer, executive, agent, salesperson, consultant,

officer and/or director of , or by virtue of the ownership by Executive ' s spouse, child or parent of any equity interest in, any firm, association, partnership, corporation or other entity engag ing in any or all of such activities ; provided, however, Executive 's or Executive ' s spouse 's , child 's or parent 's own er s hip of less than one percent (1%) of the issued equity interest in a ny publicly traded corporation shall not alone constitute a violation of this Agreement .

      6.4  Scope of Covenants.  Employer and Executive acknowledge that the time, scope, geographic area and other provisions of Sections 6 and 7 have been specifically negotiated by sophisticated commercial parties and agree that they consider the restrictions and covenants contained in such Sections to be reasonable and necessary for the protection of the interests of the Related Companies, but if any such restriction or covenant shall be held by any court of competent jurisdiction to be void but would be valid if deleted in part or reduced in application, such restriction or covenant shall apply with such deletion or modification as may be necessary to make it valid and enforceable.  The restrictions and covenants contained in each provision of such Sections shall be construed as separate and individual restrictions and covenants and shall each be capable of being severed without prejudice to the other restrictions and covenants or to the remaining provisions of this Agreement.

      7.  <u>No Solicitation of Employees</u> .  Executive will not directly or indirectly, at any time during the Term and the 12-month period after termination of Executive's employment, either for Executive or for any other person or entity, recruit or solicit for hire any employee, officer, director or other personnel of the Employer or any of the Related Companies, or to induce or encourage such a person or entity to terminate his, her or its relationship, or breach an agreement, with the Employer or one of the Related Companies.

      8.  <u>Nondisclosure of Confidential Information</u> .  Executive will keep in strict confidence, and will not, directly or indirectly, at any time during or after Executive's employment with Employer, disclose, furnish, disseminate, make available or, except in the course of performing Executive's duties of employment, use any trade secrets or confidential business and technical information of Employer, any other Related Company or any of its respective customers or vendors, without limitation as to when or how Executive may have acquired such information.  Such confidential information shall include, without limitation, Employer's and any other Related Company's unique selling and servicing methods and business techniques, business strategies, financial information, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, processes, inventions, patents, copyrights, trademarks and other intellectual property and intangible rights, and other business information. Executive specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Executive and whether compiled by Employer, any other Related Company and/or Executive, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by Employer or another Related Company, as the case may be, to maintain the secrecy of such information, that such information is the sole property of Employer or another Related Company and that any retention and use of such information or rights by Executive during his employment with Employer (except in the course of performing his duties and

-7-

obligations hereunder) or after the termination of his employme n t shall constitute a misappropriation of Employer' s or another Related Company's trade secrets , rights or other property .

9. <u>Legally Authorized Disclosures.</u> Pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (a) is made: (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Also pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.   In addition, nothing contained in this Agreement (i) limits Executive's right to communicate or cooperate with any federal, state or local governmental agency or commission ("Government Agencies") or (ii) bars Executive from responding to an order, regulation, rule or subpoena of a court or Government Agency.

10. <u>Return of Company Property</u> .   Executive agrees that upon termination of Executive's employment with Employer, for any reason, Executive shall return to Employer, in good condition, all property of Employer and the other Related Companies, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in Section 8 of this Agreement.  In the event that such items are not so returned, Employer will have the right to charge Executive for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

11. <u>Representations and Warranties</u> .   Executive hereby represents and warrants that he has the legal capacity to execute and perform this Agreement, that this Agreement is a valid and binding agreement enforceable against him according to its terms, and that the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding, written or oral, to which Executive is a party or any judgment or decree to which Executive is subject.  In addition, Executive represents and warrants that he knows of no reason why he is not physically or legally capable of performing his obligations under this Agreement in accordance with its terms.  Executive hereby indemnifies the Related Companies and shall hold harmless the Related Companies from and against all liability, loss, cost, or expense, including, without limitation, reasonable attorneys' fees and expenses, incurred by any Related Company by reason of the inaccuracy of Executive's representations and warranties contained in this Section 11.

12. <u>Survival</u> .   Each of the agreements, representations, warranties and covenants set forth in Sections 4.5, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 21 of this Agreement shall survive and shall continue to be binding upon Employer and Executive notwithstanding the termination of Executive's employment or the expiration of the Term for any reason whatsoever.

1 3 .  Breach by Executive .   Executive is obligated under this Agreement to render services of a special, unique, unusual, extraordinary, and intellectual character, which give this Agreement particular value.  The loss of these services cannot be reasonably or adequately compensated in damages in an action at law.  Accordingly, in addition to other remedies provided by law or this Agreement, Employer shall have the right during the Term and any period of non-competition governed by this Agreement, to seek injunctive relief against breach or threatened breach of this Agreement by Executive or the performance of services , or threatened performance of services, by Executive in violation of this Agreement, or both.   This Section is not meant to limit the damages the Employer may pursue and is not meant to be an exhaustive list of the relief available to the Employer.

14.  Controlling Law .   This Agreement shall be controlled, construed and enforced in accordance with the laws of the State of California, without regard to conflicts of laws principles.

15.  Notices .   Any notice to Employer required or permitted under this Agreement shall be given in writing to Employer, either by personal service or by registered or certified mail, postage prepaid, addressed to the Chief Executive Officer of Employer, or equivalent, with a copy to the General Counsel of Employer, at Employer's then principal place of business.  Any such notice to Executive shall be given in a like manner and, if mailed, shall be addressed to Executive at his home address then shown in Employer's files.  For the purpose of determining compliance with any time limit in this Agreement, a notice shall be deemed to have been duly given (a) on the date of service, if served personally on the party to whom notice is to be given, or (b) on the third business day after mailing, if mailed to the party to whom the notice is to be given in the manner provided by this Section.

16.  Amendments .   This Agreement may be amended only by written agreement of each of the parties to this Agreement.

17.  Severability .   If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated; provided that if Executive breaches Section 6 and if Section 6 is finally determined to be unenforceable, the payment obligations of Section 5.4(a)(iii) and Section 5.4(c) shall be deemed void ab initio .

18.  Assignment .   Executive shall not transfer or assign this Agreement or any part thereof.   Employer reserves the right to transfer or assign this Agreement to any organization associated with it or any successor organization; provided , however , that Employer may assign this Agreement to any Related Company the stock or other equity of which is distributed to the shareholders of Employer and which, at the time of such distribution, agrees to employ Executive and assume Employer's obligations under this Agreement.

19.  Third-Party Beneficiaries .   This Agreement shall not confer any rights or remedies upon any party other than Employer, the other Related Companies, Executive and their respective successors and permitted assigns.

-9 -

20 . <u>Integration</u> .

(a) This Agreement; the SERP; any stock option, restricted stock, stock appreciation right or other equity compensation plan of Employer or any other Related Company (including, without limitation, the First American Financial Corporation 2010 Incentive Compensation Plan) and any award agreement entered into thereunder; any pension plan and pension restoration plan of Employer or any Related Company; any deferred compensation plan of Employer or any other Related Company; any other employee benefit plan of Employer or any other Related Company; any change-of-control or similar agreement to which Employer and/or any Related Party and Executive are parties; any Confidential Information and Inventions Agreement between Executive and Employer; and any amendment, restatement or successor to any of the foregoing (the foregoing, collectively, the "Employment Arrangements") contain the entire Agreement between the parties and supersedes all prior verbal and written agreements, understandings, commitments and practices between the parties. The benefits conferred upon Executive pursuant to this Agreement shall be in addition to the benefits provided for under the other Employment Arrangements; <u>provided</u> , <u>however</u> , that duplicative benefits shall not be payable pursuant to this Agreement and any other Employment Arrangement and, for the avoidance of doubt, none of the benefits provided in this Agreement shall be payable to the extent they are otherwise payable under the other Employment Arrangements.

(b) In the event (i) Executive is a party to an agreement with a Related Company providing for a severance benefit in the event Executive's employment terminates following a change-in-control (a "Change-in-Control Agreement"), (ii) Executive becomes entitled to such benefit and (iii) Executive becomes entitled to the Severance Amount under Section 5.4(a)(iii), then the severance benefit payable to Executive under the Change-in-Control Agreement shall offset any Severance Amount payable to Executive pursuant to Section 5.4(a)(iii).

21. <u>Counterparts</u> .   This Agreement may be executed in any number of counterparts, each of which when executed shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

[SIGNATURES ON NEXT PAGE]

-10 -

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement effective as of the day and year first above written.

"EXECUTIVE"                    "EMPLOYER"

/s/ Dennis J. Gilmore          /s/ Kenneth D. DeGiorgio

Name: Dennis J. Gilmore        Name: Kenneth D. DeGiorgio

Date: February 19, 2019        Title:    Executive    Vice
                               President

                               Date: February 19, 2019

Signature Page to
Employment Agreement

Exhibit 10.8

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") dated as of February 19, 2019 is made and entered into by and between Kenneth D. DeGiorgio ("Executive") and First American Financial Corporation ("Employer").  In consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

1.  Employment of Executive .  Subject to the terms and conditions of this Agreement, Employer hereby employs Executive, and Executive hereby accepts employment, as Executive Vice President.  Executive shall devote Executive's entire productive time, effort and attention to the business of Employer during the Term (as defined below).  Executive will use his best efforts at all times to promote and protect the good name of Employer and Employer's current and future subsidiaries, affiliates and other related companies (together with Employer, each a "Related Company" and, collectively the "Related Companies") as well as that of their respective officers, directors, employees, agents, products and services.  Executive shall not directly or indirectly render any service of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of Employer.

2.  Duties To Be Performed .  Executive shall perform the duties and have the responsibilities customarily performed and held by a person in a position similar to that set forth in Section 1.  Executive shall also perform such other duties as directed by Employer's Board of Directors and the Chief Executive Officer of Employer or his designee.  Any modification made by Employer's Board of Directors to the duties of Executive shall not constitute a breach of this Agreement.

3.  Term of Agreement .  This Agreement shall become effective on the date of this Agreement and, unless earlier terminated pursuant to the provisions of the Agreement, shall continue through the close of business on December 31, 2021 (the "Term").  Unless continued on an "at-will" basis by Employer or any other Related Company or pursuant to another agreement, Executive's employment shall terminate upon the termination of this Agreement for any reason.

4.  Compensation .  In full payment for Executive's services, Employer shall provide to Executive compensation and benefits determined in accordance with this Section 4.

4.1  Salary.   During the Term, Employer shall pay Executive a base annual salary (the "Base Salary"), before deducting all applicable withholdings, of $775,000 per year, payable at the times and in the manner dictated by Employer's standard payroll policies, which Base Salary may be increased in the sole and unfettered discretion of the Compensation Committee of the Board of Directors of Employer (the "Compensation Committee") or the Board of Directors of Employer. The Base Salary shall be prorated for any partial pay period that occurs during the Term.

4.2  Performance Bonus; Long-Term Incentive Equity Awards .  During the Term, in addition to the Base Salary, Employer may, in the sole and unfettered discretion of

the Compensation Committee , pay to Executive an annual bonus and long-term incentive equity award .

4.3 <u>Benefits</u> . Executive shall, subject to the terms and conditions of any applicable benefits plan documents and applicable law, be entitled to receive all benefits of employment generally available to other similarly situated executives of Employer when and as he becomes eligible for them, including medical, dental, life and disability insurance benefits.  Employer reserves the right to modify, suspend or discontinue any and all of the above benefit plans, policies, and practices at any time without notice to or recourse by Executive, so long as such action is taken generally with respect to other similarly situated executives of Employer and does not single out Executive.

4.4 <u>Taxes and Withholdings</u> .  Employer may deduct from all compensation payable under this Agreement to Executive any taxes or withholdings Employer is required to deduct pursuant to state and federal laws or by mutual agreement between the parties.  Executive is solely liable for any and all taxes beyond those specifically withheld by Employer.

4.5 <u>Recoupment</u> .  Executive acknowledges and agrees that to the extent provided by any Employment Arrangement (as defined in Section 20(a) below) or any plan or policy, including any clawback policy, in any case reasonably adopted by the Company from time to time, compensation paid to Executive shall be subject to clawback, forfeiture, recoupment or similar requirement.

5. <u>Termination</u> .

5.1 <u>Termination Upon Death</u> .  The Term (and Executive's employment) shall automatically terminate with immediate effect upon the death of Executive.

5.2 <u>Termination by Employer</u> .  Notwithstanding anything in this Agreement to the contrary, express or implied, the Term (and Executive's employment) may be terminated immediately by Employer (by delivery of written notice specifying that termination is made pursuant to this Section 5.2) as follows:

(a) Whenever Executive is not physically or mentally able (with reasonable accommodation) to perform the essential functions of Executive's job;

(b) For "Cause," which shall be defined as: (i) embezzlement, theft or misappropriation by the Executive of any property of any of the Related Companies; (ii) Executive's willful breach of any fiduciary duty to Employer; (iii) Executive's willful failure or refusal to comply with laws or regulations applicable to Employer and its business or the policies of Employer governing the conduct of its employees; (iv) commission by Executive of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) Executive's refusal to perform Executive's job duties or to perform reasonable specific directives of Executive's supervisor or his successor or designee and the Board of Directors of Employer; or (vi) any gross negligence or willful misconduct of

-2-

Executive resulting in a loss to Employer o r any other Related Company, or damage to the reputation of Employer or any other Related Company ; or

(c) Upon the occurrence of any material breach (not covered by any of clauses (i) through (viii) of Section 5.2(b) above) of any of the provisions of this Agreement, it being agreed that for all purposes under this Agreement any violation of any of the provisions of Sections 6, 7, 8, 10 or 11 shall be deemed to be a material breach of this Agreement.

5.3 <u>Termination by Employer without Cause</u> .   Employer may terminate the Term (and Executive's employment) by giving two weeks written notice to Executive.  A termination made pursuant to this Section 5.3 is a "termination Without Cause."  A termination made pursuant to Section 5.2 (and satisfying the notice requirement set forth therein) shall under no circumstance be considered a termination Without Cause.

5.4 <u>Rights and Obligations Upon Termination</u> .

(a) In the event of Employer's termination of the Term (and Executive's employment) pursuant to Section 5.3 (which, for the avoidance of doubt, is a termination Without Cause), Employer shall pay Executive:

(i) his Base Salary through the date of termination, paid within 5 days following the termination date (or earlier if required by law);

(ii) any annual bonus earned for any fiscal year completed before the date of termination that remains unpaid as of the date of termination, paid within 5 days following the termination date (or earlier if required by law); and

(iii) an amount (the "Severance Amount") equal to two (2) times the sum of (A) his Base Salary and (B) the median of the last three (3) annual bonuses paid to Executive (whether earned pursuant to this Agreement or otherwise and whether paid in cash, restricted stock units, stock options or otherwise) (the "Median Bonus"), fifty percent (50%) of which will be paid on the first business day following the 12-month anniversary of the date of termination and fifty percent (50%) of which will be paid in twelve installments equal to 1/24 th of the Severance Amount, the first payment of which will be made on the 29 th day following termination and the remaining eleven payments of which will be made on the first business day of each calendar month thereafter.

For the purpose of determining the Median Bonus, the value of (1) the portion of any annual bonus paid in the form of restricted stock or restricted stock units ("RSUs") shall be determined by multiplying the number of restricted shares or RSUs granted by the closing price of the restricted shares or stock underlying the RSUs on the grant date and (2) the portion of any annual bonus paid in the form of stock options or other equity (excluding restricted stock or RSUs) shall be determined using the methodology utilized by Employer for determining the cost of such stock option or other equity for financial reporting purposes, but without giving effect to the amortization of such stock option or other equity.  For the avoidance of doubt, the Median Bonus

-3-

shall not include any long-term incentive equity awards which would not be included in "Covered Compensation" under the Executive Supplemental Benefit Plan ( including any amendment, modification or successor thereto, the "SERP") . For the avoidance of doubt, "median" means, with respect to a set of three amounts, the middle amount and not the highest or the lowest amount, unless two of the amounts in the set are the same amount, in which case "median" means the amount which occurs twice in the set.

In exchange for Employer's agreement to pay the Severance Amount and as a condition thereto, Executive agrees to execute (within 21 days following the date of termination of employment), deliver and not revoke (within the time period permitted by applicable law) a general release of the Related Companies and their respective officers, directors, employees and owners from any and all claims, obligations and liabilities of any kind whatsoever, including all such claims arising from or in connection with Executive's employment or termination of employment with Employer or this Agreement (including, without limitation, civil rights claims), in such form as is reasonably requested by Employer.  Executive's right to receive the Severance Amount is conditioned upon the release described in the preceding sentence becoming irrevocable within the prescribed time period.  In addition, Executive's right to receive the Severance Amount shall immediately cease in the event that Executive violates any of the provisions of Sections 7 or 8.  Apart from the payments set forth in this Section 5.4(a) and the benefits to which Executive may be entitled under the Employment Arrangements (as defined below), upon such termination Employer shall have no further liability whatsoever to Executive.

(b)     In the event of the termination of the Term (and Executive's employment) pursuant to Sections 5.1 or 5.2 or, if Executive's employment does not continue on an at-will basis or pursuant to another agreement, upon the expiration of the Term, Employer shall be obligated to pay Executive (or, in the case of a termination under Section 5.1, Executive's heir or successor) the Base Salary through the date of termination and any annual bonus earned for any fiscal year completed before the date of termination, in each case, that remains unpaid as of the date of termination.  Apart from the payments set forth in this Section 5.4(b) and the benefits to which Executive may be entitled under the Employment Arrangements, upon such termination or expiration, as the case may be, Employer shall have no further liability whatsoever to Executive.

(c)     If (i) Executive's employment is terminated Without Cause by Employer prior to the expiration of the Term, (ii) as of the date of such termination Executive has not yet reached his "Early Retirement Date", as defined in the SERP and (iii) Executive would have reached his "Early Retirement Date" during the Term had his employment not been earlier terminated, Executive will be deemed to be vested in the SERP on the date he would have reached his "Early Retirement Date" and he will begin receiving payments under the SERP on such date as otherwise provided in, and otherwise subject to the provisions of, the SERP; provided , however , that in such circumstance Executive's "Final Average Compensation" (or equivalent) for purposes of the SERP shall be determined as of the date of the termination of his employment.

(d) If it becomes known that Executive's employment will terminate for any reason, Employer may, in its sole discretion and subject to its other obligations under this

-4-

Agreement, relieve Executive of his duties under this Agreement and assign Executive other reasonable duties and responsibilities to be performed until the termination becomes effective.

(e)   In the event that any payment or benefit received or to be received by Executive under this Agreement and all other arrangements or programs, including any acceleration of vesting of stock options, restricted stock, restricted stock units, deferred compensation, or long-term incentive awards (collectively, the "Payments"), would constitute an excess parachute payment within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), as determined in good faith by Employer's independent auditors, then the portion of the Payments that would be treated as parachute payments under Section 280G of the Code shall be reduced so that the Payments, in the aggregate, are reduced to the Safe Harbor Amount (as defined below).  For purposes of this Agreement, the term "Safe Harbor Amount" means the largest portion of the Payments that would result in no portion of the Payments being considered parachute payments under Section 280G of the Code.  In applying this principle, the reduction shall be made in a manner consistent with the requirements of Section 409A of the Code and where two economically equivalent amounts are subject to reduction but payable at different times, such amounts shall be reduced on a pro rata basis but not below zero.  In addition, with regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A of the Code, all such payments shall be made on or before the last day of calendar year following the calendar year in which the expense occurred.

(f)   A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service."  If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment or the provision of any benefit (whether under this Agreement or otherwise) that is considered deferred compensation under Section 409A of the Code payable on account of a "separation from service," and that is not exempt from Section 409A of the Code as involuntary separation pay or a short-term deferral (or otherwise), such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive or (ii) the date of Executive's death (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 5.4(f) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum without interest, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.  For purposes of Section 409A of the Code, each payment amount or benefit due under this Agreement will be considered a separate payment and Executive's entitlement to a series of payments or benefits under this Agreement is to be treated as an entitlement to a series of separate payments.

(g)   Upon termination of Executive's employment for any reason, Executive hereby resigns from any and all (i) positions with all Related Companies, whether as a

-5-

director, manager, general partner, officer or otherwise ; (ii) committee memberships, fiduciary capacities or similar positions with respect to employee benefit plans sponsored by any Related Compan y , and (iii) any other positions associated with any Related Company .

### 6. Restrictive Covenants

6.1 Access to Trade Secrets and Confidential Information . Executive acknowledges and agrees that in the performance of Executive's duties of employment Executive will be brought into frequent contact with existing and potential customers of Employer and the other Related Companies throughout the world.  Executive also agrees that trade secrets and confidential information of Employer and the other Related Companies gained by Executive during Executive's association with Employer and the other Related Companies have been developed by Employer and the other Related Companies through substantial expenditures of time, effort and money and constitute valuable and unique property of Employer and the other Related Companies, and Employer and/or the Related Companies will suffer substantial damage and irreparable harm which will be difficult to compute if, during the Term and thereafter, Executive should disclose or improperly use such confidential information and trade secrets in violation of the provisions of this Section 6.  Executive further understands and agrees that the foregoing makes it necessary for the protection of the businesses of Employer and the other Related Companies that Executive not compete with Employer or any other Related Company during his or her employment, as further provided in this Section 6.

6.2 Non-Compete and Non-Solicit .  While employed by Employer or any other Related Company, Executive will not, directly or indirectly, engage in or render any service of a business, commercial or professional nature to any other person, entity or organization, whether for compensation or otherwise, that is in competition with Employer or any other Related Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, Executive will not:

(a) enter into or engage in any business which competes with the business of Employer or any other Related Company;

(b) solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the business of Employer or any other Related Company;

(c) divert, entice, or take away any customers, business, patronage or orders of Employer or any other Related Company or attempt to do so; or

(d) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the business of Employer or any other Related Company.

6.3 Scope of Restricted Activities .  For the purposes of Section 6.2, but without limitation thereof, Executive will be in violation thereof if Executive engages in any or all of the activities set forth therein directly as an individual on Executive's own account, or indirectly as a stockholder, partner, joint venturer, executive, agent, salesperson, consultant,

-6-

officer and/or director of , or by virtue of the ownership by Executive ' s spouse, child or parent of any equity interest in, any firm, association, partnership, corporation or other entity engag ing in any or all of such activities ; provided, however, Executive 's or Executive ' s spouse 's , child 's or parent 's own er s hip of less than one percent (1%) of the issued equity interest in a ny publicly traded corporation shall not alone constitute a violation of this Agreement .

      6.4 Scope of Covenants.   Employer and Executive acknowledge that the time, scope, geographic area and other provisions of Sections 6 and 7 have been specifically negotiated by sophisticated commercial parties and agree that they consider the restrictions and covenants contained in such Sections to be reasonable and necessary for the protection of the interests of the Related Companies, but if any such restriction or covenant shall be held by any court of competent jurisdiction to be void but would be valid if deleted in part or reduced in application, such restriction or covenant shall apply with such deletion or modification as may be necessary to make it valid and enforceable.   The restrictions and covenants contained in each provision of such Sections shall be construed as separate and individual restrictions and covenants and shall each be capable of being severed without prejudice to the other restrictions and covenants or to the remaining provisions of this Agreement.

      7.  <u>No Solicitation of Employees</u> .   Executive will not directly or indirectly, at any time during the Term and the 12-month period after termination of Executive's employment, either for Executive or for any other person or entity, recruit or solicit for hire any employee, officer, director or other personnel of the Employer or any of the Related Companies, or to induce or encourage such a person or entity to terminate his, her or its relationship, or breach an agreement, with the Employer or one of the Related Companies.

      8.  <u>Nondisclosure of Confidential Information</u> .   Executive will keep in strict confidence, and will not, directly or indirectly, at any time during or after Executive's employment with Employer, disclose, furnish, disseminate, make available or, except in the course of performing Executive's duties of employment, use any trade secrets or confidential business and technical information of Employer, any other Related Company or any of its respective customers or vendors, without limitation as to when or how Executive may have acquired such information.  Such confidential information shall include, without limitation, Employer's and any other Related Company's unique selling and servicing methods and business techniques, business strategies, financial information, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, processes, inventions, patents, copyrights, trademarks and other intellectual property and intangible rights, and other business information. Executive specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Executive and whether compiled by Employer, any other Related Company and/or Executive, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by Employer or another Related Company, as the case may be, to maintain the secrecy of such information, that such information is the sole property of Employer or another Related Company and that any retention and use of such information or rights by Executive during his employment with Employer (except in the course of performing his duties and

<div align="center">-7-</div>

obligations hereunder) or after the termination of his employme n t shall constitute a misappropriation of Employer' s or another Related Company's trade secrets , rights or other property .

9.  Legally Authorized Disclosures. Pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (a) is made: (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Also pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.   In addition, nothing contained in this Agreement (i) limits Executive's right to communicate or cooperate with any federal, state or local governmental agency or commission ("Government Agencies") or (ii) bars Executive from responding to an order, regulation, rule or subpoena of a court or Government Agency.

10.  Return of Company Property .   Executive agrees that upon termination of Executive's employment with Employer, for any reason, Executive shall return to Employer, in good condition, all property of Employer and the other Related Companies, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in Section 8 of this Agreement.  In the event that such items are not so returned, Employer will have the right to charge Executive for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

11.  Representations and Warranties .   Executive hereby represents and warrants that he has the legal capacity to execute and perform this Agreement, that this Agreement is a valid and binding agreement enforceable against him according to its terms, and that the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding, written or oral, to which Executive is a party or any judgment or decree to which Executive is subject.  In addition, Executive represents and warrants that he knows of no reason why he is not physically or legally capable of performing his obligations under this Agreement in accordance with its terms.  Executive hereby indemnifies the Related Companies and shall hold harmless the Related Companies from and against all liability, loss, cost, or expense, including, without limitation, reasonable attorneys' fees and expenses, incurred by any Related Company by reason of the inaccuracy of Executive's representations and warranties contained in this Section 11.

12.  Survival .   Each of the agreements, representations, warranties and covenants set forth in Sections 4.5, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 21 of this Agreement shall survive and shall continue to be binding upon Employer and Executive notwithstanding the termination of Executive's employment or the expiration of the Term for any reason whatsoever.

-8 -

1 3 .  <u>Breach by Executive</u> .    Executive is obligated under this Agreement to render services of a special, unique, unusual, extraordinary, and intellectual character, which give this Agreement particular value.  The loss of these services cannot be reasonably or adequately compensated in damages in an action at law.  Accordingly, in addition to other remedies provided by law or this Agreement, Employer shall have the right during the Term and any period of non-competition governed by this Agreement, to seek injunctive relief against breach or threatened breach of this Agreement by Executive or the performance of services , or threatened performance of services, by Executive in violation of this Agreement, or both.    This Section is not meant to limit the damages the Employer may pursue and is not meant to be an exhaustive list of the relief available to the Employer.

14.  <u>Controlling Law</u> .    This Agreement shall be controlled, construed and enforced in accordance with the laws of the State of California, without regard to conflicts of laws principles.

15.  <u>Notices</u> .    Any notice to Employer required or permitted under this Agreement shall be given in writing to Employer, either by personal service or by registered or certified mail, postage prepaid, addressed to the Chief Executive Officer of Employer, or equivalent, with a copy to the Chief Financial Officer of Employer, at Employer's then principal place of business.  Any such notice to Executive shall be given in a like manner and, if mailed, shall be addressed to Executive at his home address then shown in Employer's files.  For the purpose of determining compliance with any time limit in this Agreement, a notice shall be deemed to have been duly given (a) on the date of service, if served personally on the party to whom notice is to be given, or (b) on the third business day after mailing, if mailed to the party to whom the notice is to be given in the manner provided by this Section.

16.  <u>Amendments</u> .    This Agreement may be amended only by written agreement of each of the parties to this Agreement.

17.  <u>Severability</u> .    If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated; <u>provided</u> that if Executive breaches Section 6 and if Section 6 is finally determined to be unenforceable, the payment obligations of Section 5.4(a)(iii) and Section 5.4(c) shall be deemed void <i>ab initio</i> .

18.  <u>Assignment</u> .    Executive shall not transfer or assign this Agreement or any part thereof.   Employer reserves the right to transfer or assign this Agreement to any organization associated with it or any successor organization; <u>provided</u> , <u>however</u> , that Employer may assign this Agreement to any Related Company the stock or other equity of which is distributed to the shareholders of Employer and which, at the time of such distribution, agrees to employ Executive and assume Employer's obligations under this Agreement.

19.  <u>Third-Party Beneficiaries</u> .    This Agreement shall not confer any rights or remedies upon any party other than Employer, the other Related Companies, Executive and their respective successors and permitted assigns.

20 . Integration .

(a) This Agreement; the SERP; any stock option, restricted stock, stock appreciation right or other equity compensation plan of Employer or any other Related Company (including, without limitation, the First American Financial Corporation 2010 Incentive Compensation Plan) and any award agreement entered into thereunder; any pension plan and pension restoration plan of Employer or any Related Company; any deferred compensation plan of Employer or any other Related Company; any other employee benefit plan of Employer or any other Related Company; any change-of-control or similar agreement to which Employer and/or any Related Party and Executive are parties; any Confidential Information and Inventions Agreement between Executive and Employer; and any amendment, restatement or successor to any of the foregoing (the foregoing, collectively, the "Employment Arrangements") contain the entire Agreement between the parties and supersedes all prior verbal and written agreements, understandings, commitments and practices between the parties. The benefits conferred upon Executive pursuant to this Agreement shall be in addition to the benefits provided for under the other Employment Arrangements; provided , however , that duplicative benefits shall not be payable pursuant to this Agreement and any other Employment Arrangement and, for the avoidance of doubt, none of the benefits provided in this Agreement shall be payable to the extent they are otherwise payable under the other Employment Arrangements.

(b) In the event (i) Executive is a party to an agreement with a Related Company providing for a severance benefit in the event Executive's employment terminates following a change-in-control (a "Change-in-Control Agreement"), (ii) Executive becomes entitled to such benefit and (iii) Executive becomes entitled to the Severance Amount under Section 5.4(a)(iii), then the severance benefit payable to Executive under the Change-in-Control Agreement shall offset any Severance Amount payable to Executive pursuant to Section 5.4(a)(iii).

21. Counterparts .   This Agreement may be executed in any number of counterparts, each of which when executed shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

[SIGNATURES ON NEXT PAGE]

-10 -

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement effective as of the day and year first above written.

"EXECUTIVE"                              "EMPLOYER"

/s/ Kenneth D. DeGiorgio                  /s/ Dennis J. Gilmore
Name: Kenneth D. DeGiorgio                Name: Dennis J. Gilmore
Date: February 19, 2019                   Title: Chief Executive Officer
                                          Date: February 19, 2019


Signature Page to
Employment Agreement

**Exhibit 10.9**

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") dated as of February 19, 2019 is made and entered into by and between Christopher M. Leavell ("Executive") and First American Financial Corporation ("Employer").  In consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

1.  Employment of Executive .  Subject to the terms and conditions of this Agreement, Employer hereby employs Executive, and Executive hereby accepts employment, as Executive Vice President, Chief Operating Officer of First American Title Insurance Company, a wholly owned subsidiary of Employer.  Executive shall devote Executive's entire productive time, effort and attention to the business of Employer during the Term (as defined below).  Executive will use his best efforts at all times to promote and protect the good name of Employer and Employer's current and future subsidiaries, affiliates and other related companies (together with Employer, each a "Related Company" and, collectively the "Related Companies") as well as that of their respective officers, directors, employees, agents, products and services.  Executive shall not directly or indirectly render any service of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of Employer.

2.  Duties To Be Performed .  Executive shall perform the duties and have the responsibilities customarily performed and held by a person in a position similar to that set forth in Section 1.  Executive shall also perform such other duties as directed by Employer's Board of Directors and the Chief Executive Officer of Employer or his designee.  Any modification made by Employer's Board of Directors to the duties of Executive shall not constitute a breach of this Agreement.

3.  Term of Agreement .  This Agreement shall become effective on the date of this Agreement and, unless earlier terminated pursuant to the provisions of the Agreement, shall continue through the close of business on December 31, 2021 (the "Term").  Unless continued on an "at-will" basis by Employer or any other Related Company or pursuant to another agreement, Executive's employment shall terminate upon the termination of this Agreement for any reason.

4.  Compensation .  In full payment for Executive's services, Employer shall provide to Executive compensation and benefits determined in accordance with this Section 4.

4.1  Salary.   During the Term, Employer shall pay Executive a base annual salary (the "Base Salary"), before deducting all applicable withholdings, of $725,000 per year, payable at the times and in the manner dictated by Employer's standard payroll policies, which Base Salary may be increased in the sole and unfettered discretion of the Compensation Committee of the Board of Directors of Employer (the "Compensation Committee") or the Board of Directors of Employer. The Base Salary shall be prorated for any partial pay period that occurs during the Term.

4 .2 <u>Performance Bonus ; Long-Term Incentive Equity Awards</u> .    During the Term, in addition to the Base Salary, Employer may, in the sole and unfettered discretion of the Compensation Committee , pay to Executive an annual bonus and long-term incentive equity award .

4.3 <u>Benefits</u> .  Executive shall, subject to the terms and conditions of any applicable benefits plan documents and applicable law, be entitled to receive all benefits of employment generally available to other similarly situated executives of Employer when and as he becomes eligible for them, including medical, dental, life and disability insurance benefits.  Employer reserves the right to modify, suspend or discontinue any and all of the above benefit plans, policies, and practices at any time without notice to or recourse by Executive, so long as such action is taken generally with respect to other similarly situated executives of Employer and does not single out Executive.

4.4 <u>Taxes and Withholdings</u> .  Employer may deduct from all compensation payable under this Agreement to Executive any taxes or withholdings Employer is required to deduct pursuant to state and federal laws or by mutual agreement between the parties.  Executive is solely liable for any and all taxes beyond those specifically withheld by Employer.

4.5 <u>Recoupment</u> .   Executive acknowledges and agrees that to the extent provided by any Employment Arrangement (as defined in Section 20(a) below) or any plan or policy, including any clawback policy, in any case reasonably adopted by the Company from time to time, compensation paid to Executive shall be subject to clawback, forfeiture, recoupment or similar requirement.

5. <u>Termination</u> .

5.1 <u>Termination Upon Death</u> .  The Term (and Executive's employment) shall automatically terminate with immediate effect upon the death of Executive.

5.2 <u>Termination by Employer</u> .  Notwithstanding anything in this Agreement to the contrary, express or implied, the Term (and Executive's employment) may be terminated immediately by Employer (by delivery of written notice specifying that termination is made pursuant to this Section 5.2) as follows:

(a)    Whenever Executive is not physically or mentally able (with reasonable accommodation) to perform the essential functions of Executive's job;

(b)    For "Cause," which shall be defined as: (i) embezzlement, theft or misappropriation by the Executive of any property of any of the Related Companies; (ii) Executive's willful breach of any fiduciary duty to Employer; (iii) Executive's willful failure or refusal to comply with laws or regulations applicable to Employer and its business or the policies of Employer governing the conduct of its employees; (iv) commission by Executive of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) Executive's refusal to perform Executive's job duties or to perform reasonable specific

-2-

directives of Executive's supervisor or his successor or designee and the Board of Directors of Employer; or (v i ) any gross negligence or willful mis conduct of Executive resulting in a loss to Employer or any other Related Company, or damage to the reputation of Employer or any other Related Company ; or

(c) Upon the occurrence of any material breach (not covered by any of clauses (i) through (viii) of Section 5.2(b) above) of any of the provisions of this Agreement, it being agreed that for all purposes under this Agreement any violation of any of the provisions of Sections 6, 7, 8, 10 or 11 shall be deemed to be a material breach of this Agreement.

5.3   <u>Termination by Employer without Cause</u> .   Employer may terminate the Term (and Executive's employment) by giving two weeks written notice to Executive.  A termination made pursuant to this Section 5.3 is a "termination Without Cause."  A termination made pursuant to Section 5.2 (and satisfying the notice requirement set forth therein) shall under no circumstance be considered a termination Without Cause.

5.4  <u>Rights and Obligations Upon Termination</u> .

(a)   In the event of Employer's termination of the Term (and Executive's employment) pursuant to Section 5.3 (which, for the avoidance of doubt, is a termination Without Cause), Employer shall pay Executive:

(i)   his Base Salary through the date of termination, paid within 5 days following the termination date (or earlier if required by law);

(ii)   any annual bonus earned for any fiscal year completed before the date of termination that remains unpaid as of the date of termination, paid within 5 days following the termination date (or earlier if required by law); and

(iii)   an amount (the "Severance Amount") equal to two (2) times the sum of (A) his Base Salary and (B) the median of the last three (3) annual bonuses paid to Executive (whether earned pursuant to this Agreement or otherwise and whether paid in cash, restricted stock units, stock options or otherwise) (the "Median Bonus"), fifty percent (50%) of which will be paid on the first business day following the 12-month anniversary of the date of termination and fifty percent (50%) of which will be paid in twelve installments equal to 1/24 th of the Severance Amount, the first payment of which will be made on the 29 th day following termination and the remaining eleven payments of which will be made on the first business day of each calendar month thereafter.

For the purpose of determining the Median Bonus, the value of (1) the portion of any annual bonus paid in the form of restricted stock or restricted stock units ("RSUs") shall be determined by multiplying the number of restricted shares or RSUs granted by the closing price of the restricted shares or stock underlying the RSUs on the grant date and (2) the portion of any annual bonus paid in the form of stock options or other equity (excluding restricted stock or RSUs) shall be determined using the methodology utilized by Employer for determining the cost of such

-3-

stock option or other equity for financial reporting purposes, but without giving effect to the amortization of such stock option or other equity .  For the avoidance of doubt, t he Median Bonus shall not include any long-term incentive equity awards which would not be included in "Covered Compensation" under the Executive Supplemental Benefit Plan ( including any amendment, modification or successor thereto, the "SERP") . For the avoidance of doubt, "median" means, with respect to a set of three amounts, the middle amount and not the highest or the lowest amount, unless two of the amounts in the set are the same amount, in which case "median" means the amount which occurs twice in the set.

In exchange for Employer's agreement to pay the Severance Amount and as a condition thereto, Executive agrees to execute (within 21 days following the date of termination of employment), deliver and not revoke (within the time period permitted by applicable law) a general release of the Related Companies and their respective officers, directors, employees and owners from any and all claims, obligations and liabilities of any kind whatsoever, including all such claims arising from or in connection with Executive's employment or termination of employment with Employer or this Agreement (including, without limitation, civil rights claims), in such form as is reasonably requested by Employer.  Executive's right to receive the Severance Amount is conditioned upon the release described in the preceding sentence becoming irrevocable within the prescribed time period.  In addition, Executive's right to receive the Severance Amount shall immediately cease in the event that Executive violates any of the provisions of Sections 7 or 8.  Apart from the payments set forth in this Section 5.4(a) and the benefits to which Executive may be entitled under the Employment Arrangements (as defined below), upon such termination Employer shall have no further liability whatsoever to Executive.

(b)      In the event of the termination of the Term (and Executive's employment) pursuant to Sections 5.1 or 5.2 or, if Executive's employment does not continue on an at-will basis or pursuant to another agreement, upon the expiration of the Term, Employer shall be obligated to pay Executive (or, in the case of a termination under Section 5.1, Executive's heir or successor) the Base Salary through the date of termination and any annual bonus earned for any fiscal year completed before the date of termination, in each case, that remains unpaid as of the date of termination.  Apart from the payments set forth in this Section 5.4(b) and the benefits to which Executive may be entitled under the Employment Arrangements, upon such termination or expiration, as the case may be, Employer shall have no further liability whatsoever to Executive.

(c)      If (i) Executive's employment is terminated Without Cause by Employer prior to the expiration of the Term, (ii) as of the date of such termination Executive has not yet reached his "Early Retirement Date", as defined in the SERP and (iii) Executive would have reached his "Early Retirement Date" during the Term had his employment not been earlier terminated, Executive will be deemed to be vested in the SERP on the date he would have reached his "Early Retirement Date" and he will begin receiving payments under the SERP on such date as otherwise provided in, and otherwise subject to the provisions of, the SERP; provided , however , that in such circumstance Executive's "Final Average Compensation" (or equivalent) for purposes of the SERP shall be determined as of the date of the termination of his employment.

-4 -

(d ) If it becomes known that Executive's employment will terminate for any reason , Employer may, in its sole discretion and subject to its other obligations under this Agreement, relieve Executive of his duties under this Agreement and assign Executive other reasonable duties and responsibilities to be performed until the termination becomes effective.

(e) In the event that any payment or benefit received or to be received by Executive under this Agreement and all other arrangements or programs, including any acceleration of vesting of stock options, restricted stock, restricted stock units, deferred compensation, or long-term incentive awards (collectively, the "Payments"), would constitute an excess parachute payment within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), as determined in good faith by Employer's independent auditors, then the portion of the Payments that would be treated as parachute payments under Section 280G of the Code shall be reduced so that the Payments, in the aggregate, are reduced to the Safe Harbor Amount (as defined below).  For purposes of this Agreement, the term "Safe Harbor Amount" means the largest portion of the Payments that would result in no portion of the Payments being considered parachute payments under Section 280G of the Code.  In applying this principle, the reduction shall be made in a manner consistent with the requirements of Section 409A of the Code and where two economically equivalent amounts are subject to reduction but payable at different times, such amounts shall be reduced on a pro rata basis but not below zero.  In addition, with regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A of the Code, all such payments shall be made on or before the last day of calendar year following the calendar year in which the expense occurred.

(f) A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service."  If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment or the provision of any benefit (whether under this Agreement or otherwise) that is considered deferred compensation under Section 409A of the Code payable on account of a "separation from service," and that is not exempt from Section 409A of the Code as involuntary separation pay or a short-term deferral (or otherwise), such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive or (ii) the date of Executive's death (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 5.4(f) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum without interest, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.  For purposes of Section 409A of the Code, each payment amount or benefit due under this Agreement will be considered a separate payment and Executive's entitlement to a series of payments or benefits under this Agreement is to be treated as an entitlement to a series of separate payments.

-5 -

(g)       Upon termination of Executive's employment for any reason, Executive hereby resigns from any and all (i) positions with all Related Companies, whether as a director, manager, general partner, officer or otherwise ; (ii) committee memberships, fiduciary capacities or similar positions with respect to employee benefit plans sponsored by any Related Compan y , and (iii) any other positions associated with any Related Company .

6. Restrictive Covenants

6.1 Access to Trade Secrets and Confidential Information .   Executive acknowledges and agrees that in the performance of Executive's duties of employment Executive will be brought into frequent contact with existing and potential customers of Employer and the other Related Companies throughout the world.   Executive also agrees that trade secrets and confidential information of Employer and the other Related Companies gained by Executive during Executive's association with Employer and the other Related Companies have been developed by Employer and the other Related Companies through substantial expenditures of time, effort and money and constitute valuable and unique property of Employer and the other Related Companies, and Employer and/or the Related Companies will suffer substantial damage and irreparable harm which will be difficult to compute if, during the Term and thereafter, Executive should disclose or improperly use such confidential information and trade secrets in violation of the provisions of this Section 6.  Executive further understands and agrees that the foregoing makes it necessary for the protection of the businesses of Employer and the other Related Companies that Executive not compete with Employer or any other Related Company during his or her employment, as further provided in this Section 6.

6.2 Non-Compete and Non-Solicit .   While employed by Employer or any other Related Company, Executive will not, directly or indirectly, engage in or render any service of a business, commercial or professional nature to any other person, entity or organization, whether for compensation or otherwise, that is in competition with Employer or any other Related Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, Executive will not:

(a)  enter into or engage in any business which competes with the business of Employer or any other Related Company;

(b)  solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the business of Employer or any other Related Company;

(c)  divert, entice, or take away any customers, business, patronage or orders of Employer or any other Related Company or attempt to do so; or

(d)  promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the business of Employer or any other Related Company.

6.3 Scope of Restricted Activities .   For the purposes of Section 6.2, but without limitation thereof, Executive will be in violation thereof if Executive engages in any or

-6-

all of the activities set forth therein directly as an individual on Executive ' s own account, or indirectly as a stockholder, partner, joint venturer, e xecutive , agent, salesperson, consultant, officer and/or director of , by virtue of the ownership by Executive ' s spouse, child or parent of any equity interest in, any firm, association, partnership, corporation or other entity engag ing in any or all of such activities ; provided, however, Executive 's or Executive ' s spouse 's , child 's or parent 's own er s hip of less than one percent (1%) of the issued equity interest in a ny publicly traded corporation shall not alone constitute a violation of this Agreement .

6.4 Scope of Covenants.  Employer and Executive acknowledge that the time, scope, geographic area and other provisions of Sections 6 and 7 have been specifically negotiated by sophisticated commercial parties and agree that they consider the restrictions and covenants contained in such Sections to be reasonable and necessary for the protection of the interests of the Related Companies, but if any such restriction or covenant shall be held by any court of competent jurisdiction to be void but would be valid if deleted in part or reduced in application, such restriction or covenant shall apply with such deletion or modification as may be necessary to make it valid and enforceable.  The restrictions and covenants contained in each provision of such Sections shall be construed as separate and individual restrictions and covenants and shall each be capable of being severed without prejudice to the other restrictions and covenants or to the remaining provisions of this Agreement.

7. <u>No Solicitation of Employees</u> .  Executive will not directly or indirectly, at any time during the Term and the 12-month period after termination of Executive's employment, either for Executive or for any other person or entity, recruit or solicit for hire any employee, officer, director or other personnel of the Employer or any of the Related Companies, or to induce or encourage such a person or entity to terminate his, her or its relationship, or breach an agreement, with the Employer or one of the Related Companies.

8. <u>Nondisclosure of Confidential Information</u>  .  Executive will keep in strict confidence, and will not, directly or indirectly, at any time during or after Executive's employment with Employer, disclose, furnish, disseminate, make available or, except in the course of performing Executive's duties of employment, use any trade secrets or confidential business and technical information of Employer, any other Related Company or any of its respective customers or vendors, without limitation as to when or how Executive may have acquired such information.  Such confidential information shall include, without limitation, Employer's and any other Related Company's unique selling and servicing methods and business techniques, business strategies, financial information, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, processes, inventions, patents, copyrights, trademarks and other intellectual property and intangible rights, and other business information.  Executive specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Executive and whether compiled by Employer, any other Related Company and/or Executive, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by Employer or another Related Company, as the case may be, to maintain the secrecy of such information, that such information is the sole property of Employer or another

-7-

Related Company and that any retention and use of such information or rights by Executive during his employment with Employer (except in the course of performing his duties and obligations hereunder) or after the termination of his employme n t shall constitute a misappropriation of Employer' s or another Related Company's trade secrets , rights or other property .

        9.  <u>Legally Authorized Disclosures.</u> Pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (a) is made: (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Also pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.  In addition, nothing contained in this Agreement (i) limits Executive's right to communicate or cooperate with any federal, state or local governmental agency or commission ("Government Agencies") or (ii) bars Executive from responding to an order, regulation, rule or subpoena of a court or Government Agency.

        10. <u>Return of Company Property</u> .  Executive agrees that upon termination of Executive's employment with Employer, for any reason, Executive shall return to Employer, in good condition, all property of Employer and the other Related Companies, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in Section 8 of this Agreement.  In the event that such items are not so returned, Employer will have the right to charge Executive for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

        11. <u>Representations and Warranties</u> .  Executive hereby represents and warrants that he has the legal capacity to execute and perform this Agreement, that this Agreement is a valid and binding agreement enforceable against him according to its terms, and that the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding, written or oral, to which Executive is a party or any judgment or decree to which Executive is subject.  In addition, Executive represents and warrants that he knows of no reason why he is not physically or legally capable of performing his obligations under this Agreement in accordance with its terms.  Executive hereby indemnifies the Related Companies and shall hold harmless the Related Companies from and against all liability, loss, cost, or expense, including, without limitation, reasonable attorneys' fees and expenses, incurred by any Related Company by reason of the inaccuracy of Executive's representations and warranties contained in this Section 11.

        12. <u>Survival</u> .  Each of the agreements, representations, warranties and covenants set forth in Sections 4.5, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 21 of this Agreement shall survive and shall continue to be binding upon Employer and Executive

<center>-8-</center>

notwithstanding the termination of Executive's employment or the expiration of the Term for any reason whatsoever.

13. <u>Breach by Executive</u> .   Executive is obligated under this Agreement to render services of a special, unique, unusual, extraordinary, and intellectual character, which give this Agreement particular value.  The loss of these services cannot be reasonably or adequately compensated in damages in an action at law.  Accordingly, in addition to other remedies provided by law or this Agreement, Employer shall have the right during the Term and any period of non-competition governed by this Agreement, to seek injunctive relief against breach or threatened breach of this Agreement by Executive or the performance of services, or threatened performance of services, by Executive in violation of this Agreement, or both.  This Section is not meant to limit the damages the Employer may pursue and is not meant to be an exhaustive list of the relief available to the Employer.

14. <u>Controlling Law</u> .   This Agreement shall be controlled, construed and enforced in accordance with the laws of the State of California, without regard to conflicts of laws principles.

15. <u>Notices</u> .   Any notice to Employer required or permitted under this Agreement shall be given in writing to Employer, either by personal service or by registered or certified mail, postage prepaid, addressed to the Chief Executive Officer of Employer, or equivalent, with a copy to the General Counsel of Employer, at Employer's then principal place of business.  Any such notice to Executive shall be given in a like manner and, if mailed, shall be addressed to Executive at his home address then shown in Employer's files.  For the purpose of determining compliance with any time limit in this Agreement, a notice shall be deemed to have been duly given (a) on the date of service, if served personally on the party to whom notice is to be given, or (b) on the third business day after mailing, if mailed to the party to whom the notice is to be given in the manner provided by this Section.

16. <u>Amendments</u> .   This Agreement may be amended only by written agreement of each of the parties to this Agreement.

17. <u>Severability</u> .   If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated; <u>provided</u> that if Executive breaches Section 6 and if Section 6 is finally determined to be unenforceable, the payment obligations of Section 5.4(a)(iii) and Section 5.4(c) shall be deemed void *ab initio* .

18. <u>Assignment</u> .   Executive shall not transfer or assign this Agreement or any part thereof.  Employer reserves the right to transfer or assign this Agreement to any organization associated with it or any successor organization; <u>provided</u> , that Employer may assign this Agreement to any Related Company the stock or other equity of which is distributed to the shareholders of Employer and which, at the time of such distribution, agrees to employ Executive and assume Employer's obligations under this Agreement.

1 9 .  <u>Third-Party Beneficiaries</u> .   This Agreement shall not confer any rights or remedies upon any party other than Employer , the other Related Companies , Executive and their respective successors and permitted assigns.

20. <u>Integration</u> .

(a)  This Agreement; the SERP; any stock option, restricted stock, stock appreciation right or other equity compensation plan of Employer or any other Related Company (including, without limitation, the First American Financial Corporation 2010 Incentive Compensation Plan) and any award agreement entered into thereunder; any pension plan and pension restoration plan of Employer or any Related Company; any deferred compensation plan of Employer or any other Related Company; any other employee benefit plan of Employer or any other Related Company; any change-of-control or similar agreement to which Employer and/or any Related Party and Executive are parties; any Confidential Information and Inventions Agreement between Executive and Employer; and any amendment, restatement or successor to any of the foregoing (the foregoing, collectively, the "Employment Arrangements") contain the entire Agreement between the parties and supersedes all prior verbal and written agreements, understandings, commitments and practices between the parties. The benefits conferred upon Executive pursuant to this Agreement shall be in addition to the benefits provided for under the other Employment Arrangements; <u>provided</u> , <u>however</u> , that duplicative benefits shall not be payable pursuant to this Agreement and any other Employment Arrangement and, for the avoidance of doubt, none of the benefits provided in this Agreement shall be payable to the extent they are otherwise payable under the other Employment Arrangements.

(b)  In the event (i) Executive is a party to an agreement with a Related Company providing for a severance benefit in the event Executive's employment terminates following a change-in-control (a "Change-in-Control Agreement"), (ii) Executive becomes entitled to such benefit and (iii) Executive becomes entitled to the Severance Amount under Section 5.4(a)(iii), then the severance benefit payable to Executive under the Change-in-Control Agreement shall offset any Severance Amount payable to Executive pursuant to Section 5.4(a)(iii).

21.  <u>Counterparts</u> .   This Agreement may be executed in any number of counterparts, each of which when executed shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

[SIGNATURES ON NEXT PAGE]

-10 -

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement effective as of the day and year first above written.

"EXECUTIVE"                              "EMPLOYER"

/s/ Christopher M. Leavell              /s/ Dennis J. Gilmore
Name: Christopher M. Leavell           Name: Dennis J. Gilmore
Date: February 19, 2019                 Title: Chief Executive Officer
                                        Date: February 19, 2019

Signature Page to
Employment Agreement

**Exhibit 10.10**

### EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") dated as of February 19, 2019 is made and entered into by and between Mark E. Seaton ("Executive") and First American Financial Corporation ("Employer").  In consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

1.  Employment of Executive .  Subject to the terms and conditions of this Agreement, Employer hereby employs Executive, and Executive hereby accepts employment, as Executive Vice President, Chief Financial Officer.  Executive shall devote Executive's entire productive time, effort and attention to the business of Employer during the Term (as defined below).  Executive will use his best efforts at all times to promote and protect the good name of Employer and Employer's current and future subsidiaries, affiliates and other related companies (together with Employer, each a "Related Company" and, collectively the "Related Companies") as well as that of their respective officers, directors, employees, agents, products and services.  Executive shall not directly or indirectly render any service of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of Employer.

2.  Duties To Be Performed .  Executive shall perform the duties and have the responsibilities customarily performed and held by a person in a position similar to that set forth in Section 1.  Executive shall also perform such other duties as directed by Employer's Board of Directors and the Chief Executive Officer of Employer or his designee.  Any modification made by Employer's Board of Directors to the duties of Executive shall not constitute a breach of this Agreement.

3.  Term of Agreement .  This Agreement shall become effective on the date of this Agreement and, unless earlier terminated pursuant to the provisions of the Agreement, shall continue through the close of business on December 31, 2021 (the "Term").  Unless continued on an "at-will" basis by Employer or any other Related Company or pursuant to another agreement, Executive's employment shall terminate upon the termination of this Agreement for any reason.

4.  Compensation .  In full payment for Executive's services, Employer shall provide to Executive compensation and benefits determined in accordance with this Section 4.

4.1  Salary.   During the Term, Employer shall pay Executive a base annual salary (the "Base Salary"), before deducting all applicable withholdings, of $650,000 per year, payable at the times and in the manner dictated by Employer's standard payroll policies, which Base Salary may be increased in the sole and unfettered discretion of the Compensation Committee of the Board of Directors of Employer (the "Compensation Committee") or the Board of Directors of Employer. The Base Salary shall be prorated for any partial pay period that occurs during the Term.

4.2  Performance Bonus; Long-Term Incentive Equity Awards .  During the Term, in addition to the Base Salary, Employer may, in the sole and unfettered discretion of

the Compensation Committee , pay to Executive an annual bonus and long-term incentive equity award .

    4.3  <u>Benefits</u> .  Executive shall, subject to the terms and conditions of any applicable benefits plan documents and applicable law, be entitled to receive all benefits of employment generally available to other similarly situated executives of Employer when and as he becomes eligible for them, including medical, dental, life and disability insurance benefits.  Employer reserves the right to modify, suspend or discontinue any and all of the above benefit plans, policies, and practices at any time without notice to or recourse by Executive, so long as such action is taken generally with respect to other similarly situated executives of Employer and does not single out Executive.

    4.4  <u>Taxes and Withholdings</u> .  Employer may deduct from all compensation payable under this Agreement to Executive any taxes or withholdings Employer is required to deduct pursuant to state and federal laws or by mutual agreement between the parties.  Executive is solely liable for any and all taxes beyond those specifically withheld by Employer.

    4.5  <u>Recoupment</u> .  Executive acknowledges and agrees that to the extent provided by any Employment Arrangement (as defined in Section 20(a) below) or any plan or policy, including any clawback policy, in any case reasonably adopted by the Company from time to time, compensation paid to Executive shall be subject to clawback, forfeiture, recoupment or similar requirement.

    5.  <u>Termination</u> .

    5.1  <u>Termination Upon Death</u> .  The Term (and Executive's employment) shall automatically terminate with immediate effect upon the death of Executive.

    5.2  <u>Termination by Employer</u> .  Notwithstanding anything in this Agreement to the contrary, express or implied, the Term (and Executive's employment) may be terminated immediately by Employer (by delivery of written notice specifying that termination is made pursuant to this Section 5.2) as follows:

    (a)    Whenever Executive is not physically or mentally able (with reasonable accommodation) to perform the essential functions of Executive's job;

    (b)    For "Cause," which shall be defined as: (i) embezzlement, theft or misappropriation by the Executive of any property of any of the Related Companies; (ii) Executive's willful breach of any fiduciary duty to Employer; (iii) Executive's willful failure or refusal to comply with laws or regulations applicable to Employer and its business or the policies of Employer governing the conduct of its employees; (iv) commission by Executive of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) Executive's refusal to perform Executive's job duties or to perform reasonable specific directives of Executive's supervisor or his successor or designee and the Board of Directors of Employer; or (vi) any gross negligence or willful misconduct of

Executive resulting in a loss to Employer o r any other Related Company, or damage to the reputation of Employer or any other Related Company ; or

(c) Upon the occurrence of any material breach (not covered by any of clauses (i) through (viii) of Section 5.2(b) above) of any of the provisions of this Agreement, it being agreed that for all purposes under this Agreement any violation of any of the provisions of Sections 6, 7, 8, 10 or 11 shall be deemed to be a material breach of this Agreement.

5.3 <u>Termination by Employer without Cause</u> .   Employer may terminate the Term (and Executive's employment) by giving two weeks written notice to Executive.  A termination made pursuant to this Section 5.3 is a "termination Without Cause."  A termination made pursuant to Section 5.2 (and satisfying the notice requirement set forth therein) shall under no circumstance be considered a termination Without Cause.

5.4 <u>Rights and Obligations Upon Termination</u> .

(a)   In the event of Employer's termination of the Term (and Executive's employment) pursuant to Section 5.3 (which, for the avoidance of doubt, is a termination Without Cause), Employer shall pay Executive:

(i)   his Base Salary through the date of termination, paid within 5 days following the termination date (or earlier if required by law);

(ii)   any annual bonus earned for any fiscal year completed before the date of termination that remains unpaid as of the date of termination, paid within 5 days following the termination date (or earlier if required by law); and

(iii)   an amount (the "Severance Amount") equal to two (2) times the sum of (A) his Base Salary and (B) the median of the last three (3) annual bonuses paid to Executive (whether earned pursuant to this Agreement or otherwise and whether paid in cash, restricted stock units, stock options or otherwise) (the "Median Bonus"), fifty percent (50%) of which will be paid on the first business day following the 12-month anniversary of the date of termination and fifty percent (50%) of which will be paid in twelve installments equal to 1/24 th of the Severance Amount, the first payment of which will be made on the 29 th day following termination and the remaining eleven payments of which will be made on the first business day of each calendar month thereafter.

For the purpose of determining the Median Bonus, the value of (1) the portion of any annual bonus paid in the form of restricted stock or restricted stock units ("RSUs") shall be determined by multiplying the number of restricted shares or RSUs granted by the closing price of the restricted shares or stock underlying the RSUs on the grant date and (2) the portion of any annual bonus paid in the form of stock options or other equity (excluding restricted stock or RSUs) shall be determined using the methodology utilized by Employer for determining the cost of such stock option or other equity for financial reporting purposes, but without giving effect to the amortization of such stock option or other equity.  For the avoidance of doubt, the Median Bonus

-3-

shall not include any long-term incentive equity awards which would not be included in "Covered Compensation" under the Executive Supplemental Benefit Plan ( including any amendment, modification or successor thereto, the "SERP") . For the avoidance of doubt, "median" means, with respect to a set of three amounts, the middle amount and not the highest or the lowest amount, unless two of the amounts in the set are the same amount, in which case "median" means the amount which occurs twice in the set.

In exchange for Employer's agreement to pay the Severance Amount and as a condition thereto, Executive agrees to execute (within 21 days following the date of termination of employment), deliver and not revoke (within the time period permitted by applicable law) a general release of the Related Companies and their respective officers, directors, employees and owners from any and all claims, obligations and liabilities of any kind whatsoever, including all such claims arising from or in connection with Executive's employment or termination of employment with Employer or this Agreement (including, without limitation, civil rights claims), in such form as is reasonably requested by Employer.  Executive's right to receive the Severance Amount is conditioned upon the release described in the preceding sentence becoming irrevocable within the prescribed time period.  In addition, Executive's right to receive the Severance Amount shall immediately cease in the event that Executive violates any of the provisions of Sections 7 or 8.  Apart from the payments set forth in this Section 5.4(a) and the benefits to which Executive may be entitled under the Employment Arrangements (as defined below), upon such termination Employer shall have no further liability whatsoever to Executive.

(b)        In the event of the termination of the Term (and Executive's employment) pursuant to Sections 5.1 or 5.2 or, if Executive's employment does not continue on an at-will basis or pursuant to another agreement, upon the expiration of the Term, Employer shall be obligated to pay Executive (or, in the case of a termination under Section 5.1, Executive's heir or successor) the Base Salary through the date of termination and any annual bonus earned for any fiscal year completed before the date of termination, in each case, that remains unpaid as of the date of termination.  Apart from the payments set forth in this Section 5.4(b) and the benefits to which Executive may be entitled under the Employment Arrangements, upon such termination or expiration, as the case may be, Employer shall have no further liability whatsoever to Executive.

(c)        If (i) Executive's employment is terminated Without Cause by Employer prior to the expiration of the Term, (ii) as of the date of such termination Executive has not yet reached his "Early Retirement Date", as defined in the SERP and (iii) Executive would have reached his "Early Retirement Date" during the Term had his employment not been earlier terminated, Executive will be deemed to be vested in the SERP on the date he would have reached his "Early Retirement Date" and he will begin receiving payments under the SERP on such date as otherwise provided in, and otherwise subject to the provisions of, the SERP; provided , however , that in such circumstance Executive's "Final Average Compensation" (or equivalent) for purposes of the SERP shall be determined as of the date of the termination of his employment.

(d) If it becomes known that Executive's employment will terminate for any reason, Employer may, in its sole discretion and subject to its other obligations under this

-4-

Agreement, relieve Executive of his duties under this Agreement and assign Executive other reasonable duties and responsibilities to be performed until the termination becomes effective.

(e) In the event that any payment or benefit received or to be received by Executive under this Agreement and all other arrangements or programs, including any acceleration of vesting of stock options, restricted stock, restricted stock units, deferred compensation, or long-term incentive awards (collectively, the "Payments"), would constitute an excess parachute payment within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), as determined in good faith by Employer's independent auditors, then the portion of the Payments that would be treated as parachute payments under Section 280G of the Code shall be reduced so that the Payments, in the aggregate, are reduced to the Safe Harbor Amount (as defined below). For purposes of this Agreement, the term "Safe Harbor Amount" means the largest portion of the Payments that would result in no portion of the Payments being considered parachute payments under Section 280G of the Code. In applying this principle, the reduction shall be made in a manner consistent with the requirements of Section 409A of the Code and where two economically equivalent amounts are subject to reduction but payable at different times, such amounts shall be reduced on a pro rata basis but not below zero. In addition, with regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A of the Code, all such payments shall be made on or before the last day of calendar year following the calendar year in which the expense occurred.

(f) A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment or the provision of any benefit (whether under this Agreement or otherwise) that is considered deferred compensation under Section 409A of the Code payable on account of a "separation from service," and that is not exempt from Section 409A of the Code as involuntary separation pay or a short-term deferral (or otherwise), such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive or (ii) the date of Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 5.4(f) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum without interest, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. For purposes of Section 409A of the Code, each payment amount or benefit due under this Agreement will be considered a separate payment and Executive's entitlement to a series of payments or benefits under this Agreement is to be treated as an entitlement to a series of separate payments.

(g) Upon termination of Executive's employment for any reason, Executive hereby resigns from any and all (i) positions with all Related Companies, whether as a

-5-

director, manager, general partner, officer or otherwise ; (ii) committee memberships, fiduciary capacities or similar positions with respect to employee benefit plans sponsored by any Related Compan y , and (iii) any other positions associated with any Related Company .

### 6. Restrictive Covenants

6.1 <u>Access to Trade Secrets and Confidential Information</u> .   Executive acknowledges and agrees that in the performance of Executive's duties of employment Executive will be brought into frequent contact with existing and potential customers of Employer and the other Related Companies throughout the world.   Executive also agrees that trade secrets and confidential information of Employer and the other Related Companies gained by Executive during Executive's association with Employer and the other Related Companies have been developed by Employer and the other Related Companies through substantial expenditures of time, effort and money and constitute valuable and unique property of Employer and the other Related Companies, and Employer and/or the Related Companies will suffer substantial damage and irreparable harm which will be difficult to compute if, during the Term and thereafter, Executive should disclose or improperly use such confidential information and trade secrets in violation of the provisions of this Section 6.   Executive further understands and agrees that the foregoing makes it necessary for the protection of the businesses of Employer and the other Related Companies that Executive not compete with Employer or any other Related Company during his or her employment, as further provided in this Section 6.

6.2 <u>Non-Compete and Non-Solicit</u> .   While employed by Employer or any other Related Company, Executive will not, directly or indirectly, engage in or render any service of a business, commercial or professional nature to any other person, entity or organization, whether for compensation or otherwise, that is in competition with Employer or any other Related Company anywhere in the world.  In accordance with this restriction, but without limiting its terms, Executive will not:

(a) enter into or engage in any business which competes with the business of Employer or any other Related Company;

(b) solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the business of Employer or any other Related Company;

(c) divert, entice, or take away any customers, business, patronage or orders of Employer or any other Related Company or attempt to do so; or

(d) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the business of Employer or any other Related Company.

6.3 <u>Scope of Restricted Activities</u> .   For the purposes of Section 6.2, but without limitation thereof, Executive will be in violation thereof if Executive engages in any or all of the activities set forth therein directly as an individual on Executive's own account, or indirectly as a stockholder, partner, joint venturer, executive, agent, salesperson, consultant,

officer and/or director of , or by virtue of the ownership by Executive ' s spouse, child or parent of any equity interest in, any firm, association, partnership, corporation or other entity engag ing in any or all of such activities ; provided, however, Executive 's or Executive ' s spouse 's , child 's or parent 's own er s hip of less than one percent (1%) of the issued equity interest in a ny publicly traded corporation shall not alone constitute a violation of this Agreement .

      6.4  Scope of Covenants.   Employer and Executive acknowledge that the time, scope, geographic area and other provisions of Sections 6 and 7 have been specifically negotiated by sophisticated commercial parties and agree that they consider the restrictions and covenants contained in such Sections to be reasonable and necessary for the protection of the interests of the Related Companies, but if any such restriction or covenant shall be held by any court of competent jurisdiction to be void but would be valid if deleted in part or reduced in application, such restriction or covenant shall apply with such deletion or modification as may be necessary to make it valid and enforceable.   The restrictions and covenants contained in each provision of such Sections shall be construed as separate and individual restrictions and covenants and shall each be capable of being severed without prejudice to the other restrictions and covenants or to the remaining provisions of this Agreement.

      7.  <u>No Solicitation of Employees</u> .   Executive will not directly or indirectly, at any time during the Term and the 12-month period after termination of Executive's employment, either for Executive or for any other person or entity, recruit or solicit for hire any employee, officer, director or other personnel of the Employer or any of the Related Companies, or to induce or encourage such a person or entity to terminate his, her or its relationship, or breach an agreement, with the Employer or one of the Related Companies.

      8.  <u>Nondisclosure of Confidential Information</u> .   Executive will keep in strict confidence, and will not, directly or indirectly, at any time during or after Executive's employment with Employer, disclose, furnish, disseminate, make available or, except in the course of performing Executive's duties of employment, use any trade secrets or confidential business and technical information of Employer, any other Related Company or any of its respective customers or vendors, without limitation as to when or how Executive may have acquired such information.  Such confidential information shall include, without limitation, Employer's and any other Related Company's unique selling and servicing methods and business techniques, business strategies, financial information, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, processes, inventions, patents, copyrights, trademarks and other intellectual property and intangible rights, and other business information. Executive specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Executive and whether compiled by Employer, any other Related Company and/or Executive, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by Employer or another Related Company, as the case may be, to maintain the secrecy of such information, that such information is the sole property of Employer or another Related Company and that any retention and use of such information or rights by Executive during his employment with Employer (except in the course of performing his duties and

-7-

obligations hereunder) or after the termination of his employme n t shall constitute a misappropriation of Employer' s or another Related Company's trade secrets , rights or other property .

9.  Legally Authorized Disclosures.  Pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (a) is made: (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Also pursuant to Section 7 of the Defend Trade Secrets Act of 2016, Executive is advised that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.   In addition, nothing contained in this Agreement (i) limits Executive's right to communicate or cooperate with any federal, state or local governmental agency or commission ("Government Agencies") or (ii) bars Executive from responding to an order, regulation, rule or subpoena of a court or Government Agency.

10.  Return of Company Property .   Executive agrees that upon termination of Executive's employment with Employer, for any reason, Executive shall return to Employer, in good condition, all property of Employer and the other Related Companies, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in Section 8 of this Agreement.  In the event that such items are not so returned, Employer will have the right to charge Executive for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

11.  Representations and Warranties .   Executive hereby represents and warrants that he has the legal capacity to execute and perform this Agreement, that this Agreement is a valid and binding agreement enforceable against him according to its terms, and that the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding, written or oral, to which Executive is a party or any judgment or decree to which Executive is subject.  In addition, Executive represents and warrants that he knows of no reason why he is not physically or legally capable of performing his obligations under this Agreement in accordance with its terms.  Executive hereby indemnifies the Related Companies and shall hold harmless the Related Companies from and against all liability, loss, cost, or expense, including, without limitation, reasonable attorneys' fees and expenses, incurred by any Related Company by reason of the inaccuracy of Executive's representations and warranties contained in this Section 11.

12.  Survival .   Each of the agreements, representations, warranties and covenants set forth in Sections 4.5, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 21 of this Agreement shall survive and shall continue to be binding upon Employer and Executive notwithstanding the termination of Executive's employment or the expiration of the Term for any reason whatsoever.

1 3 . <u>Breach by Executive</u> .    Executive is obligated under this Agreement to render services of a special, unique, unusual, extraordinary, and intellectual character, which give this Agreement particular value.  The loss of these services cannot be reasonably or adequately compensated in damages in an action at law.  Accordingly, in addition to other remedies provided by law or this Agreement, Employer shall have the right during the Term and any period of non-competition governed by this Agreement, to seek injunctive relief against breach or threatened breach of this Agreement by Executive or the performance of services , or threatened performance of services, by Executive in violation of this Agreement, or both.   This Section is not meant to limit the damages the Employer may pursue and is not meant to be an exhaustive list of the relief available to the Employer.

14. <u>Controlling Law</u> .   This Agreement shall be controlled, construed and enforced in accordance with the laws of the State of California, without regard to conflicts of laws principles.

15. <u>Notices</u> .   Any notice to Employer required or permitted under this Agreement shall be given in writing to Employer, either by personal service or by registered or certified mail, postage prepaid, addressed to the Chief Executive Officer of Employer, or equivalent, with a copy to the General Counsel of Employer, at Employer's then principal place of business.  Any such notice to Executive shall be given in a like manner and, if mailed, shall be addressed to Executive at his home address then shown in Employer's files.  For the purpose of determining compliance with any time limit in this Agreement, a notice shall be deemed to have been duly given (a) on the date of service, if served personally on the party to whom notice is to be given, or (b) on the third business day after mailing, if mailed to the party to whom the notice is to be given in the manner provided by this Section.

16. <u>Amendments</u> .   This Agreement may be amended only by written agreement of each of the parties to this Agreement.

17. <u>Severability</u> .   If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated; <u>provided</u> that if Executive breaches Section 6 and if Section 6 is finally determined to be unenforceable, the payment obligations of Section 5.4(a)(iii) and Section 5.4(c) shall be deemed void *ab initio* .

18. <u>Assignment</u> .   Executive shall not transfer or assign this Agreement or any part thereof.   Employer reserves the right to transfer or assign this Agreement to any organization associated with it or any successor organization; <u>provided</u> , <u>however</u> , that Employer may assign this Agreement to any Related Company the stock or other equity of which is distributed to the shareholders of Employer and which, at the time of such distribution, agrees to employ Executive and assume Employer's obligations under this Agreement.

19. <u>Third-Party Beneficiaries</u> .   This Agreement shall not confer any rights or remedies upon any party other than Employer, the other Related Companies, Executive and their respective successors and permitted assigns.

-9 -

20 . <u>Integration</u> .

(a) This Agreement; the SERP; any stock option, restricted stock, stock appreciation right or other equity compensation plan of Employer or any other Related Company (including, without limitation, the First American Financial Corporation 2010 Incentive Compensation Plan) and any award agreement entered into thereunder; any pension plan and pension restoration plan of Employer or any Related Company; any deferred compensation plan of Employer or any other Related Company; any other employee benefit plan of Employer or any other Related Company; any change-of-control or similar agreement to which Employer and/or any Related Party and Executive are parties; any Confidential Information and Inventions Agreement between Executive and Employer; and any amendment, restatement or successor to any of the foregoing (the foregoing, collectively, the "Employment Arrangements") contain the entire Agreement between the parties and supersedes all prior verbal and written agreements, understandings, commitments and practices between the parties. The benefits conferred upon Executive pursuant to this Agreement shall be in addition to the benefits provided for under the other Employment Arrangements; <u>provided</u> , <u>however</u> , that duplicative benefits shall not be payable pursuant to this Agreement and any other Employment Arrangement and, for the avoidance of doubt, none of the benefits provided in this Agreement shall be payable to the extent they are otherwise payable under the other Employment Arrangements.

(b) In the event (i) Executive is a party to an agreement with a Related Company providing for a severance benefit in the event Executive's employment terminates following a change-in-control (a "Change-in-Control Agreement"), (ii) Executive becomes entitled to such benefit and (iii) Executive becomes entitled to the Severance Amount under Section 5.4(a)(iii), then the severance benefit payable to Executive under the Change-in-Control Agreement shall offset any Severance Amount payable to Executive pursuant to Section 5.4(a)(iii).

21. <u>Counterparts</u> .   This Agreement may be executed in any number of counterparts, each of which when executed shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

[S<small>IGNATURES ON NEXT PAGE</small>]

-10 -

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement effective as of the day and year first above written.

"EXECUTIVE"                          "EMPLOYER"

/s/ Mark E. Seaton                   /s/ Dennis J. Gilmore
Name: Mark E. Seaton                 Name: Dennis J. Gilmore
Date: February 19, 2019              Title: Chief Executive Officer
                                     Date: February 19, 2019


Signature Page to
Employment Agreement

Exhibit 21

**Subsidiaries of the Registrant**

The following is a list of subsidiaries of the Company as of December 31, 2018, omitting certain subsidiaries which, considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary.

| Name of Subsidiary : | State or Country Under Laws of Which Organized |
| --- | --- |
| Data Trace Information Services LLC | Delaware |
| FATCO Holdings, LLC | Delaware |
| FCT Holdings Company Ltd. | Canada |
| FCT Insurance Company Ltd. | Canada |
| First American Data Co., LLC | Delaware |
| First American Data Tree LLC | Delaware |
| First American Exchange Company, LLC | Delaware |
| First American Home Warranty Corporation | California |
| First American Professional Real Estate Services, Inc. | California |
| First American Property & Casualty Insurance Company | California |
| First American Specialty Insurance Company | California |
| First American Title Company | California |
| First American Title Company, Inc. | Hawaii |
| First American Title Company, LLC | Delaware |
| First American Title Guaranty Company | Texas |
| First American Title Insurance Company | Nebraska |
| First American Title Insurance Company of Australia Pty Limited | Australia |
| First American Title Insurance Company of Louisiana | Louisiana |
| First American Trust, F.S.B. | United States |
| First Title Insurance plc | United Kingdom |
| Ohio Bar Title Insurance Company | Ohio |
| Republic Title of Texas, Inc. | Texas |

**Exhibit 23**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos. 333-209859 and 333-186166) and Form S-8 (Nos. 333-190133 and 333-167228) of First American Financial Corporation of our report dated February 20, 2019 relating to the financial statements, financial statement schedules and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ P RICEWATERHOUSECOOPERS LLP
PricewaterhouseCoopers LLP
Los Angeles, California
February 20, 2019

Exhibit 31(a)

## CERTIFICATIONS

I, Dennis J. Gilmore, certify that:

1. I have reviewed this annual report on Form 10-K of First American Financial Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 20, 2019

/s/  DENNIS J. GILMORE
**Dennis J. Gilmore**
**Chief Executive Officer**
**(Principal Executive Officer)**

Exhibit 31(b)

## CERTIFICATIONS

I, Mark E. Seaton, certify that:

1. I have reviewed this annual report on Form 10-K of First American Financial Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 20, 2019

/s/  MARK E. SEATON
**Mark E. Seaton**
**Chief Financial Officer**
**(Principal Financial Officer)**

Exhibit 32(a)

**Certification pursuant to 18 U.S.C. Section 1350,
as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Form 10-K of First American Financial Corporation (the " ***Company*** ") for the period ended December 31, 2018, as filed with the Securities and Exchange Commission on the date hereof (the " ***Report*** "), I, Dennis J. Gilmore, chief executive officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this statement has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

/s/  D ENNIS J. G ILMORE

**Dennis J. Gilmore**
**Chief Executive Officer**
February 20, 2019

The foregoing certification is being furnished solely to accompany the Report pursuant to 18 U.S.C. § 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**Exhibit 32(b)**

**Certification pursuant to 18 U.S.C. Section 1350,**
**as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Form 10-K of First American Financial Corporation (the " ***Company*** ") for the period ended December 31, 2018, as filed with the Securities and Exchange Commission on the date hereof (the " ***Report*** "), I, Mark E. Seaton, chief financial officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

    1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

    2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this statement has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

/s/  MARK E. SEATON
**Mark E. Seaton**
**Chief Financial Officer**
February 20, 2019

The foregoing certification is being furnished solely to accompany the Report pursuant to 18 U.S.C. § 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

## Deric McClellan

| | |
|---|---|
| **From:** | Victor E. Morgan |
| **Sent:** | Friday, February 22, 2019 4:25 PM |
| **To:** | Deric McClellan |
| **Subject:** | FW: Wynn v. Timbercreek and First American Title Insurance Company |
| | |
| **Importance:** | High |

**From:** O'Connell, Amy [mailto:AOConnell@firstam.com]
**Sent:** Friday, February 22, 2019 4:24 PM
**To:** Victor E. Morgan
**Subject:** Wynn v. Timbercreek and First American Title Insurance Company
**Importance:** High

First American Title Insurance Company, without waiving and in full reservation of any and all defenses, objections and exceptions, hereby consents to the Notice of Removal filed by Defendant Timbercreek Acquisitions Inc. on February 22, 2019, removing to this Court that certain action filed in the District Court of Tulsa County, State of Oklahoma, styled *Wynn Westminister LLC, Wynn Wood Creek LLC, and Gold Wynn Parkwood Inc., v. Timbercreek Acquisitions Inc., and First American Title Insurance Company*, Case No. CJ-2019-00125.

**Amy C. O'Connell**
Regional Claims Manager

 *First American*

8310 South Valley Highway, Suite 130
Englewood, CO 80112
Direct Tel. No. 720-264-8728
Fax No. 800-523-7640
Email: aoconnell@firstam.com

*************************************************************************************
This message may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter.

If you received this email as a commercial message and would like to opt out of future commercial messages, please let us know and we will remove you from our distribution list.

Thank you.~
*************************************************************************************

FAFLD

**Exhibit 3**

1



## OKLAHOMA
### State Courts Network

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

## IN THE DISTRICT COURT IN AND FOR <u>TULSA COUNTY</u>, OKLAHOMA

| | |
|---|---|
| WYNN WESTMINISTER LLC, Plaintiff, and WYNN WOOD CREEK LLC, Plaintiff, and GOLD WYNN PARKWOOD INC, Plaintiff, v. TIMBERCREEK ACQUISITIONS INC, Defendant, and FIRST AMERICAN TITLE INSURANCE COMPANY, Defendant. | **No. CJ-2019-125** **(Civil relief more than $10,000: BREACH OF AGREEMENT - CONTRACT)** Filed: 01/10/2019 Judge: Morrissey, Linda G. |

## PARTIES

FIRST AMERICAN TITLE INSURANCE COMPANY, Defendant
GOLD WYNN PARKWOOD  INC, Plaintiff
TIMBERCREEK ACQUISITIONS INC, Defendant
WYNN WESTMINISTER LLC, Plaintiff
WYNN WOOD CREEK  LLC, Plaintiff

## ATTORNEYS

| **Attorney** | **Represented Parties** |
|---|---|
| HEIL, JOHN  F  III (Bar #15904) 320 S BOSTON AVE STE 200 TULSA, OK 74172 | GOLD WYNN PARKWOOD,   INC WYNN WESTMINISTER LLC, WYNN WOOD CREEK,   LLC |

**Exhibit 4**

| Attorney | Represented Parties |
|---|---|
| Morgan,  Victor  E (Bar #12419)<br>Crowe & Dunlevy<br>500 Kennedy Building<br>321 South Boston Avenue<br>Tulsa, OK 74103 | TIMBERCREEK ACQUISITIONS INC, |
| Rogers,  Johnathan  L (Bar #21341)<br>HALL, ESTILL, HARDWICK, GABLE, GOLDEN &<br>NELSON, P.C.<br>320 SOUTH BOSTON AVENUE<br>SUITE 200<br>TULSA, OK 74103 | WYNN WESTMINISTER LLC,<br>WYNN WOOD CREEK,   LLC<br>GOLD WYNN PARKWOOD,   INC |

# EVENTS

None

# ISSUES

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.**    Issue: BREACH OF AGREEMENT - CONTRACT (CONTRACT)
Filed By: WYNN WESTMINISTER LLC
Filed Date: 01/10/2019

**Party Name**                          **Disposition Information**
<u>**Defendant:**</u>  TIMBERCREEK ACQUISITIONS INC
<u>**Defendant:**</u>
FIRST AMERICAN TITLE INSURANCE COMPANY

**Issue # 2.**    Issue: BREACH OF AGREEMENT - CONTRACT (CONTRACT)
Filed By: WYNN WOOD CREEK LLC
Filed Date: 01/10/2019

**Party Name**                          **Disposition Information**
<u>**Defendant:**</u>  TIMBERCREEK ACQUISITIONS INC
<u>**Defendant:**</u>
FIRST AMERICAN TITLE INSURANCE COMPANY

**Issue # 3.**    Issue: BREACH OF AGREEMENT - CONTRACT (CONTRACT)
Filed By: GOLD WYNN PARKWOOD INC
Filed Date: 01/10/2019

| | Party Name | Disposition Information |
|---|---|---|
| **Defendant:** | TIMBERCREEK ACQUISITIONS INC | |
| **Defendant:** | | |
| | FIRST AMERICAN TITLE INSURANCE COMPANY | |

# DOCKET

| Date | Code | Description | Count | Party | Amount |
|---|---|---|---|---|---|
| 01-10-2019 | TEXT | CIVIL RELIEF MORE THAN $10,000 INITIAL FILING. | 1 | | |
| 01-10-2019 | CONTRACT | BREACH OF AGREEMENT - CONTRACT | | | |
| 01-10-2019 | DMFE | DISPUTE MEDIATION FEE | | | $ 7.00 |
| 01-10-2019 | PFE1 | PETITION<br>Document Available (#1042564533)<br>📄TIFF  📄PDF | | | $ 163.00 |
| 01-10-2019 | PFE7 | LAW LIBRARY FEE | | | $ 6.00 |
| 01-10-2019 | OCISR | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND | | | $ 25.00 |
| 01-10-2019 | OCJC | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND | | | $ 1.55 |
| 01-10-2019 | OCASA | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES | | | $ 5.00 |
| 01-10-2019 | SSFCHSCPC | SHERIFF'S SERVICE FEE FOR COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | | $ 10.00 |
| 01-10-2019 | CCADMINCSF | COURT CLERK ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | | $ 1.00 |
| 01-10-2019 | CCADMIN0155 | COURT CLERK ADMINISTRATIVE FEE ON $1.55 COLLECTION | | | $ 0.16 |
| 01-10-2019 | SJFIS | STATE JUDICIAL REVOLVING FUND - INTERPRETER AND TRANSLATOR SERVICES | | | $ 0.45 |

| Date | Code | Description | Count | Party | Amount |
|------|------|-------------|-------|-------|--------|
| 01-10-2019 | DCADMIN155 | DISTRICT COURT ADMINISTRATIVE FEE ON $1.55 COLLECTIONS | | | $ 0.23 |
| 01-10-2019 | DCADMIN05 | DISTRICT COURT ADMINISTRATIVE FEE ON $5 COLLECTIONS | | | $ 0.75 |
| 01-10-2019 | DCADMINCSF | DISTRICT COURT ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | | $ 1.50 |
| 01-10-2019 | CCADMIN04 | COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS | | | $ 0.50 |
| 01-10-2019 | LTF | LENGTHY TRIAL FUND | | | $ 10.00 |
| 01-10-2019 | EAA | ENTRY OF APPEARANCE / JOHNF. HEIL III AND JOHNATHAN L. ROGERS ENTERING AS COUNSEL | | WYNN WESTMINISTER LLC | |
| 01-10-2019 | EAA | ENTRY OF APPEARANCE / JOHN F. HEIL III AND JOHNATHAN L. ROGRS ENTERING AS COUNSEL Document Available (#1042570877) 📄TIFF  📄PDF | | WYNN WOOD CREEK LLC | |
| 01-10-2019 | TEXT | OCIS HAS AUTOMATICALLY ASSIGNED JUDGE MORRISSEY, LINDA G. TO THIS CASE. | | | |

| Date | Code | Description | Count | Party | Amount |
|------|------|-------------|-------|-------|--------|
| 01-10-2019 | ACCOUNT | RECEIPT # 2019-3878804 ON 01/10/2019.<br>PAYOR: HALL ESTILL TOTAL AMOUNT PAID: $ 232.14.<br>LINE ITEMS:<br>CJ-2019-125: $163.00 ON AC01 CLERK FEES.<br>CJ-2019-125: $6.00 ON AC23 LAW LIBRARY FEE CIVIL AND CRIMINAL.<br>CJ-2019-125: $1.66 ON AC31 COURT CLERK REVOLVING FUND.<br>CJ-2019-125: $5.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES.<br>CJ-2019-125: $1.55 ON AC59 COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND.<br>CJ-2019-125: $7.00 ON AC64 DISPUTE MEDIATION FEES CIVIL ONLY.<br>CJ-2019-125: $0.45 ON AC65 STATE JUDICIAL REVOLVING FUND, INTERPRETER SVCS.<br>CJ-2019-125: $2.48 ON AC67 DISTRICT COURT REVOLVING FUND.<br>CJ-2019-125: $25.00 ON AC79 OCIS REVOLVING FUND.<br>CJ-2019-125: $10.00 ON AC81 LENGTHY TRIAL FUND.<br>CJ-2019-125: $10.00 ON AC88 SHERIFF'S SERVICE FEE FOR COURT HOUSE SECURITY. | | | |
| 01-16-2019 | SMF | SUMMONS FEE-2 | | | $ 20.00 |
| 01-16-2019 | ACCOUNT | RECEIPT # 2019-3881661 ON 01/16/2019.<br>PAYOR: HALL ESTILL TOTAL AMOUNT PAID: $ 20.00.<br>LINE ITEMS:<br>CJ-2019-125: $20.00 ON AC01 CLERK FEES. | | | |

| Date | Code | Description | Count | Party | Amount |
|------|------|-------------|-------|-------|--------|
| 01-30-2019 | S | PARTY HAS BEEN SUCCESSFULLY SERVED. TIMBERCREEK ACQUISITIONS INC. / CORP SRV / RCVD BY RORY MCDONAGH ON 1-23-19 / BY PS<br>Document Available (#1042823595)<br>📄TIFF   📄PDF | | TIMBERCREEK ACQUISITIONS INC | |
| 02-12-2019 | EAA | SPECIAL ENTRY OF APPEARANCE AND UNOPPOSED APPLICATION OF TIME TO FURTHER PLEAD OR ANSWER / VICTOR E. MORGAN ENTRING AS COUNSEL / W-CS / CERTIFICATE OF SERVICE<br>Document Available (#1042835025)<br>📄TIFF   📄PDF | | TIMBERCREEK ACQUISITIONS INC | |
| 02-13-2019 | CTFREE | MORRISSEY, LINDA G; ORDER GRANTING SPECIAL ENTRY OF APPEARANCE AND UNOPPOSED APPLICATION OF TIME TO FURTHER PLEAD OR ANSWER; THE EXTENSION IS GRANTED UNTIL 2-22-2019; (((((ORDER PLACED IN THE JUDGE'S OUTBOX TO BE PICKED UP FOR FILING))))) | | | |
| 02-13-2019 | S | PARTY HAS BEEN SUCCESSFULLY SERVED. FIRST AMERICAN TITLE INSURANCE COMPANY / CORP SRVC / CORP SRV / RCVD BY ? ON 1-30-19 / BY PS<br>Document Available (#1042830713)<br>📄TIFF   📄PDF | | FIRST AMERICAN TITLE INSURANCE COMPANY | |
| 02-14-2019 | O | ORDER GRANTING SPECIAL ENTRY OF APPEARANCE AND UNOPPOSED APPLICATION OF TIME TO FURTHER PLEAD OR ANSWER<br>Document Available (#1042835180)<br>📄TIFF   📄PDF | | | |

OSCN Case Details



**IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA**

| | |
|---|---|
| **WYNN WESTMINSTER LLC, WYNN WOOD CREEK LLC, and GOLD WYNN PARKWOOD INC.,** | **CJ-2019-00125**<br>Linda Morrissey |
| **Plaintiffs,** | |
| v. | Case No.   DISTRICT COURT FILED<br>JAN 1 0 2019<br>DON NEWBERRY, Court Clerk<br>STATE OF OKLA. TULSA COUNTY |
| **TIMBERCREEK ACQUISITIONS INC., and FIRST AMERICAN TITLE INSURANCE COMPANY,** | |
| **Defendant.** | |

## PETITION

For their Petition against Defendants Timbercreek Acquisitions Inc. ("Defendant Timebercreek") and First American Title Insurance Company ("Defendant First American"), Plaintiffs Wynn Westminster LLC, Wynn Wood Creek LLC, and Gold Wynn Parkwood Inc. ("Plaintiffs") allege and state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Wynn Westminster LLC is a Delaware limited liability company with its principal place of business in Tulsa, Oklahoma, which owns a multi-resident apartment property in Tulsa, Oklahoma.

2.      Plaintiff Wynn Wood Creek LLC is a Delaware limited liability company with its principal place of business in Tulsa, Oklahoma, which owns a multi-resident apartment property in Tulsa, Oklahoma.

3.      Plaintiff Gold Wynn Parkwood Inc. is a Delaware corporation with its principal place of business in Tulsa, Oklahoma, which owns a multi-resident apartment property in Tulsa, Oklahoma.

Exhibit
5

4.      Upon information and belief, Defendant Timbercreek is a Canadian corporation with its principal place of business in Toronto, Canada.

5.      Upon information and belief, Defendant First American is a Delaware corporation with its principal place of business in New York, New York.

6.      Because this is an action involving the breach of an agreement governed by Oklahoma law for the purchase of real property located in Tulsa, Oklahoma, the Court has personal jurisdiction over the parties and venue is proper in Tulsa, Oklahoma.

**FACTUAL BACKGROUND**

7.      On April 17, 2018, Plaintiffs and Defendant Timbercreek entered into a Purchase and Sale Agreement ("Agreement"), pursuant to which Plaintiffs agreed to sell and Defendant Timbercreek agreed to purchase five (5) multi-residential apartment properties in Tulsa, Oklahoma.

8.      Those apartment properties are Westminster Apartments ("Westminster"), Wood Creek Apartments ("Wood Creek"), Parkwood Apartments ("Parkwood"), Mira Vista Apartments ("Mira Vista"), and Boca Vista Apartments ("Boca Vista").

9.      Under Section 1.5 of the Agreement, Defendant Timbercreek agreed to provide an Initial Deposit of $284,750.00 and an Additional Deposit of $1,993,250.00 to an Escrow Agent.

10.      The Initial Deposit was paid to Defendant First American, which also signed the Agreement.

11.      Pursuant to Section 3.2 of the Agreement, Plaintiffs granted Defendant Timbercreek "the right to access the Property to perform such inspections, studies, assessments, examinations and tests on the Property as [Defendant Timbercreek] desires in its sole discretion," including "the right to perform environmental site assessments…and

2

necessary soil testing at the Property." Defendant Timbercreek and its "authorized agents" were also permitted "at any time [to] enter upon the Property for the purpose of performing the Inspections."

12.    Defendant Timbercreek exercised its rights under Section 3.2 of the Agreement and repeatedly directed its agents to conduct activities on its behalf in Tulsa, Oklahoma, in connection with the Agreement.

13.    With regard to the applicable Closing Date, Section 4.1 of the Agreement provides:

> Time and Place. Provided all conditions precedent to Purchaser's and Seller's obligations have been satisfied or waived, the consummation of the purchase and sale of the Property (the "Closing") shall occur on or before 5:00 p.m. Eastern Time on July 17, 2018 (the "Closing Date"). The Closing shall be conducted at the offices of Escrow Agent and shall be consummated through escrow in the customary manner for the closing of real estate transactions in the state where the Property is located or such other location as Seller and Purchaser shall mutually agree. At the Closing, Seller and Purchaser shall perform the obligations set forth in, respectively, Section 4.2 and Section 4.3 hereof, the performance of which obligations shall be concurrent requirements.

14.    With regard to Defendant Timbercreek's obligations at Closing, Section 4.3 of the Agreement provides:

> Purchaser's Obligations at Closing. At Closing, Purchaser or its designee or assignee as to each Property shall deliver to Escrow Agent, for the benefit of Seller:
>
> (a)    the Purchase Price (less the Deposit), as increased or decreased by prorations and adjustments as expressly herein provided, in immediately available wire transferred funds pursuant to Section 1.4 hereof;
>
> (b)    duly executed counterparts of the Assignments of Leases, the Assignments of Contracts and General Intangibles and the Tenant Notices;

3

(c)     an employee indemnity relating to the Required Assumed Employees;

(d)     if applicable, any Withholding Forms required to be provided or executed by Purchaser;

(e)     if applicable, a duly executed counterpart of the Tax Indemnity;

(f)     a duly executed counterpart of the Settlement Statement;

(g)     a duly executed certificate of Purchaser confirming that the representations and warranties of Purchaser in Section 5.5 below are true and correct in all material respects as of the Closing Date;

(h)     the Loan Assumption Documents;

(i)     such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(j)     such additional documents as shall be reasonably required by Escrow Agent or Seller to consummate the transaction contemplated by this Agreement.

15.     With regard to conditions precedent to Defendant Timbercreek's obligations, Section 4.6(a) of the Agreement provides:

> Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date (or such earlier date as may be specified below) of all of the following conditions precedent, any or all of which may be waived by Purchaser in its sole discretion:
>
> (i)     Seller shall have delivered to the Title Company in escrow, as applicable, all of the items required to be delivered at Closing pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.2 hereof;
>
> (ii)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing;

4

    (iii)    Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date;

    (iv)    As further contemplated by Article X below, Purchaser shall have obtained the Lender Approvals no later than 5:00 p.m. Eastern Time on the last date of the Inspection Period, on terms and conditions satisfactory to the Purchaser; and

    (v)    Seller shall have met all requirements set forth in Schedule A of the Title Commitment and satisfied all requirements set forth in the Title Notice.

16. With regard to a default by Defendant Timbercreek, Section 6.1 of the Agreement provides:

> Default by Purchaser. In the event the sale of the Property as contemplated hereunder is not consummated due to Purchaser's default hereunder, Seller shall be entitled, as its sole and exclusive remedy, to terminate this Agreement and receive the Deposit as liquidated damages for the breach of this Agreement, it being agreed between the parties hereto that the actual damages to Seller in the event of such breach are impractical to ascertain and the receipt of the Deposit by the Seller as aforesaid is a reasonable estimate thereof. Seller's right to receive the Deposit is intended not as a penalty, but as full liquidated damages. Purchaser hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Deposit (or any part thereof) on the grounds it is unreasonable in amount and exceeds Seller's actual damages, or that its retention by Seller constitutes a penalty and not agreed upon reasonable liquidated damages.

17. Because the Agreement is "governed by and construed in accordance with the laws of the state where the Property is located" and the Property is located in Tulsa, Oklahoma, the Agreement is governed by the laws of the State of Oklahoma.

18. On July 6, 2018, Plaintiffs and Defendant Timbercreek entered into a Waiver and First Amendment to Purchase and Sale Agreement ("First Amendment").

5

19.     The First Amendment modified the terms of the Agreement to remove Mira Vista and Boca Vista from the Property being purchased by Defendant Timbercreek.

20.     The First Amendment also modified the Closing Date from July 17, 2018, to "not later than September 30, 2018; provided, however, if Purchaser has not received Lender Approval for the Wood Creek property by September 30, 2018, the Seller will provide the Purchaser with such extra time as is needed to obtain such Lender Approval."

21.     The First Amendment also increased the Additional Deposit to $3,000,000.00.

22.     On November 5, 2018, Plaintiffs and Defendant Timbercreek entered into a Second Amendment to Purchase and Sale Agreement ("Second Amendment").

23.     The Second Amendment further modified the Closing Date to December 17, 2018.

24.     Although Plaintiffs have complied with all Conditions Precedent to the obligations of Defendant Timbercreek under the Agreement, Defendant Timbercreek has refused to close the purchase of Westminster, Wood Creek, and Parkwood.

25.     Instead, on December 14, 2018, Defendant Timbercreek sent a letter to Plaintiffs purporting to terminate the Agreement based on the alleged failure of Plaintiffs to satisfy all Conditions Precedent to Defendant Timbercreek's obligations under the Agreement. Defendant Timbercreek's assertions are without merit and provide no justification for its failure to proceed with the purchase of the Property.

26.     By improperly refusing to close the purchases of Westminster, Wood Creek, and Parkwood by December 17, 2018, Defendant Timbercreek has breached the Agreement.

6

27.     As a result of Defendant Timbercreek's failure to close the purchases of Westminster, Wood Creek, and Parkwood by December 17, 2018, Plaintiffs are entitled to an award of liquidated damages under the terms of Section 6.1 of the Agreement.

28.     Under Section 1.6(a) of the terms of the Agreement, "[i]f [Defendant First American] is made a party to any judicial, non-judicial or administrative action, hearing or process based on acts of any of the other parties hereto and not based on the willful misconduct or gross negligence of [Defendant First American] in performing its duties hereunder, the party/parties whose alleged acts are held or found to be the cause of such proceedings shall indemnify, save and hold [Defendant First American] harmless from said expenses, costs and reasonable attorneys' fees so incurred."

29.     Because Defendant Timbercreek has improperly attempted to terminate the Agreement and has demanded that Defendant First American return the Initial Deposit, including any interest thereon, to Defendant Timbercreek, and, as a result, Defendant First American is unable to release the Initial Deposit to Plaintiffs absent a determination of Plaintiffs' entitlement to those funds, Defendant Timbercreek, rather than Plaintiffs, is the party whose acts are the cause of this proceeding and who is therefore obligated to indemnify, save, and hold Defendant First American harmless from any expenses, costs, and reasonable attorneys' fees that Defendant First American may be forced to incur as a result of its inclusion in this action.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT (AGAINST DEFENDANT TIMBERCREEK)

30.     Plaintiffs and Defendant Timbercreek entered into a valid Agreement pursuant to which Defendant Timbercreek agreed to close the purchases of Westminster, Wood Creek, and Parkwood by December 17, 2018.

31.     Defendant Timbercreek defaulted on its obligation under the Agreement to close the purchases of Westminster, Wood Creek, and Parkwood by December 17, 2018.

32.     As a result of Defendant Timbercreek's default under the Agreement, Plaintiffs are entitled to liquidated damages in the amount of the Initial Deposit and the Additional Deposit made by Defendant Timbercreek, including any interest thereon.

## SECOND CLAIM FOR RELIEF

## DECLARATORY JUDGMENT (AGAINST DEFENDANTS)

33.     An actual, existing, justiciable controversy exists between Plaintiffs and Defendants regarding (a) whether Plaintiffs complied with all Conditions Precedent to Defendant Timbercreek's obligations under the Agreement, (b) whether Defendant Timbercreek defaulted on its obligations under the Agreement by failing to close the purchases of Westminster, Wood Creek, and Parkwood by December 17, 2018, (c) whether Plaintiffs are therefore entitled to receive the Initial Deposit, which is held in escrow by Defendant First American, and the Additional Deposit, including any interest thereon, as liquidated damages for Defendant Timbercreek's default, and (d) whether Defendant Timbercreek is obligated to indemnify, save, and hold Defendant First American harmless from any expenses, costs, and reasonable attorneys' fees incurred in connection with this action because Defendant Timbercreek is the cause of this action.

34.     Plaintiffs have a legally protectable interest in the Initial Deposit and Additional Deposit sufficient to warrant a determination by the Court of the rights of Plaintiff and Defendant Timbercreek to the Initial Deposit and Additional Deposit, as well as an interest in their potential liability for any costs, expenses, or reasonable attorneys' fees incurred by Defendant First American in this action.

8

35.     Pursuant to the Uniform Declaratory Judgments Act, Plaintiffs request that the Court declare that (a) Plaintiffs complied with all Conditions Precedent to Defendant Timbercreek's obligations under the Agreement, (b) Defendant Timbercreek defaulted on its obligations under the Agreement by failing to close the purchases of Westminster, Wood Creek, and Parkwood by December 17, 2018, (c) Plaintiffs are therefore entitled to receive the Initial Deposit, which is held in escrow by Defendant First American, and Additional Deposit, including any interest thereon, as liquidated damages for Defendant Timbercreek's default, and (d) Defendant Timbercreek is obligated to indemnify, save, and hold Defendant First American harmless from any expenses, costs, and reasonable attorneys' fees incurred in connection with this action because Defendant Timbercreek is the cause of this action.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Timbercreek on Plaintiffs' claim for breach of contract, award Plaintiffs the full amount of the Initial Deposit and Additional Deposit, including any interest thereon, as well as all applicable fees, costs, and expenses, issue the affirmative declarations requested above, and award Plaintiffs any other and further relief that the Court deems just and proper.

Respectfully submitted,

John F. Heil, III, OBA #15904
Johnathan L. Rogers, OBA #21341
**HALL, ESTILL, HARDWICK, GABLE,**
**GOLDEN & NELSON, P.C.**
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3706
Telephone (918) 594-0400
Facsimile (918) 594-0505

**ATTORNEYS FOR PLAINTIFFS,**
**WYNN WESTMINSTER LLC, WYNN**
**WOOD CREEK LLC, AND GOLD**
**WYNN PARKWOOD INC.**

3835275.1:914540:01987

10





**ORIGINAL SUMMONS**

## IN THE DISTRICT COURT OF TULSA COUNTY, STATE OF OKLAHOMA

WYNN WESTMINSTER LLC, WYNN
WOOD CREEK LLC, and GOLD WYNN
PARKWOOD INC.,

     **Plaintiffs,**

v.

TIMBERCREEK ACQUISITIONS INC.,
and FIRST AMERICAN TITLE
INSURANCE COMPANY,

     **Defendants.**

**DISTRICT COURT**
**FILED**

JAN 3 0 2019

**DON NEWBERRY, Court Clerk**
**STATE OF OKLA. TULSA COUNTY**

Case No.  CJ-2019-00125
Linda Morrissey

**TO THE ABOVE NAMED DEFENDANT:**

    **Timbercreek Acquisitions Inc.**
    **25 Price Street**
    **Toronto, Ontario, Canada M4W 1Z1**

You have been sued by the above-named Plaintiff and you are directed to file a written Answer to the attached Petition in the Court at the above written address within twenty (20) days. Within the same time, a copy of your Answer must be delivered or mailed to the attorney for the Plaintiff. Unless you answer the attached Petition within the time stated judgment may be rendered against you for the relief prayed for.

Issued this _16_ day of ___1___, 2019

Don Newberry, Court Clerk

By: _____
            Deputy Court Clerk

(Seal)

    This Summons, with Plaintiff's Petition, was served on _January 23_, 2019, on the above Defendant by _Personal service._

_____
(Signature of person serving Summons)

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THIS SUMMONS.

3835394.1:914540:01987

**Return ORIGINAL for filing.**

**Exhibit**
**6**



# IN THE DISTRICT COURT OF TULSA COUNTY, STATE OF OKLAHOMA

WYNN WESTMINSTER LLC,
WYNN WOOD CREEK LLC,
and GOLD WYNN PARKWOOD INC.,

        Plaintiffs,

v.

TIMBERCREEK ACQUISITIONS INC.,
and FIRST AMERICAN TITLE
INSURANCE COMPANY

        Defendants.

**Case No.: CJ-2019-00125**
**Linda Morrissey**

## AFFIDAVIT OF SERVICE

I, **Alex Martenstyn** of the City of Toronto, in the Province of Ontario, MAKE OATH AND SAY:

1.    I am a process server with KAP LITIGATION SERVICES, and, as such, have knowledge of the following matters.

2.    I served the defendant, Timbercreek Acquisitions Inc., with the **Original Summons and Petition** on January 23, 2019**,** by leaving copies with Rory McDonagh, Legal Counsel, at 25 Price Street, Toronto, Ontario, Canada, M4W 1Z1, the registered office address for Timbercreek Acquisitions Inc.

3.    I was able to ascertain the identity of the individual by means of verbal admission.

**SWORN BEFORE ME** at the City of
Toronto, in the Province of Ontario on
January 25, 2019

 

_____
Commissioner for Taking Affidavits
(or as may be)

Andrew Julian Attisano, a Commissioner, etc.,
Province of Ontario, for 756671 Ontario Inc.
o/a KAP Litigation Services, and for process serving only.
Expires May 4, 2021.

)
)
)
)
)
)
)
)

_____
**Alex Martenstyn**



*1042835025*

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

DISTRICT COURT
F I L E D

FEB 1 2 2019

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

WYNN WESTMINISTER LLC, WYNN
WOOD CREEK LLC, AND GOLD WYNN
PARKWOOD INC.,

        Plaintiffs,

v.

TIMBERCREEK ACQUISITIONS INC.,
and FIRST AMERICAN TITLE
INSURANCE COMPANY,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CJ-2019-00125
Linda Morrissey

## SPECIAL ENTRY OF APPEARANCE AND UNOPPOSED APPLICATION OF TIME TO FURTHER PLEAD OR ANSWER

    Victor E. Morgan, of the firm Crowe & Dunlevy, hereby specially enters his appearance in this case as counsel for Timbercreek Acquisitions Inc. ("Timbercreek"), and requests an additional ten (10) days, or until February 22, 2019 to respond to the allegations in the Petition filed January 10, 2019.

    By entering a special appearance, Timbercreek does not waive any defenses or objections and expressly reserves the right to assert any and all defenses allowed by Okla. Stat. tit. 12 § 2012 and other Oklahoma law, including, but not limited to, the defenses of lack of personal jurisdiction, failure to state a claim upon which relief can be granted, improper service, improper venue, insufficiency of process, lack of capacity, and/or failure to join a proper party and other defenses, if applicable.

    Counsel for Plaintiff does not oppose this application.

Exhibit
7

Respectfully submitted,

Victor E. Morgan, OBA #12419
CROWE & DUNLEVY
A Professional Corporation
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313
(918) 592-9800
(918) 592-9801 (Facsimile)

*Attorney for Timbercreek Acquisitions Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of February, 2019, a true and correct copy of the above and foregoing was deposited in the U.S. Mail, first class, postage pre-paid, addressed to:

John F. Heil, III
Johnathan L. Rogers
HALL, ESTILL, HARDWICK, GABLE,
GOLDEN  & NELSON, P.C.
320 South Boston Avenue, Suite 200
Tulsa, OK 74103-3706
*Attorneys for Plaintiffs,*
*Wynn Westmiminster, LLC Wynn Wood Creek*
*LLC, and Gold Wynn Parkwood Inc.*

Victor E. Morgan

3423587.1




## ORIGINAL SUMMONS

### IN THE DISTRICT COURT OF TULSA COUNTY, STATE OF OKLAHOMA

WYNN WESTMINSTER LLC, WYNN
WOOD CREEK LLC, and GOLD WYNN
PARKWOOD INC.,

      **Plaintiffs,**

v.

TIMBERCREEK ACQUISITIONS INC.,
and FIRST AMERICAN TITLE
INSURANCE COMPANY,

      **Defendants.**

**DISTRICT COURT**
**F I L E D**

FEB 1 3 2019

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

Case No.  CJ-2019-00125
Linda Morrissey

**TO THE ABOVE NAMED DEFENDANT:**

**First American Title Insurance Company**
**c/o Corporation Service Company**
**10300 Greenbriar Place**
**Oklahoma City, OK 73159**

You have been sued by the above-named Plaintiff and you are directed to file a written Answer to the attached Petition in the Court at the above written address within twenty (20) days.  Within the same time, a copy of your Answer must be delivered or mailed to the attorney for the Plaintiff.  Unless you answer the attached Petition within the time stated judgment may be rendered against you for the relief prayed for.

Issued this __16__ day of __1__, 2019

Don Newberry, Court Clerk

By: _____

Deputy Court Clerk

(Seal)

This Summons, with Plaintiff's Petition, was served on __30, Jan.__, 2019, on the above Defendant by __PPS__.

_____
(Signature of person serving Summons)

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.  SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THIS SUMMONS.

**Return ORIGINAL for filing.**

<div style="background-color: yellow;">

**Exhibit
8**

</div>



# RICKS INVESTIGATIONS
## Investigator & Process Server
### Proof of Service Affidavit

STYLE: _Wynn Westminster LLC, Wynn_ Case No. _CJ-2019-00125_
_Wood Creek LLC, and Gold Wynn Parkwood,_ et al., Plaintiff(s)
_Inc._
(vs.)
_Timbercreek Acquisitions Inc. and First_
_American Title Ins., Co.,_ et al., Defendant(s)

COUNTY: _____ Court Date _____

Documents Served: I, being duly sworn, certify that on _____,
20_____,
I received the foregoing, to wit:

| | | |
|---|---|---|
| ___ Summons | ___ Affidavit | ___ HOA |
| X Summons w/Petition | ___ Garnishment | ___ Temporary Order |
| ___ Amendment to Petition | ___ Subpoena | ___ Interrogatories |
| ___ Notice: _____ | ___ Order: _____ | ___ Deficiency Judgement |
| ___ Other: _____ | | |
| ___ Other: _____ | | |
| ___ Other: _____ | | |
| ___ Other: _____ | | |

**METHOD OF SERVICE:** Answered the same according to law in the following manner, to wit:

*PERSONAL SERVICE*
     by delivering a true copy of said process personally to _____
     at _____ Date:_____ Time:_____
*USUAL PLACE OF RESIDENCE*
     by leaving a copy of said process for _____
     with _____, a resident/family member, fifteen (15)
     years of age or older, at _____ which is his/her
     usual place of residence.   Date:_____ Time:_____
*CORPORATION/PARTNERSHIP/GOVERNMENT ENTITIES*
     by delivering a true copy of said process to _First American Title Ins. Co. / Corporation Service Co._
     he/she/it, being the _Authorized Representatives_ authorized to accept service at
     _10300 Greenbriar Pl. OKC, OK_ Date: _1-30-19_ Time: _1:13 PM_
*NOT FOUND*
     Said process WAS NOT SERVED on the following NAMED PERSON/PERSONS:
     _____
     _____

Subscribed and sworn before me this _8_ day
of _Feb, 20 19_                          Undersigned declares under penalty of perjury
                                         that the foregoing is true and correct.

Notary Public _Theresa L Ricks_          License Number: _PSS-2016-73_

Commission Exp. _5/20/21_

Ricks Investigation, Inc. 405.210.6956          Email: ricksinvestigations@msn.com

THERESA L. RICKS
NOTARY
# 09004299
EXP. 05/20/21
PUBLIC
STATE OF OKLAHOMA





## IN THE DISTRICT COURT OF TULSA COUNTY
## STATE OF OKLAHOMA

DISTRICT COURT
**F I L E D**

FEB 1 4 2019

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

WYNN WESTMINISTER LLC, WYNN
WOOD CREEK LLC, AND GOLD WYNN
PARKWOOD INC.,

        Plaintiffs,

v.

TIMBERCREEK ACQUISITIONS INC.,
and FIRST AMERICAN TITLE
INSURANCE COMPANY,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  CJ-2019-00125
Linda Morrissey

## ORDER GRANTING SPECIAL ENTRY OF APPEARANCE AND UNOPPOSED APPLICATION OF TIME  TO  FURTHER PLEAD OR ANSWER

     This matter comes before the Court on the Special Entry of Appearance and Unopposed

Application of Time to Further Plead or Answer for an extension of time until February 22,

2019, to respond to the allegations in the Petition filed January 10, 2019.  For good cause shown,

the Court finds that the extension of time should be granted.

     IT IS THEREFOR ORDERED that Defendant Timbercreek Acquisitions Inc. be granted

until February 22, 2019 to submit a response to the Petition.

_____
Linda Morrissey
Judge of the District Court

2·13·19

**Exhibit
9**

3423595.1